```
 1        &
                    IN THE UNITED STATES DISTRICT COURT
 2
                     FOR THE CENTRAL DISTRICT OF UTAH
 3
 4        OL PRIVATE COUNSEL,       )  30(b)(6) Deposition of
          LLC, a Utah limited       )
 5        liability company,        )  OL Private Counsel, LLC
                                    )  through:
 6             Plaintiff,           )
                                    )  Thomas Olson
 7        vs.                       )
                                    )  Civil No. 2:21-CV-00455-DBB
 8        EPHRAIM OLSON, an         )
 9        individual,               )  Judge David Barlow
10                                  )  Magistrate Daphne A. Oberg
11             Defendants.          )
12
13
14
15
16              February 15, 2023 * 9:00 a.m.
17
18                Location:  Fabian VanCott
19             95 South State Street, Suite 2300
20                Salt Lake City, Utah 84111
21
22
23
24             Reporter:  Diana Kent, RPR, CRR
25        Notary Public in and for the State of Utah

                                                     Page 1
```

```
 1    Q.   Do you know their names?
 2    A.   No, I don't know the name of the person or
 3 persons who assembled this information for me.
 4    Q.   Okay.  Do you know the source material for
 5 the columns?
 6    A.   This would have been -- it would have been
 7 off the computer record, but I'm not sure exactly what
 8 portion of the computer record would have this.
 9    Q.   Okay.  If you could turn to the last page.
10 Just above the mid-point of the document you see an
11 entry for OL Private Counsel Ephraim Olson.  Do you see
12 that?
13    A.   I see that.
14    Q.   Okay.  And this document purports to
15 represent that his access to the server started prior
16 to January 1, 2018.  Do you see that?
17    A.   I see that.
18    Q.   Do you know the date that that access
19 started?
20    A.   I think I mentioned earlier, I don't know
21 when he first got access to the servers.
22    Q.   Okay.  And it says that the access to the
23 server ended on September 1, 2019.  Do you see that?
24    A.   I see that.
25    Q.   Where did that date come from?
```
Page 70

```
 1    A.   It came from the computer logs, I assume,
 2 that they gathered, whatever computer records they had
 3 to gather to demonstrate this.
 4    Q.   So you think there are documents that back
 5 up this table?
 6    A.   I assume there's some kind of a computer
 7 log that shows that.
 8    Q.   Okay.  And then it says he had access to
 9 client files on matters for which the individual was
10 performing those services.  Do you see that?
11    A.   I see that.
12    Q.   It says that for everyone; is that correct?
13    A.   Right.
14    Q.   Okay.  Where does that information come
15 from?
16    A.   That would be on some kind of a computer
17 record that showed accesses to -- showing that -- that
18 phrase refers to, as I -- I can't say.  Those are not
19 my words, so I believe it just means -- I'm
20 speculating.
21    Q.   Do you know whose words they are?
22    A.   That would either be the words that come
23 off the computer, or the words that some IT person
24 would have put in there.
25    Q.   Okay.  So again, you think that there are
```
Page 71

```
 1 documents which would support the information in the
 2 last column of this table?
 3    A.   There would be some kind of computer
 4 record, I assume, that would show that.  I'm assuming
 5 that.
 6    Q.   Okay.  The allegations in this case,
 7 Mr. Olson, and I am paraphrasing here, I realize this
 8 will not be correct, but are generally that Ephraim
 9 Olson improperly obtained access to OLPC's private
10 confidential information.  Is that your understanding
11 of the general nature of this lawsuit?
12         MR. JORDAN:  Objection.  Misstates the
13 pleadings.
14    A.   Got access to documents, yes.  He got
15 access to documents to which he wasn't entitled to get.
16    Q.   Okay.  Let's go through those documents.
17         (EXHIBIT 12 WAS MARKED.)
18    Q.   Mr. Olson, do you recognize this document?
19    A.   I do recognize the document, yes.
20    Q.   What is it?
21    A.   It looks like it's a summary of trusts
22 with some information, well, it speaks for itself, but
23 summarizing information about the trust.
24    Q.   Who created this document?
25    A.   It would have been created by one of the
```
Page 72

```
 1 lawyers.
 2    Q.   For which entity?
 3    A.   Well, one of the lawyers for the firm
 4 would have summarized this for all of the trusts.
 5    Q.   And what firm are you talking about?
 6    A.   Well, this would have probably been done
 7 in ITCL, but it could have been prepared somewhere
 8 else.  But probably ITCL.
 9    Q.   Okay.  Do you know when it was created?
10    A.   I don't know the date it was created.
11    Q.   Was it created for OLPC?
12    A.   It was created for use by any lawyers that
13 had need to look at this information.
14    Q.   And who did those lawyers -- what entity
15 did those lawyers work for?
16    A.   They could have worked for or could have
17 been contractors with OLPTE, ICL, they could have been
18 any of the contractors that had a need to go through
19 this particular information on a client, on a trust.
20    Q.   Does this document -- to which client does
21 this document refer, the individual or the -- yeah, to
22 which client does this document refer?
23    A.   Sorry?
24    Q.   Does this document refer to a specific
25 client of OLPCCIL?
```
Page 73

