# EXHIBIT 9

# EXHIBIT 9

In the Matter of:

# OL PRIVATE COUNSEL, LLC

## vs

# OLSON

## THOMAS OLSON

## December 19, 2024

Page 3

```
         IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF UTAH
                        ) Videoconference
OL PRIVATE COUNSEL, LLC, a   ) 30(b)(6) Deposition
Utah limited liability       ) of:
company,                     )
                             ) OL PRIVATE COUNSEL,
    Plaintiff,          )         LLC
                       )
v.                     ) WITNESS:
                       )
EPHRAIM OLSON, an        ) THOMAS H. OLSON
individual,            )
                      )
    Defendant.        ) Case No.
                 ) 2:21-cv-00455-DBB
                 )
                 ) Judge David Barlow
                 )
                 ) Magistrate Judge
                 ) Daphne A. Oberg
      December 19, 2024 * 3:02 p.m.
         Location: Empire Tower
         1 South Sathorn Road
         Yan Nawa, Sathon
         Bankok, Thailand
     Reporter: Kathy Morgan, CSR, RPR
Utah License No. 259764-7801 Nevada License No. 357
   Notary Public in and for the State of Utah
```

Page 3

```
1
2                E X H I B I T S
3
    Number        Description        Page
4
5    1   Invoices from Foley & Lardner to ...   4
         OL Private Counsel for Burton v.
6        Lemons
7    2   Invoices from Borden Lardner & .....  38
         Gervais
8
     3   OLPC's Second Supplemental .........  61
9        Response to Interrogatory 13
10   4   Peacock Linder Halt & Mack .........  65
         invoices
11
     5   Mareva injunction..................  77
12
     6   Stipulation and settlement .........  99
13       agreement, Ephraim Olson 8399 to
         8473
14
     7   Stipulation and settlement .........  102
15       agreement, OL Private
         Counsel-Ephraim Olson 2518 to 2538
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
1
          A P P E A R A N C E S
2
         (All via videoconference)
3
  FOR THE PLAINTIFF:
4
      David J. Jordan
5     Monica S. Call
      FOLEY & LARDNER, LLP
6     299 South Main Street, Suite 2000
      Salt Lake City, Utah 84111
7     Tel: 801.401.8900
      djordan@foley.com
8     mcall@foley.com
9
  FOR THE DEFENDANT:
10
      Sarah C. Vaughn
11    Scott M. Lilja
      FABIAN VANCOTT
12    95 South State Street, Suite 2300
      Salt Lake City, Utah 84111
13    Tel: 801.531.8900
      slilja@fabianvancott.com
14    svaughn@fabianvancott.com
15
16
17         I N D E X
18 Examinations:              Page
19   By Ms. Vaughn:........................   4
20
21
22
23
24
25
```

Page 4

```
1              PROCEEDINGS
2        OL PRIVATE COUNSEL, LLC,
3    by and through its designated representative,
4        THOMAS H. OLSON
5  was called as a witness, appeared remotely before me,
      and having been first duly sworn
6        was examined and testified as follows:
7        MS. VAUGHN:  Mr. Olson, thank you for
8  making time for us today.  I know it is early there.
9  We appreciate it, as it's almost our close of the day
10 here, so we will try to be quick.
11        We are here pursuant to court order to go
12 over the damages claimed, that OLPC has alleged and
13 the invoices, on the eve, or the close, of fact
14 discovery in this case, so I am just going to jump
15 right in.
16        I would like to mark Exhibit 1, which are
17 the Foley & Lardner invoices Batesed as OL Private
18 Counsel-Ephraim Olson 14200 to 14233, and then also
19 14828 to 14829.
20        (EXHIBIT 1 WAS IDENTIFIED.)
21        I will go ahead and share my screen.
22              EXAMINATION
23 BY MS. VAUGHN:
24   Q.  Do you see this document, Mr. Olson?
25   A.  I do.
```

Case 2:21-cv-00455-DBB    Document 368-10    Filed 01/31/25    PageID.11007    Page 4 of 35
OL PRIVATE COUNSEL, LLC vs OLSON
THOMAS OLSON - 12/19/2024

5 to 8

Page 5

1    Q.  Okay, and this represents, from my
2  understanding, invoices from Foley & Lardner to
3  OL Private Counsel for the matter Burton v. Lemons;
4  is that correct?
5    A.  Yes.
6    Q.  I'll scroll quickly through.  We'll go
7  through some in more detail, but at the end here we
8  have -- two documents?  Yeah, two documents that
9  appear to be sort of a tally of sorts.  On the last
10 page, I'm trying to figure out, essentially, the
11 total amount that Foley & Lardner has billed, or at
12 least as reflected in this Exhibit 1 for the Burton
13 v. Lemons matter.  Do you know if that's $154,304 or
14 $149,677?
15   A.  Well, I'd have to add up those bills.  I
16 believe that I added them up at one time to $149,000,
17 but I'd have to add those up again if you'd like me
18 to.
19   Q.  No, that's okay, 149 is -- that's close
20 enough.  Are you aware that OLPC's expert, Rick
21 Hoffman, has calculated the damages related to these
22 invoices as not $149,677, but rather $109,832.  Are
23 you aware of that?
24   A.  Could you show me that, please.
25   Q.  I can.  Adobe can be quite slow sometimes.

Page 6

1  There it goes.  Okay, do you see this document,
2  Mr. Olson?
3    A.  I do.
4    Q.  And do you recognize this as the expert
5  report from Rick Hoffman in this matter?
6    A.  Yes, it appears to be.
7    Q.  Okay, and do you understand that Rick
8  Hoffman is OLPC's expert?
9    A.  Yes.
10   Q.  Okay.  I'm going to scroll down to the
11 bottom here.  He has a table, Foley & Lardner
12 Invoices, $109,832.  Do you see that?
13   A.  I do.
14   Q.  Okay.  Do you know what the difference is
15 between the $109,832 that Mr. Hoffman has calculated
16 and the $149,677 shown in the actual invoices?
17   A.  Can I look at the report, please.
18   Q.  Yes.  Which page would you like to go to?
19   A.  Can you scroll up for me, please.
20   Q.  Here's the analysis on the Foley &
21 Lardner.
22   A.  Can you take me back to the Foley
23 invoices, please.
24   Q.  They're quite long, 36 pages.  Do you know
25 exactly what you'd like to look at?

Page 7

1    A.  I want to see the beginning date and
2  ending date on the invoices.
3    Q.  Sure.  Looks like it begins on
4  October 17th of 2022 for the first invoice.  And
5  assuming they were produced in chronological order,
6  which I assume they were, they go through
7  February 29th of 2024.
8    Q.  Can you take me back to the expert
9  paragraph on that, please.
10   Q.  Yes.
11   Q.  Can you take me back to Schedule 2,
12 please.
13   Q.  Oh, sorry.  Of the report?  Schedule 2?
14   A.  Yes.
15   Q.  I think the schedules are at the end.
16 Schedule 3, Schedule 2.
17   A.  So if you'd like, I'll go through and just
18 go through each of the invoices.  Then if you'd go
19 back to the invoices, I'll --
20   Q.  Frankly, I'm not sure we have time for
21 that today, given we only have two hours.  Do you
22 know what the difference is?  I mean, is there a
23 difference?
24   A.  Well, you're asking me a question, and I'd
25 like to go through the invoices and see what they add

Page 8

1  up to.
2    Q.  Let me see if I can drop them in the chat
3  here for you, and perhaps that's faster than me
4  scrolling through it for you.  That should be coming
5  through.  Do you see that in the chat now,
6  Mr. Thomas -- Mr. Olson?
7    A.  The chat?  Just a second here, sorry.  I
8  don't know how to open that.  Let me just see if I
9  can open it, figure out how to open it.  Is it all
10 right if I write, find a piece of paper to write down
11 these numbers so I can add them up?
12   Q.  Sure.
13   A.  Okay.  So the invoices, it seems to me, I
14 add up to $109,831.
15   Q.  Okay.  So this other document that was
16 produced showing total billed as 149, OLPC is not
17 seeking damages for those; correct?  For that 149.
18 It's just the 109 in the invoices?
19   A.  That is all the amount claimed at that
20 time.
21   Q.  Okay, and let me just back up.  You
22 understand today that we're here on a court order;
23 correct?
24   A.  Yes.
25   Q.  Okay, and you understand that OLPC, the

Page 9

1  corporate entity, is being deposed today; correct?
2      A.  Yes.
3      Q.  Okay, and that even though you're an
4  individual with your own individual knowledge, the
5  questions I ask you today I want to be answered not
6  with your individual knowledge, but essentially from
7  the corporation.  Do you understand that?
8      A.  Yes.
9      Q.  Okay, and that your testimony today is
10  binding on OLPC; correct?
11      A.  Yes.
12      Q.  All right.  So again, just to clarify.
13  OLPC is only seeking damages from the Burton v.
14  Lemons matter of 109,832.  Oh, sorry, $109,832.
15      A.  As -- at the time of that report, that's
16  correct.
17      Q.  Okay.  Does OLPC intend to seek additional
18  damages in this case?
19      A.  Well, if the matter's ongoing, the expert
20  and the lawyers may supplement that, I suspect.  But
21  as of that date, those were the invoices.
22      Q.  Okay.  Is the Burton v. Lemons matter
23  ongoing?
24      A.  It has been stayed in Utah and is being
25  carried on in Canada.

Page 10

1      Q.  And does OLPC intend to seek damages for
2  costs related to that Canadian action?
3      A.  Well, that would be the lawyers and the
4  experts will make a decision about supplementing the
5  expert report based on any additional damages, I
6  suspect.
7      Q.  So you don't know?
8      A.  Well, that's a decision for the lawyers
9  and the experts to make about the additional damages.
10      Q.  Well --
11      A.  But the matters are ongoing.  The matters
12  are ongoing.
13      Q.  Okay.  OLPC does not know if it will be
14  supplementing its damages?
15      A.  Again, that's the lawyers -- OLPC will be
16  taking advice from the lawyers and experts on that.
17  My sense is it would be, but that's not -- that will
18  be a call between the experts and the lawyers.  But
19  the matters are ongoing, and additional liability
20  continues to go on as those matters proceed in
21  Canada.
22      Q.  Okay.  Is OLPC a party to Burton v.
23  Lemons?
24      A.  No.
25      Q.  Why is OLPC receiving the bills from

Page 11

1  Foley & Lardner for the Burton v. Lemons matter?
2      A.  The matter was based on confidential
3  documents and information that was stolen by Ephraim
4  Olson, who was a former employee of OLPC.
5      Q.  Is there a contractual obligation for OLPC
6  to pay the claims, the fees, incurred by Foley &
7  Lardner in the Burton v. Lemons matter?
8          MR. JORDAN:  Objection; calls for a legal
9  conclusion.
10      Q.  (By Ms. Vaughn)  You can go ahead and
11  answer.
12      A.  OLPC has agreed to cover -- to reimburse
13  the costs incurred in the Burton v. Lemons matter.
14      Q.  Okay, and who did OLPC reach that
15  agreement with?
16      A.  Waterton Land Trust.
17      Q.  Okay.  Is Waterton Land Trust a party to
18  the Burton v. Lemons matter?
19      A.  Waterton Land Trust is indemnifying
20  Lemons, who was a trustee of the Waterton Land Trust.
21      Q.  Okay.  Who negotiated the indemnification
22  between Waterton Land Trust and Bruce Lemons?
23          MR. JORDAN:  Objection; assumes facts not
24  in evidence.
25      Q.  (By Ms. Vaughn)  You can go ahead and

Page 12

1  answer.
2      A.  That would be between the trustee of
3  Waterton Land Trust and Bruce Lemons.
4      Q.  Who's the trustee of Waterton Land Trust?
5      A.  Hyrum Olson.
6      Q.  Okay.  When did Hyrum Olson and Bruce
7  Lemons reach an agreement to indemnify Bruce Lemons
8  for the Burton v. Lemons matter?
9      A.  To my understanding, it was from the
10  outset, when the matter first arose.
11      Q.  What was the date of that agreement?
12      A.  My understanding is it was at or about the
13  time shortly after the lawsuit was served on Bruce
14  Lemons.
15      Q.  And what are the terms of that agreement?
16      A.  That Bruce would be indemnified for his
17  legal fees.
18      Q.  How does OLPC know what the terms of that
19  agreement are?
20      A.  That's to my understanding.
21      Q.  What is that understanding based on?
22      A.  It's based on the -- in part on the trust
23  document.
24      Q.  Okay.  Is it a written indemnification
25  agreement?

Page 13

1    A.  I believe the trust document itself
2  provides for indemnification.
3    Q.  Okay, and when did OLPC agree to reimburse
4  the Waterton Land Trust for that indemnification?
5    A.  After it was advised that Bruce had been
6  sued by Naomi Burton.
7    Q.  What was the date?
8    A.  It would have been shortly after OLPC was
9  advised of the lawsuit and the nature of the lawsuit.
10    Q.  And who did OLPC negotiate that agreement
11  with?
12    A.  That would have been with the trustee of
13  the Waterton Land Trust.
14    Q.  With Hyrum Olson?
15    A.  Yes.
16    Q.  How did OLPC negotiate with Hyrum Olson?
17  Via e-mail?  Phone call?
18    A.  It would have been by telephone call.
19    Q.  Okay.  When were the telephone calls?
20    A.  It would have been after the trustee
21  advised me, sometime after the trustee advised me
22  that there would -- that there was an ongoing lawsuit
23  between Bruce Lemons and Naomi Burton.  So it would
24  have been probably before this invoice arose, the
25  first invoice.

Page 14

1    Q.  And what are --
2    A.  Which was October 2022.
3    Q.  What are the terms of OLPC's agreement
4  with the trustee of the Waterton Land Trust to
5  reimburse it for these fees?
6    A.  Terms that it will reimburse Waterton Land
7  Trust, indemnify Waterton Land Trust, for the costs
8  incurred in this lawsuit.
9    Q.  Okay.  And it's not a written agreement?
10    A.  No.
11    Q.  Is it memorialized anywhere in writing?
12    A.  No.
13    Q.  Okay.  What other individuals would have
14  knowledge about this agreement?
15    A.  Well, who the trustee spoke to, I wouldn't
16  know that.  I certainly advised counsel of that.  But
17  beyond that, I don't know who else would be advised
18  of it.
19    Q.  And the trustee is Hyrum Olson?
20    A.  Yes.  Yes, it is now.
21    Q.  Now.  When did Hyrum Olson become the
22  trustee of the Waterton Land Trust?
23    A.  I'm not -- I don't recall when he became
24  the trustee.
25    Q.  Can you put a date on it, like an

Page 15

1  estimate?
2    A.  Would you like me to speculate?
3    Q.  No, but I want to know that you were
4  dealing with the appropriate trustee of the Waterton
5  Land Trust.
6    A.  At the time, yes.  At the time these
7  invoices were rendered, he was the trustee.
8    Q.  Okay.  And what documents would prove that
9  Hyrum Olson was the trustee of the Waterton Land
10  Trust?
11    A.  Well, he advised me that he was.  He
12  represented that he was the trustee.
13    Q.  Okay, so you were just going on Hyrum
14  Olson's word that he was the trustee?
15    A.  I believe so.  I believe that that's --
16  that he advised me of that, that he was the trustee,
17  the current trustee, and seeking indemnity.
18    Q.  Okay.  Just to make sure I understand,
19  OLPC is claiming damages for the fees incurred in
20  Burton v. Lemons because OLPC agreed to indemnify the
21  Waterton Land Trust; correct?
22    A.  That's correct.
23    Q.  Okay.  And the Waterton Land Trust is
24  allegedly responsible for the fees in the first place
25  because the Waterton Land Trust agreed to indemnify

Page 16

1  Bruce Lemons?
2    A.  Yes.
3    Q.  Okay.  And you negotiated the terms of
4  OLPC's agreement with the Waterton Land Trust with
5  Hyrum Olson; correct?
6    A.  Yes.
7    Q.  Is Waterton Land Trust a client of OLPC?
8    A.  Yes.  The trustee -- it has been,
9  historically, and it continues to get advice from --
10  it continues to file tax returns and so on for
11  Waterton Land Trust.
12    Q.  Okay.  Does OLPC have an engagement
13  agreement with Waterton Land Trust?
14    A.  Yes.
15    Q.  Is that a written document?
16    A.  Well, let me be clear.  I don't -- OLPC
17  does not have a written document with Waterton Land
18  Trust because it takes its instructions from the
19  OLPCCIL to do work for Waterton Land Trust, so it
20  doesn't have a written document.
21    Q.  Okay.  So is Waterton Land Trust a client
22  of OLPCCIL?
23    A.  It is a client of OLPC and OLPCCIL, that's
24  correct.
25    Q.  Okay, but it doesn't have an engagement

Page 17

1  agreement with OLPC?
2      A.  Not a written one.
3      Q.  You mentioned a little bit earlier that
4  Burton v. Lemons is about the confidential documents.
5  Have you read the pleadings in Burton v. Lemons?
6      A.  I have read some of the pleadings, yes. I
7  may have read them all, but I -- yeah, I have.
8  Actually, I have reviewed them early on, but not
9  recently.
10     Q.  Okay.  How did you get access to those
11  pleadings?
12     A.  I was referred to -- when I was advised
13  that there was a -- that they'd be claiming damages,
14  I asked for a summary of the -- of what the nature of
15  the lawsuit was, and so I was advised of the nature
16  of those proceedings.
17     Q.  Okay, and that summary, was that written
18  down?
19     A.  No, it was not a written summary.  It was
20  based on advice of counsel.
21     Q.  Who was the counsel?
22     A.  Foley advised me of the nature of the
23  lawsuit.
24     Q.  Okay.  So you understand that Naomi Burton
25  sued Bruce Lemons in his individual capacity;

Page 18

1  correct?
2      A.  Excuse me.  My understanding is he was --
3  that's a legal question.  My understanding was he was
4  sued based on actions he took as a trustee.
5      Q.  Okay.  And which specific confidential
6  documents were used in the Burton v. Lemons matter?
7      A.  The trust agreement.
8      Q.  Is that the only one?
9      A.  I believe that's right, that I can recall
10  right now, uh-huh.
11     Q.  And that's the Waterton Land Trust
12  agreement?
13     A.  That's correct.
14     Q.  And how was that document used by Naomi
15  Burton in the litigation?
16     A.  To determine, I believe, the trustee, the
17  protector, the beneficiaries and provisions, other
18  provisions of the trust agreement regarding -- and
19  other provisions of the trust agreement.
20     Q.  How does OLPC know that Naomi Burton used
21  the trust agreement to make those determinations?
22     A.  Because my understanding is she was given
23  a copy of that trust agreement.
24     Q.  Okay, but how does OLPC -- you know she
25  had a copy of it.  You know she filed a complaint.

