```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF UTAH


  OL PRIVATE COUNSEL, LLC, a    )
  Utah limited liability        ) Videotaped
  company,                      ) Deposition of:
                                )
                                ) PATRICIA KUENDIG
        Plaintiff,              )
                                )
  vs.                           )
                                ) Case No.
  EPHRAIM OLSON, an             ) 2:21-cv-00455-DDB-DAO
  individual,                   )
                                ) Judge David Barlow
                                )
        Defendants.             ) Magistrate Judge
                                  Daphne A. Oberg




                  November 29, 2023

               9:13 a.m. - 5:22 p.m.


                  FOLEY & LARDNER
         95 South State Street, Suite 2500
            Salt Lake City, Utah 84111




       Reporter:  Tamra J. Berry, CSR, RPR
           Videographer:  Alyse Largin
```

Page 1

```
 1        MS. PORTER: I'm going to object. I think    11:50:16
 2   that calls for mental impressions of counsel and  11:50:18
 3   protected. I'm going to instruct her not to answer. 11:50:21
 4   Q.   (BY MR. MORTENSEN) Well, let me ask it --    11:50:24
 5   let me try a different way then. Is there any reason 11:50:27
 6   why you didn't identify -- well, let me ask it this 11:50:29
 7   way: Were these the only entities that you were   11:50:32
 8   aware of when you signed -- when you filed the    11:50:35
 9   counter petition?                                  11:50:37
10   A.   The only entities I was aware of?           11:50:38
11   Q.   The only trusts or other entities that      11:50:42
12   were related to the Olson family in any way?     11:50:44
13   A.   No.                                         11:50:51
14   Q.   You were aware of other ones?               11:50:52
15   A.   Yeah, there's others listed in here, but    11:50:53
16   they're not parties.                              11:50:56
17   Q.   And is there a reason why those other ones  11:50:57
18   aren't parties?                                   11:51:04
19        MS. PORTER: I'm going to object. Calls      11:51:05
20   for the mental impressions of counsel and instruct 11:51:06
21   her not to answer.                                11:51:09
22   Q.   (BY MR. MORTENSEN) Do you recall what, if   11:51:13
23   anything, you were told about these trusts that   11:51:20
24   you've identified as third party -- as the third  11:51:22
25   party defendants?                                 11:51:25
                                                      Page 106
```

```
 1        MS. PORTER: I'm going to object only to     11:51:26
 2   the extent that the question includes --          11:51:27
 3        MR. MORTENSEN: I'm not looking -- I'm not   11:51:31
 4   looking for any discussion with Ms. Carolyn Olson. 11:51:32
 5   So let's set that aside.                          11:51:34
 6   Q.   (BY MR. MORTENSEN) Other than what you     11:51:36
 7   may have been told by Carolyn Olson, were you told 11:51:37
 8   anything else about these entities that you've    11:51:40
 9   identified as third party defendants?             11:51:42
10   A.   Told anything like verbally from another    11:51:44
11   individual?                                       11:51:47
12   Q.   Yes.                                        11:51:48
13   A.   I mean, in terms of the word "anything,"   11:51:50
14   that's pretty broad. Before I filed this I had   11:51:53
15   conversations with Jim Hanks, for example. So I  11:51:56
16   guess my answer is yes, I did have information from 11:51:59
17   others.                                           11:52:02
18   Q.   And you say you had conversation with Jim   11:52:03
19   Hanks before you filed this. What do you recall  11:52:07
20   discussing with Jim Hanks prior to filing the counter 11:52:11
21   petition?                                         11:52:14
22   A.   I mean, we had many discussions. So I      11:52:15
23   can't -- I don't remember exactly. But, I mean, it 11:52:18
24   was all geared towards settlement and, you know, me 11:52:20
25   trying to figure out -- I remember telling him over 11:52:24
                                                      Page 107
```

```
 1   and over again I've got to do my due diligence. I   11:52:28
 2   was trying to get information. And so, you know, I'd 11:52:32
 3   ask him questions, he'd get back to me with         11:52:33
 4   information. But specifics, I don't remember.       11:52:36
 5   Q.   Do you recall any of the specific             11:52:40
 6   information that Mr. Hanks provided you during those 11:52:43
 7   settlement discussions?                             11:52:46
 8   A.   Specifics, I don't remember off the top of   11:52:47
 9   my head, no.                                         11:52:51
10   Q.   Were you told what the purpose of any of      11:52:57
11   these -- the trusts that are identified as third    11:52:59
12   party defendants, were you told what the purpose of 11:53:03
13   any of those trusts was?                            11:53:05
14   A.   By whom?                                      11:53:06
15   Q.   Anyone other -- well, let's start with a      11:53:07
16   yes-no, on the -- on the anyone, and then we'll carve 11:53:08
17   out any client's communications. So did anyone tell 11:53:11
18   you what the purpose of the trust was?              11:53:15
19        MS. PORTER: I'm sorry, I'm going to          11:53:17
20   object. When you combine that question with the next 11:53:19
21   question, it does circumvent the privilege. Can you 11:53:21
22   exclude Carolyn so that there's not an inherent     11:53:28
23   disclosure in the following question.               11:53:30
24        MR. MORTENSEN: I mean, I just disagree      11:53:32
25   with your premise that -- that whether she had a    11:53:33
                                                        Page 108
```

```
 1   discussion with someone is about -- whether someone 11:53:36
 2   told her about the purpose of the trust is           11:53:39
 3   privileged.                                          11:53:41
 4        MS. PORTER: Well, I mean, let me -- can I    11:53:42
 5   just give you a hypothetical. Suppose I said to you: 11:53:43
 6   Did anyone tell you who murdered, you know, Jim     11:53:45
 7   Smith? Yes. Okay. Who told you? It's privileged. 11:53:48
 8   I mean, you've just disclosed who told you -- do you 11:53:51
 9   see what I mean? It's a tie-in of the two           11:53:54
10   questions --                                         11:53:56
11        MR. MORTENSEN: I understand your point.      11:53:57
12   But I'm not -- I didn't ask what the purpose of the 11:53:58
13   trust was. My question was far broader. What -- did 11:54:01
14   anyone tell you what the purpose was?                11:54:03
15        MS. PORTER: The thing is, though, the       11:54:05
16   purpose is a little narrower. If it was about the   11:54:06
17   trust, I'm not sure that I would be making this     11:54:09
18   objection just if it was about the trust. But the   11:54:11
19   purpose seems to narrow the question.                11:54:12
20   Q.   (BY MR. MORTENSEN) All right. In an        11:54:14
21   attempt to try to resolve this concern, I'm going to 11:54:15
22   carve out Carolyn Olson for now. I am reserving the 11:54:18
23   right to readdress this issue when we're going to be 11:54:21
24   talking about this later.                            11:54:24
25        But for purposes of now, exclude             11:54:25
                                                        Page 109
```

