```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE CENTRAL DISTRICT OF UTAH

 3                         -o0o-

 4   OL PRIVATE COUNSEL, LLC, a    )
     Utah limited liability        )
 5   company,                      )
                                   )
 6            Plaintiff,           )
                                   ) 2:21-CV-00455-DDB-DAO
 7       v.                        ) Honorable David Barlow
                                   )
 8   EPHRAIM OLSON, an             )
     individual,                   )
 9                                 )
              Defendant.           )
10   _____)

11

12

13

14       VIDEO RECORDED DEPOSITION OF CAROLYN OLSON

15

16              Taken on Friday, July 8, 2022

17                    At 1:08 p.m.

18

19                 At Foley & Lardner

20              299 South Main Street

21                    Suite 2000

22           Salt Lake City, Utah  84111

23

24

25   Reported by:   Emily A. Gibb, RPR, CSR, CCR
```

Page 118

1  A.  Well, I know that he -- the trust that he
2  put in I thought was for tax purposes that he had
3  created to be the lender of that --
4      (Clarification by the Reporter.)
5      THE WITNESS: -- $700,000, which was the
6  mortgage on the house.
7  BY MS. VAUGHN:
8   Q.  So we've -- we've talked about this box of
9  documents.
10     When I reference the box of documents in the
11 garage, do you know what I'm talking about?
12  A.  I do.
13  Q.  Who found this box?
14  A.  I did.
15  Q.  Okay.  And what were you doing when you
16 found it?
17  A.  I was cleaning the garage.
18  Q.  All right.  Where was it when you found it?
19 Was it like near other stuff?
20  A.  There was some -- it was called monitors and
21 things.  I'm not sure if it was right by them, but
22 those all things were there.
23  Q.  Were they -- were they Tom's things?
24  A.  Yes.
25  Q.  Do you know who left the box there?

Page 119

1  A.  I don't.
2  Q.  Do you think it may have been Tom?
3  A.  Could have been.  I don't know.
4  Q.  Where's the box now?
5  A.  So it's being held -- I think all of you
6  know more than I do.  It's being held somewhere
7  but -- so that nobody has access to it, but I think
8  lawyers are agreeing to go see it.
9      Is that correct?
10  Q.  Okay.  I'm going to switch topics a bit.
11     Do you know who Tom Olson's parents are?
12  A.  I do.
13  Q.  What are their names?
14  A.  Marlene -- Melba Marlene Olson -- well,
15 Whitehead Olson and Jack Hardy Olson.
16  Q.  Do you know their citizenship?
17  A.  Yes.
18  Q.  Are they U.S. citizens?
19  A.  Yes.
20  Q.  How do you know that?
21  A.  Because they -- I've seen their passports.
22 They were so excited, Grandma was when she got her
23 U.S. citizenship, and Grandpa's already been a U.S.
24 citizen.
25  Q.  So Thomas' father has always been a U.S.

Page 120

1  citizen?
2  A.  Yes.
3  Q.  And his mother is also a U.S. citizen?
4  A.  Yes.
5  Q.  Do you know who Tom Olson's sister is?
6  A.  Yes.
7  Q.  Is her name Collette Olson Williamson?
8  A.  Yes.
9  Q.  Do you know if she is a U.S. citizen?
10  A.  Yes, she is.
11  Q.  How do you know that?
12  A.  She's living in Texas, and I know when
13 she -- I mean, she just told everybody she's so
14 excited about getting --
15  Q.  How did she prove her citizenship?
16  A.  Through her mom and dad.
17  Q.  Through her parents?
18  A.  Her parents.
19  Q.  The same parents that Tom Olson has?
20  A.  Yes.
21  Q.  You're -- you are a U.S. citizen.
22  A.  I am.
23  Q.  Multiple of your children are a U.S.
24 citizen.
25  A.  Yes.

