```
         IN THE UNITED STATES JUDICIAL DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF UTAH

                           -o0o-

OL Private Counsel, LLC,   )
                           )
         Plaintiff,        )
                           )Civil No: 2:21-CV-00455-DDB-DAO
    v.                     )Judge David Barlow
                           )
Ephraim Olson,             )
                           )
         Defendant.        )
 _____)




              DEPOSITION OF NAOMI BURTON

      TAKEN THROUGH ADVANCED REPORTING SOLUTIONS



              Wednesday, July 20, 2022

                9:06 a.m. to 3:19 p.m.



                  Foley & Lardner
                299 South Main Street
                     Suite 2000
              Salt Lake City, Utah  84111




    Reported by:  Kimberly A. Harmon, RPR, CRR, CSR




              ADVANCED REPORTING SOLUTIONS
                   (801)691-1000
```

Page 142

1  involves?
2    A.  It's the shareholder -- a shareholder of
3  Bison.  It is about getting documents and financial
4  statements for the corporation and other oppression
5  actions that have been taken.
6    Q.  And you filed that action; is that correct?
7    A.  Yes, I did.
8    Q.  And who represents you in that case?
9    A.  Dave Hill and Brett Stytle.  Or --
10   Q.  And where -- sorry.
11   A.  Syt- -- I -- Sytle or Stytle.  I can't...
12   Q.  And have you discussed that case with
13 Ephraim?
14   A.  Yes.
15   Q.  Okay.  What have you discussed with Ephraim
16 about the oppression action about the Bison
17 Conservation Ranch?
18   A.  That I was going to file it.
19   Q.  Did he give you advice about filing it?
20   A.  No.
21   Q.  Did he provide any information, whether
22 verbally or in documents, for those -- those actions,
23 the oppression actions?
24   A.  No.
25   Q.  Did Carolyn provide you with any documents

Page 143

1  or information for that oppression action?
2    A.  No.  No.
3    Q.  Do you know whether Ephraim or Carolyn's
4  lawyers provided any information to your lawyers for
5  that oppression action?
6    A.  I do not know.
7    Q.  Are you familiar with the Waterton Land
8  Trust?
9    A.  Yes.
10   Q.  I think the easiest place for us to look at
11 this is to go back to Exhibit 2.  Or wait.  No,
12 that's 6, I think; right?  Let's go back to
13 Exhibit 6.  Page 278.
14      Do you recognize this document at page 278
15 of Exhibit 6?
16   A.  278.  Yes.
17   Q.  And what is this document?
18   A.  I believe it's the document -- sorry.
19 It's -- I think it's the Waterton Land Trust
20 document.
21   Q.  On that first page, 278, it recognizes the
22 original trustee as an entity called 1030911 Alberta
23 LTD.
24      Do you see that?
25   A.  Yes.

Page 144

1    Q.  Are you familiar with that entity?
2    A.  I think it became -- I believe it became
3  Waterton Land Trust Ltd., which I was a director of.
4    Q.  Which you were a director of; is that right?
5    A.  (Witness nods head.)
6    Q.  What was the purposes of this trust?
7    A.  It was family assets.
8    Q.  What does that mean?
9    A.  Things that were for the family.  Like, I
10 believe it holds a ranch, and that was -- that my dad
11 bought, and I think he put it in a trust so that it
12 wouldn't be taxed or something like that.  But it was
13 our family ranch.
14   Q.  Are there any other purposes other than
15 holding assets for that trust?
16   A.  Not that I know of.
17   Q.  And -- and you were the director of the
18 trustee for the trust for a period of time; correct?
19   A.  I believe I was the director of the company
20 that was the trustee.
21   Q.  Are the assets of this trust matrimonial
22 property?
23      MR. HOFFMAN:  Objection.  Legal conclusion.
24 Vague and ambiguous.  Foundation.
25 ///