**Page 74**

1  A.  It refers to information that OLPCCIL had
2  in its possession on behalf of several different
3  clients.
4  Q.  And who are those clients?
5  A.  Well, the Olson estate trust would have
6  been -- that document would have been in the possession
7  from when the trust was first settled.  The trustee, I
8  believe at the time, was -- I don't recall who the
9  trustee was at the time this document was produced.
10        White Buffalo Trust was first received
11 when Bruce Lemons settled the trust.  And the law firm
12 continued and continues to represent the trustees of
13 the trust, as well as at times a protector.
14        Carolyn Olson Spousal Trust was first
15 obtained when I settled the trust.
16        Waterland Trust was obtained when Bruce
17 Lemons first settled that trust.
18        Thomas H. Olson Trust was obtained when
19 Thomas and Carolyn first settled the trust.
20        Olson Manitoba Conservation Trust was
21 obtained when Jack Hardy Olson first settled the trust.
22        William Bell Hardy Trust was obtained when
23 Marlene Olson first settled the trust.
24        Ruth Doxey Family Trust was first obtained
25 when Ruth Doxey settled the trust.

**Page 75**

1        And the George Whitehead Family Trust was
2  first obtained when Marlene Olson first settled the
3  trust.
4  Q.  And you are using the phrase "obtained."
5  Do you mean that OLPCCIL obtained the client when the
6  trust was first settled?
7  A.  That's correct.  When these settlors
8  settled the trust, we represented the settlor when the
9  settlor first settled these trusts.
10 Q.  Were some of these trusts settled before
11 OLPCCIL was created?
12 A.  Yes.  Olson Lemons.
13 Q.  What is OLPC Lemons?
14 A.  Olson Lemons was a law firm in Calgary,
15 Olson Lemons, LLP.
16 Q.  Okay.  And what is the relationship
17 between Olson Lemons, LLP and OLPCCIL?
18 A.  They were two law firms in which I was
19 involved.  There was no other sort of contractual
20 relation between them OL, LLP.  The clients, unless
21 they requested to stay, transferred over to OLPCCIL.
22 Q.  And when did that transfer happen?
23 A.  I believe it was in 2010.
24 Q.  And was that documented in any way?  Were
25 the clients requested to go to OLPCCIL?