Page 19

1  But how does OLPC know that she used that copy of the
2  document to draft her complaint?
3      A.  That's our understanding, that she
4  obtained a copy of it, directly or indirectly, from
5  Ephraim, a copy of that agreement.
6      Q.  And so is it OLPC's assumption that she
7  used that trust document to draft the complaint?
8      A.  It's our understanding that she used the
9  information from the stolen document to draft that
10  complaint, that's correct.
11     Q.  Okay, but you don't have actual evidence
12  that she used that document to draft the complaint,
13  do you?
14     A.  It's our understanding that she did not
15  have that document, and so the information in the
16  complaint and her deposition would not have -- she
17  would not have had that information but for the
18  document.
19     Q.  And are you aware that Naomi was deposed
20  in this case?
21     A.  I understand that she was.
22     Q.  Okay, and are you aware that she testified
23  that she received the Waterton Land Trust from her
24  lawyer?
25     A.  That's my understanding.

Page 20

1      Q.  Okay.  And are you aware that she also
2  testified that her lawyer received the Waterton Land
3  Trust from a response to her motion to intervene in
4  the divorce suit?
5      A.  I'm not -- I'm not aware that that was the
6  source of the document.
7      Q.  But are you aware that she provided that
8  testimony?
9      A.  I don't -- I don't recall that.
10     Q.  Okay.  Let's pull it up.  Okay.  This is
11  Naomi Burton's deposition taken in this matter on
12  July 20th, 2022.  I am looking -- okay, sorry, let me
13  back up so we can all see a little better.  She
14  testifies -- it's a bit unclear who -- oh, yeah,
15  here.
16          "Who did you receive the trust instrument
17  from?"
18          "My lawyer."
19          "Who did your lawyer receive it from?"
20          "I don't know."
21          And then later on down here she says:
22          "I believed it was filed as a response to
23  my motion to intervene in the divorce suit."
24          Do you see that?
25     A.  Can you hear me, Sarah?  I can switch

Page 21

1  headsets. My headset might have gone dead, I'm not
2  sure. Sorry, I missed that when you were pointing
3  down to the bottom of that page. Sorry, I missed
4  that.
5      Q.  Okay. She -- there are more questions
6  about where she got the trust document from, and she
7  says:
8      "I believed it was filed as a response to
9  my motion to intervene in the divorce suit."
10      Do you see that?
11     A.  Yeah, I see that.
12     Q.  Okay. Who would have opposed Naomi's
13 motion to intervene in the divorce suit?
14     A.  That's a procedural question. I don't
15 recall that.
16     Q.  You don't recall. Do you recall which
17 divorce suit this was in?
18     A.  This would be the divorce suit between
19 Carolyn and myself personally.
20     Q.  In Utah?
21     A.  Yes.
22     Q.  Okay. And is it your understanding that
23 those filings are private?
24     A.  My understanding is there's a protective
25 order on the documents that were filed in the

Page 22

1  lawsuit.
2      Q.  Okay, but if Naomi received the trust
3  document as part of the divorce proceeding, then why
4  are there damages related to the Burton v. Lemons
5  matter?
6      MR. JORDAN: Objection; hypothetical
7  question, assumes facts not in evidence, calls for
8  speculation.
9      A.  Were there any -- were there any -- sorry?
10     MR. JORDAN: Scott, you were saying
11 something?
12     MR. LILJA: No, no.
13     MR. JORDAN: You came across --
14     MR. LILJA: I didn't know my audio was on.
15 I'll make sure it's off, how's that.
16     THE WITNESS: Sorry, could you repeat your
17 question, please, Sarah.
18     Q.  (By Ms. Vaughn) Yes. So if Naomi
19 testified that she received the trust document in the
20 divorce proceeding when she sought to intervene, why
21 is OLPC claiming damages from Ephraim for Naomi's
22 alleged use of the trust document?
23     MR. JORDAN: Objection; hypothetical,
24 assumes facts not in evidence, calls for speculation.
25     A.  Was there a -- it's OLPC's understanding

Page 23

1  that she had access to a copy of the trust agreement
2  other than that which was -- that was under
3  protective order in the matrimonial case.
4      Q.  (By Ms. Vaughn) So you're saying she got
5  a different trust agreement in the divorce
6  proceeding?
7      A.  Yeah, she had access to.
8      MR. JORDAN: Calls for speculation.
9      THE WITNESS: It's my understanding she
10 had access to a different copy, other than the Bates
11 stamped copy that was subject to a protective order.
12     Q.  (By Ms. Vaughn) And how do you know that
13 Naomi used the one she allegedly got from Ephraim
14 versus the one that was produced to her in the
15 divorce case?
16     MR. JORDAN: Objection; assumes facts not
17 in evidence.
18     You do not have to assume Ms. Vaughn's
19 statement to be true, that she got anything in the
20 divorce case.
21     A.  She was -- it's my understanding that she
22 had been in communication with Ephraim from the
23 outset and was aware of the document in connection
24 with the Mareva injunction.
25     Q.  (By Ms. Vaughn) Well, maybe I can ask it

Page 24

1  a different way. Does OLPC have evidence that
2  Ephraim Olson sent Naomi Burton a copy of the
3  Waterton Land Trust document?
4      A.  It's our understanding that she did. She
5  did communicate with Ephraim with respect to the
6  Waterton Land Trust.
7      Q.  That was not my question, Mr. Olson. Does
8  OLPC have evidence that Ephraim Olson sent Naomi a
9  copy of the Waterton Land Trust document?
10     Did you hear my question, Mr. Olson?
11     A.  I did. I believe that she was served with
12 a copy of the Mareva injunction papers, which had a
13 copy of the stolen Waterton Land Trust document.
14     Q.  So that's how you think Naomi Burton
15 received the Waterton Land Trust document, is because
16 it was attached to the Mareva injunction?
17     A.  Well, I think at least that was the latest
18 stage that she would have received it, yes.
19     Q.  Okay. So is the answer to my original
20 question no, OLPC does not have evidence that Ephraim
21 Olson sent Naomi Burton a copy of the Waterton Land
22 Trust document?
23     A.  At this point I don't recall that we have
24 evidence that he sent that to her --
25     Q.  Okay, and you understand --

Page 25

1    A.  -- but she did receive it in connection
2  with the Mareva injunction.
3    Q.  Okay.  You understand that fact discovery
4  in this matter has closed?
5    A.  That's my understanding.  I'm not sure
6  what that means, but that's my understanding,
7  whatever that means.
8    Q.  You know, I ask that because we're to the
9  point in the case now where OLPC will have to prove
10  its claims, and that's why I'm trying to get very
11  direct answers to what I think are clear questions.
12  I want to make sure that we all understand what
13  OLPC's claims are.
14      As you sit here today, OLPC is claiming
15  that Naomi Burton received a copy of the Waterton
16  Land Trust document because she was served with a
17  copy of the Mareva injunction action; is that
18  correct?
19      MR. JORDAN:  Objection; inconsistent with
20  his prior testimony.
21    Q.  (By Ms. Vaughn)  I would be happy to have
22  you correct me.
23    A.  We believe that she was -- she was
24  involved in the Mareva injunction from the outset and
25  had that document prior to the Mareva injunction.

Page 26

1  But at the very latest, I believe she was served --
2  had a copy of that Mareva injunction with the
3  stolen -- that was based on the stolen Waterton Land
4  Trust document.
5    Q.  Okay.  So there are two things that you
6  just said there.  She either, one, later received it
7  when she was served with the Mareva injunction
8  action; right?
9    A.  Yeah, that she had a copy of that, that's
10  right.
11    Q.  And then the other is your belief --
12  excuse me -- OLPC's belief than Naomi was involved --
13  quote, "involved" in the Mareva injunction action
14  from the outset.  What does OLPC mean when it says
15  Naomi Burton was involved?
16    A.  That she was involved in -- it's OLPC's
17  understanding that she was involved with counsel --
18    Q.  Whose counsel?
19    A.  -- in the -- counsel for Carolyn in the
20  Mareva injunction.
21    Q.  Okay, and what does OLPC base that
22  understanding on?
23    A.  I believe that -- I believe that we've
24  seen e-mail communications on a privilege log, I
25  believe, between -- on which Naomi was copied in

Page 27

1  connection with the Mareva injunction.  That's my
2  recollection.
3    Q.  Okay.  You don't have a copy of that
4  e-mail?  Does OLPC have a copy of the e-mail?
5    A.  No.
6    Q.  You don't know what that e-mail was about;
7  correct?
8    A.  Well, whatever it says in the privilege
9  log.
10    Q.  But you're limited to the privilege log.
11  Who produced that privilege log?
12    A.  I don't recall, Sarah.  I don't recall the
13  privilege log and so on.
14    Q.  So you're referring to some e-mail, in one
15  of the multiple hundreds of pages of privilege logs
16  that we have in this case, where Naomi is copied, and
17  your only understanding of that e-mail is what's in
18  the privilege log; is that right?
19    A.  I believe that's true.
20    Q.  Okay.  And in that privilege log, does it
21  show that Naomi Burton received a copy of the
22  Waterton Land Trust?
23      MR. JORDAN:  Objection; beyond the scope.
24    A.  I believe -- I don't recall now.  It's
25  whatever the privilege log says.  It says what it

Page 28

1  says.
2    Q.  (By Ms. Vaughn)  Okay.  Is it fair to say
3  that OLPC is just speculating here?
4    A.  Speculating on what?  Sorry.
5    Q.  How Naomi received -- that Naomi was,
6  quote, "involved" in the Mareva injunction action and
7  got the Waterton Land Trust document through that
8  involvement.  You're making assumptions; right?
9      MR. JORDAN:  Is that a new question?
10  Withdrawing your previous question?
11      MS. VAUGHN:  I think they build on
12  themselves.  If you want to call it compound, I can
13  break it down.
14      MR. JORDAN:  Would you.  I object as
15  compound.
16      MS. VAUGHN:  Yeah.
17    Q.  (By Ms. Vaughn)  Are you speculating that
18  OLPC -- or that Naomi Burton received a copy of the
19  Waterton Land Trust document through her alleged
20  early involvement in the Mareva injunction action?
21    A.  I'm not sure I'd call it speculation.  I
22  think we've drawn a conclusion that she received the
23  information related to the trust through her
24  involvement in the Mareva injunction.
25    Q.  You've drawn a conclusion without factual

Page 29

1 evidence; correct?
2        MR. JORDAN: Objection; misstates the
3 record.
4        A.  I didn't say that.  I said we've drawn a
5 conclusion based on the privilege logs.
6        Q.  (By Ms. Vaughn)  Okay.  Has OLPC produced
7 all of the pleadings from the Burton v. Lemons
8 matter?
9        A.  I don't know what – that's – I'm not
10 aware.  To my knowledge it's a public document, so
11 I'm not aware of what has been – if counsel has
12 produced that, I'm not aware of that.
13        Q.  Okay.  And are you aware that Burton v.
14 Lemons is actually a private matter?  It's not a
15 public document?
16        A.  I'm not aware of that.
17        Q.  Wouldn't it be important for people
18 evaluating OLPC's claim for damages to understand
19 what the Burton v. Lemons matter is about and what's
20 gone on in that litigation?
21        MR. JORDAN: Objection; calls for
22 speculation, calls for a legal conclusion.
23        A.  Wouldn't it be important for whom?
24        Q.  (By Ms. Vaughn)  Someone like myself.
25 Someone like myself.  If I'm trying to understand how

Page 30

1 Naomi's alleged access to the Waterton Land Trust
2 documents relate to all of the fees incurred by
3 Foley & Lardner, how would I do that without the
4 actual pleadings?
5        MR. JORDAN: Objection; calls for
6 speculation.
7        You're not obligated to speculate about
8 what Ms. Vaughn means, Mr. Olson.
9        THE WITNESS:  So do I answer the question?
10        MS. VAUGHN:  You can answer if you're
11 able.
12        MR. JORDAN: If you can answer it without
13 speculating.
14        THE WITNESS:  Can you repeat the question,
15 please, Sarah.
16        Q.  (By Ms. Vaughn)  I'll ask it in a
17 different way.  There are a lot of entries in this,
18 on these invoices, particularly some of the later
19 ones.  Okay.  I'm looking at this invoice from
20 October 24th of 2023.  This invoice makes up some of
21 OLPC's claimed damages in this matter; correct?
22        A.  Yes.
23        Q.  Okay.  A lot of these entries relate to a
24 subpoena to DocuSign and Mr. Lemons' attempt to quash
25 that subpoena.  Do you see that?  "DocuSign, motion

Page 31

1 to quash."
2        A.  I see that, yes.
3        Q.  Okay.  How is Naomi's access to the
4 Waterton Land Trust document related to her subpoena
5 of documents to DocuSign and Mr. Lemons' attempts to
6 quash that subpoena?
7        A.  The lawsuit is based on Mr. Lemons'
8 obligations as a trustee from the stolen documents,
9 and all of this arises as a result of the use of the
10 confidential document and confidential information in
11 bringing the lawsuit.  So it's whatever follows from
12 that.
13        Q.  So you cannot tell me how Naomi's access
14 to the Waterton Land Trust document allegedly relates
15 to the specific entries in this matter, can you?
16        A.  I think I can.
17        MR. JORDAN: Objection; inconsistent with
18 his testimony.
19        THE WITNESS:  My understanding is this
20 follows from a lawsuit based on the stolen document.
21 The question with respect to DocuSign has to do with
22 actions taken by the trustee and whether the trustee
23 had authority to take those directions.
24        Q.  (By Ms. Vaughn)  Okay, and that's what
25 Naomi claimed in the lawsuit; correct?  Was that

Page 32

1 Bruce Lemons exceeded his authority as trustee and
2 breached the duties owed to her as an alleged
3 beneficiary; correct?
4        A.  That's my understanding.
5        Q.  Okay.  So it's OLPC's position that
6 because Naomi Burton allegedly had access to the
7 Waterton Land Trust document prior to legally
8 receiving it in connection with the Mareva
9 injunction, that Ephraim is responsible for all of
10 the fees incurred in Burton v. Lemons; is that right?
11        MR. JORDAN: Objection.
12        A.  That is correct.
13        MR. JORDAN: Wait a minute.  I object to
14 Counsel's statement that she legally received it by
15 virtue of the Mareva injunction.
16        But your answer is on the record.  Thank
17 you, Mr. Olson.
18        Q.  (By Ms. Vaughn)  Have these invoices been
19 paid?
20        A.  Yes.
21        Q.  Who were they paid by?
22        A.  Initially they were paid – I believe they
23 were charged – they were paid, I think, directly or
24 indirectly, by OLPC and then charged – Waterton Land
25 Trust – then it was charged back to Waterton Land

Page 33

1 Trust with the understanding that OLPC will indemnify
2 it for all the costs incurred in connection with
3 this. So it's charged – it was charged back to –
4 charged to Waterton Land Trust.
5     Q.  Okay, let's break this down. You said it
6 was paid either directly or indirectly by OLPC.
7 Which was it?
8     A.  OLPC arranged for the payment of the fee
9 initially, and then Waterton Land Trust – charged it
10 back to Waterton Land Trust.
11     Q.  And you said OLPC arranged for the
12 payment. Did OLPC make a payment or arrange for some
13 other entity to pay it?
14     A.  No, I believe that it paid it itself.
15     Q.  Okay. And what proof would there be that
16 it was OLPC itself that paid this invoice?
17     A.  The fact that I arranged for the payment
18 of it.
19     Q.  Okay. Is there a document, documented
20 evidence, of that? Bank accounts, perhaps.
21     A.  It was paid electronically. It might show
22 on the bank statement. It's possible.
23     Q.  Whose bank statement?
24     A.  OLPC's.
25     Q.  Okay. And then you said that it was

Page 34

1 charged back to Waterton Land Trust. I'm a mere
2 litigator. What does that mean in terms of
3 accounting?
4     A.  It means that Waterton Land Trust then was
5 charged back that amount by OLPC on the understanding
6 that OLPC would indemnify it. So it was charged back
7 and – was charged back –
8     Q.  Charged back. What does charged back
9 mean?
10     MR. JORDAN:  Let him finish his answer.
11     A.  It was charged back so that Waterton Land
12 Trust then owed that amount to, at that point, to
13 OLPC.
14     Q.  (By Ms. Vaughn) And when was it charged
15 back to Waterton Land Trust?
16     A.  Oh, I believe it was charged back – I
17 believe at the end of each year, at the beginning of
18 the next year, charged back.
19     Q.  Okay, and did Waterton Land Trust pay that
20 money back to OLPC?
21     A.  Well, OLPC had a receivable from Waterton Land
22 Trust that was then assigned back to, I believe,
23 OLPCCIL. So it didn't – it no longer owed it to –
24 it no longer owed it to OLPC.
25     Q.  Now OLPCCIL owes it to OLPC?