|   |   |   |
|---|---|---|
| 1 | conversations, did anyone tell you about the purpose | 11:54:30 |
| 2 | of the trust other than Carolyn Olson? | 11:54:32 |
| 3 | A. Not that I recall. | 11:54:34 |
| 4 | Q. Did you have any discussions with anyone | 11:54:35 |
| 5 | other than Carolyn Olson about what the assets of the | 11:54:39 |
| 6 | trusts were? | 11:54:42 |
| 7 | A. When? | 11:54:43 |
| 8 | Q. At any point ever. | 11:54:44 |
| 9 | A. Yes. | 11:54:46 |
| 10 | Q. And when? | 11:54:49 |
| 11 | A. I mean, what comes to my mind is I | 11:54:51 |
| 12 | remember asking Jim Hanks a lot of questions. I was | 11:54:54 |
| 13 | trying to do my due diligence. | 11:54:56 |
| 14 | Q. Okay. | 11:55:00 |
| 15 | A. But, I mean, I can't give you specifics of | 11:55:00 |
| 16 | which ones I asked about or what I asked or -- but, I | 11:55:03 |
| 17 | mean, I remember having questions. | 11:55:07 |
| 18 | Q. Okay. Anyone other than Jim Hanks? | 11:55:13 |
| 19 | A. Yeah, I believe that there may have | 11:55:16 |
| 20 | been -- may have -- I'm trying to remember. I know | 11:55:31 |
| 21 | at some point I learned about the specific like | 11:55:50 |
| 22 | parcels of land. And I know -- but I can't remember | 11:55:55 |
| 23 | how I got that information. And I'm talking about | 11:56:02 |
| 24 | the Waterton Trust. But I'm guessing. I just don't | 11:56:07 |
| 25 | remember specifics. | 11:56:15 |

Page 110

| | | |
|---|---|---|
| 1 | Q. Okay. Do you have a general memory as to | 11:56:17 |
| 2 | how, other than your conversation with Mr. Hanks, you | 11:56:21 |
| 3 | may have learned about any of the assets of any of | 11:56:24 |
| 4 | the entities identified as third party defendants in | 11:56:27 |
| 5 | the counter petition? | 11:56:30 |
| 6 | A. I mean, I know I've learned information, | 11:56:31 |
| 7 | but I can't tell you how or when off the top of my | 11:56:46 |
| 8 | head. | 11:56:51 |
| 9 | Q. When you say you know you've learned | 11:56:52 |
| 10 | information? | 11:56:55 |
| 11 | A. Well, like, for instance, there's been | 11:56:56 |
| 12 | discovery in the divorce case. And there's been -- I | 11:56:57 |
| 13 | mean, there's -- yeah, I just can't -- I can't | 11:57:02 |
| 14 | pinpoint what I learned or when I've learned it or | 11:57:07 |
| 15 | how I've learned it just sitting here. | 11:57:11 |
| 16 | Q. Did you have discussions with Ephraim | 11:57:18 |
| 17 | Olson about the assets of the various entities | 11:57:22 |
| 18 | identified as counter -- the third party defendants | 11:57:24 |
| 19 | in the counter petition? | 11:57:26 |
| 20 | A. I don't recall specifically, no. | 11:57:27 |
| 21 | Q. You don't recall whether you had | 11:57:29 |
| 22 | conversations with Ephraim Olson about the assets of | 11:57:33 |
| 23 | those entities? | 11:57:36 |
| 24 | A. I don't recall, no. I don't recall if I | 11:57:37 |
| 25 | learned anything. | 11:57:39 |