Page 121

1  Q.  Are you familiar with the requirements for
2  U.S. citizenship by birth?
3  A.  Very clear, yes.
4  Q.  Do you think that all of your children are
5  U.S. citizens by birth?
6  A.  I do.
7     MR. JORDAN:  Objection.  Calls for a legal
8  conclusion.
9     MR. HOFFMAN:  I join in that one.
10    THE WITNESS:  Yes.
11 BY MS. VAUGHN:
12  Q.  Do you think that Tom Olson is a U.S.
13 citizen by birth?
14    MR. JORDAN:  Same objection.
15    THE WITNESS:  Yes.
16    MS. VAUGHN:  If we can just take a quick
17 break, I may be done.
18    THE WITNESS:  Okay.
19    VIDEOGRAPHER:  Off the record.  4:09.
20    (Short recess taken.)
21    VIDEOGRAPHER:  Sorry.  Back on the record.
22 4:18.
23 BY MS. VAUGHN:
24  Q.  Ms. Olson, I just have a few more questions
25 for you.

Page 122

1  A.  Okay.
2  Q.  Who is Bruce Lemons?
3  A.  He is a good friend of Tom's and a -- and a
4  family friend for a while.  They met -- or they went
5  to law school at the same time, and then they worked
6  together -- well, they both went to --
7        (Clarification by the Reporter.)
8      THE WITNESS:  Were in Colorado at the same
9  time.
10 BY MS. VAUGHN:
11 Q.  Do you know who Bruce works for?
12 A.  I'd say Tom, but I (shrugs).
13 Q.  Okay.  Are you aware of Tom ever backdating
14 documents?
15 A.  Yes.
16 Q.  Have you ever personally witnessed that?
17 A.  Yes.
18 Q.  Are you aware of Tom signing documents for
19 other individuals?
20 A.  I don't know.
21 Q.  We talked a lot about your conversation with
22 Ephraim trying to piece together how you obtained
23 Tim's contact information.
24     But do you remember the specifics of your
25 conversation with Ephraim about that?

Page 123

1  A.  I don't.
2  Q.  So you were just making assumptions about
3  what may or may not have been said?
4  A.  Yes.
5      MR. JORDAN:  Objection.  Leading.
6      THE WITNESS:  Yes.
7      MS. VAUGHN:  That's it.
8      MR. JORDAN:  I have a few follow-up
9  questions.
10
11         FURTHER EXAMINATION
12 BY MR. JORDAN:
13 Q.  First of all, would you turn to Exhibit 7
14 and to Bates No. 0002.
15     Counsel for Ephraim Olson also asked you
16 whether or not you knew things in this affidavit to
17 be true.  And I want to reference you to the second
18 to the last paragraph.  Here Mr. Akarapanich swears:
19     "On June 18, Carolyn Olson reached out to me
20    on Telegram.  She also asked about
21    confidential information from the firm
22    asking, for example, 'Is there any way for me
23    to get the trust documents for White Buffalo
24    and Majestic Trusts?'  Attached as Exhibit B
25    is a true and correct copy of my

Page 124

1    communications with Carolyn Olson through
2    Telegram and a true and correct copy of the
3    documents I sent to Carolyn through
4    Telegram."
5      So let's talk about the first sentence
6  there, that you reached out to him on Telegram on
7  June 18th.
8      You know that's true, don't you?
9  A.  Yes.  I don't know if it's June 18th.  I
10 think it's June 17th here, but ...
11 Q.  You did reach out to him in June --
12 A.  Yes.
13 Q.  -- on Telegram?
14 A.  I reached out to -- yes.
15 Q.  And you did ask him to give you the trust
16 documents for the White Buffalo and Majestic Trusts;
17 right?
18 A.  I don't recall, but according to this, yes.
19 It shows here.
20 Q.  Well, we looked specifically at --
21 A.  Right.
22 Q.  -- the photograph of you --
23 A.  Yes.  That's what I said.
24 Q.  -- in which you said:
25    "Is there any way for me to get the trust

Page 125

1    documents for White Buffalo and Majestic
2    Trusts?"
3  A.  Yes.
4  Q.  That is what you wrote, isn't it?
5  A.  I believe so.
6  Q.  And that's your picture; right?
7  A.  That is.
8  Q.  Is there any question in your mind that this
9  exchange of text messages took place between you and
10 Tim?
11 A.  No.
12 Q.  Okay.  Now, you were asked what happened to
13 your copies of the pages that show your text messages
14 with Tim.
15     Why don't you have those?
16 A.  Because Telegram, after a certain period of
17 time, if you don't communicate with the person,
18 deletes your stuff.
19 Q.  Okay.  So those were automatically deleted
20 in your --
21 A.  Yes.
22 Q.  -- phone?
23    Look again at 163.
24    What's the date right above the bubble where
25 you begin the conversation?