Page 145

1  BY MS. CALL:
2    Q.  I'm going to use a different term.
3       Are they marital assets?  That's a term you
4  used in your Manitoba legal society complaint.
5       MR. HOFFMAN:  Same objection.
6       THE WITNESS:  I would consider them for the
7  same reasons.  They were -- the money used to
8  purchase them was acquired during the time that my
9  parents were married.
10 BY MS. CALL:
11   Q.  And who explained the marital -- that the
12 assets of this trust were marital assets to you?
13   A.  I don't recall who explained to me what
14 marital property means, but it was explained to me
15 that it was any -- anything that was accrued during a
16 marriage.  This was purchased, I think, in 2004 or
17 2005, and my parents were married at the time, so
18 I -- for those reasons, I believe it's marital
19 property.  And it was purchased -- as a kid, I
20 remember it was purchased as our family ranch.
21   Q.  What were some of the duties that you
22 performed as a director for the entity that was the
23 trustee for the Waterton Land Trust?
24   A.  I don't recall.
25   Q.  Did you perform any duties as the director

Page 146

1  for a corporate entity that was the trustee for the
2  trust?
3      A.  I don't recall.
4      Q.  Can you recall any duty that you would have
5  performed in that capacity?
6      A.  I don't remember.
7      Q.  Okay.  Have you ever received documents
8  about the Waterton Land Trust?
9      A.  The corporation or the trust?
10     Q.  The trust.
11     A.  I received the trust instrument and the
12 resolution -- a trustee resolution, I think it's
13 called.
14     Q.  Who did you receive the trust instrument
15 from?
16     A.  My lawyer.
17     Q.  Who did your lawyer receive it from?
18        MR. HOFFMAN:  Objection.  Foundation.
19        THE WITNESS:  I don't know.
20 BY MS. CALL:
21     Q.  Your lawyer just appeared one day with a
22 trust document?
23        MR. HOFFMAN:  Objection to the extent you're
24 asking for attorney-client communications.
25 ///

Page 147

1  BY MS. CALL:
2      Q.  I don't want to know what your lawyer told
3  you.  I just want to know where the document came
4  from.  That's not privileged.
5         MR. HOFFMAN:  Well --
6         THE WITNESS:  I don't know.
7  BY MS. CALL:
8      Q.  And then you mentioned you also received a
9  resolution.
10        Who did you receive the resolution from?
11     A.  My lawyer.
12     Q.  And do you know where that came from?
13        MR. HOFFMAN:  To the extent that you have to
14 rev- -- reveal attorney-client privileged
15 communications to answer the question, I instruct you
16 not to do that.  But if you can answer it based on
17 nonprivileged information, go ahead.
18 BY MS. CALL:
19     Q.  So I don't want you -- advice your lawyer
20 gave you or any information you told your lawyer, but
21 where a document came from, that's -- that's what I'm
22 interested in, is whether you know where that
23 document came from.
24     A.  I believe it was filed as a response to my
25 motion to intervene in the divorce suit.

Page 148

1      Q.  So it was attached to a filing in opposition
2  to your motion to join?
3      A.  I believe so.
4      Q.  Have you received any other documents about
5  the Waterton Land Trust?
6      A.  In response to a different suit, I think
7  there's, like, a DocuSign -- a supposed DocuSign of
8  that resolution.  But all of it would be in -- I
9  don't know exactly which documents have been provided
10 in -- in that legal litigation.  I think -- those are
11 the ones I can remember.
12     Q.  And when you're referencing "litigation"
13 there, I think you're referencing the case you
14 brought against Mr. Lemons; is that correct?
15     A.  Yes.
16     Q.  Have you received documents about the
17 Waterton Land Trust Ltd., the trustee for the trust?
18     A.  I received the resignation document.
19     Q.  Any other documents you've received?
20     A.  Not that I recall.
21     Q.  And the resignation document, that was the
22 one sent to you that we looked -- we looked at the
23 emails earlier about that in regard to your
24 resignation; correct?
25     A.  Correct.

Page 149

1      Q.  How did you learn of your removal as trustee
2  of the Waterton Land Trust LTD?  Or -- I'm sorry.
3         How did you learn of your removal as a
4  beneficiary of the Waterton Land Trust?
5      A.  I think my mom mentioned it.
6      Q.  Do you recall when?
7      A.  I don't.
8      Q.  How did she know?
9         MR. HOFFMAN:  Object to foundation.
10        THE WITNESS:  I don't know.
11 BY MS. CALL:
12     Q.  She didn't tell you where she learned that
13 information?
14     A.  Not that I recall.
15     Q.  How did the topic come up?  Why did she tell
16 you?
17     A.  I think she found it surprising.
18     Q.  And she didn't -- she found it surprising,
19 and she didn't tell you where she got the
20 information?
21     A.  I don't know exactly.
22     Q.  Did you ask her?
23     A.  I think it had something to do in the case.
24     Q.  Which case?
25     A.  Her divorce.