**Page 76**

1  A.  No.  They were given the option.  OL, LLP
2  was winding down.  Some clients requested to stay with
3  OL, LLP.  The rest had transferred over, agreed to
4  transfer over.
5  Q.  I thought you said Olson Lemons was winding
6  down.
7  A.  Yes.
8  Q.  So who requested to stay with the company
9  that was winding down?
10 A.  Clients -- there were some clients that
11 had a short-term relationship -- they did not perceive
12 to have a longer term relationship, so they were happy
13 to stay with Olson Lemons as it wound down.
14 Q.  Okay.  What corporate entity maintains
15 possession of this document?
16 A.  Those were all kept by OLPCCIL.
17 Q.  Okay.  Is this a document that OLPC
18 alleges Ephraim Olson improperly obtained from the
19 server?
20 A.  Yes.
21 Q.  Does OLPC have any evidence to support the
22 claim that Ephraim Olson obtained this document from
23 the server?
24 A.  Yes.
25 Q.  What is that evidence?

**Page 77**

1  A.  He obtained it and it was obtained, as I
2  understand, when a former employee was able to get into
3  the system, get access to this document, and forward it
4  to Ephraim.
5  Q.  And is that former employee Tim A.?
6  A.  Yes.  Ti Akarapanich.  That's correct.
7  Q.  Does OLPC have any evidence that Ephraim
8  Olson has shared this document with anyone but his
9  lawyers?
10 A.  I don't recall if this was on the e-mail
11 sent to Patricia.  As I sit here, I don't recall if
12 this was on an e-mail sent to Patricia.
13 Q.  If it was not on an e-mail sent to
14 Patricia, does OLPC have any evidence that he shared
15 this with anyone but his own personal lawyers?
16 A.  As I sit here, not that I'm aware of.
17 Q.  Okay.  What is the damage to OLPC from
18 Ephraim's possession of this document?
19 A.  This is a document we would view as a
20 confidential document held on behalf of the persons who
21 entrusted us with the document.  And the ability of
22 OLPC -- OLPC has reputational damage, obviously, if it
23 can't keep confidential information entrusted to it,
24 because it reflects on the entire law firm, including
25 OLPCCIL.

Page 78

1  Q. Does Ephraim's possession of this document
2 prevent OLPC from taking any actions related to this
3 document; like can you amend it, can you draft it?
4  A. Can OLPC amend this document?
5  Q. Yes. The native. The original.
6  A. Can someone at OLPC physically amend the
7 document?
8  Q. Yes.
9  A. If they were authorized and had access to
10 it.
11  Q. Okay.
12    (EXHIBIT 13 WAS MARKED.)
13  Q. What is this document, Mr. Olson?
14  A. Carolyn Olson Spousal Trust.
15  Q. Who created this document?
16  A. I don't know who physically created the
17 document, but this was my trust, it was prepared on my
18 behalf.
19  Q. Okay. When was it created?
20  A. The actual date of creation, I don't know
21 that. The trust was effective as of February 2, 2000.
22  Q. Okay. And was it created for OLPC?
23  A. This document was -- when you say "created
24 for OLPC," I don't understand the question. It was
25 created for me.

Page 79

1  Q. For you as an individual?
2  A. As the grantor, yes.
3  Q. Who was the client that this document
4 belongs to?
5  A. Well, this was -- this document was
6 created for me. This document belongs to me because I
7 was the grantor and asked it be created.
8  Q. What is the entity that represents you?
9  A. The entity that represents me is OLPCCIL,
10 and any other entity that performs services on my
11 behalf.
12  Q. And do you have an engagement agreement
13 with OLPCCIL?
14  A. A written agreement? A written engagement
15 agreement?
16  Q. Yes.
17  A. No. Not that I recall.
18  Q. Okay. What corporate entity maintains
19 possession of this document?
20  A. OLPCCIL.
21  Q. Is this one of the documents that OLPC
22 alleges Ephraim improperly took from the server?
23  A. Yes.
24  Q. What is the proof that Ephraim obtained
25 this document from the OLPCCIL server?