Page 35

1     A.  No. Waterton Land Trust owes it to OLPC.
2 Waterton Land Trust owed it to OLPC and then used
3 that to pay back OLPCCIL.
4     Q.  How does that work? Explain that to me.
5 I don't understand that.
6     A.  Well, if A owes B money and B owes C
7 money, B can assign the receivable from A to C to pay
8 its debt, to pay down its debt.
9     Q.  Okay. So OLPC paid the invoices and then
10 charged that back to Waterton Land Trust; correct?
11     A.  Yes.
12     Q.  Waterton Land Trust did not pay that back
13 to OLPC, but instead charged it back to OLPCCIL?
14     A.  No, it assigned the receivable. It
15 factored the receivable. It got the receivable from
16 Waterton Land Trust, charged it back, and used that
17 asset to reduce its – any amount it owed to OLPCCIL.
18 And then OLPCCIL was paid by Waterton Land Trust.
19     Q.  Okay, to reduce the amount that OLPC owes
20 to OLPCCIL?
21     A.  Yes.
22     Q.  Is this documented anywhere? This
23 assignment.
24     A.  No, there's no written assignment
25 agreement.

Page 36

1     Q.  Who are the individuals that would know
2 about this charged-back receivable assignment between
3 OLPC Waterton Land Trust and OLPCCIL?
4     A.  I know that because that's what I did on
5 behalf of OLPC.
6     Q.  Who are the other individuals that would
7 know about this?
8     A.  Well, Waterton Land Trust would know that
9 its payable to OLPC was assigned, and so it would
10 know.
11     Q.  Okay. And presumably OLPCCIL would know
12 as well; correct?
13     A.  Yes.
14     Q.  Would OLPCCIL have any documents
15 evidencing the debt that was paid down via this
16 method?
17     A.  As I said before, there's no written
18 assignment.
19     Q.  But presumably, all this would be
20 accounted for in accounting records; right?
21     A.  Well, it would end up at the bottom line,
22 that's right. There would be a bottom line at the
23 end of the day, who owes what to who.
24     Q.  And you're saying that this occurred at
25 the end of every year; correct?

Page 37

1    A.  I believe it occurred periodically, that's
2  correct.  I believe it happened periodically.
3    Q.  Okay.  And these invoices here in
4  Exhibit 1 date back to October of 2022; right?
5    A.  Uh-huh (affirmative).
6    Q.  So presumably that evidence would exist
7  back to October of 2022?
8    A.  Yeah.  The assignment, the assignment
9  would have been made at the end of '22 or at the
10  beginning of '23.
11    Q.  Okay.  We may have to come back to that.
12  I'm still wrapping my head around that concept.  But
13  the proof that OLPC paid these invoices in the first
14  place would be OLPC's bank account; correct?
15    A.  Well, the proof would be that I paid it.
16  So would there also be evidence in the bank account?
17  It may or may not show that, I don't recall.
18    Q.  I mean, typically payments are documented;
19  correct?
20    A.  I don't know that it would necessarily
21  show the recipient on an electronic payment.  It may
22  or may not.  I don't know that.  I don't recall.
23    Q.  I'm talking about the payment from OLPC to
24  Foley.
25    A.  Yes.  I don't know that it necessarily

Page 38

1  shows on an electronic payment.  I don't recall that
2  right now.
3    Q.  Do you know what account OLPC used to pay
4  this amount?
5    A.  Yes.  I believe it was with a Wells Fargo
6  account that OLPC had.
7    Q.  Okay.  We might come back to this.  We're
8  going to switch gears and go to the next set of
9  invoices.  Getting my Adobe again, one second.  Do
10  you see this document, Mr. Olson?
11    A.  I see it.
12    Q.  Okay, and it's 55 pages long.  There's a
13  summary of BLG invoices.
14    A.  Can I read the first page, please.  I saw
15  it, but I didn't read it.
16    Q.  Yes.
17    A.  Can you make it a little bigger for me?
18  Thank you.
19    Okay, I see it.
20    Q.  Okay.  So this is what we're going to mark
21  as Exhibit 2.  This is Bates numbered OL Private
22  Counsel-Ephraim Olson 14885 to 14909.
23    (EXHIBIT 2 WAS IDENTIFIED.)
24    These are all invoices from Borden
25  Lardner & Gervais.  Looking at this first page,

Page 39

1  Mr. Olson, why does it say these documents were
2  produced by Hyrum Olson, the Waterton Land Trust,
3  Waterton Land Trust, Ltd and Joshua Olson?
4    A.  Because they were named as defendants in
5  the lawsuit in Canada.
6    Q.  And how did OLPC receive these invoices?
7    A.  They were sent to my counsel.
8    Q.  By whom?
9    A.  By, I believe, the solicitors for Hyrum
10  Waterton Land Trust, Waterton Land Trust, Ltd and
11  Joshua.
12    Q.  Do you know when your counsel received
13  them?
14    A.  I believe it was in connection with the
15  expert report, which would have been sometime prior
16  to -- sometime prior to the issuance of the expert
17  report.
18    Q.  Okay.  It looks like these invoices total
19  $321,486.91.  Do you see that?
20    A.  Yes.
21    Q.  Then in Mr. Hoffman's report -- let's just
22  double check he's got the same amount.  He does not.
23  He claims damages of $237,450.  Do you see that?
24    A.  I see that.
25    Q.  Do you know what the discrepancy is there?

Page 40

1    A.  Can you go back to -- let me just add this
2  up with my calculator here for a moment, please.
3    Yes, that's the difference between the
4  Canadian dollar and the U.S. dollar.
5    Q.  Okay, great.  Is OLPC responsible for
6  paying these fees?
7    A.  Yes.  It's agreed to indemnity those
8  parties for the fees.
9    Q.  Why did OLPC agree to indemnify those
10  parties for the fees?
11    A.  Because the lawsuit was based on documents
12  that were stolen by Ephraim.
13    Q.  Okay.  What -- so these invoices, they all
14  say, in the subject line, "trust litigation."  Do you
15  know what specific lawsuit they relate to?
16    A.  They relate to a lawsuit filed in April,
17  filed in April of 2022, by Carolyn, Naomi and other
18  unnamed parties against multiple parties, including
19  Hyrum, Waterton Land Trust, Waterton Land Trust, Ltd
20  and Joshua.
21    Q.  Okay.  Was that Burton v. Bison
22  Conservation Ranch?
23    A.  No.
24    Q.  No?  Okay.  What's the name of the case?
25    A.  Well, it's Carolyn Olson, Naomi Burton,

Case 2:21-cv-00455-DBB    Document 368-10    Filed 01/31/25    PageID.11016    Page
OL PRIVATE COUNSEL, LLC vs OLSON
56 of 35
THOMAS OLSON - 12/19/2024

41 to 44

Page 41

1  some Jane Does and John Does, against these parties,
2  plus me, Bruce, Colette Williamson and I believe
3  other Jane and John Does.
4    Q.  Okay.  Do you know the case number?
5    A.  No.  It's a public record document in
6  Alberta, but I don't know the case number offhand.
7  No, I don't know that.
8    Q.  Okay.  Do you know anything else that
9  could assist somebody in finding this case?
10   A.  Well, Ephraim testified that he thought he
11 was one of the John Does, so Ephraim probably could
12 find it.  I'm sure he's had access to it since he
13 said he thought he was one of the John Does on there.
14 But the records are -- they're public records in
15 Canada, so they're easy to find.
16   Q.  Okay, and has OLPC produced any of the
17 documents from that lawsuit?  Like the filings or the
18 pleadings.
19   A.  Well, I'm not aware that they have been,
20 but I'm not aware that they haven't been.  I don't
21 believe they have, but I'm not fully aware.
22   Q.  You don't know?
23   A.  I'm not aware they have, that's correct.
24   Q.  Okay.  So OLPC agreed to indemnity Hyrum
25 Olson; is that correct?

Page 42

1    A.  Hyrum -- all the parties listed here.
2    Q.  I want to break them down one by one.
3  OLPC agreed to indemnity Hyrum Olson; correct?
4    A.  That is correct.
5    Q.  Okay.  Is Hyrum Olson a client of OLPC?
6    A.  Yes, he is, because he's involved with the
7  Waterton Land Trust as a director and the Waterton
8  Land Trust, Limited.
9    Q.  In this case, was he sued individually or
10 in his capacity related to Waterton Land Trust?
11   A.  It was all mixed together.  The lawsuit
12 is -- in all capacities.  But without the Waterton
13 Land Trust, he's not sued.  It's involving the
14 Waterton Land Trust.
15   Q.  Okay.  Is Hyrum Olson an employee of OLPC?
16   A.  No.
17   Q.  Okay.  The Waterton Land Trust, we've
18 talked about that already.  That's a client of
19 OLPCCIL; correct?
20   A.  And OLPC, yes.
21   Q.  Okay.  Waterton Land Trust, Ltd., what's
22 the difference between the trust and the corporate
23 entity?
24   A.  One is a corporation and one's a trust.
25   Q.  Okay.  Is Waterton Land Trust, Ltd a

Page 43

1  client of OLPC?
2    A.  Yes.
3    Q.  Is Joshua Olson a client of OLPC?
4    A.  Yes.  OLPC has done work for Joshua.
5    Q.  In what sense?
6    A.  Well, it's filed tax returns for him and
7  given him tax advice.
8    Q.  Is Joshua Olson an employee of OLPC?
9    A.  No.
10   Q.  And does Joshua Olson have any sort of
11 corporate or trust or any relation to Waterton Land
12 Trust?
13   A.  Well, as I said, all these lawsuits are
14 based on Waterton Land Trust and whatever involvement
15 he had and Hyrum had with it.
16   Q.  And what involvement did Joshua Olson have
17 with Waterton Land Trust?
18   A.  Well, the lawsuit alleges that he was
19 involved with it.
20   Q.  And this agreement to indemnify, when was
21 it reached?
22   A.  It was reached shortly after I was served
23 with the lawsuit and the Waterton Land Trust was
24 served.  And I, at that point, entered into
25 discussions with the trustee of the Waterton Land

Page 44

1  Trust in connection with the indemnification.
2    Q.  And that's Hyrum Olson?
3    A.  That's correct.
4    Q.  Okay, and then you presumably also entered
5  into discussions with Joshua Olson?
6    A.  He was advised that since it related to
7  the Waterton Land Trust, he would also be
8  indemnified.
9    Q.  Okay, and that agreement was reached when
10 they were served.  When did that happen?
11   MR. JORDAN:  Well, I'm going to object.
12 Misstates the evidence.  He said when he was served.
13   A.  Yeah, I was served.  I became aware of it
14 at that point, and then subsequently I was advised
15 that Hyrum and the Waterton Land Trust had also been
16 served -- advised by Hyrum, and that they had engaged
17 counsel.
18   Q.  (By Ms. Vaughn) Okay.  When were you
19 served?
20   A.  Somewhere in the spring, I believe, of
21 2003.
22   Q.  2003?
23   A.  Uh-huh (affirmative).
24   MR. JORDAN:  2023, Mr. Olson?
25   THE WITNESS:  Oh, sorry.  2023, sorry,

Page 45

1  sorry. I got up quite early this morning, so sorry
2  if I'm a little sloggy.
3      Q.  (By Ms. Vaughn) Spring of 2023?
4      A.  Yeah.
5      Q.  Correct?
6      A.  I believe spring or summer. It could have
7  been summer of '23, but sometime in '23.
8      Q.  Okay, and presumably --
9      A.  It was -- actually, I believe it was
10  actually more than a year after. It was probably,
11  now that I think of it, it was probably -- the
12  lawsuit was from April. I don't think I was served
13  until maybe as late as August or September, perhaps.
14  August, it was probably August when I was served, but
15  it was more than a year after the lawsuit had been
16  filed.
17      Q.  When was the lawsuit filed?
18      A.  April of 2022.
19      Q.  And you think you were served anywhere
20  from April 2023 to the summer of 2023?
21      A.  No, it was more than a year after, so it
22  would have been almost certainly the summer of 2023 I
23  was served.
24      Q.  Is there --
25      A.  Sorry?

Page 46

1      Q.  Is there a document that would show when
2  you were served?
3      A.  Oh, I'm sure it would be on the public
4  court filings.
5      Q.  And presumably that document, that date,
6  would also set the date for when this indemnification
7  agreement was reached?
8      A.  Yes. It would be after I was served that
9  I confirmed that OLPC would be -- would indemnify
10  Waterton Land Trust and Hyrum for the fees.
11      Q.  Okay, and is that indemnification
12  agreement written anywhere?
13      A.  No.
14      Q.  And what are the terms of that agreement?
15      A.  That OLPC will indemnify Waterton Land
16  Trust for its costs in connection with this lawsuit.
17      Q.  And was the agreement to indemnify for the
18  entire lawsuit or just a limited period of time?
19      A.  No, for the entire lawsuit.
20      Q.  Okay. So then looking at the summary
21  here, why do we only have invoices from September
22  of 2023 to March of '24?
23      A.  Those are all the invoices that have been
24  presented for indemnification so far. I understand
25  that there are ongoing matters, but I have not been

Page 47

1  advised of any further invoices that have been
2  requested for indemnification yet.
3      Q.  How did they make the request for
4  indemnification?
5      A.  Well, the request -- Hyrum made the
6  request to me, and I had -- and then at that point I
7  was advised of the amount of the invoice and the
8  nature of the invoice. And then that's how it was
9  agreed to. So as the invoices were rendered, we
10  would be advised -- not necessarily the date the
11  invoice was rendered, but advised that the amounts
12  had been rendered.
13      Q.  Okay, and who would advise OLPC about
14  that?
15      A.  About what? Sorry.
16      Q.  About the invoices for indemnification.
17  You said as invoices were rendered, they would be
18  advised of the invoice.
19      A.  Yeah. We would be advised of how much
20  Waterton Land Trust had to pay, and then we would
21  agree to pay that, but not as each invoice came out.
22  It would be done, I believe, at the end of each -- at
23  the end of each year we were advised of that, and we
24  acknowledged that we're liable for those invoices.
25      Q.  And who would advise OLPC as to the

Page 48

1  invoices?
2      A.  As to the quantum of the invoices? Is
3  that your question?
4      Q.  As to the incurrence and the amount.
5  Which individual relayed that information to you?
6      A.  Hyrum relayed that information to me.
7      Q.  How did Hyrum relay that information to
8  you?
9      A.  He would tell me orally as to that they
10  had incurred the amounts, these invoices. So he'd
11  tell me orally that they'd incurred amounts.
12      Q.  Okay. He never e-mailed you the invoices?
13      A.  No, no, other than these redacted
14  invoices.
15      Q.  And then you also said that you would be
16  advised as to the amount of the invoice and the
17  nature of the invoice. What do you mean by the
18  nature of the invoice?
19      A.  That it related to the lawsuit against
20  Waterton Land Trust, the one that I was familiar
21  with, the one with which I was served, the same
22  lawsuit.
23      Q.  Is it your understanding -- is it OLPC's
24  understanding that all of these invoices relate to
25  that April 2022 lawsuit against Waterton Land Trust?