Page 111

| | | |
|---|---|---|
| 1 | Q. When you say you don't recall whether | 11:57:40 |
| 2 | you've learned anything, setting aside whether you | 11:57:47 |
| 3 | learned it from him -- | 11:57:50 |
| 4 | A. Uh-huh. | 11:57:50 |
| 5 | Q. -- have you had discussions with him about | 11:57:50 |
| 6 | the assets? | 11:57:53 |
| 7 | A. I just don't remember is what I was trying | 11:57:53 |
| 8 | to say. | 11:57:55 |
| 9 | Q. At this point when you filed the counter | 11:57:56 |
| 10 | petition, did you have a copy of any of the trust | 11:58:02 |
| 11 | documents for any of the trusts identified as third | 11:58:06 |
| 12 | party defendants? | 11:58:11 |
| 13 | A. I don't remember. | 11:58:12 |
| 14 | Q. At this point when you filed the counter | 11:58:14 |
| 15 | petition, did you have any of the formation documents | 11:58:20 |
| 16 | for any of the entities identified as third party | 11:58:26 |
| 17 | defendants? | 11:58:30 |
| 18 | A. Formation documents, like the actual trust | 11:58:31 |
| 19 | document, is that what you're saying? | 11:58:39 |
| 20 | Q. The trust document or the articles of | 11:58:40 |
| 21 | incorporation or -- for the LLCs, the membership | 11:58:43 |
| 22 | agreements. | 11:58:47 |
| 23 | A. So I can say that if it's a Utah entity, I | 11:58:47 |
| 24 | would have pulled whatever was on the State of Utah | 11:58:52 |
| 25 | Department of Corporations before I filed this. I | 11:58:56 |

Page 112

| | | |
|---|---|---|
| 1 | don't have a specific recollection of that, but | 11:59:00 |
| 2 | that's my practice. | 11:59:02 |
| 3 | As for the trusts, I don't remember | 11:59:05 |
| 4 | specifically. I believe I did, but I don't -- that's | 11:59:08 |
| 5 | a guess. | 11:59:15 |
| 6 | Q. So I want to make sure. You believe you | 11:59:23 |
| 7 | had copies of the trusts, but you don't recall for | 11:59:26 |
| 8 | sure? | 11:59:28 |
| 9 | A. Right. | 11:59:29 |
| 10 | MR. MORTENSEN: Okay. I'm about ready to | 11:59:32 |
| 11 | launch into a new area, so I think it's best to take | 11:59:33 |
| 12 | a break. Let's take our lunch break now. Let's go | 11:59:36 |
| 13 | off the record. | 11:59:39 |
| 14 | VIDEOGRAPHER: Off the record at 11:59. | 11:59:39 |
| 15 | (Break taken from 11:59 to 12:39.) | 11:59:41 |
| 16 | (EXHIBIT NUMBER 8 WAS MARKED.) | 12:40:13 |
| 17 | VIDEOGRAPHER: This is the beginning of | 12:40:21 |
| 18 | media 3. We're back on the record. The time is | 12:40:23 |
| 19 | 12:39. | 12:40:26 |
| 20 | Q. (BY MR. MORTENSEN) Ms. Kuendig, I'm going | 12:40:27 |
| 21 | to show you what is being marked as Exhibit 8. It is | 12:40:29 |
| 22 | a document that you produced in response to the | 12:40:32 |
| 23 | subpoena that was served on Dodd & Kuendig. And you | 12:40:36 |
| 24 | can see it's an assessment after normal reassessment | 12:40:44 |
| 25 | period recommendation report. Do you see that | 12:40:48 |

Page 113

29 (Pages 110 - 113)