Page 126

1  A.  June 18th.
2  Q.  And what's the date in Mr. Akarapanich's
3  affidavit?
4  A.  June 18th.
5  Q.  Same date; right?
6  A.  (Nods head.)
7  Q.  Right?
8  A.  Right.
9  Q.  All right.  Let's look at Exhibit 6, and
10  we'll start on page 0008.  You looked at this with
11  counsel a few moments ago.
12     This relates to the William Bell Hardy
13  Trust; right?
14  A.  Right.
15  Q.  And you were an original trustee of this
16  trust; correct?
17  A.  Yes.
18  Q.  On June the 18th of 2020 when you
19  received --
20     MR. HOFFMAN:  Can you hold on a second,
21  David.
22     THE WITNESS:  Where are we --
23     MR. HOFFMAN:  Yeah, it's 8.  Go up.  There
24  you go.
25  ///

Page 127

1  BY MR. JORDAN:
2  Q.  On June 18th of 2020 when you received this
3  document in response to your request to
4  Mr. Akarapanich, were you still a trustee of the
5  William -- William Bell Hardy Trust?
6  A.  I don't know.
7  Q.  Let's look at the trust that begins on 0016.
8  It's the Ruth Doxey Trust.
9     Do you see that?
10  A.  Yes.
11  Q.  And you testified, and you can see from the
12  document, that you were an original trustee of this
13  trust; right?
14  A.  Right.
15  Q.  Right?
16  A.  Yes.
17  Q.  Now, if you'd turn to Bates page No. 028.
18     Do you see that in December of 2010, you
19  resigned as trustee of the Ruth Doxey Trust and
20  Ephraim Olson was appointed in your place?
21  A.  Yes.
22  Q.  So on December the 18th when you solicited
23  this document from Mr. Akarapanich, you were not a
24  trustee, were you?
25     MR. HOFFMAN:  I'm going to object to --

Page 128

1  assumes facts not in evidence.  You said
2  December 18th.
3     MR. JORDAN:  I'm sorry.  My mistake.
4  BY MR. JORDAN:
5  Q.  On June the 18th of 2020 when you solicited
6  the document from Mr. Akarapanich, you were not a
7  trustee of the Ruth Doxey Family Trust, were you?
8  A.  Not that I know of.
9  Q.  All right.  Let's look at the trust that
10  begins at Bates page No. 029.
11     This is the George Whitehead Family Trust;
12  correct?
13  A.  Correct.
14  Q.  And you were an original trustee of this
15  trust?
16  A.  Yes.
17  Q.  As of June the 18th of 2020, were you still
18  a trustee of this trust?
19  A.  I don't know.
20  Q.  Have you ever been a Canadian citizen?
21  A.  Yes.
22  Q.  No?
23  A.  Yes.
24  Q.  Yes?
25     Have you -- are you now a United States

Page 129

1  citizen?
2  A.  I'm both Canadian and U.S.
3  Q.  You have dual citizenship?
4  A.  I do.
5  Q.  What is your understanding of whether or not
6  as a U.S. citizen you are an excluded person from
7  being a beneficiary of these trusts?
8  A.  I don't know.
9  Q.  Let's turn to Bates page No. 049.
10     This is the Trust Settlement for the
11  Thomas H. Olson Trust.
12     You were a settlor of this trust; correct?
13  A.  Correct.
14  Q.  Were you ever a trustee of this trust?
15  A.  I don't know.
16  Q.  Let's turn to Bates page No. 0063.
17     This is the Trust Settlement for the White
18  Buffalo Trust; correct?
19  A.  Correct.
20  Q.  Were you ever a trustee of this trust?
21  A.  I don't know.
22  Q.  Let's look at 0082.
23     This is the Trust Settlement for the Olson
24  Estate Trust; correct?
25  A.  Yes.