Naomi Burton
July 20, 2022
Pages 150..153

Page 150

1  Q.  You think she learned of your removal as
2  trustee through the divorce -- or as beneficiary
3  through the divorce?
4     A.  I believe so.
5     Q.  Is that what she told you?
6     A.  I don't remember.
7     Q.  Did she provide you with the resolution
8  documenting your removal?
9     A.  No.
10    Q.  When did you see that resolution for the
11 first time?
12    A.  I believe it was September 2021.
13    Q.  And who provided it to you?
14    A.  My lawyer.
15    Q.  Your lawyer in which action?
16    A.  Steve Mayfield.  In my request to intervene.
17    Q.  In the divorce case?
18    A.  Yeah.  I believe it was also provided to my
19 Canadian counsel, Jake Maslowski.
20    Q.  When you were serving as a director for the
21 Waterton Land LTD in its capacity as trustee for the
22 Waterton Land Trust, what tax returns were filed?
23    A.  I don't recall.
24    Q.  Did you ever know that information?
25    A.  Not that I can remember.

Page 151

1     Q.  Did you request documents related to the
2  Waterton Land Trust?
3     A.  I believe I did.
4     Q.  When?
5     A.  I believe it was with my original request
6  that Jakub Maslowski sent.
7     Q.  Did you get the documents you requested?
8     A.  No, I didn't.  I got a few documents.
9     Q.  Have you ever heard -- well, let me just ask
10 you what documents you received.
11    A.  I believe I received the trust instrument
12 for OMCT, some trial balances prepared by my dad's
13 law firm, and a number of tax returns.  Some were
14 signed, some were unsigned.  And at some point, I
15 also received the Bison Conservation Ranch's
16 incorporation document in conjuncture with that
17 request.
18       MS. CALL:  We'll mark this as 9.
19       (Exhibit 9 was marked for
20       identification.)
21 BY MS. CALL:
22    Q.  I'll represent to you that these are initial
23 disclosures provided by Ephraim Olson in this case.
24 I wanted you to turn -- it's not -- the pages aren't
25 numbered, but if you'll look on page 2, there's a

Page 152

1  bolded sentence with the letter A in front of it.
2        Do you see that?
3     A.  Yes.
4     Q.  And that says that the table below -- well,
5  I'll represent to you that the table below is below
6  this language.  It states:
7        "The name and, if known, the address and
8     telephone number of each individual likely to
9     have discoverable information - along with
10    the subjects of that information - that the
11    disclosing party may use to support its
12    claims or defenses, unless the use would be
13    solely for impeachment."
14       And then if you look at page 4, the last
15 name in that table is yours.
16       Do you see that?
17    A.  Yes.  Sorry.  I don't quite understand what
18 this -- what am I looking at?
19    Q.  So this is a fi- -- a -- a discovery
20 document served by Ephraim's counsel in this case.
21    A.  Okay.
22    Q.  Have you seen this before?  I should have
23 asked you that to start with.  No?
24    A.  No.
25    Q.  Okay.  So here, Ephraim's counsel, in the

Page 153

1  column that states "Subject Matter of Discoverable
2  Information," for you, it says:
3        "Naomi Burton has information regarding
4     Plaintiff's claims and Defendant's
5     counterclaims set forth in the pleadings on
6     file with the Court."
7        Do you see that?
8     A.  Yeah.
9     Q.  Have you ever seen the complaint before
10 today?
11    A.  Not that I remember.
12    Q.  Have you ever seen Defendant's answer in
13 this case?
14    A.  I don't -- is that the one that was included
15 with the subpoena?  There was something included in
16 the document subpoena, and I think that was -- if
17 that was the answer or the counterclaim.  You would
18 know that.
19    Q.  Did you -- did you review the counterclaim?
20    A.  Yes.
21    Q.  And are you -- or do you have information
22 related to Plaintiff's claims and Defendant's
23 counterclaims in this case?
24    A.  I don't know enough to say.
25    Q.  Okay.  Let me ask you about the Mareva