Page 80

1  A. Proof? I'm not sure what you mean by
2 "proof," buy my understanding is that it requested Tim
3 Akarapanich found a way to get around the system and
4 get into the server and download this document, which
5 he then passed on to Ephraim.
6  Q. Okay. What is the damage to OLPC's
7 clients for Ephraim having possession of this document?
8  A. Again, it goes to the point that we have
9 an obligation to protect confidential information of
10 our clients. And when we fail to do that, that has an
11 impact on our trustworthiness and our credibility.
12  Q. Does Ephraim's possession of this document
13 preclude OLPC, OLPCCIL, or its clients from exercising
14 any control over the trust?
15  A. Can you repeat the question?
16  Q. Yes. Does Ephraim's possession of this
17 document preclude OLPC, OLPCCIL, or the client from
18 exercising any control over the trust?
19  A. No.
20  Q. What is the proof that OLPC has that
21 Ephraim Olson shared this document with anyone but his
22 personal lawyers?
23  A. Because this trust document shows up in
24 Carolyn's counter-petition, as I recall. And I believe
25 this may or may not have been listed in the --

Page 81

1 somewhere in the Mareva injunction or some other
2 lawsuit.
3  Q. So the only proof is that it potentially
4 came up in your divorce proceeding; is that right?
5    MR. JORDAN: Objection. Misstates his
6 testimony.
7  A. I think it has appeared in multiple
8 lawsuits.
9  Q. Okay. But what is the proof that Ephraim
10 is the individual that provided that document?
11  A. That's an ongoing investigation.
12  Q. Okay.
13    (EXHIBIT 14 WAS MARKED.)
14  Q. What is this document?
15  A. It's a trust deed.
16  Q. Who created this document?
17  A. I don't know the lawyer that prepared the
18 document, but it was prepared for Bruce Lemons as a
19 client.
20  Q. Okay. So this document belongs to Bruce
21 Lemons?
22  A. This document was prepared for Bruce
23 Lemons, that's correct.
24  Q. What corporate entity maintains possession
25 of this document?

1  A.  OLPCCIL.
2  Q.  Did Bruce Lemons sign an engagement
3 agreement for the representation of OLPCCIL?
4  A.  I am not -- I do not recall whether he
5 signed a written engagement agreement.
6  Q.  Okay.  Is this a document that OLPC
7 alleges Ephraim improperly obtained from the server?
8  A.  I just want to make sure which one this
9 is, sorry.
10      Yes.
11  Q.  Okay.  And is the only proof that OLPC has
12 of that, the fact that Ephraim got this from Tim A.?
13      MR. JORDAN:  Tim A. is Akarapanich?
14      MS. VAUGHN:  Yes.  I just don't feel like
15 butchering his name every time, so I'm just saying "Tim
16 A."
17  A.  No.  This document shows up in several
18 pieces of litigation.
19  Q.  (By Ms. Vaughn) Okay.  But what is the
20 proof that Ephraim obtained this from the server?
21  A.  Because Tim Akarapanich got into our
22 server and was able to retrieve the document, and then
23 downloaded it and sent it to Ephraim.
24  Q.  Okay.  Does Ephraim's possession of this
25 document prevent OLPC, OLPCCIL, or its clients, from

Page 82

1 taking any actions respective to the trust?
2  A.  At any time?  What time frame are you
3 talking about?
4  Q.  Any time post Ephraim's possession of this
5 document.  Any time post 2020.
6  A.  Yes.  I believe that when Buffalo Trust
7 was listed in the Mareva injunction.
8  Q.  Well, the prevention of acting on that
9 trust is related to the Mareva injunction, not purely
10 Ephraim's possession, correct?
11      MR. JORDAN:  Objection.  Argumentative.
12  A.  Neither the law firm nor the trustee nor
13 the protector I think was able to deal with aspects of
14 this trust as a result of the Mareva injunction.
15  Q.  Okay.  And that is what prevented
16 amendments to the trust or any actions under the trust,
17 is the Mareva injunction?
18  A.  Well, the Mareva injunction prevented the
19 trustee or anyone from doing anything with respect to
20 certain aspects of the operation of the trust.  That's
21 what you're asking?
22  Q.  I'm asking if Ephraim's possession of the
23 document prevents someone, disregarding the Mareva
24 injunction, from taking action under the trust.
25  A.  Are you saying -- I don't understand