Page 49

1  If you'd like, I can send you them in the chat as
2  well and you can thumb through them, but they are
3  entirety redacted, so I'm not sure how helpful that
4  would be.
5      MR. JORDAN: Do you have the question in
6  mind, Mr. Olson?
7      THE WITNESS: Yes.
8      A.  The answer is yes.
9      Q.  (By Ms. Vaughn) Okay.  So it's OLPC's
10 understanding that all of these invoices relate to
11 one lawsuit; correct?
12     A.  Yes.  Yes.
13     Q.  How can we verify that?
14     MR. JORDAN: Objection; calls for
15 speculation by the witness.
16     A.  How can I verify?
17     Q.  (By Ms. Vaughn) Yes.
18     A.  Well, perhaps you could send me -- Hyrum
19 told me that was the case.  And perhaps you could
20 send me those invoices, I'll take a look.  It's in
21 the same matter.
22     Q.  I will do that.
23     Okay, that should have come through on the
24 chat now.
25     A.  So I'm a party to that litigation myself

Page 50

1  in my personal capacity.  I'm aware that there are
2  actions going on.  Because of my -- because I'm
3  personally a litigant, I was aware of actions that
4  involved Waterton Land Trust in that litigation.  And
5  the file number is the same file number for all
6  matters, and so I'm aware that things are going on
7  during this time period in connection with that
8  lawsuit.  I'm not aware that there's any other matter
9  with respect to which BLG is representing the
10 Waterton Land Trust.
11     Q.  Okay.
12     A.  Except for the lawsuit in Canada.
13     Q.  Okay.  Did OLPC have a duty to indemnify
14 Hyrum Olson, the Waterton Land Trust, Joshua Olson?
15     MR. JORDAN: Calls for a legal conclusion.
16     You can give your understanding.
17     A.  OLPC believed it had an obligation to
18 indemnify them because the documents were stolen.
19 The documents on which this was based were stolen.
20     Q.  (By Ms. Vaughn) Okay, and tell me which
21 specific documents were used in this lawsuit.
22     A.  Referencing the lawsuit, it refers to
23 Waterton Land Trust, and in a previous -- it refers
24 to Waterton Land Trust.  A reference is made about
25 White Buffalo Trust and other -- I think other

Page 51

1  references to other trusts are referred to, all
2  of which -- other trust documents were stolen that
3  referred to the lawsuit.
4      Q.  Which documents?
5      A.  Trust deeds.  Information from trust deeds
6  that were stolen are referred to in the pleadings,
7  the litigation.
8      Q.  Are they --
9      A.  Go ahead.
10     Q.  Are they referred to or are they used?
11     MR. JORDAN: Objection; vague.
12     A.  The lawsuits are based upon information
13 from those trust deeds.
14     Q.  (By Ms. Vaughn) Okay, and I just want to
15 clarify.  You just said the lawsuits, plural.  But
16 we're just talking about one lawsuit; right?
17     A.  There were three lawsuits in Canada.  This
18 was one of them.
19     Q.  Okay.  I'm only asking about this one
20 lawsuit.
21     A.  Yes.
22     Q.  Which specific documents were used in this
23 one lawsuit?
24     A.  Several of the trust deeds, including
25 Waterton Land Trust, White Buffalo Trust, I believe

Page 52

1  Olson Estate Trust, and -- those trusts, and there
2  may be others.  The pleadings are quite extensive.
3  Also, I believe, referred to in -- yeah, so they're
4  in the pleadings.  They're quite extensive.  Like I
5  said, it's all public record.  They're all -- these
6  various trust deeds are referred to, information on
7  the various trust deeds are referred to.
8      Q.  Okay.  And are the trust deeds referred to
9  or are they utilized in the litigation?  In other
10 words, are they attached to any pleadings?
11     A.  I believe so.
12     Q.  Who attached them to the pleadings?
13     MR. JORDAN: Objection; calls for
14 speculation.
15     A.  Counsel for Carolyn and Naomi.
16     Q.  (By Ms. Vaughn) Which pleadings were they
17 attached to?
18     A.  To affidavits that were filed in
19 connection with this litigation.
20     Q.  Okay.  How does OLPC link Carolyn and
21 Naomi -- so it's Carolyn and Naomi who are plaintiffs
22 in this lawsuit?
23     A.  Yes.
24     Q.  How does OLPC link their access to those
25 documents to Ephraim Olson?

Page 53

1     A.   Because they're the documents that were --
2   they're the documents that were stolen in the -- by
3   Ephraim.
4     Q.   That was not my question.  Does OLPC have
5   evidence that Ephraim Olson sent those documents to
6   Carolyn?
7     A.   Carolyn got copies of the documents from
8   Tim Akarapanich when Ephraim set up the call with Tim
9   to provide documents to Carolyn so that she could
10  have documents herself.
11    Q.   Does OLPC have evidence that Ephraim sent
12  these documents to Naomi?
13    A.   Well, Naomi's counsel and Carolyn's
14  counsel, who are the same person, has those
15  documents, so they got them somehow.
16    Q.   So OLPC has no evidence that they got them
17  from Ephraim; correct?
18    MR. JORDAN:  Objection; inconsistent with
19  the witness' testimony.
20    A.   Ephraim arranged -- Ephraim arranged for
21  the theft of the documents, and Carolyn had those
22  documents because she downloaded them, and those
23  documents were used in connection with the lawsuit.
24    Q.   (By Ms. Vaughn)  And again, my question
25  was:  Does OLPC have any evidence that Ephraim sent

Page 54

1   these documents to Naomi?
2     A.   No, we do not see an e-mail from Ephraim
3   to Naomi, if that's your question.
4     Q.   Let me back up.  What is this lawsuit
5   about?  What's going on in it?
6     A.   Well, the allegations are that all these
7   trust deeds, all these trusts from which we're
8   talking about here that relate to the stolen
9   documents, are part of some grand conspiracy on the
10  part of the trustees, the settlors, myself, to
11  somehow deny Carolyn, Naomi and other persons rights
12  to assets that they would have otherwise been
13  entitled to.
14    Q.   And is it OLPC's position that this
15  lawsuit would not have been filed but for Ephraim's
16  access, allegedly accessing those documents?
17    A.   Yes.
18    Q.   What do you base that on?
19    A.   The fact that the documents were used in
20  the litigation.  The litigation is based on those
21  documents, based on information in those documents.
22    Q.   How could we tell that the work done --
23  let me share my screen again -- by the BLG relates to
24  the documents?
25    A.   They relate?

Page 55

1     MR. JORDAN:  Objection.  Who's "we" in
2   your question?
3     MS. VAUGHN:  The collective.
4     Q.   (By Ms. Vaughn)  How can anyone tell that
5   the work done by BLG relates to those documents?
6     A.   The lawsuit is based on those documents,
7   so all that relates to the documents.
8     Q.   Okay, but do these invoices reference the
9   lawsuit?
10    A.   How do you mean, "reference"?  It says
11  "trust litigation, Waterton Land Trust and Hyrum."
12    Q.   Right.  Do they say anywhere that this
13  work done relates to the lawsuit that you told us is
14  related to the April 2022 lawsuit?
15    A.   I'm advised that it does relate to that
16  lawsuit, exclusively to that lawsuit.
17    Q.   And who advised you of that?
18    A.   Hyrum advised me of that.
19    Q.   Hyrum?
20    A.   Hyrum advised me that this relates -- and
21  I'm aware because I'm a litigant in here -- that BLG
22  was involved, because I've got my own counsel
23  involved, and I'm aware that BLG was highly involved
24  representing the trust in connection with this
25  lawsuit.

Page 56

1     Q.   So is it just your word that we have to
2   link these invoices to that lawsuit?
3     A.   Well, I'm aware of it.
4     MR. JORDAN:  Objection; inconsistent with
5   the witness' testimony.
6     THE WITNESS:  I'm aware of it, and on the
7   face of the document Hyrum has indicated this relates
8   solely to that, and I'm aware that there were things
9   going on at that time related to that lawsuit.
10    Q.   (By Ms. Vaughn)  What was going on in this
11  time frame related to that lawsuit?
12    A.   Well, there was questions about -- let's
13  see.  This was in August of '23.  I believe that at
14  or about this time, there were hearings set for
15  questions on service, whether the service was good
16  service or not.
17    Q.   Have these invoices been paid?
18    A.   Yes.
19    Q.   Who were they paid by?
20    A.   Waterton Land Trust has paid these
21  invoices.
22    Q.   And what's the proof of that?
23    A.   Well, because they show they've been paid,
24  and Hyrum has advised that Waterton Land Trust has
25  been responsible for these accounts.

Page 57

1    Q.  So has OLPC incurred any debts as a result
2  of this?
3    A.  OLPC has agreed to indemnity Waterton Land
4  Trust and Hyrum for the cost of these invoices.
5    Q.  That agreement's not written; correct?
6    A.  That is correct.
7    Q.  And OLPC has not yet paid Waterton Land
8  Trust back; correct?
9    A.  No, it hasn't.
10    Q.  And OLPC reached this agreement sometime
11  in 2023; correct?
12    A.  Yes.  Shortly -- it was soon after my
13  counsel contacted me about service that those
14  discussions were had.
15    Q.  And the documents that were used in this
16  case, you've identified a few specifics.  Waterton
17  Land Trust, White Buffalo Trust, I think you said
18  maybe the Olson Estate Trust, and there might be
19  others; correct?
20    A.  Yes, Thomas -- I believe Thomas H. Olson
21  Trust is also referred to in there.
22    Q.  And it's OLPC's position that Carolyn
23  Olson received these documents from Tim A; correct?
24    A.  Yes.
25    Q.  What about the box of documents?  Were

Page 58

1  these documents in the box of documents?
2    A.  I don't believe so.
3    Q.  Okay.
4    A.  I don't think there were any printed
5  copies of those, to my recollection, in the box of
6  documents.
7    Q.  Are you familiar with a disk that was in
8  the box of documents that had these documents on it?
9    A.  I am aware that there is a disk.
10    MR. JORDAN:  Objection.  Wait.  Assumes
11  facts not in evidence.
12    THE WITNESS:  I understand that there may
13  have been a disk that may have had some or all of
14  these documents on there.  I don't know.
15    Q.  (By Ms. Vaughn)  And is it your
16  understanding that the box of documents was in
17  Carolyn Olson's home?
18    A.  Well, in our matrimonial home, yes, that's
19  what I understand.
20    Q.  And is it also your understanding that her
21  lawyer has testified -- Patricia Cundick, her divorce
22  lawyer -- has testified that she went through the box
23  of documents and pulled documents out of it?
24    A.  I'm aware that she testified that she
25  found the CRA document that referred to me and Moose

Page 59

1  Mountain Buffalo Ranch, but I believe she testified
2  she didn't go through the documents that appeared to
3  belong to the law firm.
4    Q.  Do you have --
5    A.  But that will be -- that's in her
6  testimony, I mean, so if you want to pull up her
7  transcript, we can review that, but that's my
8  recollection.
9    Q.  Do you have an understanding -- or let me
10  back up.  How can OLPC state that Carolyn got these
11  documents from Tim A rather than from the box?
12    A.  Well, Carolyn asked Tim for them because
13  she didn't have them.  That's why she asked him to
14  produce all the documents.  So obviously when she
15  stole the documents, she didn't have the documents.
16    Q.  And she asked Tim A for them herself;
17  correct?
18    A.  Well, Ephraim did, and then he passed it
19  on to Carolyn to take the rest of them, the rest of
20  the documents.
21    Q.  And how does OLPC know that?
22    A.  Because of the chats between Tim and
23  Carolyn and Ephraim.
24    Q.  So it's just limited to the chats.  You're
25  inferring things beyond the chats; correct?

Page 60

1    A.  Sorry?
2    Q.  We're talking past each other.  Can OLPC
3  state definitively that Carolyn Olson did not receive
4  these documents from the box of documents?
5    A.  Referring to the trust deed; is that
6  correct?
7    Q.  Yes, the ones used in this litigation in
8  the invoices from BLG.  I'm limiting it solely to
9  that.
10    A.  Yes, I can.
11    Q.  How?
12    A.  Because when Carolyn got the documents
13  from Tim, she downloaded them and sent them to
14  Patricia Cundick.
15    Q.  Okay.  Is that it?
16    A.  Yeah, I believe that's primarily it.  I
17  think that's right.  That's right, she did do that.
18  So that was the documents that Patricia had that
19  ended up with counsel in Canada, were the documents
20  that Carolyn sent to Patricia Cundick.
21    Q.  When does OLPC plan to pay Waterton Land
22  Trust back for this amount?
23    A.  It will pay it back when these matters are
24  resolved.
25    Q.  At some unknown point in the future?

Page 61

1    A.   Yeah, at some point in the future.
2    Q.   Let's look at Exhibit 3.  Well, actually
3  let's back up.  Yeah, okay.
4         (EXHIBIT 3 WAS IDENTIFIED.)
5         This is OLPC's Second Supplemental
6  Response to Interrogatory 13.  Do you see this?
7    A.   I do.
8    Q.   And am I correct that that is your
9  signature there?
10   A.   Yes.
11   Q.   And this was signed on May 22nd, 2024?
12   A.   Yes.
13   Q.   So interrogatory 13 specifically asked
14  OLPC to name its clients that the documents -- the
15  converted or the stolen documents were allegedly used
16  against.  Do you see that?
17   A.   Yes, I see that.
18   Q.   And then it also asks for the title and
19  jurisdiction of the legal action.  Do you see that?
20   A.   I see that.
21   Q.   Okay.  Let's look at OLPC's response.  We
22  have the various documents.  Then the response for
23  the clients is right here.  Are Hyrum Olson or Joshua
24  Olson listed there?
25   A.   No.

Page 62

1    Q.   Okay.  Is Waterton Land Trust, Ltd listed
2  there?
3    A.   No.
4    Q.   So are they not clients of OLPC?
5         MR. JORDAN:  Objection; misstates the
6  document, misstates the testimony, asked and
7  answered.
8         THE WITNESS:  Do I answer this question?
9         MR. JORDAN:  If you can.
10   A.   This, the Waterton Land Trust, includes
11  trustees of the Waterton Land Trust, so Hyrum being
12  sued is included in there.  The costs relate to the
13  lawsuit against the Waterton Land Trust.
14   Q.   (By Ms. Vaughn)  Is Joshua Olson a trustee
15  of the Waterton Land Trust?
16   A.   No, but it alleges he was involved with
17  the Waterton Land Trust.
18   Q.   The lawsuit alleges that?
19   A.   Yes.  It talks about a conspiracy and that
20  it somehow involves Joshua as part of the Waterton
21  Land Trust, as being involved with the Waterton Land
22  Trust.
23   Q.   Okay.
24   A.   And the other trusts.  He is the trustee
25  of the Thomas H. Olson Trust, Joshua is.

Page 63

1    Q.   And tell me where in paragraph 3 the
2  lawsuit for the BLG invoices is identified.
3    A.   The lawsuit is a continuation of that
4  initial case number.
5    Q.   Which one?
6    A.   The Mareva injunction.  The lawsuit is
7  basically the same case that was filed in that Mareva
8  injunction.
9    Q.   Is it the same case or is it basically the
10  same case?
11   A.   Well, it's refiled, but it's the same
12  details as contained in the -- it's basically the
13  same case as the injunction.
14   Q.   It's a separate legal action; correct?
15   A.   It's a separate legal action.
16   Q.   Okay.
17   A.   But it's the same case.
18   Q.   And it's not identified?  Is it identified
19  here?
20   A.   I don't see it on this list here, no.
21   Q.   Okay.  Just to make sure it wasn't
22  supplemented, this matter right here.
23        MR. JORDAN:  Is there a question?
24        MS. VAUGHN:  Yeah.
25   Q.   (By Ms. Vaughn)  I'm wondering if this is

Page 64

1  the matter -- I'm just going through the supplements.
2  I want to make sure we make sure we're being fair.
3    A.   Can I look at the document, please.  Can
4  you upload that for me to look at, please.
5    Q.   Yes.
6         MR. JORDAN:  Mr. Olson, the question
7  pending is: In the first supplemental response to
8  this interrogatory, is the Alberta case that you
9  previously described identified?
10   A.   I'm just trying to go through here to see.
11        Yes.  I believe it's the case referred to
12  on the second -- supplemental response to
13  number 13, case number 2201-04486.
14   Q.   (By Ms. Vaughn)  Olson v. Olson?
15   A.   Yes.
16        MR. JORDAN:  Sarah, we've been going a
17  couple hours now.  Can we take a brief restroom
18  break?
19        MS. VAUGHN:  Sure, and I will say this is
20  taking a lot longer than I expected because of the
21  response time, so we will be going past 5:30.  We
22  might be done at 6:00, if that's agreeable, then.
23  We're off the record.
24        (Recess 4:57 to 5:03.)
25        MS. VAUGHN:  I think I was ready to switch

Page 65

1  gears. I'm going to look at the last set of
2  invoices. I think this will be Exhibit 5. This is
3  Bates numbered OL Private Counsel-Ephraim Olson 12651
4  to 12656. Oh, this was not what I want. Yeah, this
5  is Exhibit 4.
6      (EXHIBIT 4 WAS IDENTIFIED.)
7      So Exhibit 4 will be OL Private
8  Counsel-Ephraim Olson 14849 to 14854, and these are
9  the Peacock Linder Halt & Mack invoices. Mr. Olson,
10 do you see these?
11 A.  Yes.
12 Q.  Why does it say these documents were
13 produced by Thomas Olson?
14 A.  Because the invoice was charged to me.
15 Q.  Okay. And how did OLPC obtain these
16 documents?
17 A.  My counsel provided them to Foley.
18 Q.  Who is your counsel?
19 A.  Peter Linder.
20 Q.  Okay, and did they provide it to Foley?
21 A.  Foley and the expert, yes.
22 Q.  Is OLPC responsible for paying these fees?
23 A.  Yes.
24 Q.  Why?
25 A.  Because this was in connection with the