|  |  |
|---|---|
| 1  document?                               12:40:51 | 1  A.  Let me make sure I'm clear. The only       12:43:30 |
| 2     A.  I see it.                        12:40:51 | 2  person that has given me information about the  12:43:33 |
| 3     Q.  And I will represent to you this is one of  12:40:51 | 3  origin, yes, is my client.              12:43:37 |
| 4  the documents that you produced to us in response to  12:40:54 | 4     Q.  Okay. Have you discussed the boxes of  12:43:39 |
| 5  the subpoena. Have you seen this document before?  12:40:57 | 5  documents with anyone other than Carolyn Olson?  12:43:41 |
| 6     A.  Yes.                             12:40:59 | 6     A.  Yes.                             12:43:45 |
| 7     Q.  When did you first see it?        12:41:01 | 7     Q.  Who?                             12:43:45 |
| 8     A.  I don't remember exactly.         12:41:02 | 8     A.  Gosh, lots of people. Mark Hindley,  12:43:46 |
| 9     Q.  Do you have a year or a month or anything?  12:41:08 | 9  Monica Call, Sarah Vaughn. And I can't remember  12:43:52 |
| 10    A.  I don't. I know I produced it in    12:41:11 | 10 Chase's last name, but Chase -- he represents Ruth  12:43:59 |
| 11 discovery in the divorce case, so it would have been  12:41:15 | 11 Doxey Trust. I'm blanking on his last name. I  12:44:05 |
| 12 before then.                             12:41:18 | 12 cannot think of it, so we're just going to say Chase.  12:44:17 |
| 13    Q.  How did you get the document?     12:41:19 | 13 Other counsel.                            12:44:23 |
| 14    A.  This was in a box of documents delivered  12:41:32 | 14    Q.  And what did -- what did you discuss about  12:44:27 |
| 15 to my office, or boxes, sorry.             12:41:45 | 15 the box of documents with Sarah Vaughn?   12:44:33 |
| 16    Q.  When were the boxes of documents delivered  12:41:53 | 16    A.  So we -- at Mark Hindley's request, we put  12:44:40 |
| 17 to you?                                   12:42:00 | 17 the documents at Salt Lake Legal, and then there's  12:44:50 |
| 18    A.  I don't remember.                 12:42:00 | 18 multiple e-mails with all of us because we agreed  12:44:56 |
| 19    Q.  I take it before you produced it, any of  12:42:01 | 19 that all of us would be involved, and like we talked  12:45:00 |
| 20 it?                                      12:42:04 | 20 about like do we get them inventoried, how do we get  12:45:04 |
| 21    A.  Absolutely.                       12:42:04 | 21 them inventoried, what do we need more information  12:45:08 |
| 22    Q.  So before you did the discovery in the  12:42:05 | 22 on, who do they belong to? And there's been a lot of  12:45:11 |
| 23 divorce case you got those boxes of documents?  12:42:09 | 23 group communications and we went there in person. I  12:45:15 |
| 24    A.  Yes.                             12:42:11 | 24 think Sarah was there, I think so. I mean, I can't  12:45:21 |
| 25    Q.  And who delivered the box of -- the boxes  12:42:12 | 25 remember exactly. But this was a -- that box has  12:45:24 |
|                                        Page 114 |                                        Page 116 |
| 1  of documents to you?                      12:42:16 | 1  been a source of discussion and sort of group  12:45:27 |
| 2     A.  My client.                        12:42:17 | 2  consciousness.                            12:45:31 |
| 3     Q.  Carolyn Olson?                    12:42:18 | 3     Q.  And in any of those discussions was there  12:45:34 |
| 4     A.  Yes.                             12:42:20 | 4  any discussion about the source of those boxes of  12:45:36 |
| 5     Q.  And did she deliver them personally?  12:42:21 | 5  documents?                                12:45:39 |
| 6     A.  Yes.                             12:42:26 | 6     A.  Not that I recall, more -- it was more  12:45:39 |
| 7     Q.  What is your understanding of what the  12:42:27 | 7  about ownership.                          12:45:46 |
| 8  documents in the boxes of documents was? Excuse me,  12:42:40 | 8     Q.  And do you have a copy of the documents  12:45:47 |
| 9  let me try that again.                    12:42:44 | 9  that are in the boxes of documents?       12:45:52 |
| 10       The boxes of documents, what's your  12:42:45 | 10    A.  No. The only thing that I've retained was  12:45:55 |
| 11 understanding of where they came from?    12:42:48 | 11 what was produced in discovery in the divorce case.  12:45:59 |
| 12       MS. PORTER: I'm going to object only to  12:42:51 | 12 Mark Hindley asked me not to keep anything with that  12:46:03 |
| 13 the extent that any understanding might have derived  12:42:53 | 13 exception.                                12:46:13 |
| 14 from communications with her client. You can answer  12:42:56 | 14    Q.  Did you review the documents in the boxes  12:46:14 |
| 15 it excluding any communications with your client.  12:43:04 | 15 of documents before they were delivered to Salt Lake  12:46:34 |
| 16       THE WITNESS: Then I can't answer it.  12:43:07 | 16 Legal?                                   12:46:39 |
| 17    Q.  (BY MR. MORTENSEN) Is it -- is it your  12:43:10 | 17    A.  Not all but some.                  12:46:39 |
| 18 testimony that the only person you've discussed those  12:43:11 | 18    Q.  How did you pick what to review and what  12:46:41 |
| 19 boxes of documents with is Carolyn Olson?  12:43:14 | 19 not to review?                            12:46:48 |
| 20    A.  You asked me about the origin of the  12:43:17 | 20    A.  I don't know that I can answer that.  12:46:49 |
| 21 documents, and the answer is yes.          12:43:19 | 21       MS. PORTER: I was just thinking that. I  12:46:55 |
| 22    Q.  Okay. So with respect to the origin of  12:43:22 | 22 do think that is intruding into mental impressions.  12:46:57 |
| 23 the documents, the only person you've discussed the  12:43:24 | 23    Q.  (BY MR. MORTENSEN) What portion of the  12:47:03 |
| 24 boxes of documents with is Carolyn; is that what  12:43:27 | 24 documents did you review?                  12:47:04 |
| 25 you're saying?                            12:43:29 | 25    A.  I --                              12:47:05 |
|                                        Page 115 |                                        Page 117 |