Page 83

1 question.  You're saying if he physically had this in
2 his hands --
3  Q.  Yes.
4  A.  -- and it went nowhere else does that stop
5 OLPCCI from taking instructions on dealing with the
6 trust instrument?  Is that what you're saying?  I
7 didn't understand.
8  Q.  Yes.
9  A.  That's what you're saying?
10  Q.  Yes.
11  A.  No.
12  Q.  Okay.
13      (EXHIBIT 15 WAS MARKED.)
14  Q.  Is this another document that OLPC alleges
15 Ephraim obtained from the server?
16  A.  Yes.
17  Q.  Who is the corporate entity that maintains
18 possession of this document?
19  A.  OLPCCIL.
20  Q.  Who is the client to which this document
21 belongs?
22  A.  Well, this document originally belonged to
23 me and to Carolyn as settlors of the trust, and was
24 subsequently used by the trustee of the trust.
25  Q.  Do you know who the current trustee is?

Page 84

1  A.  Current trustee is Hyrum Olson.
2      That's H-Y-R-U-M.
3  Q.  Besides the fact that Ephraim obtained
4 this document from Tim A., is there any evidence that
5 it came from the server?
6  A.  Tim Akarapanich identified that he went
7 into the server, retrieved this document, downloaded
8 it, and sent it to Ephraim.
9  Q.  Where did he identify that?
10  A.  Where did he identify that?
11  Q.  Yes.
12  A.  He told me that.  He told others that,
13 too.  May I look at his declaration or is that not
14 necessary?  Yeah, he told me that, so that's how I
15 know.
16      (EXHIBIT 16 WAS MARKED.)
17  Q.  Is this another document that OLPC alleges
18 Ephraim improperly obtained from the server?
19  A.  Yes.
20  Q.  And besides obtaining it from Tim A., and
21 Tim A.'s representation to you, is there any proof that
22 this came from the server?
23  A.  Not that I'm aware of as I sit here.
24  Q.  Who is the corporate entity that holds
25 this document?

Page 85

22 (Pages 82 - 85)

**Page 98**

1   (EXHIBIT 20 WAS MARKED.)
2   Q.  Is this another document that OLPC alleges
3 came from the server?
4   A.  Yes.
5   Q.  Beyond Tim A.'s representation and the
6 ongoing investigation, sitting here today what evidence
7 do you have that this came from the server?
8   A.  If this information had been had by
9 Ephraim otherwise, there would have been no reason to
10 request it.
11   Q.  Who is the client that this document
12 belongs to?
13   A.  This was in the possession on behalf of
14 the settlor, who was Jack Hardy Olson.
15   Q.  Who is the corporate entity that holds
16 this document?
17   A.  OLPCCIL.
18   Q.  And what is the proof that Ephraim
19 provided this document to anyone but his personal
20 lawyers?
21   A.  I believe this shows up in a number of
22 lawsuits.
23   Q.  What are those lawsuits again?
24   A.  Well, there's the matrimonial matter.
25 There are Mareva injunctions and several matters in

**Page 99**

1 Alberta.  And Ephraim informed -- he had, two days ago
2 -- apparently there are other matters pending that may
3 or may not include this.
4   Q.  But you don't know that?
5   A.  I don't know what's in those matters.
6   Q.  Okay.  And the matters that these
7 documents were used in, those are all cases in which
8 you are personally named, correct?
9   A.  Well, I and perhaps others.
10   Q.  But are you personally named?
11   A.  I am one of the persons named, yes.
12   Q.  Okay.  Is OL Private Counsel, OLPC, the
13 plaintiff in this lawsuit, named in those other
14 actions?
15   A.  I don't recall.
16   Q.  Okay.  I want to just double back.  We
17 looked at the Carolyn Olson Spousal Trust, Exhibit 13,
18 I believe.  Yeah, 13.  Is Ephraim Olson the current
19 trustee of the Carolyn Olson Spousal Trust?
20   A.  As far as I know.
21   Q.  Okay.  Does OLPCCIL currently represent
22 the Carolyn Olson Spousal Trust?
23   A.  No.
24   Q.  When did that representation end?
25   A.  I don't know.  It would have been some