Page 66

1  Mareva injunction, which deigned an injunction
2  against the Waterton Land Trust, the Olson Estate
3  Trust, White Buffalo Trust and me personally.
4  Q.  But why is OLPC responsible for payment of
5  these fees?
6  A.  Because they're based on confidential
7  documents and information stolen by Ephraim and
8  Carolyn.
9  Q.  And does OLPC have a legal obligation to
10 reimburse Thomas Olson for this?
11     MR. JORDAN: Objection; calls for a legal
12 conclusion.
13 A.  It's not just Thomas Olson. The trusts
14 were enjoined in this, so the trusts – the trusts
15 were attacked using the documents that were stolen,
16 as well as Tom.
17 Q.  (By Ms. Vaughn) Okay, but these invoices,
18 are they to Thomas Olson or to the trust?
19 A.  The invoices were sent to me, but the work
20 that was done was – or the injunction that was set
21 aside, obtained and set aside, related to me and the
22 trusts.
23 Q.  And what's the proof that the work done in
24 these invoices relates to you and the trust?
25 A.  I'm aware of the work that was done

Page 67

1  because I was involved, since I was served with the
2  Mareva injunction.
3  Q.  And where does OLPC's knowledge come from?
4  A.  OLPC's knowledge about what?
5  Q.  Of these invoices related to the trust
6  rather than you individually.
7  A.  That's not what I said. I said they were
8  related to me and they relate to the trusts. We were
9  all – several parties were subject to the Mareva
10 injunction. Related to all of us.
11 Q.  Let me ask it a different way. Did
12 Peacock Winder Halt & Mack represent just you or you
13 and the trusts?
14 A.  I guess that's a legal question. They
15 clearly represented me, and clearly the injunction
16 was set aside for all parties. So when the
17 injunction was set aside for me, it was set aside for
18 them, too. So whether that meant that he was – I
19 don't know the answer. That's a legal question. I
20 don't know the answer to that.
21 Q.  Is there a document that could tell us
22 that answer?
23 A.  I think it's a question of law as to
24 whether, by representing me, they also represented
25 the trust. But the trust got the same benefit I did

Page 68

1  from this. The injunction was set aside.
2  Q.  So you don't think it would be in the
3  engagement agreement?
4  A.  No.
5  Q.  So what is OLPC's responsibility to
6  reimburse you for your legal fees?
7  A.  Based on the actions against all parties,
8  all parties were clients of OLPC, and the documents
9  were stolen by a former employee of OLPC.
10 Q.  Are you a client of OLPC?
11 A.  I am.
12 Q.  Does OLPC have any agreement with you to
13 reimburse you for these legal fees?
14 A.  Yes, it's supposed to reimburse me for the
15 legal fees.
16 Q.  Is that written down somewhere?
17 A.  No.
18 Q.  Okay. Who negotiated that agreement
19 between OLPC and you to pay you back for your legal
20 fees?
21 A.  That was me.
22 Q.  You and yourself?
23 A.  OLPC. I'm the manager of OLPC, and so I
24 also represent myself, as well as the Waterton Land
25 Trust and the Olson Estate Trust.

Page 69

1   Q.  But you don't know if these invoices
2   relate to Waterton Land Trust and the Olson Estate
3   Trust?
4   A.  They do.  The invoices to get the
5   injunction set aside affected all the parties, me,
6   Waterton Land Trust.
7   Q.  But did Peacock Linder Halt & Mack perform
8   work for just you or also the trust?
9   A.  Peacock Linder & Halt got the injunction
10  set aside, which affected all the parties, including
11  me.
12  Q.  Okay.  Who would know the answer to this
13  question about who Peacock Linder Halt & Mack
14  represented?
15  A.  Well, I think --
16      MR. JORDAN:  Objection; asked and
17  answered.
18      THE WITNESS:  -- it's a legal question,
19  whether having to set -- that's a legal question.
20  Q.  (By Ms. Vaughn)  How is it a legal
21  question; do you know?
22  A.  Well, it's a professional ethics question.
23  When Peter Linder represented me and had the
24  injunction lifted, was he also, as a matter of law,
25  representing the other parties who were listed on the

Page 70

1   injunction?
2   Q.  Are you a trustee of the other parties
3   listed on the injunction?
4   A.  No.
5   Q.  Then why would Peter Linder's
6   representation of you infer representation of other
7   entities or a trust document?
8       MR. JORDAN:  Objection; argumentative.
9   Sarah, he's told you it's a legal question.  Why are
10  you asking him again and again?
11      MS. VAUGHN:  Because someone has to know
12  this answer.  It's not a legal question,
13  respectfully.
14      MR. JORDAN:  Well, it is -- in his mind,
15  it's a legal question.
16      MS. VAUGHN:  Okay.  Let me ask a different
17  question, then, David.
18  Q.  (By Ms. Vaughn)  Mr. Olson, would Peter
19  Linder know the answer as to whether or not he
20  represented just you or you and also the entities?
21      MR. JORDAN:  Objection; calls for
22  speculation as to what Peter Linder would know.
23  A.  Again, it's an ethics question, whether he
24  was representing them or not, certainly.  So he was
25  representing me for sure.

Page 71

1   Q.  (By Ms. Vaughn)  Okay.  And is OLPC's
2   obligation to pay for these an agreement with you or
3   an agreement with the trusts?
4   A.  I advised the trustees that I would pick
5   up the costs for the injunction, to set aside the
6   injunction.
7   Q.  And you as an individual or you as a --
8   A.  No, no.  I, as a lawyer, agreed that it
9   would be -- that the responsibility fell on me, as a
10  lawyer, to be responsible for the efforts to set
11  aside the injunction.
12  Q.  Okay.  So you represented yourself as a
13  lawyer and advised yourself that OLPC should pay for
14  these -- let me back up.  You are here as a
15  representative for OLPC; correct?
16      MR. JORDAN:  Well, are you withdrawing
17  your last question?
18      MS. VAUGHN:  Yeah.  I didn't finish it.
19      MR. JORDAN:  Okay.  It's hard to tell
20  sometimes.
21  A.  Yes, I'm here on behalf of OLPC.
22  Q.  (By Ms. Vaughn)  Okay.  And you're also an
23  individual; correct?
24  A.  I'm also an individual, yes.
25  Q.  And you're also a lawyer; right?

Page 72

1   A.  Yes.
2   Q.  Okay.  You advised, as a lawyer, the trust
3   entities that you, as a lawyer, should pick up the
4   fees for setting aside the Mareva injunction;
5   correct?
6       MR. JORDAN:  Objection; misstates the
7   testimony.  Maybe you could ask him as a lawyer for
8   whom, and I think you'd get to the bottom of what
9   you're looking for.
10      MS. VAUGHN:  I'm going to let the question
11  stand.
12      MR. JORDAN:  Okay, go ahead.
13  A.  I'm a lawyer.  I'm a lawyer that is the
14  manager of OLPC.  I advised the trusts that the fees
15  would be taken care of; that they did not have to
16  deal with the fees; that I would deal with the fees.
17  And then I have an arrangement with OLPC that it
18  would indemnify the cost of those fees.  So that's
19  the answer.
20      MS. VAUGHN:  Okay.  Can you read that
21  answer back.
22      (The previous answer was read back.)
23  Q.  (By Ms. Vaughn)  So you, as a lawyer, or
24  you, as a manager for OLPC, advised the trust that?
25  A.  Well, in both capacities.

Case 2:21-cv-00455-DBB    Document 368-10    Filed 01/31/25    PageID.11024    Page
OL PRIVATE COUNSEL, LLC vs OLSON
THOMAS OLSON - 12/19/2024

73 to 76

Page 73

1    Q.  Okay.
2    A.  That I would -- in both capacities.
3    Q.  Okay, and you advised them that you, as a
4  lawyer and manager of OLPC, would pick up the fees?
5    A.  Yes.
6    Q.  Is that correct?
7    A.  Yes.
8    Q.  And did OLPC, other than your agreement to
9  indemnify, have an obligation to indemnify the trust
10  for the Mareva injunction action?
11        MR. JORDAN:  Objection; calls for a legal
12  conclusion.
13    A.  Could you repeat the question, please,
14  Sarah.
15    Q.  (By Ms. Vaughn)  Other than your agreement
16  with the trust to indemnify them, was there an
17  otherwise standing obligation for OLPC to indemnify
18  the trust?
19        MR. JORDAN:  Objection, and you changed
20  the question as well.
21    A.  No, at that point that was -- when I gave
22  my word that they would be taken care of, that was
23  the agreement.  That was the indemnification.
24    Q.  (By Ms. Vaughn)  And is that an agreement
25  that you voluntarily entered into?

Page 74

1        MR. JORDAN:  Objection; vague.
2    A.  Yes.
3    Q.  (By Ms. Vaughn)  Okay.  And again, we
4  don't know, to my understanding, you don't know if
5  these invoices relate to fees just for you or fees
6  for the trust?
7    A.  The fees relate to the setting aside of
8  the injunction.
9    Q.  Okay.  And is Peter Linder the only one
10  who would know who he was representing in these
11  invoices?
12        MR. JORDAN:  Objection; calls for
13  speculation.
14    A.  That's a question of ethics.  He took
15  instructions from me.  I did not represent, on this
16  matter, did not personally represent the trusts.  He
17  took instructions from me.  They were beneficiaries
18  of the legal work that was done.  I don't know
19  whether that means they were technically clients of
20  his or whether the fact they were just -- I don't
21  know, as a matter of law, whether they were treated
22  as clients.  I think that's an ethics question in
23  Canada.  It's not a question the answer of which I
24  know.
25    Q.  (By Ms. Vaughn)  Okay, and these are

Page 75

1  addressed to you in Calgary, Alberta.  Do you see
2  that?
3    A.  Uh-huh (affirmative).
4    Q.  Why are they addressed to you in Alberta?
5        MR. JORDAN:  Objection; calls for
6  speculation.
7    A.  My guess is that's probably what was on
8  the file from many, many years ago.
9    Q.  (By Ms. Vaughn)  And what are the terms of
10  the indemnification you reached with yourself and the
11  trusts?
12    A.  That OLPC would indemnify for all the
13  costs related to the lawsuit underlying the Mareva
14  injunction and setting aside the Mareva injunction.
15    Q.  Okay.  And which confidential documents
16  were used in the Mareva injunction matter?
17    A.  White Buffalo Trust Deed, the Waterton
18  Land Trust Deed, the Olson Estate Trust Deed, the CRA
19  documents, confidential documents that talked about
20  me.  Those are some that were used.
21    Q.  Which other documents were used?
22    A.  Well, I'd have to go back and look at
23  Carolyn's affidavit.  There may have been other
24  documents, but those ones for sure.
25    Q.  And were they all attachments to the

Page 76

1  affidavit?
2    A.  At this point I don't recall if they were
3  attachments to the affidavit.  They may have been.
4  But certainly, from the transcript, with counsel,
5  they were referred to.  They were referred to in
6  getting the ex-parte application in the first
7  instance, the terms of the trust deeds, Waterton Land
8  Trust and Olson Estate Trust.
9    Q.  Which transcript with counsel are you
10  referring to?
11    A.  This was -- these are the transcript of
12  the hearing, the ex-parte hearing that was held.
13  They referred to the terms of the trust deeds.
14    Q.  And has that transcript been produced in
15  this case?
16    A.  Not to my knowledge.
17    Q.  So how do you know that these documents
18  were referred to in the transcript?
19    A.  Well, I listened to the transcript, and --
20  I listened to the transcript and I saw the affidavit
21  that Carolyn filed in connection with the Mareva
22  injunction.
23    Q.  If the trust documents themselves are not
24  attached to the affidavit, how do you know that she
25  used those trust documents in drafting the affidavit?

Page 77

1   A.   Because the information had to come from
2   the documents that she had.  Let me just think.  I'm
3   not sure if they were attached or not attached.  I
4   don't recall right now if those trust deeds were
5   attached or provided to the Court for the ex-parte
6   application.  They were referred to, and her
7   affidavit clearly refers to information in those
8   affidavits.
9   Q.   The injunction itself -- let's see.  We'll
10  mark Exhibit 5 now.
11       (EXHIBIT 5 WAS IDENTIFIED.)
12       It says that it is entered based "upon
13  the ex-parte application of the Plaintiff, the
14  statement of claim... the affidavit... the brief
15  filed in support and hearing the submissions of
16  counsel."  Do you see all that?
17  A.   I do.
18  Q.   So how do you know, or does OLPC know,
19  that this injunction was issued solely because of
20  Carolyn's access to those documents rather than
21  everything else in those documents?
22  A.   Could you repeat the question, please.
23  Q.   Yeah.  Is there a way for us to tell that
24  without Carolyn Olson's access to the trust
25  documents, the Mareva injunction would not have

Page 78

1   issued?
2   A.   Yes, I believe that's the case.
3   Q.   How do you know that?
4   A.   Because in making the attempt to make the
5   application ex-parte, the argument was made that the
6   admissions of the trust deeds allow the trust to be
7   moved offshore, and therefore it's necessary to do it
8   ex-parte, without the benefit of cross-examination of
9   Carolyn on her affidavit, because if I had knowledge
10  of it as protector, I could conspire to have the
11  trusts immediately moved offshore outside the
12  jurisdiction of the Court.
13  Q.   That was the basis?
14  A.   That was the -- because the trust deed
15  permits that, and that was referred to by the judge,
16  that the trust could be taken out of his
17  jurisdiction.
18  Q.   And it's your belief that Carolyn Olson
19  had no other way to know that the trust deed said
20  that, other than getting them from Tim A?
21  A.   She admitted that, I believe, on her
22  cross-examination, that she knew that because of the
23  documents she stole.
24  Q.   Okay, and has that cross-examination been
25  produced in this case?

Page 79

1   A.   I don't believe it has.
2   Q.   So how am I supposed to know that?
3   A.   Because I attended the cross-examination.
4   Q.   Which stolen documents were used in the
5   ex-parte application?
6       MR. JORDAN:  Objection; asked and
7   answered.  That's the very question you asked ten
8   minutes ago, Sarah.
9       MS. VAUGHN:  Great.  I'd love to hear the
10  answer again, then.
11  A.   Okay, well -- to read it back, I'll tell
12  you what it was.  The Waterton Land Trust, the trust
13  deed, the Olson Estate Trust trust deed, the White
14  Buffalo Trust trust deed, the CRA documents
15  pertaining to the Moose Buffalo Ranch as they refer
16  to me at an audit level.  Those documents were used.
17  Q.   (By Ms. Vaughn)  And were those documents
18  also used in the statement of claim?
19  A.   They were used for both.
20  Q.   Okay, and the affidavit of Carolyn Olson?
21  A.   Yes.
22  Q.   And the briefing filed in support of the
23  application?
24  A.   Yes.
25  Q.   Okay, and the submissions of counsel?

Page 80

1   A.   Yes.
2   Q.   Okay.  And have all of those documents
3   been produced in this case?
4   A.   No.
5   Q.   Why not?
6       MR. JORDAN:  Objection; calls for
7   speculation.
8   A.   If they haven't, I don't know if we're
9   authorized or able to produce those documents.
10  Q.   (By Ms. Vaughn)  Why wouldn't they be --
11  A.   Maybe at all.
12  Q.   Why wouldn't you be able to produce them?
13      MR. JORDAN:  Objection; calls for a legal
14  conclusion.
15      Mr. Olson, I instruct you not to reveal
16  any privileged information based upon any privileged
17  conversations with counsel.
18  A.   It's privileged information, then, based
19  on my discussions with counsel.
20  Q.   (By Ms. Vaughn)  Okay, but --
21      MR. JORDAN:  That's certainly something
22  you can discuss with Monica if you'd like to.
23  Mr. Olson doesn't make decisions about what gets
24  produced and what doesn't get produced.
25      MS. VAUGHN:  Great.  That's a great

Case 2:21-cv-00455-DBB    Document 368-10    Filed 01/31/25    PageID.11026    Page
OL PRIVATE COUNSEL, LLC vs OLSON
THOMAS OLSON - 12/19/2024

81 to 84

Page 81

1 clarification. Thank you, David.

2    Q.   (By Ms. Vaughn)  The affidavit has been

3 produced, though; right, Mr. Olson?

4    A.   I don't know if the affidavit has or

5 hasn't.  I don't recall.  It may have been.

6    Q.   Okay.

7    A.   But I'm aware of the affidavit because I

8 read it myself and I was there for the cross.

9    Q.   You're aware -- we talked about this

10 earlier -- that Ms. Cundick testified that she found

11 some of the documents -- I think at least the CRA

12 document -- herself in the box of documents; correct?

13    A.   I'm aware that she said she found it in

14 the box.

15    Q.   Okay, and are you aware that she testified

16 that she was the individual that sent it to Dentons?

17    A.   I don't recall that.  That may be.

18    Q.   So is OLPC seeking damages relating -- let

19 me back up.  Is OLPC seeking damages for that CRA

20 document from Ephraim?

21    A.   Well, it's all part of one parcel, so the

22 Mareva injunction was based on several things.

23 That's just one of several things.

24    Q.   So is the answer yes?

25    A.   Yes, it is.  It is.

Page 82

1    Q.   But Ephraim's not responsible for sending

2 that document; right?

3    A.   Responsible?  I don't know if he had

4 discussions with Cundick about it or not.

5    Q.   You just don't know?

6    A.   No, I wasn't there for any discussions

7 that he may or may not have had with Carolyn's

8 counselor, Patricia Cundick.

9    Q.   Have these invoices in Exhibit 4 been

10 paid?