|   |   |   |
|---|---|---|
| 1 | MS. PORTER: That's going to be work | 12:47:09 |
| 2 | product. | 12:47:10 |
| 3 | MR. MORTENSEN: No way that's true. | 12:47:12 |
| 4 | Q. (BY MR. MORTENSEN) Okay. Is there any | 12:47:13 |
| 5 | records that would show what of the box of documents | 12:47:23 |
| 6 | you reviewed and which ones you didn't? | 12:47:26 |
| 7 | A. Not that comes to mind. | 12:47:30 |
| 8 | Q. Did anyone review the documents in the | 12:47:32 |
| 9 | boxes of documents other than you that you're aware | 12:47:35 |
| 10 | of? | 12:47:37 |
| 11 | A. I believe your office has a copy of them. | 12:47:39 |
| 12 | And we all when we went there looked in the boxes. | 12:47:49 |
| 13 | But no, not that I can -- not that I know of or I can | 12:48:00 |
| 14 | remember other than that. | 12:48:04 |
| 15 | Q. Okay. So other than whatever portion you | 12:48:07 |
| 16 | reviewed and then whatever portion counsel in this | 12:48:13 |
| 17 | room may have reviewed after getting them from Salt | 12:48:18 |
| 18 | Lake Legal -- | 12:48:22 |
| 19 | A. Well, not everybody's in the room. | 12:48:22 |
| 20 | Q. Okay. Other than Mark Hindley and anyone | 12:48:26 |
| 21 | associated with Stoel Rives and now Foley & Lardner, | 12:48:32 |
| 22 | anyone at Ms. Vaughn's law firm or yourself, are you | 12:48:38 |
| 23 | aware of anyone else reviewing the docs -- the | 12:48:41 |
| 24 | documents in the boxes of documents? | 12:48:44 |
| 25 | A. From the time I had them forward? | 12:48:46 |

Page 118

|   |   |   |
|---|---|---|
| 1 | Q. At any point ever? | 12:48:47 |
| 2 | A. Well, I'm not aware of anything before I | 12:48:48 |
| 3 | had them. So I would say -- remember I mentioned | 12:48:51 |
| 4 | Chase earlier, but I can't remember his last name. | 12:48:59 |
| 5 | He was present at that meeting. And then I don't -- | 12:49:02 |
| 6 | we know Salt Lake Legal had to have because they did | 12:49:05 |
| 7 | an inventory. | 12:49:08 |
| 8 | Q. Okay. Other than those individuals? So | 12:49:09 |
| 9 | we've now excluded Ms. Vaughn's firm, the individuals | 12:49:13 |
| 10 | at Stoel Rives and at Foley, we've excluded Chase, | 12:49:16 |
| 11 | whatever his last name is, and Salt Lake Legal and | 12:49:20 |
| 12 | yourself. | 12:49:24 |
| 13 | A. Uh-huh. | 12:49:25 |
| 14 | Q. Other than that, are you aware of anyone | 12:49:25 |
| 15 | else reviewing any of the documents that were in the | 12:49:28 |
| 16 | boxes of documents? | 12:49:30 |
| 17 | A. Sorry, I don't remember who else, if | 12:49:31 |
| 18 | anybody, was at that meeting. So I would just say I | 12:49:35 |
| 19 | don't know. And then obviously this doc -- I think | 12:49:39 |
| 20 | this is the document -- this was produced with | 12:49:44 |
| 21 | regards to number 3 request on the subpoena; is that | 12:49:46 |
| 22 | right? | 12:49:49 |
| 23 | Q. I don't remember which specific request | 12:49:50 |
| 24 | you were produced it in response to, but -- but... | 12:49:53 |
| 25 | A. Okay. Let me -- let me just review it to | 12:49:58 |