**Page 100**

1 years ago.  I don't recall when.
2   Q.  And who is the client to which the Carolyn
3 Olson Spousal Trust belongs?
4   A.  Who is -- sorry, what's the question?
5   Q.  Who is the OLPCCIL client to which the
6 Carolyn Olson Spousal Trust belongs?
7   A.  Well, Carolyn Olson Spousal Trust was
8 settled by me, so I obtained it in my capacity as the
9 settlor.
10      Let's pull it up here.
11      MR. JORDAN:  13.
12   A.  And we did represent my father, Jack Olson,
13 as trustee in that trust for some period of time.  For
14 the entire time he was the trustee.
15   Q.  Okay.
16      (EXHIBIT 21 WAS MARKED.)
17   Q.  I understand it's now noon, but we are
18 almost to the end of this category of documents so I'd
19 like to just push through if you are okay with that,
20 Mr. Olson.
21      MR. JORDAN:  That's fine.
22   A.  I am fine.
23   Q.  Is this another document that OLPC alleges
24 came from the server?
25   A.  Number 21?

**Page 101**

1   Q.  Yes.
2   A.  Yes.
3   Q.  And besides Tim A.'s representation and
4 the ongoing investigation, sitting here today what
5 proof do you have that this came from the server?
6   A.  Because there was no reason for this to be
7 outside otherwise.  And it was sent to Ephraim and
8 Carolyn, and so the only -- so what other proof?  I
9 don't have any other proof other than that.  Other than
10 any other ongoing analysis that maybe somebody is
11 doing.
12   Q.  And what is the corporate entity that
13 holds this document.
14   A.  OL Private Counsel International, limited.
15   Q.  Okay.  Who is the current trustee of this
16 trust?
17   A.  Hyrum Olson.
18   Q.  Okay.
19      (EXHIBIT 22 WAS MARKED.)
20   Q.  Is this another document that OLPC alleges
21 came from the server?
22   A.  Yes.
23   Q.  Okay.  Besides Tim A.'s representation,
24 what is the support for that statement?
25   A.  Prior to the ongoing investigation, this