11    A.   Yes.

12    Q.   Who were they paid for by?

13    A.   They were paid by -- I paid for them at

14 the outset.

15    Q.   You as an individual?

16    A.   I believe that I was charged the amount

17 originally and then charged it back to OLPC.  So I

18 believe it was the funds were charged to my account,

19 and then OLPC said it would indemnify me from that.

20    Q.   And has OLPC paid that amount to you?

21    A.   No.

22    Q.   When is it going to do that?

23    A.   At some point when these matters are

24 finished.

25    Q.   Okay.  Isn't the Mareva injunction

Page 83

1 finished?

2    A.   No.  The lawsuit against me is ongoing.

3    Q.   That's a separate lawsuit, though; right?

4    A.   It arises out of the same stolen

5 documents.

6    Q.   So is the Mareva injunction finished?

7    A.   The Mareva injunction, this aspect is

8 finished, yes.

9    Q.   And just looking at Exhibit 3, the

10 response to written discovery, that's this case;

11 correct?  Olson v. Olson, 2001-14224.

12    A.   Yes, I believe that's correct.

13    Q.   Okay, and is that lawsuit closed?

14    A.   Yes.

15    Q.   And is there proof, Mr. Olson, documented

16 proof that you individually paid for the fees

17 incurred in Exhibit 4?

18    A.   I incurred -- yes, I believe there would

19 be some record showing that it was charged against my

20 account.

21    Q.   Okay, and then would there be some record

22 of the chargeback between you and OLPC?

23    A.   I don't know what that record would be

24 offhand.

25    Q.   Do you remember when you, as an

Page 84

1 individual, paid these fees?

2    A.   I don't recall.  It would have been -- it

3 would have been soon after, I think, the invoice was

4 rendered.

5    Q.   Okay, and do you know when the agreement

6 or when the chargeback to OLPC occurred?

7    A.   I believe it happened -- it would have

8 been at about the same time.

9    Q.   And this would show, I mean, if it's been

10 a chargeback to OLPC, wouldn't it show as a debt in

11 OLPC's books?

12    A.   OLPC shows up on my personal tax return.

13 It's a flow-through entity for tax purposes.

14    Q.   So this could potentially be, this debt

15 could be seen for OLPC on your personal tax returns?

16    A.   No, because it doesn't show up like that.

17 It's a line item.

18    Q.   A line item in what?

19    A.   In the personal tax returns.  So the line

20 item shows all the expenses.  It doesn't break out

21 individual liabilities.  It just shows all the

22 expenses of OLPC, so it wouldn't show that, would not

23 show that.

24    Q.   So there should be a document that shows

25 the debt is owed by OLPC; right?  Your tax returns

Page 85

1  are based on something; right?
2      A.   Well, there would be this invoice,
3  probably.  This invoice would be there.  That would
4  be the backup for it.
5      Q.   Just the invoice issued to you?
6      A.   Yeah, that indemnified me for that.  That
7  would be the invoice, would be the evidence that it
8  was obligated, the quantum and the fact the debt was
9  incurred.
10     Q.   Does OLPC keep records of the debts that
11  it owes?
12     A.   Well, it's obligated to indemnify me, so
13  we have -- where the invoices are retained, we keep
14  copies of those invoices.  We keep copies of the
15  invoices.
16     Q.   Does OLPC use any accounting documents to
17  keep track of its liabilities?
18     A.   There may be some ledger somewhere that
19  would have that, but the documents would be these
20  documents here.  These are the documents that would
21  identify the quantum of the debt, the quantum of the
22  indemnity.
23     Q.   So OLPC does have ledgers?
24     A.   It would have some ledger somewhere that
25  would record that, I think, in preparing the tax

Page 86

1  return.
2      Q.   That would show the debt owed from OLPC to
3  you individually?
4      A.   It would show the -- well, it may not, so
5  it may not incur the expense.  An indemnity would not
6  necessarily show up on a ledger.  It could, but it
7  wouldn't necessarily show up on a ledger.  An
8  indemnity may or may not show up on a ledger, so I
9  can't actually speak to that.
10     Q.   Who would know if the indemnities we've
11  gone over here in Exhibit 4 and Exhibit 2 would show
12  up on OLPC's ledger?
13     A.   These would not show up on OLPC's ledger
14  because they were charged back to Waterton Land
15  Trust, so they wouldn't show up on OLPC's ledger
16  until OLPC paid the account, I believe.
17     Q.   I believe you told me that these invoices
18  were paid by Waterton Land Trust.
19     A.   Yes.
20     Q.   And that OLPC has agreed to indemnify
21  Waterton Land Trust from the cost of the invoices.
22     A.   Yes.
23     Q.   Wouldn't that be the same chargeback that
24  we just talked about in Exhibit 4, same concept?
25     A.   Not necessarily, because on my account,

Page 87

1  and I don't recall right now whether it was -- shows
2  up as a specific liability or not, or it's just a
3  contingent liability, which don't show up yet.  So on
4  this one, it shows up -- I believe it shows up as an
5  expense in OLPC that's --
6      Q.   I don't want to interrupt you, I just want
7  to make sure we're being clear.  When you said on
8  this one it would show up as an expense for OLPC, are
9  you talking about Exhibit 2 or Exhibit 4?
10     A.   The one you're showing me -- no, no,
11  sorry.
12     Q.   Exhibit 4?
13     A.   Yes, Peacock Linder Halt Mack, yes.  That
14  one, I believe the expense shows up on the -- on my
15  tax return, but it's not broken out as a separate
16  expense, but I believe that it may show up on my tax
17  return from the LLC.  The other ones I don't think
18  show up on the tax return yet.
19     Q.   And you mentioned a word, "contingent
20  liabilities."  Are the liabilities that OLPC has,
21  based on Exhibit 4 and Exhibit 2 -- let me put them
22  next to each other.
23     A.   Well, "contingent," let me clarify.  It's
24  not contingent in that sense.  I'm not -- on a cash
25  basis in PC, so it hasn't been paid yet.  So it's on

Page 88

1  a cash basis, so it hasn't been paid yet.
2      Q.   If it's a not cash basis, what is the
3  basis?  How does OLPC keep its accounting records?
4      A.   On a cash basis.
5      Q.   I thought you just said it's not a cash
6  basis.
7      A.   No, I said -- no.  I said it wasn't
8  contingent.  It hasn't been deducted yet in OLPC
9  until it's paid.
10     Q.   But how does OLPC carry these liabilities
11  year to year?  Are there any documents that show
12  that?
13     A.   These tax -- these invoices that have been
14  submitted for reimbursement.
15     Q.   Okay, but I thought I heard you testify
16  earlier that you only got these invoices when your
17  counsel reached out to the lawyers at Peacock and
18  BLG.
19     A.   These invoices, copies of the invoices
20  received that Hyrum identified to me that he was
21  incurring liabilities and advised me as to the
22  quantum of that.  And we made note of that.  I made
23  note of that, that these were the obligations, and I
24  think --
25     Q.   Where did you make note of that?

Page 89

1    A. I don't recall. I don't recall where I
2  would have made that note. It's not something I have
3  right now, but I was trying to keep track of the
4  costs on this.
5    Q. What documents would show you were trying
6  to keep track of the costs on this?
7    A. Oh, Hyrum just kept advising me from time
8  to time of the costs. So I don't have -- I don't
9  know that I have a particular notation, but I was
10  trying to keep track of generally the quantum of the
11  costs of these. So I don't have -- whether there was
12  a notation or just my memory, I don't recall right
13  now, but I was aware of the costs and the quantum of
14  the costs.
15    Q. So were you just --
16    A. Certainly by the end of each year.
17    Q. Were you just doing it in your head?
18    A. Well, I don't recall if there was, you
19  know, if there was some scratch paper that had it or
20  not. I don't recall that, or whether I got a
21  calculator out, I don't recall that. But I was aware
22  of the general quantum. Each year I wanted to know
23  the general quantum of those costs.
24    Q. And you cannot point us to any documents
25  which would show OLPC carrying these liabilities year

Page 90

1  to year?
2    A. Well, they haven't been paid yet, but
3  they're indemnifications. But other than the fact
4  that I was aware they were there, I was not -- I was
5  not aware of that.
6    Q. Other than your individual knowledge, your
7  knowledge?
8    A. Knowledge that was given to me by Waterton
9  Land Trust.
10    Q. And before this litigation --
11    A. Of the costs.
12    Q. Before this litigation, had you ever seen
13  these actual invoices?
14    A. No. Well, at Peacock Linder & Holt I did,
15  but not the BLG or the Foley invoices.
16    Q. Okay. You only saw those -- OLPC only saw
17  those invoices in relation to this lawsuit?
18    A. Yes.
19    Q. I want to go back to the supplemental
20  response. Okay. Again, we asked you -- we asked
21  OLPC in this response to identify, you know, the
22  title and jurisdiction of legal actions where its
23  alleged documents were stolen -- or used, sorry --
24  where its documents were used. OLPC identified
25  actions here in subparagraph 3, one of which was

Page 91

1  Olson v. Olson, and that is the state court divorce
2  proceeding here in Utah; correct?
3    A. That's correct.
4    Q. Okay. Did any of the invoices we reviewed
5  in Exhibits 1, 4 or 2 relate to that Utah State
6  divorce matter?
7    A. No.
8    Q. So OLPC is not seeking any damages in this
9  case relating to the state divorce matter, Olson v.
10  Olson, case number 204904555?
11    A. Well, that's an issue between our expert
12  and counsel as to which ones they've identified. I
13  believe they're in the expert report.
14    Q. Sitting here today, is OLPC seeking any
15  damages relating to that case?
16    A. Again, at this point my understanding is
17  counsel and the expert have not sought any damages
18  with respect to that particular litigation.
19    Q. Okay.
20    A. That involve me.
21    Q. Why that distinction, that involve you?
22  What does that mean?
23    A. Well, I was sued in that case, and I have
24  not -- I am not seeking, on this case,
25  indemnification for me on that.

Page 92

1    Q. Okay. Didn't you file for that divorce?
2    A. I did.
3    Q. Okay. Just wanted to make sure we're
4  talking about the same one. Okay, the next one is
5  Olson v. Olson, the Mareva injunction. And those are
6  the invoices that we just went over in Exhibit 4;
7  correct? From Peacock Linder Halt & Mack.
8    A. Yes.
9    Q. Okay, and sitting here today, only the
10  damages in Exhibit 4 -- let me rephrase. OLPC is
11  only seeking to recover the damages detailed relating
12  to the Mareva injunction in Exhibit 4; correct?
13    A. Yes.
14    Q. And then we have Burton v. Bison
15  Conservation Ranch. Did any of the invoices we
16  looked at in Exhibits 1, 2 and 4 deal with that
17  matter?
18    A. No.
19    Q. So OLPC is not seeking any damages
20  relating to that lawsuit; correct?
21    A. That's my understanding.
22    Q. Okay. The next one, Olson v. Burton,
23  King's Bench of Alberta, did any of the invoices we
24  went over today relate to that lawsuit?
25    A. No.

Page 93

1    Q.  So OLPC is not seeking any damages
2  relating to that lawsuit; correct?
3    A.  That's my understanding.
4    Q.  Law Society of Manitoba complaint against
5  Thomas Olson is the next one.  Same question.  Did
6  any of the invoices relate to that lawsuit?
7    A.  No.
8    Q.  OLPC is not seeking damages relating to
9  that lawsuit; correct?
10    A.  That's my understanding.
11    Q.  The next one listed here is Burton v.
12  Lemons, and those are the invoices we went over in
13  Exhibit 1; right?
14    A.  I think that's the exhibit.  Let me just
15  confirm.  Foley's was the first exhibit, that's
16  correct.
17    Q.  Okay.  And the only damages that OLPC is
18  seeking relating to the Burton v. Lemons matter are
19  those damages described in Exhibit 1; correct?
20    A.  Well, the matter is ongoing in Canada, so
21  I expect there will be additional invoices submitted
22  at some point for reimbursement, indemnification.
23    Q.  But sitting here today, the only damages
24  OLPC is seeking are the ones in Exhibit 1; right?
25        MR. JORDAN:  Objection; asked and

Page 94

1  answered.
2    A.  The answer is yes.
3    Q.  (By Ms. Vaughn)  And what's the lawsuit in
4  Canada that you're talking about?
5    A.  It's a lawsuit between Carolyn and the
6  trusts and Bruce Lemons and me and several other
7  parties.
8    Q.  Okay.  Is that this Olson v. Olson case?
9    A.  I believe that's the case number.
10    Q.  And I think you also testified that in the
11  supplemental response to interrogatory number 3,
12  Olson v. Olson, case number 2201-04486, are the
13  documents or is the case that's detailed in invoices
14  in Exhibit 2; correct?
15    A.  I believe that to be the case.
16    Q.  Okay.
17        MR. JORDAN:  Just to correct the record,
18  you said supplemental response to interrogatory
19  number 3.  It's 13.
20        MS. VAUGHN:  Yes, thank you.
21    Q.  (By Ms. Vaughn)  And here in the
22  supplemental response you state that documents were
23  also used in the March 16, 2023 affidavit of Carolyn
24  Olson.  Do you see that?
25    A.  Yes.

Page 95

1    Q.  And the July 14th, 2023 affidavit of Naomi
2  Burton.  Do you see that?
3    A.  Yes.
4    Q.  Okay, in this Alberta matter, the
5  2201-04486; right?
6    A.  Yes.
7    Q.  Why, then, do we not have invoices from
8  BLG in those time periods?  Let's go side to side
9  again.  So March 16th of 2023 is when Carolyn used
10  allegedly stolen documents in that lawsuit, and yet
11  we don't have any invoices from BLG in that matter
12  for March of 2023; right?
13    A.  We don't.
14    Q.  Why not?
15    A.  Because we have -- neither we nor the
16  trust had been served on the claim yet.
17    Q.  But I thought this action was filed in
18  2022.
19    A.  It was.
20    Q.  Okay, and there was no legal work being
21  done until September 21 of '23?
22    A.  That's correct.
23    Q.  Okay.  Was that also why there's no fees
24  incurred in July of 2023 when Naomi filed her
25  affidavit?

Page 96

1    A.  That's correct.
2    Q.  Was anyone defending the case at that time
3  when Carolyn and Naomi filed their affidavits?
4    A.  No.
5    Q.  No, okay.  So is OLPC seeking any damages
6  related to those affidavits in that case?
7    A.  Yes.
8    Q.  And where are the fees incurred because of
9  those affidavits?
10    A.  They're in the BLG invoices.
11    Q.  Okay, just several months later?
12    A.  Yes.
13    Q.  And how do we know that?  Is there a way
14  for me to tell that these redacted entries relate to
15  those affidavits?
16    A.  Not from the invoices.
17    Q.  And then also in the supplemental response
18  to interrogatory 13, OLPC says that in a December 20,
19  2023 affidavit in a matter pending in the Cook
20  Islands, that these documents showed up as well; is
21  that right?
22    A.  That's correct.
23    Q.  Okay.  Did any of the invoices we went
24  over today relate to the matter in the Cook Islands?
25    A.  No.

Case 2:21-cv-00455-DBB    Document 368-10    Filed 01/31/25    PageID.11030    Page
OL PRIVATE COUNSEL, LLC vs OLSON
THOMAS OLSON - 12/19/2024

97 to 100

Page 97

1    Q.  So OLPC is not seeking damages related to
2  the use of its confidential documents in the Cook
3  Islands matter?
4    A.  I have not received any invoices for
5  indemnification from White Buffalo Trust at this
6  point.
7    Q.  Who is the trustee of White Buffalo Trust?
8    A.  Well, it's confidential information, so --
9  it's confidential information.  I don't know that
10  I've got that information at this point.  But I don't
11  -- I don't know at this point for sure what the name
12  of the trustee is.
13    Q.  So how did OLPC receive notice that this
14  document was used in the Cook Islands matter?
15    A.  Because it was served on me.  I saw it
16  with my eyes.
17    Q.  Oh, December 20th of 2023?
18    A.  Yeah, I believe it was served on me in
19  December of 2023.
20    Q.  Okay.  And then we have the second
21  supplemental response, which talks about the draft of
22  a proposed stipulation in the marital dispute being
23  used in a May 9th, 2024 mediation.  Did any of the
24  invoices we reviewed today relate to that May 9th,
25  2024 mediation?