Page 119

|   |   |   |
|---|---|---|
| 1 | make sure I -- | 12:50:00 |
| 2 | Q. Please, take whatever time you need. | 12:50:02 |
| 3 | A. So I think this is the document that I | 12:50:25 |
| 4 | produced with regards to number 3 on your subpoena | 12:50:27 |
| 5 | duces tecum. And there's an e-mail showing this was | 12:50:31 |
| 6 | sent to Dentons in Canada. And like I said, this was | 12:50:35 |
| 7 | produced in the divorce case, so divorce counsel, | 12:50:42 |
| 8 | various divorce counsel would also have it. | 12:50:45 |
| 9 | Q. Okay. So setting aside those people | 12:50:47 |
| 10 | you've now told me, and I'm probably going to keep | 12:50:54 |
| 11 | asking this question until you've given me the | 12:50:57 |
| 12 | exhaustive list that you're aware of -- | 12:50:59 |
| 13 | A. Uh-huh. | 12:50:59 |
| 14 | Q. -- are you aware of anyone else reviewing | 12:51:00 |
| 15 | any of the documents in the boxes of documents? | 12:51:02 |
| 16 | A. Other than the answers I've given you, I | 12:51:05 |
| 17 | don't remember. | 12:51:07 |
| 18 | Q. Okay. Are you aware of whether Ephraim | 12:51:07 |
| 19 | Olson reviewed the documents in the boxes of | 12:51:15 |
| 20 | documents? | 12:51:17 |
| 21 | A. I don't know. | 12:51:17 |
| 22 | MS. VAUGHN: Foundation. | 12:51:18 |
| 23 | THE WITNESS: I don't know if he was -- I | 12:51:19 |
| 24 | don't think he was at that meeting, but no, I don't | 12:51:20 |
| 25 | know. | 12:51:22 |

Page 120

|   |   |   |
|---|---|---|
| 1 | Q. (BY MR. MORTENSEN) So after you received | 12:51:22 |
| 2 | the boxes of documents from Ms. Carolyn Olson and | 12:51:35 |
| 3 | before you gave them to Salt Lake Legal, did you do | 12:51:40 |
| 4 | anything with the documents? | 12:51:43 |
| 5 | A. I've already told you I reviewed some of | 12:51:44 |
| 6 | them. | 12:51:49 |
| 7 | Q. Other than the ones that you reviewed -- | 12:51:50 |
| 8 | well, did you use any of the documents that you | 12:51:58 |
| 9 | reviewed in connection with any of the legal services | 12:52:01 |
| 10 | you provided? | 12:52:04 |
| 11 | A. Whatever I've produced in discovery only, | 12:52:05 |
| 12 | that I can think of. I know this was one of them. I | 12:52:12 |
| 13 | just don't -- I haven't looked back at the discovery | 12:52:18 |
| 14 | in a while. | 12:52:19 |
| 15 | Q. How long did you spend reviewing documents | 12:52:20 |
| 16 | in the boxes of documents? | 12:52:22 |
| 17 | A. Oh, I don't know. | 12:52:23 |
| 18 | Q. Did you -- other than providing the | 12:52:24 |
| 19 | documents to Salt Lake Legal, did you provide any of | 12:52:33 |
| 20 | the documents in the boxes of documents to anyone | 12:52:38 |
| 21 | else? | 12:52:41 |
| 22 | A. I already told you I -- this document was | 12:52:41 |
| 23 | e-mailed to Dentons. | 12:52:43 |
| 24 | Q. Okay. So Exhibit 8 you sent to Dentons? | 12:52:45 |
| 25 | A. Yeah, this was in that subpoena duces | 12:52:51 |

Page 121

## Page 122

```
 1  tecum three response, there was an e-mail.      12:52:55
 2        MR. MORTENSEN:  Let's go off the record.  12:53:02
 3        VIDEOGRAPHER:  Going off the record at    12:53:02
 4  12:52.)                                          12:53:08
 5        (Break taken from 12:52 to 12:52.)        12:53:15
 6        VIDEOGRAPHER:  Back on the record, 12:52. 12:53:17
 7     Q.  (BY MR. MORTENSEN)  Okay.  Other than that  12:53:22
 8  e-mail that you sent when you sent this document to  12:53:23
 9  Dentons, anyone else that you've sent any of the   12:53:27
10  documents from the box of documents to?           12:53:29
11     A.  I don't recall.                            12:53:32
12     Q.  Why were you sending the document to      12:53:39
13  Dentons, Exhibit 8?                                12:53:42
14        MS. PORTER:  I think that intrudes into    12:53:43
15  mental impressions.  I'm going to instruct her not to  12:53:45
16  answer.                                            12:53:48
17     Q.  (BY MR. MORTENSEN)  You mentioned that    12:53:56
18  there were disks in the boxes of documents.  Did you  12:54:00
19  review any of the documents on the disks?         12:54:03
20     A.  I mentioned -- I didn't mention that.    12:54:05
21     Q.  Are you aware were there any disks in the  12:54:10
22  boxes of documents?                                12:54:12
23     A.  I know I can recall one.  I don't know if   12:54:13
24  there were multiple.                               12:54:15
25     Q.  And did you review any of the documents on  12:54:16
```