26 (Pages 98 - 101)

```
 1  document would not have been kept in any type of paper
 2  form and would only have been available by going into
 3  the serve ever and retrieving it.
 4      Q.  What is this document?
 5      A.  This appears to be a director's resolution
 6  of OL Private Counsel PTE, LTD., and a further document
 7  appointing auditors.
 8      Q.  Why were the auditors appointed?
 9      A.  Because auditors are required.  At the
10  time auditors were required, I believe, to -- let me
11  just see if we waived them or if they are still
12  required.  So we appointed auditors under Singapore
13  law.
14      Q.  Okay.  Is this a document that's ever
15  filed with a government agency?
16      A.  Not to my knowledge.  Lawyers would know,
17  but I don't believe so.  I believe this is just kept in
18  the corporate head offices.
19      Q.  Was it ever subject to inspection by a
20  government agency?
21      A.  Well, I don't know if -- I don't know if
22  this document could be.  It's possible.  But I don't
23  know that it could be.  I'm not aware.
24      Q.  Okay.  What makes this document
25  confidential?
                                                  Page 102
```

```
 1      A.  Because it's a resolution of a private
 2  corporation.  It's not a public document.
 3      Q.  That makes it private.  What makes it
 4  confidential?
 5          MR. JORDAN:  Objection.
 6      Q.  What in here is confidential information?
 7          MR. JORDAN:  Objection.  Ambiguous.
 8      A.  Any activities of a corporation, a private
 9  corporation, are confidential.  They are not for public
10  distribution.
11      Q.  And OL Private Counsel PTE's corporate
12  documents are stored on the OLPCCIL server?
13      A.  They are.
14          (EXHIBIT 23 WAS MARKED.)
15      Q.  Is this another document that OLPC alleges
16  Ephraim obtained from the server?
17      A.  Yes.
18      Q.  And besides Tim A.'s representation and
19  the ongoing investigation, what is the evidence for
20  that?
21      A.  No one would have had access to this
22  document other than being on the server, other than
23  perhaps corporate counsel in Singapore.  This would not
24  be a document available to anybody else except on the
25  server.
                                                  Page 103
```

```
 1      Q.  Okay.  And what is the evidence that
 2  Ephraim has shared this document with anyone?
 3      A.  Much information contained in various
 4  lawsuits and this document.  There may or may not have
 5  been information on this document that was put into
 6  those lawsuits.
 7      Q.  Okay.
 8      A.  Or given to counsel in preparation for the
 9  lawsuits.
10      Q.  Okay.  The besides the OLPC PTE, the two
11  documents we just went over, and disregarding the
12  Mareva injunction, does Ephraim's possession of the
13  trust documents prevent the trustees or OLPC from
14  taking any actions respective to the trust?
15      A.  I don't think I understand the question.
16  When say -- you're asking if the law firm could take
17  any action with respect to the trust.  I'm not sure
18  what you are referring to, "any action."
19      Q.  Does Ephraim's possession of just a copy
20  of a trust document prevent anyone from taking actions
21  respective to the trust?
22          MR. JORDAN:  You want him to exclude the
23  Mareva injunction?
24          MS. VAUGHN:  Yes.
25      A.  "Taking actions" meaning what?
                                                  Page 104
```

```
 1      Q.  Distributing funds, making amendments, any
 2  actions that the trust would take.
 3      A.  No.  Not that I can think of.
 4      Q.  Okay.  This is a good breaking point.  Why
 5  don't we take lunch.
 6          (Break taken from 12:09 to 1:23 p.m.)
 7      Q.  I want to circle back a little bit.  You
 8  mentioned that the server is accessed via VPN.  Is that
 9  different from a remote desktop, do you know?
10          MR. JORDAN:  Objection.  Ambiguous.
11      A.  To my understanding a remote desktop is a
12  computer that, to get in the main section of the
13  server, requires a VPN.  It's a special connection into
14  the server.
15      Q.  Okay.  Now the documents we went over
16  before the break, I'm going to call them the trust
17  related documents, I believe you testified that all of
18  them were stored on OLPCCIL's server, correct?
19      A.  Some portion of the server.  That's my
20  understanding.
21      Q.  But this lawsuit is being brought on
22  behalf of OLPC, correct?
23      A.  Yes.
24      Q.  Okay.  But the documents belonged to
25  OLPCCIL, correct?
                                                  Page 105
```

                1   A.   Yeah.  The documents belonged to OLPCCIL,
                2   but OLPC has access to them for its purposes.  And all
                3   members of OLPC.
                4   Q.   And so wouldn't OLPCCIL also have a claim
                5   against Ephraim Olson for the alleged improper
                6   conversion of these documents?
                7        MR. JORDAN:  Objection.  Calls for a legal
                8   conclusion.
                9   A.   I don't know that they would have a
               10   separate claim, because they didn't employ him.  I
               11   don't know the answer to that.
               12   Q.   Okay.  Does PTE have ownership of any of
               13   these documents?
               14   A.   It can have use of the documents for
               15   purposes of doing legal work for clients, but it
               16   doesn't have -- it doesn't own the documents.
               17   Q.   Okay.  Just like OLPC?
               18   A.   Just like OLPC.
               19   Q.   Okay.  So wouldn't PTE have the same right
               20   to sue Ephraim Olson for the alleged improper
               21   conversion of these documents?
               22        MR. JORDAN:  Same objection.  Calls for a
               23   legal conclusion.
               24   A.   Ephraim Olson was not an employee of Olson
               25   Lemons, Private Counsel PTE, LTD.