Page 98

1    A.  My understanding is that -- can we go back
2  and look at those invoices?
3    Q.  Yeah.  Which ones would you like to look
4  at?
5    A.  Well, the BLG, and I think that's
6  Exhibit 2, and I think I have that here.
7    Q.  Okay.  Oh, that's 4, sorry.
8    A.  I believe that the final bill related, at
9  least in part, to that mediation, which is -- the
10  date is March 5th, 2024.
11    Q.  Okay, and how do you know that this
12  March 5th, 2024 invoice related to a mediation that
13  was set to occur in two months?
14    A.  Because counsel for Carolyn had discussed
15  mediation with my counsel, and I was aware of it.
16  And so Peter Linder advised me that I would need to
17  get some information ready for that, and I was
18  advised by Hyrum that his counsel was preparing some
19  maps and some items for that.  So that would have
20  been included in some of the work done in that final
21  invoice.
22    Q.  Other than the statement you received from
23  Hyrum, is there any way to tell, based on the
24  document itself, that it relates to the mediation?
25    A.  Just a second here.  No.  Hyrum mentioned

Page 99

1  that they had pulled together some information.  So
2  other than what he told me, it would have been some
3  small part of that final bill from March.
4    Q.  Okay.  We've gone over the invoices.  We
5  went over the response to discovery.  I have a few
6  more questions.  Excuse me.  One of the allegations
7  in this case is that -- let me share this again.
8  This will be Exhibit 6, which is -- sorry, not that
9  one.  Let's see.  Here we go.  We'll mark this one as
10  Exhibit 6.
11        (EXHIBIT 6 WAS IDENTIFIED.)
12        It's Ephraim Olson 8399 to 8473.  One of
13  the allegations in this lawsuit is that: "Ephraim
14  Olson, while he was an employee of OLPC, sent these
15  confidential stipulation and agreements to his
16  personal e-mail and then sent them to Patricia
17  Cundick's divorce counsel."
18        Are you aware of that allegation?
19    MR. JORDAN:  Object as beyond the scope.
20  Sarah, would you please explain how this relates to
21  the scope that part of this supplemental deposition outlined by
22  the judge and defined by your exhibit to your
23  deposition notice.
24    MS. VAUGHN:  Yeah.  If you'll let me get
25  to my next question, none of the invoices we went

Page 100

1  over relate to these documents.  That's going to be
2  the next question.  So if you give me a little
3  leeway, we'll be done soon.
4    MR. JORDAN:  Okay, but what's your
5  question?
6    Q.  (By Ms. Vaughn)  Are you aware of the
7  allegation that part of OLPC's complaint is that
8  Ephraim took these documents while he was an employee
9  of OLPC and sent them to Patricia Cundick, to Carolyn
10  Olson's counsel Patricia Cundick?  Are you aware that
11  allegation has been made?
12    A.  Yes.
13    Q.  Okay.  And did any of the invoices we went
14  over relate to litigation where these documents were
15  used?
16    A.  Yes.
17    Q.  Which ones?
18    A.  Both the stipulation agreements.
19    Q.  Let me clarify.  Before the mediation in
20  May of 2024, Burton v. Lemons, were these documents
21  used in Burton v. Lemons?
22    A.  I don't believe so.
23    Q.  Okay.  Were these documents used in the
24  Mareva injunction?
25    A.  Yes.

Page 101

1    Q.   When and where?

2    A.   They were used in connection with

3  Carolyn's affidavit.

4    Q.   How do you know that?

5    A.   Because it has information on there that

6  came from these stolen documents.

7    Q.   Which information?

8    A.   Corporations that were at some point owned

9  by me, a family member, or the trusts, partnerships,

10  that were involved by me, the corporations or the

11  trust.

12    Q.   I'm going to send you this document.  I

13  would like you to go through it and tell me which

14  parts were used in the Mareva action.  It's titled

15  Exhibit 7, but it actually got entered as Exhibit 6.

16    MR. JORDAN:  Are you thinking we're seeing

17  it in the chat?

18    MS. VAUGHN:  It's coming.  It's loading.

19  It should be there now.

20    A.   Yes.  It's paragraph -- back up here --

21  definitions 1.5, Roman VIII, Roman IX and Roman X.

22    Q.   (By Ms. Vaughn)  And what Bates number

23  pages are you on?

24    A.   Sorry?

25    Q.   The Bates numbers that those sections

Page 102

1  appeared on.

2    A.   I see.  Just a second here.  00008405,

3  00008406.

4    Q.   Okay.  And are you aware that Hyrum Olson

5  also sent Carolyn Olson a very similar document?

6    A.   Yes, he sent her a similar document.

7    Q.   Okay.

8    A.   Similar, but not the same.

9    Q.   Great.  We'll mark that as Exhibit 7, and

10  that's Bates numbered OL Private Counsel-Ephraim

11  Olson 2518 to 2534.

12    (EXHIBIT 7 WAS IDENTIFIED.)

13    I'll put these next to each other for

14  you.  So on the left side of my screen here you can

15  see the Ephraim Olson Bates number.  This is the

16  version that Ephraim sent to Carolyn's counsel.  And

17  on the right side here is the OL Private Counsel

18  Bates number.  And I'll scroll up quickly so you can

19  see that this is the version that Hyrum sent to

20  Carolyn.  Do you see that?

21    A.   Yes.

22    Q.   And Hyrum sent this to Carolyn on May 24th

23  of 2019.  Do you see a difference here between what

24  Hyrum sent with respect to the two pages that you

25  believed were used in the Mareva injunction and what

Page 103

1  Ephraim sent?

2    MR. JORDAN:  Before you answer, Mr. Olson,

3  Sarah, I'm going to ask you again, the scope of this

4  is the damage invoices and the basis therefor.  What

5  does this --

6    MS. VAUGHN:  Exactly.

7    MR. JORDAN:  What does this have to do

8  with that?

9    MS. VAUGHN:  I think it's obvious.  I can

10  explain it to you if you'd like.

11    MR. JORDAN:  I would very much like you to

12  explain it.

13    MS. VAUGHN:  There is no way for OLPC to

14  decipher that these documents in Exhibit 7 are what

15  were used in the Mareva injunction when Hyrum Olson

16  himself sent it to Carolyn Olson.

17    MR. JORDAN:  What does that have to do

18  with anything?

19    MS. VAUGHN:  How are they linking these

20  invoices to Ephraim Olson?

21    MR. JORDAN:  Who says they're linking

22  these to Ephraim Olson in this deposition?  What does

23  that have to do with the damages claimed?

24    MS. VAUGHN:  I'm trying to ask that.

25    MR. JORDAN:  Well, you're not asking that.

Page 104

1  What does it have to do with the damages in the

2  invoices?

3    MS. VAUGHN:  Well, he just told me that

4  the damages in the BLG case relate to these

5  documents.

6    MR. JORDAN:  No, he did not.  He told you

7  that these documents were used in the Mareva

8  injunction.  He did not tell you that the BLG

9  invoices are based on these.

10    MS. VAUGHN:  I misstated, then.  He said

11  that the Peacock Linder & Halt invoices were based on

12  these documents, then, or the invoices for the Mareva

13  injunction.

14    MR. JORDAN:  I don't think he said that,

15  either.  So ask your question.

16    MS. VAUGHN:  Let me ask the original

17  question.

18    Q.   (By Ms. Vaughn)  What damages for these

19  documents here is OLPC seeking in the three invoices?

20    MR. JORDAN:  It assumes a fact not in

21  evidence, that he's seeking any damages based on

22  these documents.

23    MS. VAUGHN:  That's what I'm trying to

24  establish, David.  Let him answer the question.

25    MR. JORDAN:  Yeah.  The question is:  Are

Page 105

you seeking damages based on these documents?
MS. VAUGHN: Great.
Q. (By Ms. Vaughn) Mr. Olson, are you seeking damages based on these documents?
A. Yes.
Q. Which damages, based on the invoices we reviewed?
A. These documents were used in the mediation and --
Q. Go ahead. I want to let you finish. I want to make sure we're clear.
A. They were used -- well...
Q. Would you like me to send them to you?
A. Just a second. I think -- give me just a second here. Can you send me the document that Hyrum sent to Carolyn, please.
Q. Well, I don't know that your counsel is going to let me ask you about it, so let's lay some foundation first. Exhibit 7 should be in your chat.
A. Just a second here. My mouse is acting up. I tried to press the page down button. My mouse is acting up now. I can't get this document to scroll down. Just a second here. I'll try to load it again. One of the stipulation agreements was never sent to Carolyn and it was used in the

Page 106

mediation.
Q. The May 2024 mediation; correct?
A. The May 2024 mediation, that's correct.
Q. Okay. Is OLPC alleging that any of these documents relate to the Mareva injunction?
A. Yes. I believe that they were used, that information from those was used in the Mareva injunction, that's correct.
Q. And does that basis support the invoices in the Peacock Linder invoices we went over earlier tonight?
A. I'm not sure what your question is.
Q. You said OLPC is seeking damages relating to these documents. I'm trying to figure out which invoices relate to these documents.
A. There's no invoice that relates to a specific document, Sarah. It was a Mareva injunction based on a whole bunch of things, a whole bunch of stolen things that may have included this.
Q. Okay. So the Mareva injunction invoices relate to these documents; correct?
A. Relate to information on these documents.
Q. Okay, and that information is what you pointed out on 8005 and -- oh, sorry -- 8405 and 8406; correct? That's what I'm looking at right here

Page 107

on my screen.
A. It relates to information about family corporations, yeah. So yes, it relates to -- that information was provided by Ephraim to Patricia.
Q. Okay. And this information was also provided to Carolyn by Hyrum; right?
A. I haven't reviewed those documents side by each. It may have been.
Q. Okay, and we're right back where we were about ten minutes ago. This one now on the left side of my screen, do you see the OLPC Bates numbering? This is the version from Hyrum. I'm happy to scroll up to the top again if you would like. On the right side of my screen is the version from Ephraim. Can you decipher any differences in the information that Hyrum shared with Carolyn Olson versus the information in the document that Ephraim sent to Patricia Cundick?
A. Well, the document speaks for itself. If they're the same, they're the same. The document speaks for itself.
Q. Okay. So it's fair to say that Carolyn Olson received information supporting the Mareva injunction action from Hyrum Olson; correct?
A. It's possible they're the same, yes.

Page 108

Q. So there have been lots of other claimed stolen documents that I have not heard us talk about tonight, and I want to make sure -- this is my last chance with you, likely -- that we know exactly what documents OLPC is claiming were stolen that support the invoices we've gone over. So I have not heard any mention of the Carolyn Olson Spousal Trust. Is OLPC seeking any damages relating to the use of the Carolyn Olson Spousal Trust?
A. There's a whole bunch of stolen things that were used in these proceedings, and which specific ones were used in which document, the invoices do not relate to that. They relate to the action generally. So there's no line item talking about Carolyn Olson Spousal Trust as a separate item. It's about all the stolen documents that were used were the basis for these lawsuits. And there's no specific breakdown in any invoice about Carolyn Olson Spousal Trust versus this versus that. There wouldn't be, because it's the whole lawsuit. It's an amalgam of all that stuff.
Q. And was the Carolyn Olson Spousal Trust used in Burton v. Lemons?
A. Not that I recall.
Q. Was it used in the Mareva injunction?

Page 109

1    A.  I'd have to go look at those.  I don't
2  recall if it was or wasn't.
3    Q.  You don't know; correct?
4    A.  Well, it may have been listed in it.  I
5  don't know at this point.
6    Q.  Okay.  Was it used in the lawsuit that the
7  BLG invoices relate to?
8    A.  That lawsuit refers to a bunch of trusts.
9  It may well be in that lawsuit.  I haven't memorized
10  it.  I don't have that in front of me right now.  But
11  it refers to a bunch of trusts, so it may well have
12  been referred to in that document.
13    Q.  Okay.  But sitting here today, you don't
14  know?
15    A.  No, I don't recall specifically about that
16  trust.
17    Q.  And would I have to review all of the
18  pleadings in the BLG -- the lawsuit for the BLG
19  invoices to determine whether or not the Carolyn
20  Olson Spousal Trust was used or referred to in that
21  litigation?
22    MR. JORDAN:  Objection; calls for
23  speculation.
24    A.  Well, you know that the -- I don't know
25  that.

Page 110

1    Q.  (By Ms. Vaughn)  Okay.  White Buffalo
2  Trust, I think we have talked about that, but let's
3  just make sure.  Was White Buffalo Trust used in
4  Burton v. Lemons?
5    A.  Not that I recall.
6    Q.  Was it used in the Mareva injunction?
7    A.  Yes.
8    Q.  Where?
9    MR. JORDAN:  Where?  You want him to cite
10  a paragraph to you?
11    Q.  (By Ms. Vaughn)  Was it used in the
12  affidavit?  Was it used in the Notice of Claim?  A
13  pleading would be sufficient.
14    A.  It was used in the oral argument, I'm
15  sure, because I listened to that, and it was for sure
16  used there.
17    Q.  And we don't have a copy of the oral
18  argument; correct?
19    MR. JORDAN:  Whose "we"?
20    MS. VAUGHN:  Me, counsel for Ephraim
21  Olson.
22    MR. JORDAN:  Well, you know the answer to
23  that.  You don't need to ask Mr. Olson that.
24    Q.  (By Ms. Vaughn)  Mr. Olson, has OLPC
25  produced a copy of the oral argument in this case?

Page 111

1    A.  I don't know that.  I don't know if we
2  even can do that.
3    Q.  Okay.  And was the White Buffalo Trust
4  document used in the lawsuit that BLG invoices relate
5  to?
6    A.  Yes, I believe information from that is
7  referred to in that lawsuit.
8    Q.  Okay, and again, is the only way to figure
9  out if that trust was referred to in the lawsuit to
10  review the actual lawsuit itself?
11    A.  No, because I reviewed it, and it's
12  referred to in there.
13    Q.  So it's your word or nothing; right?
14    MR. JORDAN:  Objection; vague and
15  argumentative.
16    MS. VAUGHN:  That was a little
17  argumentative, I'll give you that, David.  Okay.
18    Q.  (By Ms. Vaughn)  Thomas H. Olson Trust,
19  was that used in Burton v. Lemons?
20    A.  Not that I'm aware of.
21    Q.  Was it used in the Mareva injunction?
22    A.  Yes, I believe so.
23    Q.  Do you know how it was used in the Mareva
24  injunction?
25    A.  I believe it was in Carolyn's affidavit.

Page 112

1    Q.  Okay.  Was it used in the lawsuit that the
2  BLG invoices relate to?
3    A.  Yes.
4    Q.  How?
5    A.  It's referred to in the pleadings.
6    Q.  Okay.  The Olson Estate Trust, was that
7  used in Burton v. Lemons?
8    A.  I don't believe so.
9    Q.  Was it used in the Mareva injunction?
10    A.  Yes.
11    Q.  Okay.  How?
12    A.  How?
13    Q.  Yes.
14    A.  I believe it's in the pleadings.  It's
15  referred to in oral argument, referred to in the
16  written brief.  Either counsel has referred to it in
17  Carolyn's affidavit.
18    Q.  Is the Olson Estate Trust used in the
19  lawsuit that the BLG invoices relate to?
20    A.  Yes.
21    Q.  How?
22    A.  It's in the pleadings.
23    Q.  Okay.  The George Whitehead Trust, is that
24  used in Burton v. Lemons?
25    A.  No.

Page 113

1    Q.   The Mareva injunction?

2    A.   Yes, I believe so.

3    Q.   How?

4    A.   I believe it's in Carolyn's affidavit and

5    it's in the affidavit -- it's in the underlying

6    lawsuit, I believe.  I believe it's referred to in

7    the underlying lawsuit.

8    Q.   Is it used in the BLG lawsuit?

9    A.   Yes, I believe it's referred to in the BLG

10   lawsuit.

11   Q.   Where is it referred to in the lawsuit?

12   A.   I think in the pleadings, as I recall.

13   Q.   Waterton Land Trust we've covered.  Ruth

14   Doxey Family Trust, is that used in Burton v. Lemons?

15   A.   No.

16   Q.   Is it used in the Mareva injunction?

17   A.   Yes, I believe it is.

18   Q.   How?

19   A.   I believe it's in Carolyn's affidavit and

20   it may have been in the underlying pleadings.

21   Q.   Was it used in the BLG lawsuit?

22   A.   I believe so, but I don't recall

23   specifically right now.

24   Q.   And how would you verify that?

25   A.   I would have to go back, I guess, and

Page 114

1    review the pleadings, I guess.

2    Q.   Olson Manitoba Conservation Trust, was

3    that used in Burton v. Lemons?

4    A.   No.

5    Q.   Was that used in the Mareva injunction?

6    A.   Yes, I believe so.

7    Q.   How?

8    A.   It's in Carolyn's affidavit.

9    Q.   Anywhere else?

10   A.   It may have been in the underlying

11   pleadings, I don't recall right now.

12   Q.   Okay.  Was it used in the BLG litigation?

13   A.   I don't recall.  I believe it was, but I

14   don't recall.

15   Q.   How would you confirm that?

16   A.   I'd have to go look at the pleadings, I

17   guess.

18        MS. VAUGHN:  Gosh, I'm losing track here.

19   Was that the William Bell Hardy that I just asked

20   about?

21        MR. JORDAN:  No.

22        MS. VAUGHN:  No, okay.

23   Q.   (By Ms. Vaughn)  William Bell Hardy Trust,

24   was that used in Burton v. Lemons?

25   A.   No.

Page 115

1    Q.   Was it used in the Mareva injunction?

2    A.   Yes.

3    Q.   How?

4    A.   I believe it's in Carolyn's affidavit.

5    Q.   Anywhere else?

6    A.   May have been in the underlying pleadings,

7    I don't recall.

8    Q.   Was it used in the BLG litigation?

9    A.   I believe so, but I don't have a precise

10   recollection right now.

11   Q.   How would you confirm that?

12   A.   Well, I'd have to think about it, have to

13   go think about it and I'd remember, or have to go

14   back and look in the pleadings, I guess.  One of the

15   two.

16   Q.   I'm going to show you --

17        MS. VAUGHN:  And I'd be happy to mark this

18   as an exhibit, but whatever your preference is on

19   that, David.