## Page 123

```
 1  the one you remember?                             12:54:18
 2     A.  I don't recall reviewing them.  I recall  12:54:19
 3  reviewing the file names.                          12:54:22
 4     Q.  I see.  So you opened the disk, looked at  12:54:27
 5  the file names, but don't recall actually looking at  12:54:31
 6  the documents; is that what you're saying?        12:54:34
 7     A.  Yeah, I don't recall.                     12:54:36
 8     Q.  Okay.  Let's turn back to Exhibit 8.  When  12:54:37
 9  you got -- when you reviewed this document -- well,  12:54:47
10  let me change the question.  You did review this  12:54:56
11  document, I take it, Exhibit 8?                   12:54:58
12     A.  Yeah.                                      12:55:01
13     Q.  And you provided a copy of this to        12:55:02
14  Dentons?                                           12:55:05
15     A.  Yes.                                       12:55:06
16     Q.  For use in connection with the Mareva     12:55:07
17  injunction?                                        12:55:11
18     A.  I didn't say that.                         12:55:12
19     Q.  Was that true or not?                     12:55:12
20        MS. PORTER:  Let me have the question.    12:55:14
21  You're asking her why she sent it?                12:55:15
22     Q.  (BY MR. MORTENSEN)  Did you send it to    12:55:16
23  Dentons for use in connection with the Mareva    12:55:18
24  injunction?                                        12:55:22
25        MS. PORTER:  I think that intrudes into   12:55:22
```

## Page 124

```
 1  mental impressions.  I'm going to instruct her not to  12:55:24
 2  answer.                                            12:55:26
 3     Q.  (BY MR. MORTENSEN)  When did you send it  12:55:26
 4  to Dentons?                                        12:55:28
 5     A.  I'd have to see the e-mail.  I don't know.  12:55:29
 6     Q.  Do you have a memory of -- even of the   12:55:31
 7  timing at all?                                     12:55:35
 8     A.  I don't.                                   12:55:35
 9     Q.  Did you discuss this document with anyone  12:55:36
10  other than Carolyn Olson?                          12:55:48
11     A.  With Dentons.                              12:55:55
12     Q.  Okay.  So Exhibit 8, other than with      12:55:59
13  Dentons or with Carolyn Olson, did you discuss it  12:56:03
14  with anyone else?                                  12:56:06
15     A.  No.  Not that I recall.                   12:56:06
16     Q.  When you received this document, were you  12:56:08
17  aware that the findings in the document had been  12:56:17
18  reversed?                                          12:56:20
19     A.  I'm not aware of that.                    12:56:21
20     Q.  You're not aware of that even as of today?  12:56:25
21     A.  Yes.                                       12:56:32
22     Q.  Did you have any idea where the document  12:56:32
23  came from other than with respect to the box of   12:56:39
24  documents?                                         12:56:43
25     A.  I can't answer that without going into    12:56:44
```

## Page 125

```
 1  what my client shared.                             12:56:50
 2     Q.  So the only -- your only understanding of  12:56:52
 3  where this document came from is based on what your  12:56:56
 4  client told you?                                   12:56:59
 5     A.  Yes.                                       12:57:00
 6     Q.  Did you have an understanding this was a  12:57:06
 7  confidential document?                             12:57:07
 8        MS. VAUGHN:  Assumes facts not in          12:57:14
 9  evidence.                                          12:57:15
10        MS. PORTER:  I'm going to again object to  12:57:18
11  any understanding to the extent that it derives from  12:57:21
12  communication with your client.  But apart from that,  12:57:25
13  please answer.                                     12:57:31
14        THE WITNESS:  Could we take a short break?  12:57:32
15  I have a question on the objection.               12:57:35
16        MS. PORTER:  Okay.  Since it's for the    12:57:38
17  purpose of assessing privilege, I think we are   12:57:40
18  entitled to do that.                               12:57:42
19        MR. MORTENSEN:  We'll take a break.       12:57:43
20        VIDEOGRAPHER:  Off the record, 12:57.     12:57:44
21        (Break taken from 12:57 to 1:01 p.m.)     12:57:47
22        VIDEOGRAPHER:  Back on the record at 1:01.  13:01:40
23        MS. PORTER:  Could we have the last       13:01:43
24  question back, please.                             13:01:44
25        THE REPORTER:  "Did you have an           13:01:45
```

**Page 126**

```
 1  understanding this was a confidential document?"           12:57:06
 2       MR. MORTENSEN: It should be that this was             13:01:57
 3  a confidential document. But anyway.                       13:01:59
 4       Q. (BY MR. MORTENSEN) Let's go ahead. I'll            13:01:59
 5  ask the question again. Did you have an                    13:02:02
 6  understanding that Exhibit 8 was a confidential            13:02:03
 7  document?                                                  13:02:06
 8       MS. VAUGHN: Assumes facts not in                      13:02:07
 9  evidence.                                                  13:02:09
10       MS. PORTER: I am going to instruct her                13:02:10
11  not to answer because the -- it implicates                 13:02:11
12  attorney/client privilege. Even just the yes or no         13:02:14
13  part for the reasons I discussed earlier.                  13:02:19
14       Q. (BY MR. MORTENSEN) So your only                    13:02:21
15  understanding as to whether this document is               13:02:22
16  confidential or not is based on something that was         13:02:25
17  told to you by Carolyn Olson; is that correct?             13:02:26
18       MS. PORTER: I think he's entitled to                  13:02:32
19  know.                                                      13:02:34
20       THE WITNESS: Okay. My answer is no.                   13:02:34
21       Q. (BY MR. MORTENSEN) Okay. So there is               13:02:35
22  another basis for your understanding as to whether         13:02:37
23  this is confidential. What is the other basis?             13:02:39
24       A. Can I answer that?                                 13:02:42
25       MS. PORTER: Yeah, I think you can. I                  13:02:49
```