Page 106

                1   Q.   But OLPC is not just suing Ephraim Olson
                2   pursuant to an employment agreement, is it?
                3   A.   It's pursuant to his relationship with the
                4   firm as a lawyer.
                5   Q.   Okay.  One second.  I printed some stuff
                6   during the break and I want to grab it.
                7        (Break taken from 1:26 to 1:27 p.m.)
                8   Q.   During the break I went on to the Utah Bar
                9   website and tried to find the Seth you referenced that
               10   currently works for OLPC.  Tell me if these names sound
               11   familiar to you.
               12   A.   I think I remembered.  It's Seth Daniels.
               13   Q.   Okay.  Great.  Let's mark this as Exhibit
               14   24.
               15        (EXHIBIT 24 WAS MARKED.)
               16   Q.   Is that the Seth Daniels that is currently
               17   employed at OLPC as a lawyer?
               18   A.   Yes.
               19   Q.   Okay.  Why does he not tell the Utah State
               20   Bar that he works at OLPC?
               21        MR. JORDAN:  Objection.  Calls for
               22   speculation.
               23   Q.   Do you know why he does not tell the Utah
               24   State Bar that he works at OLPC?
               25   A.   I don't know the answer to that.

Page 107

                1   Q.   Do you know what that law firm is that he
                2   references there?
                3   A.   I don't know what that law firm is.
                4   Q.   Okay.  Do you contract with Mr. Daniels or
                5   is he a W-2 employee?
                6   A.   We may well contract with him.  It's
                7   possible.  I don't recall.
                8   Q.   Okay.  And would you contract with his law
                9   firm or with him as an individual?
               10   A.   Again, I don't recall how that would work.
               11   Q.   Are you capable of making that
               12   determination at a future date?
               13   A.   I could go back and find some contracts.
               14   Q.   Okay.
               15   A.   Or some pay stubs or something that would
               16   give an indication.
               17        (EXHIBIT 25 WAS MARKED.)
               18   Q.   Mr. Olson, this document has been labeled
               19   in OLPC's Responses to Written Discovery as an alleged
               20   converted document.  This is an e-mail between Tim A.
               21   and Joshua Olson, correct?
               22   A.   6-6-20.  Josh Olson's screenshot, yes.
               23   Q.   And then the screenshot is the attachment
               24   to the e-mail.
               25   A.   Yes.

Page 108

                1   Q.   I wanted to understand the allegation.  Is
                2   the allegation that the e-mail from Tim A. is
                3   converted, or just the screenshot?
                4        MR. JORDAN:  What were the two options?
                5        MS. VAUGHN:  The e-mail itself being the
                6   converted document.
                7        MR. JORDAN:  Without the attachment?
                8        MS. VAUGHN:  With the attachment.  Or is
                9   it the attachment that's the converted document.
               10   A.   Well, the attachment is a confidential
               11   record.  Without the attachment I don't -- I mean, I
               12   don't know.  I don't know that this would be
               13   necessarily a converted document.  I don't know that.
               14   Q.   Okay.
               15   A.   But certainly the confidential document is
               16   the attachment.
               17   Q.   Okay.  And is this a document that OLPC
               18   alleges Tim A. improperly obtained from the server?
               19   A.   I believe this is one of them, yes.
               20   Q.   Okay.  It's a screenshot of an e-mail,
               21   correct?
               22   A.   It looks like some kind of a screenshot,
               23   uh-huh (affirmative).
               24   Q.   Okay.  What is the proof that Tim A.
               25   obtained this document, this e-mail, from the server?

Page 109

28 (Pages 106 - 109)

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com                    801-746-5080