20   Q.   (By Ms. Vaughn)  This is another one of

21   the converted documents or alleged converted

22   documents that is Bates numbered OLPC-Ephraim Olson

23   474 to 478.  Do you see this document, Mr. Olson?

24   A.   Uh-huh (affirmative).

25   Q.   Was this used in Burton v. Lemons?

Page 116

1    A.   Can I look at the whole document, please.

2    Q.   Yeah.  Let me know if I'm going too fast.

3    I can send it to you as well.

4        That's it.

5        MR. JORDAN:  Wait until you've

6    sufficiently reviewed the document in order to answer

7    her question.  Have you sufficiently reviewed the

8    document in order to answer her question as to

9    whether this particular document was used in the

10   Burton v. Lemons case?

11        THE WITNESS:  It was not used in Burton v.

12   Lemons, to my knowledge.

13        MS. VAUGHN:  Okay, and I've just dropped

14   it in the chat so that you have time to review it if

15   you need additional time.

16   Q.   (By Ms. Vaughn)  Was this document used in

17   the Mareva injunction?

18   A.   Information from it may have been.

19   Q.   Okay.  How do you know that?

20   A.   Well, I believe there was information

21   regarding my directorship referred to somewhere.  So

22   I think it may have been there, but I don't recall

23   specifically.

24   Q.   Okay, and how would you confirm that?

25   A.   I don't know.  I'd have to think about it

Page 117

1  and think about the issues that I had to respond to
2  in preparing for Carolyn's cross-examination. So I
3  could maybe look at her affidavit or the
4  cross-examination of her affidavit, I don't know.
5  I'd have to think about that. I do have a
6  recollection, though, that reference to my
7  directorship was in there.
8       Q.  Was this document used in the BLG
9  litigation?
10      A.  I don't recall right now.
11      Q.  And how would you confirm that?
12      A.  Well, I'd have to try to reconstruct the
13  conversations about Carolyn and Naomi's affidavits,
14  and what my response was, if I had to respond to
15  questions about my directorship, so I don't recall.
16  That or maybe look at the underlying affidavits that
17  they prepared, and perhaps even the pleadings.
18      Q.  Okay. The next document, and I do promise
19  we are getting to the end line here. I'm going to
20  drop this in the chat as well. This is Bates
21  numbered OLPC 479 to 483. Was this document used in
22  Burton v. Lemons?
23      A.  Which number is that, Sarah? 12?
24      Q.  It has the number 12. I'm not marking it
25  as an exhibit, so I'm happy to, but I just don't know

Page 118

1  what to call these documents where the trust
2  documents had actual names and we had read the Bates
3  numbers into the record. So the question is was this
4  used in Burton v. Lemons.
5       A.  Not Burton v. Lemons, but I haven't
6  finished reading the document yet.
7       Q.  Okay.
8       A.  Okay, so it was not used in Burton v.
9  Lemons.
10      Q.  Was it used in the Mareva injunction?
11      A.  I believe information from here was used
12  in the Mareva injunction.
13      Q.  What do you base that on?
14      A.  Based on the information that was prepared
15  on this document about directorships and so on was
16  referred to in the underlying litigation and
17  Carolyn's affidavit, I believe.
18      Q.  Was this used in the BLG matter?
19      A.  I believe the information on here is
20  referred to, yes, I believe so.
21      Q.  And how would you confirm that?
22      A.  Well, I'd have to think back on it,
23  because -- think back on it about when we were
24  preparing my defense, what I had to respond to. And
25  I believe I did have to respond to these questions

Page 119

1  about directorships when I prepared my defense in the
2  same case, that it was referred to in BLG.
3       Q.  So you'd have to review the pleadings to
4  make sure that your --
5       A.  I'm pretty sure it was. I'd have to think
6  about it. I'm pretty sure it was, though, referred
7  to. So if I thought about it, I'm sure I could
8  recall that, but I have a recollection that it was.
9       Q.  This next one is OLPC 485 to 486. This is
10  an e-mail from Tim A to Joshua Olson. Do you see
11  that, this screenshot right here? Do you see that?
12      A.  I do.
13      Q.  Was this document used in either -- gosh,
14  long day. Was this document used in Burton v.
15  Lemons, the Mareva injunction or the BLG litigation?
16      A.  Not that I recall.
17      Q.  So OLPC is not seeking damages related to
18  this document; correct?
19      MR. JORDAN: Objection; vague and
20  ambiguous. Are you asking him if this document has
21  anything to do with the cases, with the case?
22      MS. VAUGHN: Well, that was my first
23  question. He said no.
24      MR. JORDAN: No, he said it wasn't used in
25  any of the three cases you've been asking him about,

Page 120

1  the Burton v. Lemons case, the Mareva injunction case
2  or the Alberta case. Then you asked does this
3  document have anything to do -- is it related in any
4  way to your claim for damages in this case.
5       MS. VAUGHN: That's not what I asked. I
6  asked is OLPC seeking damages in this case related to
7  this document.
8       MR. JORDAN: Exactly. Right. That's
9  asking him -- is this document -- are you asking him
10  will this document be an exhibit in this case? Is
11  that your question?
12      MS. VAUGHN: I'm asking if he's seeking
13  damages related to this document.
14      MR. JORDAN: It's vague and ambiguous and
15  calls for a conclusion.
16      A.  I don't believe -- so I'll answer the
17  question, subject to the objection. I don't believe
18  that this document itself was used in any of the
19  litigation.
20      Q.  (By Ms. Vaughn) In any of the cases
21  that --
22      A.  With respect to which invoices have been
23  submitted.
24      Q.  Okay. This document has not been used in
25  the cases for which OLPC is seeking damages?

Page 121

1    A.  That's correct.
2    Q.  Okay, and you're not aware of any other
3  claim for damages that OLPC has in this case?
4    A.  What was the question?
5    Q.  Are you aware of any other damages that
6  OLPC has in this case?
7    A.  Other than what? Sorry.
8    Q.  Other than the invoices we've gone over.
9    A.  I've indicated to you that two of the
10  matters are ongoing, so I anticipate there will be
11  additional invoices issued and a claim for
12  indemnification will be made at some future point.
13    Q.  And the only damages OLPC is seeking is
14  related to those lawsuits?
15    A.  Yes.
16    Q.  Okay. The last one is --
17       MR. JORDAN:  How many more of these are we
18  going to do?  You're now almost at four hours.
19       MS. VAUGHN:  I'm almost done. This is, I
20  think, the second-to-the-last one. I'm just going
21  through all the converted documents and trying to tie
22  them to the invoices to the extent we are able.
23    Q.  (By Ms. Vaughn)  This next one is
24  OLPC-Ephraim Olson 487 to 488. This is another
25  e-mail between Tim A and Joshua Olson with another

Page 122

1  screenshot. Mr. Olson, was this document used in
2  Burton v. Lemons, the Mareva injunction or BLG
3  litigation?
4    A.  No, it was not.
5    Q.  Okay, this is the last one. It's Bates
6  numbered OLPC-Ephraim Olson 331. Mr. Olson, was this
7  document used in Burton v. Lemons? Happy to send it
8  to you if you would like.
9    A.  Please do.
10    Q.  Would you like me to repeat the question?
11    A.  Let me just look at the document first,
12  please. Then you can repeat the question.
13       MR. JORDAN:  The Bates number of this
14  document, can you roll down to the Bates number.
15       MS. VAUGHN:  Yeah, it's OLPC 331.
16       MR. JORDAN:  Thank you.
17       THE WITNESS:  Okay, sorry. Your question?
18    Q.  (By Ms. Vaughn)  Was this document used in
19  Burton v. Lemons?
20    A.  Well, information on this document was.
21    Q.  What information?
22    A.  The information on the line that says
23  "Waterton Land Trust."
24    Q.  And do you have any evidence that Naomi
25  Burton ever received a copy of this document?

Page 123

1    A.  She certainly had -- I do not have any
2  evidence that Ephraim physically sent this document
3  to her.
4    Q.  Was this document used in the Mareva
5  injunction?
6    A.  Information on here was used in the Mareva
7  injunction.
8    Q.  Where?
9    A.  Where? Information in the pleadings, in
10  the -- I believe Carolyn's affidavit has information
11  from here. It's on here, I believe, that may have
12  been -- information on here may have been used in the
13  ex-parte oral arguments and the brief.
14    Q.  And was this document used in BLG, the BLG
15  litigation?
16    A.  Yes, I believe it was. I believe
17  information on here was used.
18    Q.  And how would you confirm that?
19    A.  Sorry?
20    Q.  How would you confirm that?
21    A.  Oh, information -- Carolyn had this
22  document. Information on here shows up in the
23  pleadings, and, I believe, in her affidavit and in
24  Naomi's affidavit.
25    Q.  Mr. Olson, do you recall your deposition

Page 124

1  in February of 2023 in this matter?
2    A.  February of 2023? That was the 30(b)(6)
3  examination?
4    Q.  Yes, February 15th of 2023.
5    A.  Yeah, I do. I do recall it generally. I
6  remember having it. I don't remember all of the
7  exhibits, but I remember having it.
8    Q.  And during that deposition I asked you if
9  there were bills for the damages that OLPC would be
10  seeking in this case. Do you remember that?
11    A.  Well, you can show me the deposition. I'm
12  happy to look at it.
13    Q.  This section right here.
14    A.  This goes on for quite a few pages. Would
15  you like me to look at all of my testimony relating
16  to those damages? If you do, please find it so I can
17  read it.
18       MR. JORDAN:  Let's get the question first.
19    Q.  (By Ms. Vaughn)  This is just the one
20  question. Do you recall telling me on February 15th
21  of 2023 that OLPC did not have any invoices related
22  to its damages?
23       MR. JORDAN:  Show him the question and
24  answer you're asking him about.
25       MS. VAUGHN:  "It's going to get a bill for

Page 125

1 those services."
2 "And where are those bills? Do they exist
3 today?"
4 "No."
5 MR. JORDAN: Let's have your question
6 again, because I don't think -- I think I'm objecting
7 that it misstates the testimony we're looking at.
8 Can we hear your question again.
9 Q. (By Ms. Vaughn) Do you recall telling me
10 in February of 2023 that no invoices for OLPC's
11 damages existed at the time?
12 MR. JORDAN: That's not the testimony
13 here, so I object. Misstates the document.
14 A. So the document --
15 MR. JORDAN: "OLPC is going to get a bill
16 for those services."
17 MS. VAUGHN: Yes, and I said: "Where are
18 those bills? Do they exist today?"
19 MR. JORDAN: Yeah, bills to OLPC.
20 MS. VAUGHN: And he said no.
21 MR. JORDAN: Yeah.
22 MS. VAUGHN: So I'm clarifying.
23 Q. (By Ms. Vaughn) Are the invoices we went
24 over today not bills for OLPC?
25 MR. JORDAN: I object. Once again, asked

Page 126

1 and answered. It's evident on the face of the bills
2 to whom the bills are rendered, and they're not
3 rendered to OLPC, as you know. Unfair to
4 misrepresent his deposition testimony.
5 THE WITNESS: And the --
6 MS. VAUGHN: His deposition testimony is
7 right in front of us, David. I have not --
8 THE WITNESS: So it's --
9 MR. JORDAN: You misrepresented it in your
10 question.
11 MS. VAUGHN: I'm asking the question.
12 Q. (By Ms. Vaughn) Mr. Olson, did you tell
13 me in February of 2023 that OLPC would receive bills
14 that it would have to pay as a result of Ephraim's
15 stolen documents?
16 A. Question, on line 5:
17 "So is it -- so is it OLPCCIL has incurred
18 damages as a result of sharing these documents to
19 OLPC? OLPC is going to have to pay for those
20 damages."
21 And then it says: "Okay, and where? Is it
22 going to get a bill for those services?"
23 Q. No, you said: "It's going to get a bill
24 for those services"; right?
25 A. Yes.

Page 127

1 Q. Okay.
2 A. And OLPCCIL has not billed OLPC for those
3 services.
4 Q. Okay. So why are the invoices we went
5 over today damages when in February of 2023 you told
6 me that OLPC's damages were bills it was going to get
7 from OLPCCIL?
8 A. Well, that was some of the damages,
9 because OLPC has not billed OLPC [sic] for the costs
10 it's incurred.
11 Q. So has OLPC --
12 A. The only bills -- sorry.
13 MR. JORDAN: Repeat your answer,
14 Mr. Olson.
15 MS. VAUGHN: Were you done answering?
16 MR. JORDAN: Well, I know he wasn't done
17 because you interpreted him.
18 MS. VAUGHN: Well, he takes pauses, and
19 it's hard to tell when he's done with an answer. So
20 we're on Zoom. Let's have some leeway here, David.
21 It's difficult to tell when your client is or is not
22 responding to a question.
23 Q. (By Ms. Vaughn) Mr. Olson, please finish
24 your answer.
25 A. I was saying that OLPCCIL has not billed

Page 128

1 for the services that it's had to render in
2 connection with this matter.
3 Q. Are you done?
4 A. I'm done.
5 Q. Okay. Has OLPC's theory of damages
6 changed in this case from February of 2023?
7 MR. JORDAN: Objection; calls for a legal
8 conclusion.
9 MS. VAUGHN: Okay. Isn't it true --
10 MR. JORDAN: Mr. Olson, I instruct you not
11 to reveal any attorney-client privileged information
12 in responding to her question.
13 Q. (By Ms. Vaughn) Okay. You told me,
14 Mr. Olson, in February of 2023 that OLPC's damages
15 would be bills from OLPCCIL; correct?
16 A. I didn't say all the damages would be. I
17 said that OLPC has incurred -- OLPCCIL has
18 incurred -- it has incurred damages, and OLPC will be
19 responsible if it gets a bill for those services.
20 Q. And none of the invoices that we went over
21 today are costs that OLPCCIL has incurred; correct?
22 A. That is correct.
23 MS. VAUGHN: Thank you. I think that's
24 all the questions I have.
25 MR. JORDAN: I have no questions. That

Page 129

1  concludes this deposition. Before we go off record,
2  Monica, do you have a question that you would like to
3  ask Ms. Vaughn while Ephraim is here with her?
4       MS. CALL: Yes. Sarah, we never got a
5  response or an e-mail about whether you're going to
6  accept service -- I guess Mr. Ephraim's left the
7  deposition. But we asked whether you would accept
8  service of the protective filing in state court, and
9  we never heard back from you. So I thought with
10  Ephraim on the line we could ask you or him if you're
11  willing to accept service for him in that matter.
12       MR. JORDAN: He was on the line until I
13  asked my question.
14       MS. VAUGHN: We didn't know what your
15  question was. I think we can go off the record since
16  the deposition's complete.
17       THE REPORTER: Before you go, Mr. Jordan,
18  did you need a copy of this?
19       MS. CALL: He left as well. Yes, we do
20  need a copy.
21       (The deposition was concluded at 6:59 p.m.)
22            * * *
23
24
25

Page 130

1       REPORTER'S CERTIFICATE
2
   STATE OF UTAH          )
3                         ) ss.
   COUNTY OF SALT LAKE    )
4
5       I, Kathy Morgan, Registered Professional
   Reporter and Notary Public in and for the State of
6  Utah, do hereby certify:
7       That prior to being examined, the witness,
   THOMAS H. OLSON, appeared remotely before me, and was
8  by me duly sworn to tell the truth, the whole truth,
   and nothing but the truth;
9
       That said deposition was taken down by me
10  in stenotype on December 19, 2024 at the place
   therein named according to my ability to hear via
11  Zoom, and was thereafter transcribed and that a true
   and correct transcription of said testimony is set
12  forth in the preceding pages;
13       I further certify that, in accordance with
   Rule 30(e), a request having been made to review the
14  transcript, a reading copy was sent to Mr. David
   Jordan for the witness to read and sign, and the
15  original transcript will be delivered to Ms. Sarah
   Vaughn for safekeeping.
16
       I further certify that I am not kin or
17  otherwise associated with any of the parties to said
   cause of action and that I am not interested in the
18  outcome thereof.
19       WITNESS MY HAND AND OFFICIAL SEAL this
   29th day of December, 2024.
20
21
22
       _____
23
       Kathy Morgan, RPR, CSR
24       Notary Public
       Salt Lake County
25
   My commission expires May 24, 2027

Page 131

1  Case:  OL Private Counsel, LLC v. Ephraim Olson
   Case No.:  Case No. 2:21-cv-00455-DBB
2  Reporter:  Kathy Morgan
   Date taken: December 19, 2024
3
4       WITNESS CERTIFICATE
5       I, THOMAS H. OLSON, HEREBY DECLARE:
       That I am the witness in the foregoing
6  transcript; that I have read the transcript and know
   the contents thereof; that with these corrections I
7  have noted this transcript truly and accurately
   reflects my testimony.
8  PAGE-LINE      CHANGE/CORRECTION      REASON
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18       No corrections were made.
19       I, THOMAS H. OLSON, HEREBY DECLARE UNDER
   THE PENALTIES OF PERJURY OF THE LAWS OF THE UNITED
20  STATES OF AMERICA AND THE LAWS OF THE STATE OF UTAH
   THAT THE FOREGOING IS TRUE AND CORRECT.
21
22       _____
23            THOMAS H. OLSON
24       _____
            Date Signed
25