**Page 127**

```
 1  think he's entitled to that, but I don't think you go      13:02:53
 2  any further.                                               13:02:55
 3       THE WITNESS: Okay. Through conversations              13:02:56
 4  with Canadian lawyer, "s," plural.                         13:02:57
 5       Q. (BY MR. MORTENSEN) Okay. Let me see if I           13:03:03
 6  can parse this out. Your understanding as to the           13:03:05
 7  confidentiality of this document is based on two           13:03:09
 8  things: Communications with Carol Carolyn Olson and        13:03:12
 9  Canadian lawyers at Dentons?                               13:03:16
10       A. Yes.                                               13:03:19
11       Q. Okay. When did you have the                        13:03:21
12  communications with Carolyn Olson about whether or         13:03:26
13  not this document was confidential?                        13:03:29
14       A. I don't remember that, but I just want to          13:03:31
15  be careful as to --                                        13:03:40
16       MS. PORTER: The question does incorporate             13:03:43
17  the subject of the discussion.                             13:03:44
18       MR. MORTENSEN: That's why I said whether              13:03:46
19  or not as opposed to -- and I didn't make an opinion       13:03:48
20  as to the actual answer.                                   13:03:50
21       MS. PORTER: Yes. I did appreciate the                 13:03:53
22  wording on that. But it's still a very narrow              13:03:56
23  subject.                                                   13:04:00
24       MR. MORTENSEN: Well, Ms. Porter, she's                13:04:01
25  already told that her understanding of whether or not      13:04:04
```

**Page 128**

```
 1  this is confidential is based on a communication with      13:04:07
 2  her client and with communication with Dentons. I'm        13:04:10
 3  entitled to know when those communications occurred.       13:04:13
 4  I'm not entitled to know the substance, which is why       13:04:15
 5  I didn't ask what the substance was. But I'm               13:04:17
 6  certainly entitled to know when they occurred.             13:04:21
 7  That's not privileged.                                     13:04:23
 8       MS. PORTER: Well, the thing is we have to             13:04:24
 9  make certain threshold statements in order to assert       13:04:25
10  a privilege. And then you can't say, well, the very        13:04:27
11  fact that you -- that you made your threshold showing      13:04:30
12  relevant to a privilege issue now means I get to           13:04:35
13  explore that. I don't -- I just don't see it.              13:04:38
14       MR. MORTENSEN: Yeah, I'm not asking about             13:04:41
15  the privileged communication. I'm asking about the         13:04:42
16  timing of the communication. There's nothing               13:04:45
17  privileged about when you communicate with your            13:04:48
18  client. There is privilege about what you                  13:04:50
19  communicate with your client.                              13:04:52
20       MS. PORTER: And I actually don't agree                13:04:53
21  with that first legal statement because I've had it        13:04:54
22  come up in a case before and --                            13:04:56
23       MR. MORTENSEN: All right. Well, then                  13:04:59
24  let's just jump past that. I don't see any reason to       13:04:59
25  argue this anymore. I've asked when. Are you going         13:05:02
```

**Page 129**

```
 1  to instruct her not to answer?                             13:05:04
 2       MS. PORTER: Under these circumstances,                13:05:06
 3  yes.                                                       13:05:09
 4       Q. (BY MR. MORTENSEN) Okay. When did you              13:05:09
 5  communicate with Dentons about whether the document        13:05:09
 6  was confidential?                                          13:05:14
 7       MS. PORTER: Same instruction.                         13:05:16
 8       Q. (BY MR. MORTENSEN) Did you provide this            13:05:21
 9  document to anyone other than through e-mail to the        13:05:22
10  Dentons law firm?                                          13:05:27
11       A. I provided the box of documents to Salt            13:05:29
12  Lake Legal, and I provided this in discovery in the        13:05:34
13  divorce case.                                              13:05:38
14       Q. Did you mail a hard copy of this document          13:05:39
15  to anyone?                                                 13:05:43
16       A. No.                                                13:05:44
17       Q. And I think you told me this already, but          13:05:44
18  you're not aware of whether or not this decision was       13:05:56
19  reversed by CRA?                                           13:05:58
20       A. No.                                                13:06:00
21       Q. As we've discussed I think a little bit            13:06:01
22  today, you are aware that Carolyn Olson is being           13:06:23
23  represented by lawyers at Dentons in Canada and            13:06:26
24  potentially other jurisdictions; is that true?             13:06:31
25       A. Yes.                                               13:06:32
```

33 (Pages 126 - 129)