**APPENDIX I:**
**Ephraim's Opposition to OLPC's Statement of Additional Material Facts**

| | Statement of Additional Material Facts | Ephraim's Response |
|---|---|---|
| 1 | OLPC is a law firm practicing in the area of international taxation. OLPC offers its clients confidential taxation advice and corporate and commercial legal services. Many of OLPC's clients are foreign trusts. (Thomas Decl. ¶ 2, Ex. 1.) | **DISPUTED**. Whether OLPC is a lawfirm a legal question not presently before the Court. As Ephraim's expert has opined, "OLPC was not established in Utah as a law firm. In its 5/19/17 filings with the Utah Department of Commerce OLPC states that it was formerly known as Thomas Olson LLC, whose listed purpose as of 5/16/11 was "any lawful purpose," not the practice of law. Moreover, Thomas Olson was never a lawful officer or director of OLPC because he was never a licensed Utah attorney." Morse Report, 1, attached hereto as <mark>Exhibit A.</mark>

Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 2 | As relevant here, OLPC has been legal counsel to, among others, Thomas Olson ("Thomas"), the Waterton Land Trust, the White Buffalo Trust, the George Whitehead Family Trust, the Olson Estate Trust, the Thomas H. Olson Trust, and the William Bell Hardy Trust. (Thomas Decl. ¶ 5, Ex. 1; 12/19/24 Third OLPC 30(b)(6) ("Third OLPC 30(b)(6) Dep.") at Mot., Ex. 9, 16:7-24, 42:5-14, 17-20, 68:5-15; Mot., Ex. 18.) | **DISPUTED**. Whether OLPC is a lawfirm a legal question not presently before the Court. As Ephraim's expert has opined, "OLPC was not established in Utah as a law firm. In its 5/19/17 filings with the Utah Department of Commerce OLPC states that it was formerly known as Thomas Olson LLC, whose listed purpose as of 5/16/11 was "any lawful purpose," not the practice of law. Moreover, Thomas Olson was never a lawful officer or director of OLPC because he was never a licensed Utah attorney." Morse Report, 1, Ex. A. |

| | | |
|---|---|---|
| | | Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| **3** | Part of the value of OLPC's taxation and asset management-related services depends on its clients' documents and information remaining confidential. OLPC takes robust measures to maintain the confidentiality of its clients' documents and information. Among other things, OLPC requires its employees and other contracted staff to enter into confidentiality agreements to keep its clients' information and documents confidential. OLPC does not authorize employees or staff to access a client's information and documents except for purposes of performing services for that client. It also promptly revokes former employees' or staff's access to OLPC's documents at the time of termination of employment or contactor engagement. (Thomas Decl. ¶ 3, Ex. 1.) | **DISPUTED**. OLPC asserts this "fact" as an attempt to shore up expert testimony for which it has designated no expert. Thomas Olson has not been designated as an expert and thus the Court may not rely upon his testimony.

This fact is further disputed as "OLPCCI maintained a server that was accessible by individuals not employed by OLPCCI as lawyers or as legal staff. This practice violated a "fundamental principle in the client-lawyer relationship [ ] that, in the absence of the client's informed consent, the lawyer must not reveal information related to the representation." Rule 1.6 Comment [2]." Morse Report, 4, Ex. A.

"For example, Bruce Lemons ("**Lemons**"), who utilized an "oltax.com" email address was listed as "General Counsel" in various email signatures. However, Lemons could not testify as to the specific entity for whom he worked or who the documents belonged to. Moreover, Lemons testified that he uses his oltax.com email address to do work for another firm called B&L Family Partners." *Id.* at 4-5.

"Elijah Kukharuk ("**Elijah**"), testified that on multiple occasions from 2018 through 2020, he received client documents from Hyrum Olson and Ruth Bigler, employees working for entities affiliated with OLPCCI, even though he was not employed by OLPC or any related entities. Elijah also testified that he was able to access his "OL Tax" email account and work computer even when he was not |

| | | employed by the related entities.16 Joshua Olson, a non-lawyer and employee of a separate entity, International Tax Counsel,17 could also access the OLPCCIL server and also used his personal email and cloud databases to perform work related activities.18 In fact, OLPC and its related entities were aware of multiple employees logging into their personal email accounts on either the remote server or their work computer." *Id.* at 5.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
|---|---|---|
| **4** | OLPC understands that, as a law firm, it is obligated to its clients to maintain the confidentiality of its clients' documents and information. (Thomas Decl. ¶ 4, Ex. 1.) | **DISPUTED**. OLPC asserts this "fact" as an attempt to shore up expert testimony for which it has designated no expert. Thomas Olson has not been designated as an expert and thus the Court may not rely upon his testimony.<br><br>This fact is further disputed as "OLPCCI maintained a server that was accessible by individuals not employed by OLPCCI as lawyers or as legal staff. This practice violated a "fundamental principle in the client-lawyer relationship [ ] that, in the absence of the client's informed consent, the lawyer must not reveal information related to the representation." Rule 1.6 Comment [2]." Morse Report, 4, Ex. A.<br><br>"For example, Bruce Lemons ("**Lemons**"), who utilized an "oltax.com" email address was listed as "General Counsel" in various email signatures. However, Lemons could not testify as to the specific entity for whom he worked or who the documents belonged to. Moreover, Lemons testified that he uses his oltax.com email address to do work for another firm called B&L Family |

| | | Partners." *Id.* at 4-5. |
|---|---|---|
| | | "Elijah Kukharuk ("**Elijah**"), testified that on multiple occasions from 2018 through 2020, he received client documents from Hyrum Olson and Ruth Bigler, employees working for entities affiliated with OLPCCI, even though he was not employed by OLPC or any related entities. Elijah also testified that he was able to access his "OL Tax" email account and work computer even when he was not employed by the related entities.16 Joshua Olson, a non-lawyer and employee of a separate entity, International Tax Counsel,17 could also access the OLPCCIL server and also used his personal email and cloud databases to perform work related activities.18 In fact, OLPC and its related entities were aware of multiple employees logging into their personal email accounts on either the remote server or their work computer." *Id.* at 5. |
| | | Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 5 | At all relevant times before June 2020, OLPC maintained the confidentiality of its clients' documents and information. OLPC did not share its clients' confidential documents and information with third parties, other than as authorized by these clients or as required by law. (Thomas Decl. ¶ 6, Ex. 1.) | **DISPUTED**. OLPC asserts this "fact" as an attempt to shore up expert testimony for which it has designated no expert. Thomas Olson has not been designated as an expert and thus the Court may not rely upon his testimony.<br><br>This fact is further disputed as "OLPCCI maintained a server that was accessible by individuals not employed by OLPCCI as lawyers or as legal staff. This practice violated a "fundamental principle in the client-lawyer relationship [ ] that, in the absence of the client's |

informed consent, the lawyer must not reveal information related to the representation." Rule 1.6 Comment [2]." Morse Report, 4, Ex. A.

"For example, Bruce Lemons ("**Lemons**"), who utilized an "oltax.com" email address was listed as "General Counsel" in various email signatures. However, Lemons could not testify as to the specific entity for whom he worked or who the documents belonged to. Moreover, Lemons testified that he uses his oltax.com email address to do work for another firm called B&L Family Partners." *Id.* at 4-5.

"Elijah Kukharuk ("**Elijah**"), testified that on multiple occasions from 2018 through 2020, he received client documents from Hyrum Olson and Ruth Bigler, employees working for entities affiliated with OLPCCI, even though he was not employed by OLPC or any related entities. Elijah also testified that he was able to access his "OL Tax" email account and work computer even when he was not employed by the related entities.16 Joshua Olson, a non-lawyer and employee of a separate entity, International Tax Counsel,17 could also access the OLPCCIL server and also used his personal email and cloud databases to perform work related activities.18 In fact, OLPC and its related entities were aware of multiple employees logging into their personal email accounts on either the remote server or their work computer." *Id.* at 5.

Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*

| 6 | Ephraim Olson is an attorney licensed to practice law in Utah who was employed at OLPC between July 2014 and September 2019. (See Answer to Amended Complaint, Counterclaim and Third-Party Complaint, and Jury Demand ("Answer") at ¶ 10, Dkt. No. 15; Ephraim Depo. at 86:19-88:6, 130:17-132:14; Ex. 2; Ephraim Resume, Ex. 3; Plaintiff OL Private Counsel, LLC's Second Supplemental Response to Defendant's First and Second Set of Discovery Requests at Exhibit 1, Ex. 4.) | **DISPUTED.** The dates of Ephraim's employment at OLPC are disputed. OLPC's First Amended Complaint alleges Ephraim left OLPC's employment in June 2019. First Am. Compl., ¶ 11, attached hereto as <u>Exhibit B</u>. Ephraim testified that he believes his employment with OLPC extended through September 2019. Ephraim Dep., 131:13-22, attached hereto as <u>Exhibit C</u>. Further, this alleged statement of fact is immaterial to the Motion.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 7 | During the time Ephraim was employed with OLPC, Thomas Olson, one of OLPC's clients, and Thomas's wife, Carolyn Olson ("Carolyn"), were involved in divorce negotiations. Among other things, Carolyn and Thomas disputed whether the assets in various trusts were included as matrimonial property, including the assets of the Waterton Land Trust, the Olson Estate Trust, the Thomas H. Olson Trust, the White Buffalo Trust, the William Bell Hardy Trust, and the George Whitehead Trust (collectively, the "Trusts"). (Thomas Decl. ¶ 7, Ex. 1.) | **DISPUTED**. Whether Thomas Olson was a client of OLPC is a legal question not presently before the Court. As Ephraim's expert has opined, "OLPC was not established in Utah as a law firm. In its 5/19/17 filings with the Utah Department of Commerce OLPC states that it was formerly known as Thomas Olson LLC, whose listed purpose as of 5/16/11 was "any lawful purpose," not the practice of law. Moreover, Thomas Olson was never a lawful officer or director of OLPC because he was never a licensed Utah attorney." Morse Report, Ex. A, 1.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |

| | | |
|---|---|---|
| 8 | By the end of 2019, Ephraim had left employment with OLPC. (Thomas Decl. ¶ 10, Ex. 1.) | **DISPUTED.** The date Ephraim's OLPC employment ended is disputed. OLPC's First Amended Complaint alleges Ephraim left OLPC's employment in June 2019. Ex. B, ¶ 11 Ephraim testified that he believes his employment with OLPC extended through September 2019. Ex. C, at 131:13-22.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 9 | Per standard policies and practices at OLPC, Ephraim's access to OLPC's documents was revoked when his employment terminated. After that, OLPC did not give Ephraim permission to access its confidential information. (Thomas Decl. ¶ 12, Ex. 1.) | **DISPUTED.** Ephraim disputes that his access to "OLPC's documents was revoked by the end of 2019." As OLPC testified, in February 2019, Ephraim had "access to substantially all of the system." First OLPC Dep., 67:12-25, attached hereto as <u>Exhibit D</u>. Further, as of October 4, 2019, Ephraim still had full access to the relevant server's data center. See OLPC Ephraim Olson 13072-73, attached hereto as <u>Exhibit E</u>. OLPC testified that it "suspect[ed]" Ephraim's access to the data center may have changed from 2018 to 2020 but "didn't know that for sure." First OLPC Dep., 68:12-16, Ex. D. OLPC did not produce any Volta Security Access Lists which post-date 10/4/19 showing that Ephraim's access was removed or altered in any way.<br><br>Moreover, while OLPC produced a document purporting that it revoked Ephraim's access to documents by September 1, 2019, OLPC Second Supplemental Response, attached hereto as <u>Exhibit F</u>, that date is based purely on payroll records and memories of Hyrum Olson and Joshua Olson, non-OLPC employees. Second OLPC Dep., 37:1-5, attached hereto as <u>Exhibit G</u>. Even by OLPC's testimony, Ephraim's payroll records went "a bit beyond September |

| | | |
|---|---|---|
| | | 1st." Id. at 38:12-22. In fact, there are no documents that would actually show when Ephraim's access was changed or removed. Id. at 38:23-39:3. Ephraim further objects to this statement of fact because it does not detail which specific "confidential information" it addresses.<br><br>Ephraim further disputes that OLPC had "standard policies and procedures" as Thomas has no personal knowledge of this fact. See Objection to Evidence.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id* |
| 10 | Akarapanich, a former employee of an affiliate of OLPC who had had remote access to OLPC's client files through his employment, resigned on May 14, 2020. (See 05/14/2020 Email from T. Akarapanich to T. Olson, Ex. 5.) | **DISPUTED.** While Tim Akarapanich ("Tim A.") sent a resignation email on May 14, 2020, this email is inadmissible hearsay. See Obj. to Evid., supra. Moreover, Ephraim disputes that Tim A.'s employment with an "affiliate of OLPC" ended on May 14, 2020. Instead, the evidence establishes that Tim A. continued working for an "affiliate of OLPC" long after May 14, 2020. On May 17, 2020, just two days after the purported resignation, Thomas called Tim A. and later messaged Tim A. saying, "Very happy to have you back." Line Chat, Thomas Olson_00025, attached hereto as Exhibit H. From May 21, 2020 to May 25, 2020, Thomas and Tim A. discussed engagement agreements for clients and had multiple telephone calls. Line Chat, Thomas Olson_0028-31, Ex. H. On May 25, 2020, Tim A. messaged Thomas, appearing to quit again. Thomas Olson_0033, Ex. H. Tim A. offered to sign a disclosure form or confidentiality agreement. Id. But, from May 26, 2020 to May 27, 2020, Thomas and Tim A. again had multiple, long telephone calls. One call was |

| | | |
|---|---|---|
| | | nearly 18 minutes, the other was almost 35 minutes. Line Chat, Thomas Olson_035, 36, Ex. H. Between these calls, Tim A. and Thomas messaged about Tim. A resuming his employment, with Tim A. stating, "Tom I can start right away as well to work on process and training with Joshua." Line Chat, Thomas Olson_00037, Ex. H. Thus, there is a material issue of disputed fact with respect to the date that Tim A.'s purported employment ended.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 11 | Ephraim knew as of June 8, 2020, that Akarapanich had resigned his employment. (See Facebook Messages at EphraimOlson006938, Ex. 6; Ephraim Depo. at 263:23-264:5, Ex. 2; Akarapanich Declaration and Telegram Messages2 at OL Private Counsel-Ephraim Olson ("Telegram Conversation"), Ex. 7, at 0002 ("I indicated to Ephraim that I resigned from ITCL.").) | **DISPUTED.** Any statements from Tim A. are inadmissible hearsay. See Obj. to Evid., supra. Moreover, Ephraim disputes that Tim A.'s employment with an "affiliate of OLPC" ended on May 14, 2020. Instead, the evidence establishes that Tim A. continued working for an "affiliate of OLPC" long after May 14, 2020. On May 17, 2020, just two days after the purported resignation, Thomas called Tim A. and later messaged Tim A. saying, "Very happy to have you back." Thomas Olson_00025, Ex H. From May 21, 2020 to May 25, 2020, Thomas and Tim A. discussed engagement agreements for clients and had multiple telephone calls. Thomas Olson_0028-31, Ex. H. On May 25, 2020, Tim A. messaged Thomas, appearing to quit again. Thomas Olson_0033, Ex. H. Tim A. offered to sign a disclosure form or confidentiality agreement. Id. But, from May 26, 2020 to May 27, 2020, Thomas and Tim A. again had multiple, long telephone calls. One call was nearly 18 minutes, the other was almost 35 minutes. Thomas Olson_035, 36, Ex. H. Between these calls, Tim A. and Thomas messaged about Tim. A resuming his employment, with Tim A. stating, "Tom I can start right away as |

| | | well to work on process and training with Joshua." Thomas Olson_00037, Ex. H. Thus, there is a material issue of disputed fact with respect to the date that Tim A.'s purported employment ended. Further, Ephraim's belief as to whether Tim A. had resigned or continued to be employed by OLPC is not relevant to OLPC's conversion claim. "Although conversion results only from intentional conduct it does not however require a conscious wrongdoing, but only an intent to exercise dominion or control over the goods inconsistent with the owner's right." *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958). Thus, Ephraim's understanding of the status of Tim A.'s employment is irrelevant.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
|---|---|---|
| 12 | Ephraim requested that Akarapanich obtain OLPC's confidential documents and provide them to him and to Carolyn. (See Telegram Conversation, Ex. 7, at 0002, 0019, 0020, 0026, 0103-60, 0163 (wherein Ephraim asks "Do we have any documents about the trusts?" Akarapanich responds "which trusts ephraim." Ephraim then asks "Any of them." Akarapanich replies "I can't get them anymore/ I sneen [sic] them before but / dont [sic] have a copy with me").) | **DISPUTED.** The citations offered for this statement of fact contain no indication that Ephraim requested Akarapanich provide documents to Carolyn. Ephraim further disputes this alleged statement of fact because it does not detail which specific additional "confidential documents" it addresses. "A party does not create a genuine issue of material fact when she submits evidence that simply invites the jury to speculate as to what happened." *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 34, 390 P.3d 314, 323.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is |

| | | 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
|---|---|---|
| 13 | Akarapanich then informed Ephraim that he had found a way to access OLPC's confidential documents. (Id. at 0025-26.) Ephraim directed Akarapanich to surreptitiously misappropriate OLPC's confidential documents by "back[ing] those [confidential documents] up to another locqtion [sic]" "[s]o that if [OLPC] can wipe your phone, you don't lose them." (Id. at 0026.) | **DISPUTED.** Any statements from Tim A. are inadmissible hearsay. See Obj. to Evid. Further, Tim A. did not inform Ephraim that he could improperly access OLPC's server as implied in this statement of fact. Instead, Tim A. messaged Ephraim stating, "I think I got the trust document in my phone back then when I downloaded for him and I think I have them all." OLPC 0018-26, at 25-26, attached hereto as <u>Exhibit I.</u><br><br>Further, OLPC's statement that "Ephraim directed Akarapanich to surreptitiously misappropriate OLPC's confidential documents" is pure argument and is not supported by the record.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 14 | Akarapanich did as Ephraim instructed. A log on Akarapanich's phone shows that he uploaded documents from his phone to his Cloud Account after downloading OLPC's confidential documents from OLPC's servers. (See Dec. of Daniel L. Regard II, Ex. 8.) | **DISPUTED.** The evidence is "inconclusive as to whether Akarapanich downloaded confidential OLPC documents from a live connection to the exchange server or from cloud storage." Morrise Report, ¶ 14, attached hereto as <u>Exhibit J.</u><br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |

| 15 | As directed by Ephraim, Akarapanich transferred OLPC's confidential documents to Ephraim and to Carolyn. (See Dep. of Ephraim Olson at 282:6-285:24; 291:16-292:13, Ex. 2; Telegram Conversation, Ex. 8, at 0103-160, 0111, 0164-67, 0278-0316; see also Mot., Ex. 18; Dec. of Daniel L. Regard II, Ex. 8.) These confidential documents included the White Buffalo Trust Document (a confidential document of one of OLPC's clients setting forth the confidential terms of the trust); the Director's and/or CEO Disclosure of Interests in Transactions, Property, Offices Etc. (a confidential document summarizing officer and director information for various clients); the Waterton Land Trust (a confidential document of one of OLPC's clients setting forth the confidential terms of the trust); the Olson Estate Trust (a confidential document of one of OLPC's clients setting forth the confidential terms of the trust); the George Whitehead Family Trust (a confidential document of one of OLPC's clients setting forth the confidential terms of the trust); the William Bell Hardy Trust (a confidential document of one of OLPC's clients setting forth the confidential terms of the trust); and the Thomas H. Olson Trust (a confidential document of one of OLPC's clients setting forth the confidential terms of the trust). (See Telegram Conversation, Ex. 7, at 0103-160, 0111, 0164-67, 0278-0316; Questioning of Carolyn Ruth Walker Olson at 125:26-126:2, Ex. 9 (Carolyn confirming that Ephraim connected her with Akarapanich so she could obtain the Confidential Documents); Carolyn Olson Dep. at 38:24-39:2, Ex. 10 (same); see also Mot., Ex. 18.). | **PARTIALLY DISPUTED.** Ephraim does not dispute that Tim A. sent him the White Buffalo Trust Document or the "Director's and/or CEO Disclosure of Interests in Transactions, Property, Offices Etc." document. Ephraim does dispute that these are "confidential documents" or that they relate to OLPC's alleged clients. In fact, OLPC fails to cite to any evidence to establish the alleged fact that the White Buffalo Trust Document is a "confidential document of one of OLPC's clients." Nor does OLPC cite any evidence that the "Director's and/or CEO Disclosure of interests in Transactions" document is either confidential or that it contains information relating to OLPC's clients.<br><br>Under DUCivR 56-1(b)(3), a movant "must cite with particularity the evidence in the Appendix that supports each factual assertion." Here, no such evidence exists. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022)<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |

| 16 | None of OLPC's clients authorized the disclosure of their confidential documents and information Ephraim and Carolyn sought and obtained from Akarapanich. (Thomas Decl. ¶ 13, Ex. 1.) | **DISPUTED.** Ephraim disputes this alleged statement of fact because it does not detail which specific additional "confidential documents" it addresses or identify the clients. The "A party does not create a genuine issue of material fact when she submits evidence that simply invites the jury to speculate as to what happened." *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 34, 390 P.3d 314, 323.

Further, whether OLPC had clients is a legal question not presently before the Court. As Ephraim's expert has opined, "OLPC was not established in Utah as a law firm. In its 5/19/17 filings with the Utah Department of Commerce OLPC states that it was formerly known as Thomas Olson LLC, whose listed purpose as of 5/16/11 was "any lawful purpose," not the practice of law. Moreover, Thomas Olson was never a lawful officer or director of OLPC because he was never a licensed Utah attorney." Morse Report, 1, Ex. A.

Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 17 | OLPC discovered the misappropriation of its documents in or about October 2020, several months after it had occurred. Its documents were stolen from servers owned by OLPCCIL. Upon this discovery, and to respond to the theft and assess the damage that had been done, OLPCCIL immediately hired a US law firm, Stoel Rives, and a Thai law firm to investigate who took the documents, determine how the servers | **DISPUTED**. Ephraim disputes OLPC "discovered the misappropriation of its documents in or about October 2020" as OLPC or its affiliates had knowledge and information that Tim A. accessed its files as early as June 2020. On June 6, 2020 at 1:52:23 pm, Tim A. emailed Joshua Olson[1] ("Joshua"), an ITC employee, and stated: "Time to talk, did you know once you synchronized email with phone or cloud its always there? I saw this tips [sic] on msn, hope it will help. I also see another news on the website where |

| | | |
|---|---|---|
| | were accessed, and to interrogate one of the wrongdoers—Akarapanich—to obtain more information about the theft. (Thomas Decl. ¶ 14, Ex. 1.) | things went missing during construction. Strange things do happen." First OLPC Dep., 13:10-11, Ex. D; OLPC495, attached hereto as <u>Exhibit K</u>. Tim A. then sent Joshua several screenshots of emails on his telephone. OLPC0485-88, attached hereto as <u>Exhibit L</u>. On June 6, 2020 at 4:08:35 pm, Tim A. emailed Joshua saying: "cell email fix is you have to force them to log out or delete app before block their account. It wont update but all the old stuff wont disappear as well." OLPC 489, attached hereto as <u>Exhibit M</u>. Further, during the summer of 2020, Joshua Olson called Elijah Olson[2] and "discussed that after Tim had left Thomas's firm, and after they had changed his login credentials, he retained access through his phone to his work email account." Elijah Dep. 233:3-11, attached hereto as <u>Exhibit N</u>. <br><br> Ephraim further disputes the statement that "OLPCCIL immediately hired a US law firm, Stoel Rives, and a Thai law firm to investigate who took the documents." See Obj. to Evid. <br><br> Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 18 | During October and November 2020, the investigative and response costs amounted to just over $18,000 USD. OLPCCIL has now required payment from OLPC for those costs given the theft of information was orchestrated by OLPC's former employee, Ephraim. (Thomas Decl. ¶ 16, Ex. 1.) Indeed, OLPC has contended throughout this case that it would be | **DIPUSTED.** OLPC cites to no evidence that "investigative and response costs amounted to just over $18,000 USD." Under DUCivR 56-1(b)(3), a movant "must cite with particularity the evidence in the Appendix that supports each factual assertion." Here, no such evidence exists. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. |

| | | |
|---|---|---|
| | obligated to repay OLPCCIL for any costs incurred to respond to Ephraim's misappropriation of the confidential client documents. 2/15/2023 OLPC Dep. at 163:5-24, Ex. 11; Third OLPC 30(b)(6) Dep., Mot., Ex. 9, at 128:13-19 ("Q: You told me, Mr. Olson, in February of 2023 that OLPC's damages would be bills from OLPCCIL, correct? A: I didn't say all the damages would be. I said that OLPC has incurred -- OLPCCIL has incurred -- it has incurred damages, and OLPC will be responsible if it gets a bill for those services.") | 2022). Further, OLPC's reliance on Thomas declaration contradicts OLPC's own prior sworn testimony that as of February 15, 2023 OLPC was unable to quantify its damages and did not know when it would be able to do so. *Id.* at 173:20-174:3. OLPC also stated that no documents supporting its damages claim yet existed. *Id.* at 163:5-15.

Thomas, as the director of OLPCCIL, must have been aware of the Investigation Damages OLPCCIL allegedly incurred in October or November of 2020. And yet, he testified on behalf of OLPC that he was unaware of any such costs or fees. OLPC's gamesmanship should not be tolerated by the Court.

Further, OLPC's claim to these Investigation Damages must be excluded under Rule 26 and 37. See Reply.

Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 19 | OLPC's confidential documents have been used in pursuing third-party litigation against OLPC's clients in various jurisdictions. As relevant here, those third-party proceedings against OLPC's clients include a November 2020 ex parte Mareva injunction proceeding initiated by Carolyn (the "Mareva Injunction Proceeding"); the March 2022 Burton v. Lemons proceeding, initiated by Naomi Burton ("Naomi"), Ephraim's sister and Carolyn's daughter, | Ephraim does not dispute that OLPC claims its confidential documents have been used in the Mareva Injunction, the *Burton v. Lemons* matter or the *Olson v. Olson* matter. |

| | | |
|---|---|---|
| | against Waterton Land Trust's former trustee, Mr. Lemons; and the April 2022 Olson v. Olson proceeding in Alberta, Canada, initiated by Carolyn, Naomi, and others against Thomas and other of OLPC's clients. (See Mot., Exs. 9, 18). | |
| 20 | On November 2020, just five months after Ephraim successfully persuaded Akarapanich to share OLPC's confidential documents with him and Carolyn, Carolyn obtained an ex parte Mareva injunction against Thomas personally, freezing Thomas's assets and the assets of OLPC's clients, the Waterton Land Trust, the White Buffalo Trust, and the Olson Estate Trust. (Mot., Ex. 11 (Mareva Injunction Order).) | **DIPSUTED.** OLPC cites to no factual support that "Ephraim successfully persuaded Akarapnaich to share OLPC's confidential documents" with Carolyn. Under DUCivR 56-1(b)(3), a movant "must cite with particularity the evidence in the Appendix that supports each factual assertion." Here, no such evidence exists. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022).<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 21 | Carolyn relied upon some of OLPC's confidential documents (and/or information contained in those documents) to obtain the Mareva Injunction. (See Ephraim Depo. at 282:6–285:24; 291:16–292:13, Ex. 2; Telegram Conversations, Ex. 7, at 0032–33, 0039 (Ephraim asking Akarapanich to get various OLPC Confidential Documents); Affidavit of Carolyn Olson, Mot., Ex. 12 (discussing trust-related information in the Affidavit as a whole, and attaching the White Buffalo Trust as Exhibit 7 and the Director's and/or CEO Disclosure of Interests in Transactions, Property, | **DISPUTED.** Ephraim disputes this alleged statement of fact because it does not detail which specific additional "confidential documents" it addresses, beyond the White Buffalo Trust and the "Director's and/or CEO Disclosure of Interests in Transactions, Property, Offices Etc." document.<br><br>Regardless, this fact is not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is |

| | | |
|---|---|---|
| | Offices Etc. as Exhibit E to Exhibit 14); Undertakings of Carolyn Olson Given at Questioning on Affidavit Held December 7, 2020, at iii–iv, Ex. 12 (Carolyn confirming that she obtained the trust documents used in her affidavit from Akarapanich); Questioning of Carolyn Ruth Walker Olson at 125:26–126:2, Ex. 9 (Carolyn confirming that Ephraim connected her with Akarapanich so she could obtain the Confidential Documents); Carolyn Olson Depo. 38:24-39:2, Ex. 10 (same); OLPC Third 30(b)(6), Mot., Ex. 9, at 75:15-77:8 (discussing the various trust documents, and information from those documents, used in the Mareva Injunction proceeding); see also Mot., Ex. 11.) | 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 22 | In the Mareva proceeding, both Carolyn and Carolyn's counsel acknowledged that Carolyn obtained the trust instruments for the Waterton Land Trust, the Olson Estate Trust, and the White Buffalo Trust from Akarapanich. Indeed, during Carolyn's questioning on December 7, 2020, and in response to a question about whether Carolyn asked Tim to provide OLPC's confidential trust documents to her to use in legal proceedings against Thomas, Carolyn responded, "I'm saying he or she contacted Ephraim. Ephraim gave me their contact information, and I contacted that person, and they shared the documents I shared with my lawyer." (Undertakings of Carolyn Olson Given at Questioning on Affidavit Held December 7, 2020, at iii–iv, Ex. 12 (Carolyn confirming that she obtained the trust documents used in her affidavit from Akarapanich); Questioning of Carolyn Ruth Walker Olson at 125:26–126:2, Ex. 9 (Carolyn confirming that Ephraim connected her with Akarapanich so she could obtain the Confidential Documents). | Not disputed for purposes of this Motion.<br><br>Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |

| 23 | Additionally, Carolyn was able to obtain the Mareva Injunction on an ex parte basis against Thomas and OLPC's clients, without the benefit of cross-examination regarding her Affidavit. In arguing for ex parte relief, she asserted, based on the information contained in the confidential trust documents, that the trust instruments allowed the trusts to be moved offshore and that, if Thomas, as the trusts' Protector, had knowledge of the Mareva Injunction Proceeding, he could have the trusts moved offshore outside of the court's jurisdiction. (Mot, Ex. 12 (Carolyn's Affidavit); see also Mot., Ex. 11 (Mareva Order, ordering assets of the Waterton Land Trust, the White Buffalo Trust, and Olson Estate Trust frozen); Undertakings of Carolyn Olson Given at Questioning on Affidavit Held December 7, 2020, at iii–iv, Ex. 12 (Carolyn confirming that she obtained the trust documents used in her affidavit from Akarapanich); Questioning of Carolyn Ruth Walker Olson at 125:26–126:2, Ex. 9 (Carolyn confirming that Ephraim connected her with Akarapanich so she could obtain the Confidential Documents); Carolyn Olson Depo. 38:24-39:2, Ex. 10 (same); Third OLPC 30(b)(6), Mot., Ex. 9, at 78:4-20; Mot., Ex. 11.) | **DISPUTED.** Ephraim disputes this statement as it does not detail who the OLPC "clients" are. Further, the statement of fact contains improper legal argument.<br><br>Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| --- | --- | --- |
| 24 | The Canadian court granted the Mareva Injunction on an ex parte basis, freezing the assets of Thomas and the assets of only those trusts that Carolyn admitted she received the instruments of from Akarapanich — the White Buffalo Trust, the Olson Estate Trust, and the Waterton Land Trust. (Mot., Ex. 11 & Schedule B.) The Canadian court later dissolved the Mareva Injunction after a full hearing. (Order – Setting Aside Mareva Order, Ex. 13.) | Not disputed for purposes of this Motion.<br><br>These facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |

| 25 | In December 2020, the Peacock Linder firm defended against Carolyn's efforts to get a Mareva Injunction. In connection with their work in the Mareva Injunction Proceeding, Peacock Linder responded to Ephraim's document theft by investigating where Carolyn got the confidential documents she included in with her affidavit. Specifically, Peacock Linder questioned Carolyn in order to get her sworn testimony as to how she obtained the Confidential Documents she used in her affidavit to obtain the ex parte Mareva Injunction. The portion of Peacock Linder's invoice that is attributable to efforts to determine how Carolyn obtained the stolen documents is approximately $6,300 USD. (Thomas Decl. ¶ 17, Ex. 1; Undertakings of Carolyn Olson Given at Questioning on Affidavit Held December 7, 2020, at iii–iv, Ex. 12 (Carolyn confirming that she obtained the trust documents used in her affidavit from Akarapanich); Questioning of Carolyn Ruth Walker Olson at 125:26–126:2, Ex. 9 (Carolyn confirming that Ephraim connected her with Akarapanich so she could obtain the Confidential Documents).) | **DIPSUTED.** OLPC cites to no factual support the statement that "In December 2020, the Peacock Linder firm defended against Carolyn's efforts to get a Mareva Injunction. In connection with their work in the Mareva Injunction Proceeding, Peacock Linder responded to Ephraim's document theft by investigating where Carolyn got the confidential documents she included in with her affidavit. Specifically, Peacock Linder questioned Carolyn in order to get her sworn testimony as to how she obtained the Confidential Documents she used in her affidavit to obtain the ex parte Mareva Injunction." Under DUCivR 56-1(b)(3), a movant "must cite with particularity the evidence in the Appendix that supports each factual assertion." Here, no such evidence exists. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022).

Further, the Court must disregard Thomas's Declaration. *See* Obj. to Evid.

Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 26 | Since the Mareva Injunction Proceeding, Ephraim, Carolyn, and others aligned with them have continued to use the Confidential Documents in other litigation pending in Canada and the United States. (Third OLPC 30(b)(6) Dep., Mot., Ex. 9, at 10:25-11:4; 18:5- | **Disputed.** OLPC's characterization of Ephraim's and Carolyn's actions is not evidence. OLPC fails to cite to a single "other litigation pending in Canada and the United States" where its claimed confidential documents were used nor does OLPC identify what those documents were. Thus, these "[u]nsubstantiated |

| | | |
|---|---|---|
| | 19; 23:12-24:13; 38:20-41:15; 45:14-47:12; 50:13-19; 51:22-52:7, 50:20-51:12, 51:22-52:19, 56:22-57:6; Mot., Ex. 18.) | allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022).<br><br>Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 27 | Specifically, in March 2022, Naomi Burton ("Naomi"), a sibling of Ephraim aligned with him and Carolyn, initiated litigation against Bruce Lemons, a former Waterton Land Trust trustee. This case is Burton v. Lemons, Case No. 220901538, pending before the Third Judicial District Court, Salt Lake County, Utah. In the complaint, Naomi references and relies upon information contained in the Waterton Land Trust document itself and seeks relief based on the Waterton Land Trust instrument's provisions. (04/14/22 Burton v. Lemons Amended Complaint, Mot, Ex. 21, ¶¶ 8-10, 13 (stating that the terms of the Trust Document established the Trust's Protector's authority to change a Trustee), 16 (stating that the Trust Document's terms afford the Trust's Protector power to remove a trustee and appoint a new one); 21 (stating the trust is irrevocable); 33 (discussing the Trust Document's terms with respect to residency); 43 (discussing the Trust Document's provisions regarding an "Excluded Person"); 65-89 (setting forth causes of | **DIPSUTED.** OLPC cites to no factual support the statement that "Specifically, in March 2022, Naomi Burton ("Naomi"), a sibling of Ephraim aligned with him and Carolyn, initiated litigation against Bruce Lemons, a former Waterton Land Trust trustee. This case is Burton v. Lemons, Case No. 220901538, pending before the Third Judicial District Court, Salt Lake County, Utah." Under DUCivR 56-1(b)(3), a movant "must cite with particularity the evidence in the Appendix that supports each factual assertion." Here, no such evidence exists. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022).<br><br>Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |

| | | |
|---|---|---|
| | action based on the former trustee's conduct and certain of the Trust Document's provisions; see also Third OLPC 30(b)(6), Mot., Ex. 9, at p. 18:5-19 (stating that Naomi used the Waterton Land Trust document in the Burton v. Lemons matter to determine "the trustee, the protector, the beneficiaries and provisions, other provisions of the trust agreement . . . ."). | |
| 28 | Although Naomi testified in a July 20, 2022 deposition that she received the Waterton Land Trust document from her lawyer, who she believes obtained it when it was filed in response to her July 2021 motion to intervene in her parents' divorce suit (see Mot., Fact ¶¶ 41-42 & Exs. 22-23), the Waterton Land Trust document was not attached to the response to her motion to intervene in the divorce proceeding. (See 09/13/21 Opposition to Naomi Burton's Motion to Intervene, Ex. 14.) And, in fact, the same day that Naomi filed her July 2021 motion to intervene, she also emailed a copy of the Waterton Land Trust document to a third party. (07/09/21 Email from N. Burton to C. Donaldson, Ex. 15.) | Not disputed for purposes of this Motion.<br><br>These facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*<br><br>Nor do these facts contradict OLPC's sworn testimony that OLPC does not have evidence that Ephraim sent Naomi Burton the Waterton Land Trust. OLPC Third Dep., 24:7-24, Ex 9 to Mot.<br><br>Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 29 | In April 2022, Carolyn, Naomi, and others filed Olson v. Olson, 2201-04486, in Alberta, Canada, against Thomas and others, including the Waterton Land Trust. Carolyn, Naomi, and others used the | **DISPUTED**. OLPC offers no evidentiary support for the statement that "Ephraim persuaded Akarapanich to obtain and share" documents with Carolyn. Pursuant to DUCivR 56-1(b)(3), OLPC "must state each additional fact and cite with particularity to the |

| | | |
|---|---|---|
| | Confidential Documents that Ephraim persuaded Akarapanich to obtain and share with him and Carolyn in this action. (See Carolyn Olson Affidavit in Support of Service of Ex Juris, Ex. 16 (attaching the White Buffalo Trust as Exhibit 4); Affidavit of Naomi Burton, Ex. 17 (attaching the Waterton Land Trust as Exhibit A); see also Third OLPC 30(b)(6), Mot., Ex. 9, at 50:20-51:12, 51:22-52:19 (discussing the documents and information used in Olson v. Olson).) | Appendix that contains the supporting evidence." OLPC fails to meet this standard and thus the Court must disregard this unsupported assertion.<br><br>Ephraim does not dispute the remainder of AMF 29, but these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 30 | Ephraim, Carolyn, Naomi, and other third parties did not have access to OLPC's Confidential Documents before Ephraim persuaded Akarapanich to obtain and share them. (Telegram Conversations, Ex. 7 at 0002, 0019, 0020, 0026, 0103-60, 0163-67, 0278-0316; Undertakings of Carolyn Olson Given at Questioning on Affidavit Held December 7, 2020, at iii–iv, Ex. 12 (Carolyn confirming that she obtained the trust documents used in her affidavit from Akarapanich); Questioning of Carolyn Ruth Walker Olson at 125:26–126:2, Ex. 9 (Carolyn confirming that Ephraim connected her with Akarapanich so she could obtain the Confidential Documents).) | **DISPUTED**. OLPC offers no evidentiary support for the statement that "Ephraim, Carolyn, Naomi, and other third parties did not have access to OLPC's Confidential Documents before Ephraim persuaded Akarapanich to obtain and share them." Pursuant to DUCivR 56-1(b)(3), OLPC "must state each additional fact and cite with particularity to the Appendix that contains the supporting evidence." OLPC fails to meet this standard and thus the Court must disregard this unsupported assertion.<br><br>Further, ample evidence exists that Ephraim, Carolyn, and Naomi did have access to "OLPC's Confidential Documents." For example, Exhibit 21 to the Affidavit of Carolyn Olson is titled "Assessment After Normal (Re)Assessment Period Recommendation Report." *Id.* at OLPC Ephraim Olson 13005-13010. This document was obtained by Carolyn Olson's attorney, Patricia Keundig, who retrieved the document from a "box of documents" delivered to her by Carolyn Olson. Keundig Dep., 113:20-115:6, attached hereto as Exhibit O. Ms. Keundig sent this document to Carolyn Olson's attorneys who filed the Affidavit in the Mareva Injunction. *Id.* at 123:8-15. The Mareva Injunction also included information Carolyn Olson received |

| | | from Hyrum Olson on May 24, 2019. OLPC Third Dep. 107:5-25, Ex. 9 to Mot.; OL Private Counsel–Ephraim Olson 2518-2521, attached hereto as <u>Exhibit P</u>. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."<br><br>*Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 790 (10th Cir. 2023) (cleaned up)<br><br>Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 31 | Ephraim claims to have a joint defense/common interest relationship with those with whom he shared OLPC's Confidential Documents, including Carolyn and Naomi, since at least June 2021. Additionally, Ephraim, Carolyn, Naomi, and their lawyers have communicated extensively about the third-party litigation, OLPC's clients, and OLPC's trust-related documents since well before June 2021. (June 2023 Ephraim Relevance Log, Ex. 18; Kuendig Supplemental Privilege Log, Ex. 19; 09/12/24 Dentons Log, Ex. 20; 01/12/2024 Carolyn and Naomi Olson Privilege Log, Ex. 21; Third OLPC 30(b)(6), Mot., Ex. 9, at p. 18:20-19:18, 23:12-24:18, 25:14-27:2; 28:17-24.) | **DISPUTED**. OLPC offers no evidentiary support for the statement that "Ephraim claims to have a joint defense/common interest relationship with those with whom he shared OLPC's Confidential Documents, including Carolyn and Naomi, since at least June 2021." Pursuant to DUCivR 56-1(b)(3), OLPC "must state each additional fact and cite with particularity to the Appendix that contains the supporting evidence." OLPC fails to meet this standard and thus the Court must disregard this unsupported assertion. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022)<br><br>Moreover, OLPC's characterizations and inferences from various privilege logs are not facts and similarly fails to cite "with particularity to the Appendix that contains the supporting evidence." |

| | | Regardless, these facts are not a material fact nor does it create a genuine issue of material fact. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
|---|---|---|
| 32 | As to Naomi specifically, Naomi actively assisted Carolyn in preparing for the Mareva Injunction proceedings. Among other things, as early as April 2020 Naomi assisted Carolyn by gathering documents related to the Waterton Land Trust and sending them to Ephraim, who then sent them to Carolyn and Carolyn's lawyer, Patricia Kuendig. (10/07/22 Carolyn Olson Supp. Priv. Log, Ex. 22). These same communications are identified in Ephraim's June 29, 2023 Relevance Log. (06/29/23 Relevance Log, Ex. 18.) And the very documents Naomi provided to Carolyn in these April 2020 communications—identified in Ephraim's Relevance Log as "061348135.pdf" and described in Carolyn's Supplemental Privilege Log as included a "Transfer of Value, Affidavit of Value"—are attached to Carolyn's Affidavit as Exhibit 29. (Mot. Ex. 12 at Exhibit 29.) Additionally, a December 2019 text message communication between Naomi regarding the trusts, received from another of Thomas's children, was also included as Exhibit 15 to Carolyn's Affidavit to support Carolyn's claim that Thomas was making changes to the various trusts. (Id. at Exhibit 15.) | **DISPUTED**. OLPC offers no evidentiary support for the statement that "As to Naomi specifically, Naomi actively assisted Carolyn in preparing for the Mareva Injunction proceedings." Pursuant to DUCivR 56-1(b)(3), OLPC "must state each additional fact and cite with particularity to the Appendix that contains the supporting evidence." OLPC fails to meet this standard and thus the Court must disregard this unsupported assertion. Thus, these "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp. v. Behunin,* 38 F.4th 1183, 1200 (10th Cir. 2022)<br><br>Further, OLPC makes no assertion that the documents Naomi gathered were OLPC "Confidential Documents." Thus, these facts are irrelevant to OLPC's claims. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 33 | More broadly, since at least 2019, Ephraim has actively aligned himself with Carolyn's and Naomi's | **DISPUTED.** OLPC has failed to support this statement of fact by "cit[ing] with particularity to the Appendix that contains the |

| | | |
|---|---|---|
| | interests against those of OLPC and OLPC's clients. (See, e.g., Telegram Conversation, Ex. 7, at 0002, 0019, 0020, 0026, 0103-60, 0163-67, 0278-0316; June 2023 Ephraim Relevance Log, Ex. 18; Kuendig Supplemental Privilege Log, Ex. 19; 09/12/24 Dentons Log, Ex. 20; 01/12/2024 Carolyn and Naomi Olson Privilege Log, Ex. 21; see also Mot., Ex. 18.) | supporting evidence." DUCivR 56-1(b)(3). While OLPC attempts to cite to evidence, none of that evidence supports the assertion stated. OLPC fails to meet this standard and thus the Court must disregard this unsupported assertion. *Norwood v. United Parcel Serv., Inc.,* 57 F.4th 779, 789 (10th Cir. 2023).<br><br>Regardless, these facts are irrelevant to OLPC's claims. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.,* 92 F.4th 1189, 1198 (10th Cir. 2024). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* |
| 34 | In this action, OLPC claims as damages its indemnification of the investigation costs and attorneys' fees its clients have incurred including in defending themselves in the Mareva Injunction proceeding, the Olson v. Olson proceeding, and the Burton v. Lemons proceeding. (See Mot., Exs. 7, 8-10, 20, 24.) | Not disputed for purposes of this Motion. |
| 35 | OLPC has agreed to indemnify its clients for the costs, in the form of fees, incurred in investigating the theft and incurred in the above-mentioned proceedings. It agreed to indemnify the affected clients at or about the time the litigation commenced in each proceeding. The costs represented by the invoices are thus indemnification payments OLPC currently owes to its clients. (Thomas Decl. ¶ 18, Ex. 1; OLPC Third 30(b)(6), Mot., Ex. 9, at 13:3-9; 46:5-10.) | Not disputed for purposes of this Motion. |
| 36 | The fees incurred in connection with the Mareva Injunction proceeding for both defense and investigation were charged by the law firm Peacock | Not disputed for purposes of this Motion. |

| | | |
|---|---|---|
| | Linder. (See Mot., Ex. 7.) Thomas personally paid those fees. (OLPC Third 30(b)(6), Mot., Ex. 9, at 68:12-15; 72:2-19; 83:15-20.) OLPC has agreed to indemnify Thomas for the fees Thomas and the affected trusts incurred in investigating the theft and in defending against that proceeding—which was ultimately resolved in favor of Thomas and the affected trusts. (Id. at 68:5-9, 71:4-11, 72:13-19, 75:9-14, 82:9-24.) | |
| 37 | The fees for the Burton v. Lemons matter were charged by the law firm Foley & Lardner. (Mot., Ex. 20.) OLPC has agreed to indemnify the Waterton Land Trust for the legal fees it has incurred in defending its former trustee, Bruce Lemons, in the Burton v. Lemons matter. (Third OLPC 30(b)(6) Dep., Mot., Ex. 9, at 10:25-14:8; 15:18-22.) OLPC paid the Foley & Lardner invoices related to the Burton v. Lemons matter. (Id. at 32:18-34:13.) | **PARTIALLY DISPUTED.** Ephraim dispute this statement of fact only to the extent that OLPC testified that it paid these invoices "directly or indirectly." Mot. Ex. 9 at 32:18-33:18. |
| 38 | The fees for the Olson v. Olson matter were charged by the Canadian law firm BLG. (Mot., Ex. 24.) For the Olson v. Olson matter, OLPC has agreed to indemnify Thomas and the trusts for the fees incurred in defending that case. (Id. at 41:24-42:1, 43:20-44:17, 46:14-47:2; 57:1-4.) Waterton Land Trust paid the BLG invoices related to the Olsen v. Olsen matter. (Id. at 56:17-25.) | Not disputed for purposes of this Motion. |
| 39 | OLPC has determined it is responsible agreed to indemnify its clients for their legal fees in the above-referenced matters because those actions were against clients of OLPC, based on the Confidential Documents misappropriated by Ephraim, a former employee of OLPC. (Id. at 10:25-11:4, 50:13-19, 68:5-9.) | Not disputed for purposes of this Motion. |

# EXHIBIT A

# EXHIBIT A

**Andrew M. Morse**

176 North S St.
Salt Lake City, Utah 84103
801-560-0026
AMorseADR@outlook.com

July 12, 2024

Scott M. Lilja
Sarah C. Vaughn
FABIAN VANCOTT
95 S. State Street, Suite 2300
Salt Lake City, Utah 84116
Slilja@fabianvancott.com
svaughn@fabianvancott.com

> **Re:** **OL Private Counsel LLC v. Ephraim Olson**
> Expert Report of Andrew M. Morse
> Submitted under Federal Rule of Civil Procedure 26(a)(2)(B)

Counsel:

Pursuant to my expert retention in the above referenced matter and Fed. R. Civ. P. 26(b)(2)(B), below, please find my expert report.

## I.   Opinions and Bases for Opinions

1.      OL Private Counsel LLC ("**OLPC**") was not a Utah law firm in the context of the facts giving rise to OLPC's claims against the defendant. Ephraim Olson ("**Ephraim**"), therefore, owed no duties as a lawyer to the subject trusts.

OLPC was not established in Utah as a law firm.  In its 5/19/17 filings with the Utah Department of Commerce OLPC states that it was formerly known as Thomas Olson LLC, whose listed purpose as of 5/16/11 was "any lawful purpose,"[1] not the practice of law. Moreover, Thomas Olson was never a lawful officer or director of OLPC because he was never a licensed Utah attorney.[2]

OLPC never practiced law in Utah. The Rules Governing the Utah State Bar in effect during the relevant time period[3] provide that "only persons who are active licensed Bar members

---

[1] EphraimOlson_000025-26.
[2] Thomas Olson Depo., 5:13-14; OLPC Response to Request for Admission 1.
[3] It is my understanding that the relevant time period of Ephraim's employment at OLPC was from "approximately 2015 until approximately June 2019." First Amended Complaint, ¶ 11. All references to the Rules Governing the Utah State Bar or the Rules of Professional Conduct rely upon the rules applicable during this time period. In other words, these opinions to not take into account and amendments to Rules which became effective after 2019.

in good standing may engage in the practice of law in Utah." Rule 14-802(a). Further, "'[p]ractice of law' means representing the interest of another person by informing, counseling, advising, assisting, advocating for, or drafting document for that person through applying the law and associated legal principles to that person's facts and circumstances." Rule 14-802(b)(1). OLPC did not "represent the interest of another person" when it did piecework for OL Private Counsel Pte. Ltd. (PTE), which in turn did piecework for OL Private Corporate Counsel International LTD (OLPCCI).[4] OLPCCI was the only entity in this chain who represented a client, and the only entity that "represent[ed] the interest of another person" within the meaning of Rule 14-802(b)(1).

OLPC and Ephraim did not represent the subject trusts in Utah. The subject trusts did not enter into a retention agreement with OLPC or Olson.[5] Even if the trusts entered into any retention agreements, they did so only with OLPCCI. Nothing in OLPCCI's standard retention agreements indicates that any OLPCCI clients will also be represented by PTE or OLPC.[6] Neither PTE nor OLPC are named in the standard retention agreements. Nor can any such representation be inferred for two reasons. First, any fee splitting arrangements between law firms must be expressly stated in a retention agreement and agreed to in writing by the client under Rules 1.4 and 1.5 of the Utah Rules of Professional Conduct. Second, the Services Agreement between OLPCCI and PTE provide that PTE is "an independent contractor…" and "[n]othing contained in this Agreement may be deemed to create any relationship (employer/employee, joint venture, association or partnership) between the parties other that as set forth herein."[7] The same independent contractor provision appears in the Services Agreement between PTE and OLPC.[8]

OLPC did not assume an attorney client relationship with OLPCCI's clients by virtue of the independent contract work it did for PTE, which in turn did contract work for OLPCCI. The Standard of Care applicable to the initiation of the attorney client relationship requires a written agreement between the client and the lawyer that at least identifies the scope of work. No such written agreement exists between the subject trusts and OLPC or Ephraim. This requirement is warranted by the heavy fiduciary duty the lawyer takes on for the client's benefit. Such a duty is not easily assumed and to do so requires a writing.

OLPC was not authorized to practice law in Utah, because Thomas Olson, OLPC's sole owner, was never admitted in Utah and OLPC was otherwise forbidden from holding itself out as a Utah law firm.

---

[4] OL Private Counsel -Ephraim Olson 1408-1413.
[5] OLPC has failed to produce any engagement agreements with the trusts at issue, such as : The Carolyn Olson Spousal Trust, The White Buffalo Trust, The Thomas H. Olson Trust, The Olson Estate Trust, The George Whitehead Family Trust, the Waterton Land Trust, the Ruth Doxey Family Trust, the Olson Manitoba Conservation Trust, or the William Bell Hardy Trust.
[6] OL Private Counsel -Ephraim Olson 932-948.
[7] OL Private Counsel -Ephraim Olson 1411-1413.
[8] OL Private Counsel -Ephraim Olson 1408-1410.

Rule 5.5 of the Rules of Professional Conduct provides: "A lawyer who is not admitted to practice in this jurisdiction: (1) must not, except as authorized by these Rules or other law, establish a public – facing office in this jurisdiction for the practice of law; (2) must not hold out to the public or otherwise represent that the layer is admitted to practice law in this jurisdiction." OLPC maintained a public-facing office from its office on Centennial Parkway in Draper Utah from at least 2017 through 2019. The exception for temporary work in Utah, found in RPC 5.5(c) does not apply because Thomas Olson's firm had a permanent, not temporary, business in Utah. Olson, therefore, was not working for an authorized Utah law firm, so owed no one the duties a lawyer would normally owe a client.

OLPC presented no indicia of a Utah law firm. It is not owned by a Utah lawyer. OLPC did not maintain its own server to store and maintain client files and its work product. It did not bill the subject trusts as firm clients.[9] Another law firm did. It did not maintain an IOLTA account,[10] which every Utah law firm must maintain under The Rules Governing the Utah Bar, 14-1001. OLPC did not carry liability insurance,[11] likely because it knew it had no clients and therefore no possible exposure to malpractice claims.

Were OLPC operating as a law firm and employing Ephraim as an attorney representing its clients, OLPC and Ephraim's indirect work for OLPCCI's Canadian clients would have constituted the unauthorized practice of law under Rule 5.5(a) of the Rules of Professional Conduct. That rule provides: "A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction." Rule 5.5(a). Ephraim was not barred in Canada when he worked on Canadian matters for Canadian clients of OLPPCI.[12] As a Utah lawyer Olson had no authority, power, ability, or permission to do any legal work under Canadian law directly or indirectly for OLPCCI clients. Whatever he did for those customers of PTE and OLPCCI, it was not, and could not have been, done as a lawyer. He, therefore, owed them none of the duties that a duly barred lawyer would owe a lawful client, including a fiduciary duty and client-lawyer confidentiality under RPC 1.6, 1.9(c)(2) (confidentiality duties owed to former clients), and 1.8(b) and 1.9(c)(1) related to use of confidential information to the disadvantage of clients and former clients.

2.      As a mere employee of OLPC, Ephraim owed no fiduciary duty to his employer, OLPC.

---

[9] OLPC has failed to produce any documents reflecting invoices billed to its clients during the relevant time period.
[10] OLPC Response to Request for Admission No. 5.
[11] OLPC 30(b)(6) 58:23-25.
[12] Ephraim Olson Depo., 72:16-73:1.

Ephraim never represented OLPC as its lawyer. Likewise, he owed no fiduciary duty or duty of confidentiality to PTE, since he never represented PTE as its lawyer. Finally, Olson owed no fiduciary duty or duty of confidentiality to OLPCCI since he never represented OLPCCI as its lawyer.

Even if Olson were somehow found to have owed OLPC a fiduciary duty, and I see no basis for doing so, any such duty would have ended when his employment ended. At the latest, Olson's employment with OLPC ended around June, 2019.[13] As OLPC had no employment contracts with Ephraim or and no other agreement with him that would contain post-employment confidentiality or other covenants, there is no basis to find that Ephraim owed OLPC any confidentiality or other duties post-employment.

3.      OLPCCI was never the owner of the documents related to any of the subject trusts.

The sole owner of a client's file is the client. A lawyer must safeguard the client's file and keep it confidential under Rules of Professional Conduct 1.6, but those duties do not make the lawyer or the firm the owner of the client's file.

4.      OLPCCI did not maintain confidentiality of alleged client documents.

Under Rule of Professional Conduct 1.6(c), "[a] lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client." OLPCCI was "require[d] …to act competently to safeguard information related to the representation of a client against inadvertent or unauthorized access by third parties and against inadvertent or unauthorized disclosure by [itself] or other persons who [were] participating in the representation of the client or who are subject to[ OLPCCI's] supervision[.]" Rule 1.6 Comment [18]; Rule 5.3.

OLPCCI maintained a server that was accessible by individuals not employed by OLPCCI as lawyers or as legal staff. This practice violated a "fundamental principle in the client-lawyer relationship [ ] that, in the absence of the client's informed consent, the lawyer must not reveal information related to the representation." Rule 1.6 Comment [2]. I am not aware of any reasonable steps taken by OLPCCI to prevent access to or disclosure of information relating to the representation of a client. This is especially concerning because the client and firm were presumably bound by a written confidentiality agreement. These are "special circumstances that warrant[ed] special precautions." Rule 1.6 Comment [19]. The identical duties are owed to former clients of OLPCCI under Rule 1.9(c)(1).

For example, Bruce Lemons ("**Lemons**"), who utilized an "oltax.com" email address was listed as "General Counsel" in various email signatures. However, Lemons could not testify as to

---

[13] First Amended Complaint, ¶ 11.

the specific entity for whom he worked or who the documents belonged to. Moreover, Lemons testified that he uses his oltax.com email address to do work for another firm called B&L Family Partners.[14]

Elijah Kukharuk ("**Elijah**"), testified that on multiple occasions from 2018 through 2020, he received client documents from Hyrum Olson and Ruth Bigler, employees working for entities affiliated with OLPCCI, even though he was not employed by OLPC or any related entities.[15] Elijah also testified that he was able to access his "OL Tax" email account and work computer even when he was not employed by the related entities.[16] Joshua Olson, a non-lawyer and employee of a separate entity, International Tax Counsel,[17] could also access the OLPCCIL server and also used his personal email and cloud databases to perform work related activities.[18] In fact, OLPC and its related entities were aware of multiple employees logging into their personal email accounts on either the remote server or their work computer.[19]

As Ephraim was never employed as a lawyer and never represented anyone as a lawyer while employed at OLPC, the Rules of Professional Conduct never governed his actions. Moreover, even if Ephraim were acting as a lawyer, and there is no basis to assert he was, the duties of professional conduct are due to the client, not the employer.[20] Finally, the Rules of Professional Conduct do not "give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. . . . They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."[21]

## II.     Facts and Authority Considered in Forming the Opinions

The foregoing opinions are based on the following:
   o Deposition of Thomas Olson, as an individual and 30(b)(6) witness for OLPC, taken 2/15/23, 2/16/23 and 3/27/24, including exhibits thereto.
   o Depositions of Ephraim Olson taken 2/13/23 and 3/25/24, including exhibits thereto.
   o Deposition of Bruce Lemons, including exhibits thereto.
   o Deposition of Elijah Kukharuk, including exhibits thereto.

---

[14] Lemons Depo., 40:12-25.
[15] Kukharuk Depo., 206:18-208:3, 209:6-21.
[16] *Id.* at 209:17-211:10.
[17] OLPC 30(b)(6) 13:10-11, 55:19-56:12.
[18] Kukharuk Depo., 211:11-212:20.
[19] Kukharuk Depo., 216:4-16.
[20] UT Eth. Op. 18-05 (Utah St. Bar.)
[21] Rules of Professional Conduct, Preamble [20].

- o Reponses to Defendants' 8 Sets of Discovery Request, including produced documents.
- o Rules cited in the Opinions.
- o Eight years as President of Snow Christensen & Martineau 2011-2018.
- o June 21, 2024 Interview with Ephraim Olson.
- o The Rules Governing the Utah State Bar.
- o The Utah Rules of Professional Conduct.
- o UT Eth. Op. 96-14 (Utah St. Bar.).
- o UT Eth. Op. 18-05 (Utah St. Bar.).

### III.  Exhibits Used to Summarize or Support Opinions

The documents listed above, as well as selected excerpts from those documents, may be used as Exhibits to summarize or support the opinions.

### IV.  Qualifications and Publications

Resume, attached.

### IV.  Depositions and Trial Testimony as Expert in Prior 4 years

None

### VI.  Compensation

Mr. Morse charges $500.00 per hour

Best Regards,

Andrew M. Morse

# ANDREW M. MORSE

176 North S St.
Salt Lake City, Utah 84103
801-560-0026
AMorseADR@outlook.com

## PROFESSIONAL EXPERIENCE

**Andrew M. Morse LLC;** Mediation and Arbitration Practice**,** August 2023 to present

**Snow Christensen & Martineau,** Shareholder, Salt Lake City, Utah - 1993 to 2023, retired

> President:  2011 through 2018
> Board of Directors: 2006 to 2011
> Compensation Committee Member: 2000 to 2023
> Compensation Committee Chair: 2006 to 2011
>
> Specialized in civil trial work predominantly defense with some plaintiffs' cases tried to verdict.  Forty five jury trials and approximately a dozen bench trials tried to verdict.
>
> Practice areas included: complex commercial litigation; civil rights claims under 42 USC § 1983; municipal liability; product liability; personal injury; catastrophic injury; wrongful death; medical and professional liability; and various tort claims.

**Miller & Faignant,** Associate**,** Rutland, Vermont – 1992 to1993
> General defense trial practice.

**Snow Christensen & Martineau,** Salt Lake City, Utah – 1986 to 1992
> Associate, 1986 to 1990
> Shareholder, 1990 to1992
> General defense practice.

**Watkiss & Campbell,** Salt Lake City, Utah, 1984 to 1986, Associate
> General commercial litigation practice.

## EDUCATION

**Vermont Law School,** South Royalton, Vermont
> Juris Doctor, 1984

**University of Vermont,** Burlington, Vermont
> Bachelor of Arts, Political Science, 1977

## PROFESSIONAL and CIVIC ACTIVITIES

**Utah State Bar:** Bar Commissioner, 3rd District, 2020 to 2023

**Utah State Bar**: Co-Chair Well-Being Committee for the Legal Profession, 2017 to present.

**Utah State Bar**: Member of the Character and Fitness Committee, 2001 to 2020; Co-Chair 2012 to 2020.

**Utah State Bar**: Member of the Admissions Committee, 2012 to 2020.

**American Inn of Court**: David K. Watkiss Inn, 1988 to 1992; 2009 to present.

**Big Brothers Big Sisters of Greater Salt Lake**
Volunteer, 1984 to1992
Board Member, 1984-1992
Board President, 1986 to 1992

**Ronald McDonald House of the Intermountain West**
Board Member, 1998 to 2005
Board President, 2003 to 2004

## PROFESSIONAL RECOGNITION

Fellow, American College of Trial Lawyers – Vice Chair, Utah Chapter, 2018-2019; Chair, Utah Chapter 2019 - 2022

Fellow, International Academy of Trial Lawyers, 2018 to present

American Board of Trial Advocates – Associate 2010 to present
President – Utah Chapter, 2013 to 2020

Martindale-Hubbell: Rated AV Preeminent

## BAR ADMISSIONS

Utah State Bar
Wyoming State Bar
Vermont State Bar (Inactive)
Tenth Circuit Court of Appeals
Second Circuit Court of Appeals
U.S. Supreme Court
U.S. District Court, District of Utah
U.S. District Court, District of Wyoming

<u>**PUBLICATIONS**</u>

Author, What Judges Expect from Trial Lawyers, Utah Bar Journal, Vol. 34 No. 4, July/August 2021.

Author, The New Respect for George Sutherland, Utah Bar Journal, Sept/Oct 2012.

Author, Name Federal Courthouse for George Sutherland, Salt Lake Tribune, Op. Ed., July 15, 2012.

Author, Gallegos ex rel Rynes v. Dick Simon Trucking – The Use of Price-of-Annuity Evidence as Present Value of Compensatory Damages, Utah Bar Journal, Vol. 19 No. 3, June 2006.

Author, Spoliation of Evidence: A Trap for the Unwary, Fidelity & Surety Law Committee Newsletter, Spring 2002.


<u>**SELECTED PRESENTATIONS**</u>

Speaker, Use of Lawful and Unlawful Force, Utah Bar Convention, Sun Valley, Idaho, July 29, 2021.

Sponsor, Utah Bar Commission, Use of Lawful and Unlawful Force, April 13-15, 2021.

Sponsor, American College of Trial Lawyers Trial Boot Camp, Salt Lake City, Utah, January 12-15, 2021.

Keynote Speaker, Protecting Children While Protecting Yourself, Sixteenth International Conference on Shaken Baby Syndrome/Abusive Head Trauma, Orlando, Florida, September 2018.

Speaker, The Loss of Consortium Claim and Defending It, Utah Association for Justice, Brain Injury Conference, February 2018.

Speaker, Implicit Bias in the Courtroom, Sponsored by the American College of Trial Lawyers, S.J. Quinney College of Law, May 2017.

Speaker, The Reptile Theory at Trial, The Harmonie Group, Boston, Massachusetts, May 2017.

Speaker, The Benefit of Using Trial Prep Consulting Services for Significant Cases, Utah State Bar Summer Convention, San Diego, California, July 2016.

Speaker, Brady v. Maryland: Criminal Procedural Rights and Civil Causes of Action, Lorman Education Services, Webinar, 2015.

Speaker, Meth and a Death: The Anatomy of a Trial, American Board of Trial Advocates, Utah Chapter, February 2015.

## DEPOSITIONS AND TRIAL EXPERT TESTIMONY

*Auto Owners v. Smith*, legal malpractice.
> Worked for Plaintiff.  Deposition (2013).

*Handy v. Siegfried and Jensen*, shareholder dispute.
> Worked for plaintiff.  Deposition and trial testimony (2015).

*GeoMetWatch Corporation v. Durham Jones & Pinegar, P.C., and P. Christian Anderson*
> Legal malpractice (2019).

# EXHIBIT B

# EXHIBIT B

David J. Jordan (1751)
Mark E. Hindley (07222)
Jordan C. Hilton (17506)
STOEL RIVES LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: 801.328.3131
*david.jordan@stoel.com*
*mark.hindley@stoel.com*
*jordan.hilton@stoel.com*

*Attorneys for OL Private Counsel, LLC*

## IN THE THIRD JUDICIAL DISTRICT COURT IN AND FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| OL PRIVATE COUNSEL, LLC, a Utah limited liability company, | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Plaintiff, | Civil No. 210901401 |
| v. | The Honorable James Gardner |
| EPHRAIM OLSON, a Utah resident, | Tier 3 |
| Defendant. | |

Plaintiff OL Private Counsel ("OLPC" or "Plaintiff") hereby complains against defendant

Ephraim Olson ("Defendant") and for its causes of action alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    OLPC is a Utah limited liability company.

2.    Ephraim Olson is an attorney licensed to practice law in the State of Utah and a

resident of Salt Lake County, Utah.

3.    This Court has jurisdiction over this matter pursuant to Utah Code Ann. § 78A-5-

102.

4.    Venue lies in this Court pursuant to Utah Code Ann. § 78B-3-307.

## GENERAL ALLEGATIONS

### Plaintiff Owns and Protects Its Confidential Documents

5.      OLPC is a law firm based in Utah.

6.      OLPC associates with and serves clients in common with OL Private Corporate Counsel International Ltd., ("OLPCCI") and International Tax Counsel Ltd. ("ITC").

7.      As a law firm, and as a result of its association with OLPCCI and ITC, OLPC owns and possesses many confidential documents ("Confidential Documents"). These Confidential Documents include but are not limited to client documents such as trust and tax documents.

8.      Plaintiff secures its Confidential Documents in its offices, electronically stores such documents on password-protected, encrypted servers, and limits access to its Confidential Documents.

9.      Plaintiff also requires staff and employees to execute an employment agreement that strictly prohibits the employee or staff member from sharing OLPC's Confidential Documents. The confidentiality obligations in such agreements last indefinitely.

### Defendant Agrees to Maintain Confidential Documents in Strict Confidence

10.     Defendant is a lawyer and a member of the Utah State Bar.

11.     Defendant was employed as an attorney with OLPC from approximately 2015 until approximately June 2019.

12.     As an employee of OLPC, Defendant helped draft and enforce OLPC's general staff agreement form, which OLPC executed with its staff. The form staff agreement prohibited a staff member or employee from disclosing OLPC's Confidential Documents—including client information—both during and after his or her work for OLPC.

2

13.     Having assisted with drafting OLPC's form employment agreement, Defendant was, at all relevant times, aware of OLPC's express requirement that all staff and employees maintain all Confidential Documents—including client information—in strict confidence.

14.     Defendant agreed with OLPC that, as a condition of his employment with OLPC, Defendant would maintain all the Confidential Documents in strict confidence both during and after his employment with OLPC ("Employment Agreement").

15.     As an attorney employed with Plaintiff, Defendant owed Plaintiff a fiduciary duty, which included, at a minimum, a duty to maintain Plaintiff's confidential information in strict confidence and a duty of honest and ethical behavior.

16.     Moreover, beyond any contractual and fiduciary obligations, Defendant had independent ethical obligations under the Utah Rules of Professional Conduct to maintain confidentiality. Specifically, as a member of the Utah State Bar, Defendant is subject to Rule 1.6 of the Utah Rules of Professional Conduct, which states that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent."

17.     As a member of the Utah State Bar, Defendant is also subject to Rule 1.9(c) of the Utah Rules of Professional Conduct, which states that "[a] lawyer who has formerly represented a client in a matter . . . shall not thereafter: (c)(1) use information relating to the representation to the disadvantage of the former client . . . or (c)(2) reveal information relating to the representation" except as the rules of professional conduct allow.

18.     As a member of the Utah State Bar, Defendant is additionally subject to Rule 8.4 of the Utah Rules of Professional Conduct, which provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

3

19.     At all relevant times, Defendant has been aware of his ethical obligations under the Utah Rules of Professional Conduct.

**Defendant Accesses Plaintiff's Confidential Documents Without Justification**

20.     Defendant's employment with OLPC ceased in June 2019.

21.     When Defendant's employment with OLPC ceased, OLPC blocked Defendant's access to OLPC's Confidential Documents and removed Defendant's login credentials from OLPC's computer network. By August 2019, Defendant no longer had access to OLPC's (or ITC's or OLPCCI's) offices or servers.

22.     On or around June 2020, Defendant devised a scheme to wrongfully access Plaintiff's Confidential Documents, in violation of state and federal law, Defendant's contractual obligations, ethical and fiduciary duties, and Plaintiff's express company policies.

23.     Upon information and belief, Defendant sought such Confidential Documents in connection with an ongoing dispute between Defendant's father, Thomas Olson, and Defendant's mother, Carolyn Olson (the "Marital Dispute").

24.     On or around June 2020, Defendant, through a secure application called "Telegram," began messaging a former employee of ITC ("Former Employee"). The Former Employee had left ITC's employ in May 2020.

25.     As an employee of ITC, the Former Employee had executed an employment agreement ("ITC Employment Agreement"), which prohibited the Former Employee from at any time sharing, disclosing, copying, or otherwise disseminating any confidential information to which he had access as a result of the Former Employee's employment with ITC.

26.     At all relevant times, Defendant was aware of the Former Employee's confidentiality obligations under the ITC Employment Agreement.

4

27.     During his employment with ITC, the Former Employee had access to OLPC's Confidential Documents through ITC's computer network and servers. The computer servers on ITC's network were used in and affected interstate or foreign commerce or communication because ITC and OLPC used such computers to store and transmit confidential client information, communications (including emails) and other documents to and from the United States and throughout the world.

28.     Upon information and belief, after he left ITC's employ, the Former Employee improperly and wrongfully retained electronic access to certain Confidential Documents through ITC's computer network and servers.

29.     On June 12, 2020, despite Defendant's knowledge of the ITC Employment Agreement and its prohibition against the disclosure of confidential information, his fiduciary duties to Plaintiff, and his ethical obligations as a Utah attorney, Defendant conspired and formed a plan with the Former Employee to obtain OLPC's Confidential Documents

30.     Specifically, Defendant messaged the Former Employee on Telegram and asked the Former Employee to access ITC's computer servers to obtain any information relevant to the Marital Dispute.

31.     At the request and enticement of Defendant, the Former Employee agreed to use his access to ITC's computer servers to access many of Plaintiff's Confidential Documents. The Former Employee would not have agreed to access ITC's computer servers but for the encouragement and enticement of Defendant.

32.     On or around June 12, 2020, the Former Employee used his wrongfully-retained access to ITC's computer servers to access the Confidential Documents.

5

33.     On or around June 12, 2020, Defendant asked the Former Employee to transmit those files to Defendant, which the Former Employee did.

34.     After receiving those wrongly transferred Confidential Documents, Defendant accessed, copied, and possessed such documents.

35.     Defendant had no authorization, right, or justification to access, copy, or possess Plaintiff's Confidential Documents.

**Defendant Shares Plaintiff's Converted Documents with Others**

36.     After wrongfully obtaining Plaintiff's Confidential Documents, Defendant began sharing such information with others, including Carolyn Olson.

37.     For example, on or before June 18, 2020, Defendant communicated to Carolyn Olson that the Former Employee had Plaintiff's Confidential Documents. Defendant also provided Carolyn Olson with contact information for the Former Employee and assisted Carolyn Olson to obtain the Confidential Documents from the Former Employee.

38.     As a direct result of Defendant's conduct, the Former Employee and Defendant shared Confidential Documents with Carolyn Olson (together with the Confidential Documents Defendant obtained from the Former Employee, the "Converted Documents").

39.     The Converted Documents that Defendant, in conjunction with the Former Employee, shared with Carolyn Olson are highly sensitive and confidential. Such documents include asset protection trusts, whose value to Plaintiff's clients is dependent, in part, on the extent such documents remain confidential.

6

**Defendant Intends to Share Additional Confidential Information
in Violation of His Contractual, Fiduciary, and Ethical Duties**

40.     Upon information and belief, in addition to misappropriating and sharing the Converted Documents, Defendant continues to share further Confidential Documents regarding Plaintiff and Plaintiff's clients.

41.     Plaintiff is aware of documents and/or information that, upon information and belief, Defendant has which, if published, would reveal confidential business relationships, business practices, revenue information, and corporate structures related to Plaintiff's business, all of which Defendant obtained or learned of while employed with OLPC.

## FIRST CAUSE OF ACTION
**(Conversion)**

42.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint, as though fully set forth herein.

43.     Plaintiff is the rightful owner of its Confidential Documents, including the Converted Documents.

44.     By encouraging, enticing, conspiring, and working with the Former Employee to transmit the Converted Documents to Defendant and to other third parties, and by copying, retaining, and sharing the Converted Documents, Defendant willfully interfered with Plaintiff's rights to sole use and possession of its Confidential Documents.  For example, Defendant's actions interfered with Plaintiff's rights to restrict access to, and dissemination of, its Confidential Documents.

45.     Defendant has no right or justification to take the Converted Documents or to assist third parties to wrongfully obtain the Converted Documents.

7

46.     The Converted Documents derive a significant portion of their value by remaining confidential. Defendant's actions to misappropriate, and then share, the Converted Documents have caused the Converted Documents to decrease in value and usefulness.

47.     Defendant's actions to misappropriate and then share the Converted Documents violate numerous Utah Rules of Professional Conduct.  For example:

     a.  Defendant's actions to convert and then share the Converted Documents violate Rule 1.6 of the Utah Rules of Professional Conduct, which states that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent."

     b.  Defendant's actions to convert and then share the Converted Documents violate Rule 1.9(c) of the Utah Rules of Professional Conduct, which states that "[a] lawyer who has formerly represented a client in a matter . . . shall not thereafter: (c)(1) use information relating to the representation to the disadvantage of the former client . . . or (c)(2) reveal information relating to the representation" except as the rules of professional conduct allow.

     c.  Defendant's actions to convert and then share the Converted Documents violate Rule 8.4 of the Utah Rules of Professional Conduct, which states that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

48.     Defendant's actions to convert, share, and assist others to convert the Converted Documents were willful, malicious, and made with reckless disregard for Plaintiff's rights in the Converted Documents.

49.     As a direct result of Defendant's willful and malicious conversion of the Converted Documents, Defendant is liable to Plaintiff: (i) for actual damages in an amount to be determined at trial, but not less than $500,000; and (ii) for punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

50.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint, as though fully set forth herein.

51.     Defendant entered into the Employment Agreement with OLPC that, as a condition of his employment with OLPC, Defendant would indefinitely maintain all the Confidential Documents in strict confidence.

52.     At all times, OLPC has performed its obligations under the Employment Agreement.

53.     Defendant breached the Employment Agreement by intentionally disclosing the Converted Documents to third parties.

54.     As a direct and proximate result of Defendant's breaches of the Employment Agreement, Plaintiff has suffered damages in an amount to be proven at trial, but not less than $500,000.

## THIRD CAUSE OF ACTION
### (Intentional Interference with Economic Relations)

55.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint, as though fully set forth herein.

56.     By encouraging, enticing, and conspiring with the Former Employee to share the Converted Documents with him, and by encouraging others to obtain Converted Documents from the Former Employee, Defendant intentionally interfered with Plaintiff's existing and potential economic relations, including but not limited to its relationships with its clients.

57.     Defendant's intentional encouragement to, enticement of, and conspiracy with the Former Employee to breach the ITC Employment Agreement and disseminate, copy, and share

9

the Converted Documents was done through improper means. Defendant had no justification for encouraging and enticing the Former Employee to share the Converted Documents, and Defendant's primary intent in encouraging, enticing, and conspiring with the Former Employee to share the Converted Documents was to injure Plaintiff.

58.     Defendant's interference with Plaintiff's other current and future economic relations has injured Plaintiff, which injuries include but are not limited to: damage to Plaintiff's reputation as a result of the disclosure of the Converted Documents; a reduced ability to assure clients that all information will be kept strictly confidential; and the loss of prospective new clients as a result of Defendant's wrongful interference.

59.     Defendant's intentional interference with Plaintiff's current and future economic relations was willful, malicious, and made with reckless disregard for Plaintiff's rights.

60.     As a result of Defendant's intentional interference with Plaintiff's current and future economic relations, Defendant is liable to Plaintiff: (i) for actual damages in an amount to be determined at trial, but not less than $500,000; and (ii) for punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

61.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint, as though fully set forth herein.

62.     As an employee and associate of the Plaintiff (a law firm), Defendant owed Plaintiff a fiduciary duty.

63.      This fiduciary duty included, at a minimum, a duty to maintain all of Plaintiff's confidential information—including the Confidential Documents—in strict confidence, a duty to act in the best interests of the Plaintiff, and a duty of honest and ethical behavior.

10

64.     Defendant breached his fiduciary duties to Plaintiff by, *inter alia*: wrongfully accessing Plaintiff's Confidential Documents without justification; encouraging, enticing, and conspiring with the Former Employee to access Plaintiff's Confidential Documents without justification; and sharing Plaintiff's Confidential Documents without justification or authorization from Plaintiff.

65.     Defendant's breaches of fiduciary duties were willful and malicious and made with reckless disregard for Plaintiff's rights.

66.      As a direct and proximate result of Defendant's willful and malicious breaches of fiduciary duties to Plaintiff, Defendant is liable to Plaintiff: (i) for actual damages in an amount to be determined at trial, but not less than $500,000; and (ii) for punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (CFAA Conspiracy)

67.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint, as though fully set forth herein.

68.     ITC's computer servers are "protected computers" under the meaning of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*

69.     Upon information and belief, neither the Former Employee nor Defendant had any authority to access the Confidential Documents in June 2020 or at any time thereafter.

70.     Neither the Former Employee nor Defendant had any reason to believe that either had authority to access the Confidential Documents in June 2020 or at any time thereafter.

71.     Upon information and belief, at the request of and in concert with Defendant, the Former Employee accessed ITC's computer servers to obtain the Confidential Documents.

11

72.     Through the Former Employee's unauthorized access of the Confidential Documents, the Former Employee and Defendant obtained information, including OLPC's confidential client information.

73.     Through the Former Employee's unauthorized access of the Confidential Documents, Plaintiff has been harmed, in an amount to be proved at trial, but no less than $5,000.

74.     Upon information and belief, Defendant conspired with and enticed the Former Employee to access ITC's computer servers. The Former Employee would not have accessed ITC's computer servers but for Defendant's encouragement and enticement.

75.     Through communicating via Telegram and other messaging applications and using the Former Employee's wrongfully-retained access to ITC's computer networks to access the Confidential Documents, the Former Employee and Defendant engaged in common activities in furtherance of their conspiracy to obtain Confidential Documents in violation of the CFAA.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Conversion)

76.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint, as though fully set forth herein.

77.     The Former Employee's copying, possessing, and sharing of Converted Documents with Carolyn Olson constitutes conversion.

78.     Defendant knowingly and intentionally encouraged, enticed, and conspired with the Former Employee to convert Plaintiff's Converted Documents and participated with and joined the Former Employee in converting Plaintiff's Converted Documents.

79.     But for Defendant's conduct toward the Former Employee, the Former Employee would not have converted Plaintiff's Converted Documents.

12

80.     Defendant's aiding and abetting the Former Employee to convert Plaintiff's

Converted Documents was willful and malicious and made with reckless disregard for Plaintiff's

rights.

81.     As a direct and proximate result of Defendant's aiding and abetting the Former

Employee to convert Plaintiff's Converted Documents, Defendant is liable to Plaintiff: (i) for

actual damages in an amount to be determined at trial, but not less than $500,000; and (ii) for

punitive damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
**(Injunctive Relief)**

82.     Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of the Complaint, as though fully set forth herein.

83.     Defendant's conversion of the Converted Documents has caused and will cause

irreparable harm to Plaintiff, for which money damages are inadequate. Such irreparable harm

includes but is not limited to Plaintiff's loss of clients' goodwill and damage to Plaintiff's

reputation.

84.     The injuries to Plaintiff from the continued conversion of the Converted

Documents are substantial, severe, and outweigh the minimal burdens a narrowly tailored

injunction might place on Defendant.

85.     Defendant's actions, including the conversion of the Converted Documents have

violated or would violate at least Rules 1.6, 1.9, and 8.4 of the Utah Rules of Professional

Conduct.

86.     The public interest favors a narrowly tailored injunction prohibiting Defendant

from further converting more of Plaintiff's Confidential Documents, from sharing any of

13

Plaintiff's confidential information, and from sharing any client information protected by the Rules of Professional Conduct or any other law, rule, or regulation.

87.     There is a substantial likelihood that Plaintiff will prevail on its claims against Defendant.

## JURY DEMAND

Plaintiff demands a jury trial on all issues triable by right of jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays this Court enter judgment against Defendant, and in favor of Plaintiff, as follows:

On the First Cause of Action

1.     For general compensatory and consequential damages against Defendant in an amount subject to proof at trial, but not less than $500,000;

2.     For punitive damages against Defendant in an amount to be determined at trial; and

3.     For such other relief as the Court deems just and proper.

On the Second Cause of Action

1.     For general compensatory and consequential damages against Defendant in an amount subject to proof at trial, but not less than $500,000; and

2.     For such other relief as the Court deems just and proper.

On the Third Cause of Action

1.     For general compensatory and consequential damages against Defendant in an amount subject to proof at trial, but not less than $500,000;

2.     For punitive damages against Defendant in an amount to be determined at trial; and

111474160.1 0074788-00001

3.    For such other relief as the Court deems just and proper.

On the Fourth Cause of Action

1.    For general compensatory and consequential damages against Defendant in an

amount subject to proof at trial, but not less than $500,000;

2.    For punitive damages against Defendant in an amount to be determined at trial;

and

3.    For such other relief as the Court deems just and proper.

On the Fifth Cause of Action

1.    For general compensatory and consequential damages against Defendant in an

amount subject to proof at trial, but not less than $500,000;

2.    For such other relief as the Court deems just and proper.

On the Sixth Cause of Action

1.    For general compensatory and consequential damages against Defendant in an amount

subject to proof at trial, but not less than $500,000;

2.    For punitive damages against Defendant in an amount to be determined at trial;

and

3.    For such other relief as the Court deems just and proper.

On the Seventh Cause of Action

1.    For a permanent injunction against Defendant, ordering Defendant to:

a.    Return all physical copies of all Confidential Documents to Plaintiff;

b.    Destroy all electronic copies of all Confidential Documents and certify the

same in writing to Plaintiff;

15

c.      Immediately cease using, sharing, transmitting, exploiting, or accessing or attempting to access, directly or indirectly, any of Plaintiff's Confidential Documents;

d.      Immediately cease using, sharing, transmitting, exploiting, or accessing or attempting to access, directly or indirectly, any confidential client information as required by the Utah Rules of Professional Conduct; and

e.      Identify in writing all third parties with whom Defendant has shared or transmitted Plaintiff's Confidential Documents and to obtain any such shared or transmitted copies from such third parties.

2.      For such other relief as the Court deems just and proper.


DATED:  June 13, 2021.


                                      STOEL RIVES LLP

                                      */s/ David J. Jordan*
                                      David J. Jordan
                                      Mark E. Hindley
                                      Jordan C. Hilton
                                      *Attorneys for OL Private Counsel, LLC*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of July, 2021, a true and correct copy of the

foregoing **FIRST AMENDED COMPLAINT AND JURY DEMAND** was served on the

following via the Court's electronic filing system:


Scott M. Lilja
Sarah C. Vaughn
FABIAN VANCOTT
215 South State Street, Ste. 1200
Salt Lake City, UT 84111-2323
Telephone: (801) 531-8900
slilja@fabianvancott.com
svaughn@fabianvancott.com
*Attorneys for Defendant*


*/s/ Wendi O. Wacker*

# EXHIBIT C

# EXHIBIT C

1    that specifically I was not practicing law.

2         Q.    So let me -- let me explore your

3    understanding of how the rules of practice of law

4    work.

5              Do you -- do you believe that if you're

6    doing legal research, tax planning, consulting on tax

7    return preparation for a Canadian, that you must be

8    licensed to practice law in Canada?

9              MR. LILJA:  Object to the extent it calls

10   for a legal conclusion.

11             You can answer as to your belief.

12             THE WITNESS:  My understanding is that,

13   much like a paralegal or other research assistant,

14   performing legal research in and of itself does not

15   necessarily mean it's provision of legal services,

16   provided that a licensed attorney oversees and makes

17   sure that that advice is not given out without having

18   a lawyer finish preparing it.

19        Q.    BY MR. JORDAN:  Isn't that also true of

20   legal associates?  Lawyers?

21             Isn't it your understanding that a lawyer

22   can perform legal services for someone in a

23   jurisdiction in which they're not licensed so long as

24   their work is overseen and supervised by someone

25   licensed in that jurisdiction?

1              MR. LILJA:  Objection.  Incomplete

2    hypothetical.  It calls for a legal conclusion.

3              Go ahead and answer.

4              THE WITNESS:  I don't know the answer to

5    that.

6         Q.    BY MR. JORDAN:  You think a lawyer at

7    Baker and Botts, a young associate, can -- who's only

8    licensed in Texas can only do work for clients in

9    Texas?

10         A.    If it's a federal --

11              MR. LILJA:  Object to the extent it calls

12    for a legal conclusion.

13              Go ahead.

14              THE WITNESS:  To the extent it's federal

15    law, i.e., tax law, I believe that they would go on.

16    But if, for example, an associate in Baker Botts was

17    giving advice on New York State law, I think that

18    would be improper.

19         Q.    BY MR. JORDAN:  If they were supervised

20    by someone licensed to practice in New York, is it

21    your understanding that a Baker and Botts lawyer who's

22    only licensed in Texas could provide legal services to

23    a client in New York about New York legal matters?

24              MR. LILJA:  To the extent it calls for a

25    legal conclusion.

1                    THE WITNESS:  My understanding is that a

2    Texas lawyer would not be providing legal services

3    because they would be overseen by a lawyer who is

4    licensed in that jurisdiction.

5          Q.     BY MR. JORDAN:  Where did you get this

6    understanding from?  Is this something you've

7    personally researched?

8          A.     I don't know.  I've accumulated it

9    through the years.  I don't recall exactly where I got

10   this information.

11         Q.     Is this something you've ever sought a

12   legal opinion on?

13         A.     I have not, to my knowledge.

14         Q.     Did you have a title at OLPC?

15         A.     I don't know.  I don't know where the

16   title would show up.

17         Q.     Were you aware of ever having a title?

18         A.     I believe at the base of Tom and Hyrum's

19   emails it says "general counsel," as does Bruce

20   Lemons.  I believe I specifically did not have a title

21   in mine so that I would not run afoul of Canadian law.

22   I could be mistaken.

23         Q.     Did someone tell you that you couldn't

24   have a title or you would run afoul of Canadian law?

25         A.     Nope, that was just my gut instinct.

1        Q.     Did you ever appear in any court
2  proceedings during your employment at OLPC?
3        A.     I don't recall when it was, but I believe
4  I may have been a witness to a case that I think
5  settled, I don't -- I don't -- I never went to court
6  in it, but between OHC, Olson's High Country Buffalo,
7  and some meat processor.  Again, I don't recall the
8  date of that.
9        Q.     And the only capacity in which you
10  appeared in that matter was as a witness?
11        A.     I believe so.
12        Q.     Did you ever represent anyone in any
13  Canadian legal proceeding, whether of record or not of
14  record?
15        A.     Not to my recollection.
16        (Exhibit 3 was marked for identification.)
17        Q.     BY MR. JORDAN:  Please look at what we've
18  marked as Exhibit 3 to your deposition.
19              Can you identify this document for us,
20  please, Mr. Olson.
21        A.     This appears to be my resumé, or some
22  version of it.
23        Q.     You see that you list here as your
24  address 14858 Saddle Leaf Court, Draper, Utah?
25        A.     That is what it says.

1      Q.      And you can see that the latest date that
2   appears on this particular resumé is March 2020.
3              You see that?
4      A.      Correct.  Yes, correct.
5      Q.      When did you prepare this resumé?
6      A.      I don't recall, but I assume after March
7   of 2020.
8      Q.      For what purpose?
9      A.      I don't recall, but it might have been
10  for job applications after my LLM program.
11     Q.      You'll see that you've listed your
12  employment history on this particular resumé, and if
13  you look under the heading "Experience," three down
14  from that you'll see your employment with OL Private
15  Counsel, LLC, right?
16     A.      Correct.
17     Q.      And the dates of employment July 2014
18  through September 2019?
19     A.      Correct.
20     Q.      Are those the correct dates?
21     A.      Again, I believe so.  I -- well, again, I
22  began with OLPC, I believe, in May of 2014.
23     Q.      Why does it say July on your resumé?
24     A.      I'm not sure.
25     Q.      Are you the one who prepared this resumé?

1      A.      Likely.

2      Q.      **Do you have any idea why you got a**

3  **different date?**

4      A.      It might have been just a mistake.

5      Q.      **What's the capacity in which you state on**

6  **your resumé that you were employed by OL Private**

7  **Counsel, LLC?**

8      A.      Attorney.

9      Q.      **And do you dispute that?**

10      A.      I was an attorney at the time, so, no.

11      Q.      **Well, you were an attorney for OL Private**

12  **Counsel, LLC, right?**

13      A.      I was an attorney employed by OL Private

14  Counsel, LLC.

15      Q.      **As an attorney.  They employed you as an**

16  **attorney.  That's what this means, right?**

17      A.      I'm not sure.

18              MR. LILJA:  Objection.  It's asked and

19  answered.

20              MR. JORDAN:  Go ahead.

21              THE WITNESS:  I'm not sure.

22      Q.      **BY MR. JORDAN:  You don't know what you**

23  **meant when you wrote "Attorney, OL Private Counsel"?**

24      A.      I did not mean that I was employed as an

25  attorney by OL Private Counsel.

1          (Exhibit 4 was marked for identification.)

2          Q.     BY MR. JORDAN:  Let me show you now

3     what's been marked as Exhibit 4 to your deposition.

4          A.     Uh-huh.

5          Q.     Do you recognize this as another version

6     of your resumé?

7          A.     It appears to be.

8          Q.     And this is from an earlier point in

9     time, correct?

10         A.     It appears to be.

11         Q.     Because the latest date on this document

12    is 2014, right?

13         A.     Correct.

14         Q.     And you'll see here that at the top of

15    the experience category you've written "OL Private

16    Counsel, Attorney"?

17         A.     Yes.

18         Q.     And is it your testimony that when you

19    wrote those words, you did not mean to communicate

20    that you were an attorney for OL Private Counsel?

21         A.     I don't recall exactly.  It was nine

22    years ago.

23         (Exhibit 5 was marked for identification.)

24         Q.     BY MR. JORDAN:  Let me have you look at

25    what we've marked as Exhibit 5 to your deposition.

1                    Can you tell us what this is?

2          A.    This, again, appears to be a resumé

3    draft.

4          Q.    You're calling it a draft.  Why?

5          A.    I don't know if this was a final version

6    or a draft.

7          Q.    And this is for a period of time not

8    later than -- well, not earlier than 2015, right?

9          A.    That appears to be the case.

10         Q.    And you'll see on this resumé that you

11   list yourself as an intern for OL Private Counsel,

12   LLC, correct?

13         A.    Yes.

14         Q.    Remind us when you graduated from law

15   school.

16         A.    In the end of the semester of 2014.

17         Q.    So inasmuch as you went to work for OL

18   Private Counsel in 2014, why were you showing yourself

19   as an intern from June of 2014 to May of 2015?

20         A.    Again, I do not recall, I apologize.

21         Q.    So look back at Exhibit 3.  You'll see

22   here that you list yourself as an attorney at OL

23   Private Counsel from July of 2014 to September of

24   2019, right?

25         A.    Three, OL Private Counsel, yes.

1       Q.      And -- and in Exhibit 5 you show yourself

2   in that same time period beginning here in June of

3   2014 as an intern through May of 2015.  I'm asking if

4   you can reconcile those things for us.

5       A.      Unfortunately, I cannot.

6       Q.      If you'll look at some of the duties that

7   you performed --

8       A.      Which exhibit?

9       Q.      Five -- at OL Private Counsel in that

10  period June of 2014 to May of 2015, had you passed the

11  bar prior to May of 2015?

12      A.      Yes.

13      Q.      When did you take the bar exam in Utah?

14      A.      I -- maybe July -- I passed -- I received

15  my license in October.  I think it was a June or a

16  July bar, I don't recall.

17      Q.      October of 2014?

18      A.      Correct.

19      Q.      Read for us the work that you described

20  here as representative -- excuse me -- in Exhibit 5.

21      A.      For OL Private Counsel policy?

22      Q.      Yes.

23      A.      "Researched Canadian and U.S. tax issues

24  including Section 55, Subsection 2, 'butterfly' Loss

25  Restriction Events for trusts, tax court procedural

# EXHIBIT D

# EXHIBIT D

1 &

IN THE UNITED STATES DISTRICT COURT

2

FOR THE CENTRAL DISTRICT OF UTAH

3

4      OL PRIVATE COUNSEL,      )  30(b)(6) Deposition of
       LLC, a Utah limited      )
5      liability company,       )  OL Private Counsel, LLC
                                 )  through:
6            Plaintiff,          )
                                 )  Thomas Olson
7      vs.                       )
                                 )  Civil No. 2:21-CV-00455-DBB
8      EPHRAIM OLSON, an         )
9      individual,              )  Judge David Barlow
10                               )  Magistrate Daphne A. Oberg
11           Defendants.         )

12

13

14

15

16                February 15, 2023 * 9:00 a.m.

17

18            Location:  Fabian VanCott

19           95 South State Street, Suite 2300

20            Salt Lake City, Utah 84111

21

22

23

24           Reporter:  Diana Kent, RPR, CRR

25      Notary Public in and for the State of Utah

                                              Page 1

1    I don't know what the terms of that policy were.  But
2    that's been terminated, in any event.
3          Q.    Who was the insurer at that time?
4          A.    I just remember the initials.  It's like
5    A-L-I-S or something like that.  I don't even remember
6    the name of it right now.
7          Q.    Okay.  You mentioned earlier that for some
8    of the server questions you would have to talk to the
9    head of the IT department.  Who is that person?
10         A.    That would be somebody in the IT
11   department.  There's several IT people that have
12   different expertise.
13         Q.    Okay.  And who is an expert on the server?
14         A.    A fellow by the name -- it's a company
15   named Crucial Logics, is the company.  And there's
16   several IT experts there, so I guess I'd be guessing as
17   to which one had the expertise on servers.
18         Q.    And where is -- is it "Crucial"?
19         A.    Crucial Logics, yes.
20         Q.    Where are they located?
21         A.    Well, the head office is in Toronto, but
22   they've got people from different places around the
23   world that they work with.  So where any particular
24   person is located, I don't know that.
25         Q.    Okay.  All right.  When did Ephraim Olson

```
 1   begin working at OLPC?
 2        A.    As I recall, it was probably 20-- he may
 3   have provided services as early as 2014.
 4        Q.    Is there a way to determine the exact
 5   start date?
 6        A.    I don't know.  I mean, I don't know how I
 7   would do it right as I sit here.
 8        Q.    What about his W-2s?
 9        A.    Yeah, if he received W-2s we could check
10   W-2s.
11        Q.    If he didn't receive W-2s how would he
12   have been getting paid?
13        A.    Could have been a 1099, or it may have
14   been part of the family plan.  I don't know the answer
15   to that.  I don't recall.
16        Q.    Do you have documents of the family plan?
17        A.    "Documents" meaning?
18        Q.    When you say if he was being paid as part
19   of the family plan --
20        A.    Well, there would be record that money
21   would have come to him through the family plan.  His
22   Harvard education, for example.
23        Q.    And what sort of records would show
24   whether or not the family plan paid him for services
25   for OLPC?
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1       A.    Those are old records.  I would have to --

2  a person would have to go back and see the payments and

3  when they were paid and how they were charged.  They

4  would be charged -- they could have come from various

5  entities charged back to the family plan.

6       Q.    And are those payments logged at the time

7  they are made?

8       A.    "Logged" meaning?

9       Q.    Contemporaneous with when the payments are

10  made.

11       A.    Well, there would be a check, if that's

12  what you mean, or a wire.

13       Q.    And what was the nature of Ephraim's

14  employment at OLPC?

15       A.    He was engaged when he was -- when he was

16  admitted to the Bar, he was engaged as a lawyer.

17       Q.    Did he ever sign an employment agreement?

18       A.    Not that we have found to date.

19       Q.    Did OLPC keep an employment file for

20  Ephraim?

21       A.    Ephraim was managing that, and we have

22  seen no employment file for Ephraim.

23       Q.    Does OLPC keep employment files on other

24  employees?

25       A.    What does "an employment file" mean?

1    Q.   A file where you keep relevant documents
2    like an employment agreement, any discipline, W-2
3    history, things like that.
4    A.   I don't know that that would be a
5    particular file, but W-2 history would be kept
6    somewhere.  I'm not aware of any discipline.
7    Contracts, when they are forwarded to the head office,
8    forwarded to Bangkok, are recorded electronically.  So
9    there's a place to record electronically contracts.  If
10   it's not forwarded there, it would be -- I don't know
11   where it would be.  I would doubt there would be any
12   physical files, like file folders, that I'm aware of.
13   Q.   Okay.  So OLPC maintains all of its
14   records electronically?
15   A.   They were supposed to be -- as a general
16   rule they are supposed to be maintained electronically.
17   Q.   But OLPC doesn't have a document
18   management system, right?
19   A.   No.
20   Q.   So where were they maintained
21   electronically?
22   A.   They would be on the remote server.
23   Q.   For OLPCCIL?
24   A.   Yes.
25   Q.   And you have no record of an employment

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

agreement for Ephraim?

     A.    Not that we have found.

     Q.    Okay.  How was Ephraim paid for his work?

     A.    Salary, I believe, W-2.

     Q.    What was his salary?

     A.    It varied.  When he first came, it was sort of equivalent -- I believe it was in the thirties, $30,000 to $40,000 range.  And then it was raised at some later date.

     Q.    Were there any documents evidencing the changes for that change in salary?

     A.    It would be the W-2s.  I mean the W-2s would show that.

     Q.    Any documents showing why the change was made?

     A.    Not that I'm aware of.

     Q.    Okay.  When did Ephraim gain access to the OLPCCIL server?

     A.    I don't recall the date on which he would have gained access to the server.

     Q.    Okay.  And would Ephraim have had access to the entire server or just specific files?

     A.    Ephraim would have had access to most of the server, perhaps all the server.  People in whom we reposed the highest confidence and who would

1    occasionally deal with management type issues would
2    typically have broad access to the file, to the server.
3                    (EXHIBIT 10 WAS MARKED.)
4                    MS. VAUGHN:  I'll represent to counsel,
5    you'll note that the Bates number here has a ".01."  Do
6    you see that, David?
7                    MR. JORDAN:  I do.
8                    MS. VAUGHN:  That is because -- and I'm
9    not sure how we transmitted the files to you, if you
10   had natives.  But the image that was uploaded to our
11   document review file cut off some of the information.
12   So we went back to the native and printed it as this
13   version.  That's why it has the ".01."  So if you have
14   concerns about that, let me know.  I think we provided
15   natives in our production.  I'm not sure.  But I just
16   wanted to get that out there.
17        Q.    (By Ms. Vaughn)  Mr. Olson, this is an
18   e-mail that was sent from Volta Data Centers to various
19   individuals, mostly just Joshua, Hyrum, and Ephraim.
20   Do you see that?
21        A.    I see that.
22        Q.    Okay.  Is Volta Data Centers the company
23   that maintains the physical server for OLPCCIL?
24        A.    During the time in question, yes.
25        Q.    Okay.  Why are -- do you know why Volta

```
 1   Data Centers is e-mailing people at olsonlemons.com,
 2   iCloud accounts, or gMail accounts?
 3         A.    I have no idea.
 4         Q.    Okay.  Can you please --
 5               You'll see the original, David, as the
 6   third page.
 7               Could you please turn to the last page of
 8   this Exhibit 10.  This is a security access list from
 9   Volta Data Centers to the company International
10   Commercial Services, LTD.  Do you see that?
11         A.    I see that.
12         Q.    I believe you testified earlier that it's
13   OLPCCIL that has the contract with Volta.  Does this
14   refresh your memory that it could be ICS instead?
15         A.    ICS, being done on behalf of OLPCCIL.  But
16   OLPCCI paid all the fees and so on.  So I'm not sure
17   why that's listed there.  But OLPCCI was responsible
18   for it.  So why the holding company -- I would only
19   speculate as to why that might or how they might have
20   that name on there.
21         Q.    Okay.  And do you see that as of the date
22   of this e-mail, February 27, 2019, Ephraim Olson, line
23   3 on this table, had all levels of access to this
24   server?  Do you see that?
25         A.    I don't see where it says that.
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1      Q.     I can provide some additional context for

2   you, Mr. Olson.  On the prior page it defines what List

3   Owners, Portal Users, and Fast Track Users are.

4      A.     Okay.  May I take this document apart?

5      Q.     You can.  We will have to make sure it

6   gets put back in the correct --

7      A.     I'm trying to read this at the same time.

8             MR. JORDAN:  Don't.  You can use mine to

9   look at, but don't take the exhibits apart.

10            Why don't we take a break.

11            (Break taken from 11:00 to 11:04 a.m.)

12     Q.     Mr. Olson, have you had a chance to review

13  this document?

14     A.     I'm in the process of doing it right now.

15     Q.     Okay.

16     A.     I don't know exactly what this means but,

17  Ephraim is checked off as a list owner, a portal user,

18  and a fast track user.

19     Q.     Okay.

20     A.     But it says -- it talks about various

21  responsibilities.  My understanding was he had access

22  to all or substantially all of the system.  I don't see

23  that it says that here, necessarily, but that may well

24  be the -- but that was my understanding generally, that

25  he had access to substantially all of the system.

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1    Q.   Okay.  Do you see that it listed him as a
2    manager under Job Title?
3    A.   I see that.
4    Q.   Okay.  Is that a manager of ICS?
5    A.   I don't know where those names came from,
6    why they were put there.
7    Q.   Okay.  Would they have come from Joshua
8    Olson, who is the list owner?
9         MR. JORDAN:  Objection.  Calls for
10   speculation.
11   A.   I don't know where those names come from.
12   Q.   Okay.  Do you know if the security access
13   list has ever been amended or updated?
14   A.   I suspect it has been, during the time in
15   question, 2018 to 2020.  I suspect it has been changed
16   but I don't know that for sure.
17   Q.   And would those changes have been
18   documented?
19   A.   If they were changed, I suspect there
20   would be some kind of communication, whether oral or
21   written, I don't know, between somebody, Mike Gedlaman
22   or Joshua or somebody and Volta.
23        I can't speculate as to how changes were
24   made, if they were made internally by, say, one of the
25   IT experts internally.  I don't know that.  I don't

```
 1    know if Volta had to be involved in that.  I don't know
 2    that.
 3           Q.    Okay.  Does Olson Lemons have access to
 4    the OLPCCIL server?
 5           A.    No.
 6           Q.    Okay.  Do you know why Volta would be
 7    e-mailing individuals at an Olson Lemons e-mail account
 8    if they should not be accessing that server?
 9           A.    That was just an old e-mail address that
10    forwarded to OL Tax.
11           Q.    Okay.
12                 (EXHIBIT 11 WAS MARKED.)
13           Q.    Mr. Olson, this is another one of OLPC's
14    responses to written discovery.  For now, and you are
15    free to look at the whole thing, but I am particularly
16    interested in Exhibit 1 to this document, which is the
17    last four pages.
18                 Have you seen this document before?
19           A.    I have seen this before.
20           Q.    Okay.  Did you help prepare the document?
21           A.    No.  It was prepared by those much smarter
22    than I.
23           Q.    Who was it prepared by?
24           A.    I believe it was prepared by someone in --
25    some of the IT experts.
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1     Q.    Do you know their names?

2     A.    No, I don't know the name of the person or

3 persons who assembled this information for me.

4     Q.    Okay.  Do you know the source material for

5 the columns?

6     A.    This would have been -- it would have been

7 off the computer record, but I'm not sure exactly what

8 portion of the computer record would have this.

9     Q.    Okay.  If you could turn to the last page.

10 Just above the mid-point of the document you see an

11 entry for OL Private Counsel Ephraim Olson.  Do you see

12 that?

13     A.    I see that.

14     Q.    Okay.  And this document purports to

15 represent that his access to the server started prior

16 to January 1, 2018.  Do you see that?

17     A.    I see that.

18     Q.    Do you know the date that that access

19 started?

20     A.    I think I mentioned earlier, I don't know

21 when he first got access to the servers.

22     Q.    Okay.  And it says that the access to the

23 server ended on September 1, 2019.  Do you see that?

24     A.    I see that.

25     Q.    Where did that date come from?

1      A.    It came from the computer logs, I assume,
2    that they gathered, whatever computer records they had
3    to gather to demonstrate this.
4      Q.    So you think there are documents that back
5    up this table?
6      A.    I assume there's some kind of a computer
7    log that shows that.
8      Q.    Okay.  And then it says he had access to
9    client files on matters for which the individual was
10   performing those services.  Do you see that?
11     A.    I see that.
12     Q.    It says that for everyone; is that correct?
13     A.    Right.
14     Q.    Okay.  Where does that information come
15   from?
16     A.    That would be on some kind of a computer
17   record that showed accesses to -- showing that -- that
18   phrase refers to, as I -- I can't say.  Those are not
19   my words, so I believe it just means -- I'm
20   speculating.
21     Q.    Do you know whose words they are?
22     A.    That would either be the words that come
23   off the computer, or the words that some IT person
24   would have put in there.
25     Q.    Okay.  So again, you think that there are

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1    documents which would support the information in the
2    last column of this table?
3           A.    There would be some kind of computer
4    record, I assume, that would show that.  I'm assuming
5    that.
6           Q.    Okay.  The allegations in this case,
7    Mr. Olson, and I am paraphrasing here, I realize this
8    will not be correct, but are generally that Ephraim
9    Olson improperly obtained access to OLPC's private
10   confidential information.  Is that your understanding
11   of the general nature of this lawsuit?
12              MR. JORDAN:  Objection.  Misstates the
13   pleadings.
14          A.    Got access to documents, yes.  He got
15   access to documents to which he wasn't entitled to get.
16          Q.    Okay.  Let's go through those documents.
17              (EXHIBIT 12 WAS MARKED.)
18          Q.    Mr. Olson, do you recognize this document?
19          A.    I do recognize the document, yes.
20          Q.    What is it?
21          A.    It looks like it's a summary of trusts
22   with some information, well, it speaks for itself, but
23   summarizing information about the trust.
24          Q.    Who created this document?
25          A.    It would have been created by one of the

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

lawyers.

Q.    For which entity?

A.    Well, one of the lawyers for the firm would have summarized this for all of the trusts.

Q.    And what firm are you talking about?

A.    Well, this would have probably been done in ITCL, but it could have been prepared somewhere else.  But probably ITCL.

Q.    Okay.  Do you know when it was created?

A.    I don't know the date it was created.

Q.    Was it created for OLPC?

A.    It was created for use by any lawyers that had need to look at this information.

Q.    And who did those lawyers -- what entity did those lawyers work for?

A.    They could have worked for or could have been contractors with OLPTE, ICL, they could have been any of the contractors that had a need to go through this particular information on a client, on a trust.

Q.    Does this document -- to which client does this document refer, the individual or the -- yeah, to which client does this document refer?

A.    Sorry?

Q.    Does this document refer to a specific client of OLPCCIL?

```
  1        A.    It refers to information that OLPCCIL had

  2   in its possession on behalf of several different

  3   clients.

  4        Q.    And who are those clients?

  5        A.    Well, the Olson estate trust would have

  6   been -- that document would have been in the possession

  7   from when the trust was first settled.  The trustee, I

  8   believe at the time, was -- I don't recall who the

  9   trustee was at the time this document was produced.

 10        White Buffalo Trust was first received

 11   when Bruce Lemons settled the trust.  And the law firm

 12   continued and continues to represent the trustees of

 13   the trust, as well as at times a protector.

 14        Carolyn Olson Spousal Trust was first

 15   obtained when I settled the trust.

 16        Waterland Trust was obtained when Bruce

 17   Lemons first settled that trust.

 18        Thomas H. Olson Trust was obtained when

 19   Thomas and Carolyn first settled the trust.

 20        Olson Manitoba Conservation Trust was

 21   obtained when Jack Hardy Olson first settled the trust.

 22        William Bell Hardy Trust was obtained when

 23   Marlene Olson first settled the trust.

 24        Ruth Doxey Family Trust was first obtained

 25   when Ruth Doxey settled the trust.
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1          And the George Whitehead Family Trust was
2   first obtained when Marlene Olson first settled the
3   trust.
4          Q.    And you are using the phrase "obtained."
5   Do you mean that OLPCCIL obtained the client when the
6   trust was first settled?
7          A.    That's correct.  When these settlors
8   settled the trust, we represented the settlor when the
9   settlor first settled these trusts.
10         Q.    Were some of these trusts settled before
11  OLPCCIL was created?
12         A.    Yes.  Olson Lemons.
13         Q.    What is OLPC Lemons?
14         A.    Olson Lemons was a law firm in Calgary,
15  Olson Lemons, LLP.
16         Q.    Okay.  And what is the relationship
17  between Olson Lemons, LLP and OLPCCIL?
18         A.    They were two law firms in which I was
19  involved.  There was no other sort of contractual
20  relation between them OL, LLP.  The clients, unless
21  they requested to stay, transferred over to OLPCCIL.
22         Q.    And when did that transfer happen?
23         A.    I believe it was in 2010.
24         Q.    And was that documented in any way?  Were
25  the clients requested to go to OLPCCIL?

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1          A.     No.  They were given the option.  OL, LLP

2    was winding down.  Some clients requested to stay with

3    OL, LLP.  The rest had transferred over, agreed to

4    transfer over.

5          Q.     I thought you said Olson Lemons was winding

6    down.

7          A.     Yes.

8          Q.     So who requested to stay with the company

9    that was winding down?

10          A.     Clients -- there were some clients that

11    had a short-term relationship -- they did not perceive

12    to have a longer term relationship, so they were happy

13    to stay with Olson Lemons as it wound down.

14          Q.     Okay.  What corporate entity maintains

15    possession of this document?

16          A.     Those were all kept by OLPCCIL.

17          Q.     Okay.  Is this a document that OLPC

18    alleges Ephraim Olson improperly obtained from the

19    server?

20          A.     Yes.

21          Q.     Does OLPC have any evidence to support the

22    claim that Ephraim Olson obtained this document from

23    the server?

24          A.     Yes.

25          Q.     What is that evidence?

1      A.    He obtained it and it was obtained, as I

2   understand, when a former employee was able to get into

3   the system, get access to this document, and forward it

4   to Ephraim.

5      Q.    And is that former employee Tim A.?

6      A.    Yes.  Ti Akarapanich.  That's correct.

7      Q.    Does OLPC have any evidence that Ephraim

8   Olson has shared this document with anyone but his

9   lawyers?

10     A.    I don't recall if this was on the e-mail

11  sent to Patricia.  As I sit here, I don't recall if

12  this was on an e-mail sent to Patricia.

13     Q.    If it was not on an e-mail sent to

14  Patricia, does OLPC have any evidence that he shared

15  this with anyone but his own personal lawyers?

16     A.    As I sit here, not that I'm aware of.

17     Q.    Okay.  What is the damage to OLPC from

18  Ephraim's possession of this document?

19     A.    This is a document we would view as a

20  confidential document held on behalf of the persons who

21  entrusted us with the document.  And the ability of

22  OLPC -- OLPC has reputational damage, obviously, if it

23  can't keep confidential information entrusted to it,

24  because it reflects on the entire law firm, including

25  OLPCCIL.

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
 1          Q.    Does Ephraim's possession of this document
 2    prevent OLPC from taking any actions related to this
 3    document; like can you amend it, can you draft it?
 4          A.    Can OLPC amend this document?
 5          Q.    Yes.  The native.  The original.
 6          A.    Can someone at OLPC physically amend the
 7    document?
 8          Q.    Yes.
 9          A.    If they were authorized and had access to
10    it.
11          Q.    Okay.
12                (EXHIBIT 13 WAS MARKED.)
13          Q.    What is this document, Mr. Olson?
14          A.    Carolyn Olson Spousal Trust.
15          Q.    Who created this document?
16          A.    I don't know who physically created the
17    document, but this was my trust, it was prepared on my
18    behalf.
19          Q.    Okay.  When was it created?
20          A.    The actual date of creation, I don't know
21    that.  The trust was effective as of February 2, 2000.
22          Q.    Okay.  And was it created for OLPC?
23          A.    This document was -- when you say "created
24    for OLPC," I don't understand the question.  It was
25    created for me.
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
 1        Q.    For you as an individual?

 2        A.    As the grantor, yes.

 3        Q.    Who was the client that this document

 4   belongs to?

 5        A.    Well, this was -- this document was

 6   created for me.  This document belongs to me because I

 7   was the grantor and asked it be created.

 8        Q.    What is the entity that represents you?

 9        A.    The entity that represents me is OLPCCIL,

10   and any other entity that performs services on my

11   behalf.

12        Q.    And do you have an engagement agreement

13   with OLPCCIL?

14        A.    A written agreement?  A written engagement

15   agreement?

16        Q.    Yes.

17        A.    No.  Not that I recall.

18        Q.    Okay.  What corporate entity maintains

19   possession of this document?

20        A.    OLPCCIL.

21        Q.    Is this one of the documents that OLPC

22   alleges Ephraim improperly took from the server?

23        A.    Yes.

24        Q.    What is the proof that Ephraim obtained

25   this document from the OLPCCIL server?
```

1    A.    Proof?  I'm not sure what you mean by
2  "proof," buy my understanding is that it requested Tim
3  Akarapanich found a way to get around the system and
4  get into the server and download this document, which
5  he then passed on to Ephraim.
6    Q.    Okay.  What is the damage to OLPC's
7  clients for Ephraim having possession of this document?
8    A.    Again, it goes to the point that we have
9  an obligation to protect confidential information of
10 our clients.  And when we fail to do that, that has an
11 impact on our trustworthiness and our credibility.
12   Q.    Does Ephraim's possession of this document
13 preclude OLPC, OLPCCIL, or its clients from exercising
14 any control over the trust?
15   A.    Can you repeat the question?
16   Q.    Yes.  Does Ephraim's possession of this
17 document preclude OLPC, OLPCCIL, or the client from
18 exercising any control over the trust?
19   A.    No.
20   Q.    What is the proof that OLPC has that
21 Ephraim Olson shared this document with anyone but his
22 personal lawyers?
23   A.    Because this trust document shows up in
24 Carolyn's counter-petition, as I recall.  And I believe
25 this may or may not have been listed in the --

```
 1    somewhere in the Mareva injunction or some other
 2    lawsuit.
 3         Q.    So the only proof is that it potentially
 4    came up in your divorce proceeding; is that right?
 5              MR. JORDAN:   Objection.   Misstates his
 6    testimony.
 7         A.    I think it has appeared in multiple
 8    lawsuits.
 9         Q.    Okay.   But what is the proof that Ephraim
10    is the individual that provided that document?
11         A.    That's an ongoing investigation.
12         Q.    Okay.
13              (EXHIBIT 14 WAS MARKED.)
14         Q.    What is this document?
15         A.    It's a trust deed.
16         Q.    Who created this document?
17         A.    I don't know the lawyer that prepared the
18    document, but it was prepared for Bruce Lemons as a
19    client.
20         Q.    Okay.   So this document belongs to Bruce
21    Lemons?
22         A.    This document was prepared for Bruce
23    Lemons, that's correct.
24         Q.    What corporate entity maintains possession
25    of this document?
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
 1            A.    OLPCCIL.

 2            Q.    Did Bruce Lemons sign an engagement

 3     agreement for the representation of OLPCCIL?

 4            A.    I am not -- I do not recall whether he

 5     signed a written engagement agreement.

 6            Q.    Okay.  Is this a document that OLPC

 7     alleges Ephraim improperly obtained from the server?

 8            A.    I just want to make sure which one this

 9     is, sorry.

10            Yes.

11            Q.    Okay.  And is the only proof that OLPC has

12     of that, the fact that Ephraim got this from Tim A.?

13            MR. JORDAN:  Tim A. is Akarapanich?

14            MS. VAUGHN:  Yes.  I just don't feel like

15     butchering his name every time, so I'm just saying "Tim

16     A."

17            A.    No.  This document shows up in several

18     pieces of litigation.

19            Q.    (By Ms. Vaughn)  Okay.  But what is the

20     proof that Ephraim obtained this from the server?

21            A.    Because Tim Akarapanich got into our

22     server and was able to retrieve the document, and then

23     downloaded it and sent it to Ephraim.

24            Q.    Okay.  Does Ephraim's possession of this

25     document prevent OLPC, OLPCCIL, or its clients, from
```

1  taking any actions respective to the trust?

2       A.    At any time?  What time frame are you

3  talking about?

4       Q.    Any time post Ephraim's possession of this

5  document.  Any time post 2020.

6       A.    Yes.  I believe that when Buffalo Trust

7  was listed in the Mareva injunction.

8       Q.    Well, the prevention of acting on that

9  trust is related to the Mareva injunction, not purely

10  Ephraim's possession, correct?

11            MR. JORDAN:  Objection.  Argumentative.

12       A.    Neither the law firm nor the trustee nor

13  the protector I think was able to deal with aspects of

14  this trust as a result of the Mareva injunction.

15       Q.    Okay.  And that is what prevented

16  amendments to the trust or any actions under the trust,

17  is the Mareva injunction?

18       A.    Well, the Mareva injunction prevented the

19  trustee or anyone from doing anything with respect to

20  certain aspects of the operation of the trust.  That's

21  what you're asking?

22       Q.    I'm asking if Ephraim's possession of the

23  document prevents someone, disregarding the Mareva

24  injunction, from taking action under the trust.

25       A.    Are you saying -- I don't understand

```
1    question.  You're saying if he physically had this in
2    his hands --
3         Q.    Yes.
4         A.    -- and it went nowhere else does that stop
5    OLPCCI from taking instructions on dealing with the
6    trust instrument?  Is that what you're saying?  I
7    didn't understand.
8         Q.    Yes.
9         A.    That's what you're saying?
10        Q.    Yes.
11        A.    No.
12        Q.    Okay.
13              (EXHIBIT 15 WAS MARKED.)
14        Q.    Is this another document that OLPC alleges
15   Ephraim obtained from the server?
16        A.    Yes.
17        Q.    Who is the corporate entity that maintains
18   possession of this document?
19        A.    OLPCCIL.
20        Q.    Who is the client to which this document
21   belongs?
22        A.    Well, this document originally belonged to
23   me and to Carolyn as settlors of the trust, and was
24   subsequently used by the trustee of the trust.
25        Q.    Do you know who the current trustee is?
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
 1        A.      Current trustee is Hyrum Olson.

 2                That's H-Y-R-U-M.

 3        Q.      Besides the fact that Ephraim obtained

 4   this document from Tim A., is there any evidence that

 5   it came from the server?

 6        A.      Tim Akarapanich identified that he went

 7   into the server, retrieved this document, downloaded

 8   it, and sent it to Ephraim.

 9        Q.      Where did he identify that?

10        A.      Where did he identify that?

11        Q.      Yes.

12        A.      He told me that.  He told others that,

13   too.  May I look at his declaration or is that not

14   necessary?  Yeah, he told me that, so that's how I

15   know.

16                (EXHIBIT 16 WAS MARKED.)

17        Q.      Is this another document that OLPC alleges

18   Ephraim improperly obtained from the server?

19        A.      Yes.

20        Q.      And besides obtaining it from Tim A., and

21   Tim A.'s representation to you, is there any proof that

22   this came from the server?

23        A.      Not that I'm aware of as I sit here.

24        Q.      Who is the corporate entity that holds

25   this document?
```

```
 1        A.      OL Private Corporate Counsel International,
 2   LTD.
 3        Q.      Does OLPC have any evidence that Ephraim
 4   Olson shared this document with anyone but his personal
 5   lawyers?
 6        A.      This document shows up in several pieces
 7   of litigation.
 8        Q.      And what's the proof that it came from
 9   Ephraim?
10        A.      Because he took the document.
11        Q.      Didn't Carolyn Olson have a copy of it?
12        A.      Not to my knowledge.
13                Sorry.  She might have got a copy in
14   collaboration with Ephraim and taking documents from
15   Tim Akarapanich.  But other than that I don't believe
16   she had any access to this document.
17        Q.      Okay.  What about the prior document,
18   Exhibit 15; I think you said that this document
19   originally belonged to Carolyn Olson; is that right?
20        A.      Sorry.
21        Q.      You said this document originally belonged
22   to Carolyn Olson.
23        A.      The original clients were me and Carolyn
24   and my father, who was the trustee.  And then this
25   document subsequently was used by the trustee.
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
 1        Q.    Okay.  And as the settlor of the trust, is
 2   Carolyn Olson entitled to obtain a copy of it?
 3              MR. JORDAN:  Objection.  Calls for a legal
 4   conclusion.
 5        A.    Not that I'm aware of.
 6              (EXHIBIT 17 WAS MARKED.)
 7        Q.    What is this document?
 8        A.    A trust settlement.
 9        Q.    Okay.  And is this a document that OLPC
10   maintains Ephraim obtained from the server?
11        A.    Yes.
12        Q.    Besides the representation from Tim A., is
13   there any representation that this document came from
14   the server?
15        A.    There's an ongoing investigation.  I'm
16   aware that there may be evidence that this came, but
17   it's an ongoing investigation so I -- I believe the
18   answer is Tim told us it did, and we saw it down-
19   loaded.
20        Q.    Where did you see it downloaded?
21        A.    On the Telegram that Tim showed us.
22        Q.    Okay.  And you have Tim A.'s phone, don't
23   you?
24        A.    Yes.
25        Q.    Okay.  Does Tim A.'s phone have access to
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1  the server?

2            MR. JORDAN:  Time reference?  Today?

3       Q.    When you obtained Tim A.'s phone, did it

4  have access to the server?

5       A.    No.

6       Q.    Okay.  So beyond Tim A.'s representation

7  and the Telegram, is there any evidence that this

8  document or any of the trust documents we have looked

9  at came from the server?

10      A.    Sorry.  Are you saying that this copy came

11 from the server?  I'm confused about what you're

12 saying.

13      Q.    That Tim A.'s acquiring of this document

14 came from the server.

15      A.    Because that's how he would have to get

16 it, by going into the server and retrieving it.  That's

17 what he told us.

18      Q.    What is the evidence that Ephraim shared

19 that exhibit with anyone besides his lawyers?

20      A.    It shows up in multiple lawsuits.

21      Q.    And what is the evidence that it came from

22 Ephraim?

23      A.    Because he and Carolyn had obtained these

24 from Tim.

25            (EXHIBIT 18 WAS MARKED.)

1    Q.    Is this another document that OLPC alleges
2    Ephraim obtained from the server?
3    A.    Yes.
4    Q.    Besides the representation from Tim A.,
5    what is the evidence that this came from the server?
6    A.    As I said, that is an ongoing
7    investigation, so I am not -- I don't know exactly.
8    Q.    What information is OLPC investigating to
9    determine whether or not Tim A. obtained this document
10   from the server?
11   A.    I think there's discussion with IT
12   personnel.
13   Q.    Who is that personnel?
14   A.    That person that we are dealing with now
15   is Crucial Logics.
16   Q.    When was Crucial Logics retained?
17   A.    They have been retained for some period of
18   time.
19   Q.    Like years, months, days?
20   A.    I believe Crucial Logics has been around
21   for years, not months or days.
22   Q.    Okay.  Who is your contact at Crucial
23   Logics?
24   A.    There's several people there, so --
25   Q.    Can you name any of them?

1      A.   I can name one of them that I have talked
2  to before on a separate matter.  Amol Joshi.
3      Q.   What's the separate matter you've talked
4  to him on?
5      A.   Well, I have dealt with him on other IT
6  issues that I have had issues with before.
7      Q.   Is there anyone at Crucial Logics you've
8  spoken to about determining whether or not these
9  documents came from the server?
10     A.   Not me permanently.
11     Q.   Who has spoken to them for that
12 determination?
13     A.   I believe there are -- I'm not sure who
14 has been communicating primarily with them.
15     Q.   Hyrum?
16     A.   Could be Hyrum.
17     Q.   Joshua?
18     A.   Could be Joshua.  It could be one of the
19 other IT people.  Could be someone else.
20     Q.   What is the evidence that Ephraim shared
21 this document with anyone but his lawyers?
22     A.   It shows up in multiple lawsuits.
23     Q.   And what is the evidence that it came from
24 Ephraim?
25     A.   He received a copy of it, and to my

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
 1    knowledge there were no other copies around.  Otherwise
 2    I don't know why he would have been asking for it.
 3                (EXHIBIT 19 WAS MARKED.)
 4         Q.    Is this another document that OLPC alleges
 5    Ephraim improperly obtained from the server?
 6         A.    Yes.
 7         Q.    Is Ephraim Olson the trustee of the Ruth
 8    Doxey Trust?
 9         A.    He is one of the trustees, yes.
10         Q.    As trustee, is he entitled to have a copy
11    of this document?
12         A.    Yes.
13                MR. JORDAN:  Objection.  Calls for a legal
14    conclusion.
15         Q.    Was that a yes?
16         A.    Our law firm would normally provide it to
17    him, if requested.  Whether he is legally entitled to
18    it is another question, but we would normally provide
19    it.
20         Q.    Did you say whether he is legally entitled
21    to it, no question?
22         A.    I said if a trustee asked for a trust
23    document, it would be normally our practice, if
24    requested by the law firm, unless there was some other
25    reason, but normally our practice is to provide the
```

1    trust document.

2          Q.     And is that because the trustee is the

3    client?

4          A.     Not necessarily.

5          Q.     Who does this document belong to?

6          A.     This document was obtained on behalf of

7    the Ruth Doxey Trust, or Ruth Doxey, who settled this

8    trust.

9          Q.     Is Ruth Doxey alive?

10         A.     No.

11         Q.     Who does this document currently belong

12   to?

13         A.     This document is held by OLPCCIL.

14         Q.     On behalf of its clients, correct?

15         A.     Yes.  And at times OLPCCI or its

16   predecessor represented the Ruth Doxey Trust.

17         Q.     Whose the client today?

18         A.     Who is the client today?

19         Q.     Ruth Doxey is no longer alive.  Who is the

20   client?

21         A.     We don't currently -- at this point we are

22   not currently representing the Ruth Doxey Trust.

23         Q.     Why is that?

24         A.     Because there's a dispute over who all are

25   the trustees.

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1      Q.    And when did that dispute arise?

2      A.    Well, we realized it arose in the last

3  couple of years when Ephraim purported to be the sole

4  trustee.

5      Q.    And when did he purport to be the sole

6  trustee?  What date?

7      A.    I don't know the date.

8      Q.    After 2020?  Before 2020?

9      A.    I don't recall.  I believe it was after --

10  I don't recall when we first or when he first

11  identified that he was purporting to be the sole

12  trustee.

13      Q.    Okay.  You asked Ephraim to resign as

14  trustee of this trust, correct?

15      A.    Yes.

16      Q.    When was that?

17      A.    That was in, I believe, the fall -- I

18  could be mistaken, but my recollection is it was the

19  fall of 2019.

20      Q.    And at that point was he the sole trustee

21  of the trust?

22      A.    No.

23      Q.    As soon as the dispute arose as to whether

24  or not Ephraim was the sole trustee, is that when

25  OLPCCIL no longer represented the trust?

Page 93

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1      A.     I don't believe we had done work for the
2   trust for some period before then, so I don't know that
3   we had ongoing engagements.
4      Q.     Okay.  So is this a document that belongs
5   to OLPCCIL?
6      A.     Well, we obtained it in our capacity as
7   the settlor of the trust, and at the time we
8   represented the Ruth Doxey Trust we continued to hold
9   it.  But we obtained it on behalf of the Ruth Doxey
10  Trust -- sorry, Ruth Doxey, the settlor of this trust.
11     Q.     But who does it belong to?  Who is the
12  client that it belongs to?
13             MR. JORDAN:  Objection.  Calls for a legal
14  conclusion.
15     A.     This document -- the law firm keeps
16  records of many client matters even when a client
17  leaves.  We keep responsibility for those documents,
18  confidential documents, unless we agree with the client
19  to destroy them.
20             At the present time, we are holding this
21  document on behalf of the Ruth Doxey Trust.  And in the
22  normal course, unless there are other reasons, we would
23  have no issue, if requested, to provide this document
24  to Ephraim as co-trustee.
25     Q.     So Ephraim is entitled to possession of a

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

copy of this document?

        MR. JORDAN:  Same objection.

    A.    Yes.

    Q.    Is that correct?

    A.    Well, I don't know if he is entitled to it, but it would be our normal practice to provide it.

    Q.    How else does a trustee carry out their services under the trust if they don't have a copy of the trust?

    A.    Well, when they become a -- when a person become a trustee, they may well request a copy of the trust from the person assigning that responsibility to them.

    Q.    Okay.

    A.    It wouldn't be the law firm's responsibility.

    Q.    Because they are entitled to have a copy of the trust.

        MR. JORDAN:  Objection.  Calls for a legal conclusion.

    A.    Sorry?

    Q.    They might request a copy because they are entitled to a copy; is that right?

    A.    I don't know if they are entitled to a copy, but I would presume the trustee would want to see

1  a copy of the trust, if they are going to be a trustee.

2      Q.    What is the evidence, besides Tim A.'s

3  representation, that this came from the server?

4      A.    It's an ongoing -- it's an ongoing review.

5      Q.    Done by IT?

6      A.    Done by IT.

7      Q.    Okay.  And did you speak to them in

8  preparation for today's deposition?

9      A.    I don't have any further updates on this

10  matter.

11      Q.    Okay.  What information are they looking

12  at to determine whether or not it came from the server?

13      A.    That's an IT thing that I don't understand.

14      Q.    And did you ask them that in preparation

15  for today's deposition?

16      A.    Did I ask them what?

17      Q.    What information they are looking at to

18  determine where this document came from, from the

19  server?  What are they investigating?

20      A.    I think they are trying to look at -- I

21  don't know, actually, what they are trying to do.  I

22  don't think I understand that.

23      Q.    Did you ask them that in preparation for

24  today's deposition?

25      A.    Did I ask them specifically what they are

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

doing?

Q.   Yes.

A.   No, I did not specifically ask what they
are doing.  I asked if they were reviewing it, and
that's an ongoing investigation.  It sounds like there
are several different angles they are looking at.

Q.   What are those angles?

A.   I don't know that.  That's IT language
that is not in my comprehension.

Q.   So we would have to speak to someone from
IT to understand that, correct?

A.   If you need to know the precise nature of
the work that the expert is doing with us, and to my
knowledge their counsel has been informed about this, I
don't know whether I could summarize that or not.
Again, it's technical stuff that is not in an area that
I understand.

Q.   So you are not prepared to talk about that
today?

A.   I'm prepared to say there's an ongoing
investigation.

Q.   But no other details beyond that?

A.   I don't understand the details beyond
that.

Q.   Okay.

```
 1              (EXHIBIT 20 WAS MARKED.)
 2         Q.    Is this another document that OLPC alleges
 3    came from the server?
 4         A.    Yes.
 5         Q.    Beyond Tim A.'s representation and the
 6    ongoing investigation, sitting here today what evidence
 7    do you have that this came from the server?
 8         A.    If this information had been had by
 9    Ephraim otherwise, there would have been no reason to
10    request it.
11         Q.    Who is the client that this document
12    belongs to?
13         A.    This was in the possession on behalf of
14    the settlor, who was Jack Hardy Olson.
15         Q.    Who is the corporate entity that holds
16    this document?
17         A.    OLPCCIL.
18         Q.    And what is the proof that Ephraim
19    provided this document to anyone but his personal
20    lawyers?
21         A.    I believe this shows up in a number of
22    lawsuits.
23         Q.    What are those lawsuits again?
24         A.    Well, there's the matrimonial matter.
25    There are Mareva injunctions and several matters in
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
1   Alberta.  And Ephraim informed -- he had, two days ago
2   -- apparently there are other matters pending that may
3   or may not include this.
4        Q.   But you don't know that?
5        A.   I don't know what's in those matters.
6        Q.   Okay.  And the matters that these
7   documents were used in, those are all cases in which
8   you are personally named, correct?
9        A.   Well, I and perhaps others.
10       Q.   But are you personally named?
11       A.   I am one of the persons named, yes.
12       Q.   Okay.  Is OL Private Counsel, OLPC, the
13  plaintiff in this lawsuit, named in those other
14  actions?
15       A.   I don't recall.
16       Q.   Okay.  I want to just double back.  We
17  looked at the Carolyn Olson Spousal Trust, Exhibit 13,
18  I believe.  Yeah, 13.  Is Ephraim Olson the current
19  trustee of the Carolyn Olson Spousal Trust?
20       A.   As far as I know.
21       Q.   Okay.  Does OLPCCIL currently represent
22  the Carolyn Olson Spousal Trust?
23       A.   No.
24       Q.   When did that representation end?
25       A.   I don't know.  It would have been some
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

```
1    years ago.  I don't recall when.
2         Q.    And who is the client to which the Carolyn
3    Olson Spousal Trust belongs?
4         A.    Who is -- sorry, what's the question?
5         Q.    Who is the OLPCCIL client to which the
6    Carolyn Olson Spousal Trust belongs?
7         A.    Well, Carolyn Olson Spousal Trust was
8    settled by me, so I obtained it in my capacity as the
9    settlor.
10               Let's pull it up here.
11               MR. JORDAN:  13.
12         A.    And we did represent my father, Jack Olson,
13    as trustee in that trust for some period of time.  For
14    the entire time he was the trustee.
15         Q.    Okay.
16               (EXHIBIT 21 WAS MARKED.)
17         Q.    I understand it's now noon, but we are
18    almost to the end of this category of documents so I'd
19    like to just push through if you are okay with that,
20    Mr. Olson.
21               MR. JORDAN:  That's fine.
22         A.    I am fine.
23         Q.    Is this another document that OLPC alleges
24    came from the server?
25         A.    Number 21?
```

1     Q.    Yes.

2     A.    Yes.

3     Q.    And besides Tim A.'s representation and

4  the ongoing investigation, sitting here today what

5  proof do you have that this came from the server?

6     A.    Because there was no reason for this to be

7  outside otherwise.  And it was sent to Ephraim and

8  Carolyn, and so the only -- so what other proof?  I

9  don't have any other proof other than that.  Other than

10 any other ongoing analysis that maybe somebody is

11 doing.

12    Q.    And what is the corporate entity that

13 holds this document.

14    A.    OL Private Counsel International, limited.

15    Q.    Okay.  Who is the current trustee of this

16 trust?

17    A.    Hyrum Olson.

18    Q.    Okay.

19          (EXHIBIT 22 WAS MARKED.)

20    Q.    Is this another document that OLPC alleges

21 came from the server?

22    A.    Yes.

23    Q.    Okay.  Besides Tim A.'s representation,

24 what is the support for that statement?

25    A.    Prior to the ongoing investigation, this

Page 101

```
 1    document would not have been kept in any type of paper
 2    form and would only have been available by going into
 3    the serve ever and retrieving it.
 4         Q.    What is this document?
 5         A.    This appears to be a director's resolution
 6    of OL Private Counsel PTE, LTD., and a further document
 7    appointing auditors.
 8         Q.    Why were the auditors appointed?
 9         A.    Because auditors are required.  At the
10    time auditors were required, I believe, to -- let me
11    just see if we waived them or if they are still
12    required.  So we appointed auditors under Singapore
13    law.
14         Q.    Okay.  Is this a document that's ever
15    filed with a government agency?
16         A.    Not to my knowledge.  Lawyers would know,
17    but I don't believe so.  I believe this is just kept in
18    the corporate head offices.
19         Q.    Was it ever subject to inspection by a
20    government agency?
21         A.    Well, I don't know if -- I don't know if
22    this document could be.  It's possible.  But I don't
23    know that it could be.  I'm not aware.
24         Q.    Okay.  What makes this document
25    confidential?
```

1    A.    Because it's a resolution of a private
2    corporation.  It's not a public document.
3    Q.    That makes it private.  What makes it
4    confidential?
5          MR. JORDAN:  Objection.
6    Q.    What in here is confidential information?
7          MR. JORDAN:  Objection.  Ambiguous.
8    A.    Any activities of a corporation, a private
9    corporation, are confidential.  They are not for public
10   distribution.
11   Q.    And OL Private Counsel PTE's corporate
12   documents are stored on the OLPCCIL server?
13   A.    They are.
14         (EXHIBIT 23 WAS MARKED.)
15   Q.    Is this another document that OLPC alleges
16   Ephraim obtained from the server?
17   A.    Yes.
18   Q.    And besides Tim A.'s representation and
19   the ongoing investigation, what is the evidence for
20   that?
21   A.    No one would have had access to this
22   document other than being on the server, other than
23   perhaps corporate counsel in Singapore.  This would not
24   be a document available to anybody else except on the
25   server.

1    Q.    Okay.  And what is the evidence that
2  Ephraim has shared this document with anyone?
3    A.    Much information contained in various
4  lawsuits and this document.  There may or may not have
5  been information on this document that was put into
6  those lawsuits.
7    Q.    Okay.
8    A.    Or given to counsel in preparation for the
9  lawsuits.
10   Q.    Okay.  The besides the OLPC PTE, the two
11 documents we just went over, and disregarding the
12 Mareva injunction, does Ephraim's possession of the
13 trust documents prevent the trustees or OLPC from
14 taking any actions respective to the trust?
15   A.    I don't think I understand the question.
16 When say -- you're asking if the law firm could take
17 any action with respect to the trust.  I'm not sure
18 what you are referring to, "any action."
19   Q.    Does Ephraim's possession of just a copy
20 of a trust document prevent anyone from taking actions
21 respective to the trust?
22        MR. JORDAN:  You want him to exclude the
23 Mareva injunction?
24        MS. VAUGHN:  Yes.
25   A.    "Taking actions" meaning what?

1    Q.    Distributing funds, making amendments, any
2    actions that the trust would take.
3    A.    No.  Not that I can think of.
4    Q.    Okay.  This is a good breaking point.  Why
5    don't we take lunch.
6          (Break taken from 12:09 to 1:23 p.m.)
7    Q.    I want to circle back a little bit.  You
8    mentioned that the server is accessed via VPN.  Is that
9    different from a remote desktop, do you know?
10         MR. JORDAN:  Objection.  Ambiguous.
11   A.    To my understanding a remote desktop is a
12   computer that, to get in the main section of the
13   server, requires a VPN.  It's a special connection into
14   the server.
15   Q.    Okay.  Now the documents we went over
16   before the break, I'm going to call them the trust
17   related documents, I believe you testified that all of
18   them were stored on OLPCCIL's server, correct?
19   A.    Some portion of the server.  That's my
20   understanding.
21   Q.    But this lawsuit is being brought on
22   behalf of OLPC, correct?
23   A.    Yes.
24   Q.    Okay.  But the documents belonged to
25   OLPCCIL, correct?

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com          801-746-5080

1        A.    Yeah.  The documents belonged to OLPCCIL,

2    but OLPC has access to them for its purposes.  And all

3    members of OLPC.

4        Q.    And so wouldn't OLPCCIL also have a claim

5    against Ephraim Olson for the alleged improper

6    conversion of these documents?

7              MR. JORDAN:  Objection.  Calls for a legal

8    conclusion.

9        A.    I don't know that they would have a

10   separate claim, because they didn't employ him.  I

11   don't know the answer to that.

12       Q.    Okay.  Does PTE have ownership of any of

13   these documents?

14       A.    It can have use of the documents for

15   purposes of doing legal work for clients, but it

16   doesn't have -- it doesn't own the documents.

17       Q.    Okay.  Just like OLPC?

18       A.    Just like OLPC.

19       Q.    Okay.  So wouldn't PTE have the same right

20   to sue Ephraim Olson for the alleged improper

21   conversion of these documents?

22             MR. JORDAN:  Same objection.  Calls for a

23   legal conclusion.

24       A.    Ephraim Olson was not an employee of Olson

25   Lemons, Private Counsel PTE, LTD.

1     Q.    But OLPC is not just suing Ephraim Olson

2  pursuant to an employment agreement, is it?

3     A.    It's pursuant to his relationship with the

4  firm as a lawyer.

5     Q.    Okay.  One second.  I printed some stuff

6  during the break and I want to grab it.

7         (Break taken from 1:26 to 1:27 p.m.)

8     Q.    During the break I went on to the Utah Bar

9  website and tried to find the Seth you referenced that

10  currently works for OLPC.  Tell me if these names sound

11  familiar to you.

12     A.    I think I remembered.  It's Seth Daniels.

13     Q.    Okay.  Great.  Let's mark this as Exhibit

14  24.

15         (EXHIBIT 24 WAS MARKED.)

16     Q.    Is that the Seth Daniels that is currently

17  employed at OLPC as a lawyer?

18     A.    Yes.

19     Q.    Okay.  Why does he not tell the Utah State

20  Bar that he works at OLPC?

21         MR. JORDAN:  Objection.  Calls for

22  speculation.

23     Q.    Do you know why he does not tell the Utah

24  State Bar that he works at OLPC?

25     A.    I don't know the answer to that.

```
 1        Q.    Do you know what that law firm is that he
 2   references there?
 3        A.    I don't know what that law firm is.
 4        Q.    Okay.  Do you contract with Mr. Daniels or
 5   is he a W-2 employee?
 6        A.    We may well contract with him.  It's
 7   possible.  I don't recall.
 8        Q.    Okay.  And would you contract with his law
 9   firm or with him as an individual?
10        A.    Again, I don't recall how that would work.
11        Q.    Are you capable of making that
12   determination at a future date?
13        A.    I could go back and find some contracts.
14        Q.    Okay.
15        A.    Or some pay stubs or something that would
16   give an indication.
17              (EXHIBIT 25 WAS MARKED.)
18        Q.    Mr. Olson, this document has been labeled
19   in OLPC's Responses to Written Discovery as an alleged
20   converted document.  This is an e-mail between Tim A.
21   and Joshua Olson, correct?
22        A.    6-6-20.  Josh Olson's screenshot, yes.
23        Q.    And then the screenshot is the attachment
24   to the e-mail.
25        A.    Yes.
```

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com            801-746-5080

1    Q.    I wanted to understand the allegation.  Is
2    the allegation that the e-mail from Tim A. is
3    converted, or just the screenshot?
4              MR. JORDAN:  What were the two options?
5              MS. VAUGHN:  The e-mail itself being the
6    converted document.
7              MR. JORDAN:  Without the attachment?
8              MS. VAUGHN:  With the attachment.  Or is
9    it the attachment that's the converted document.
10    A.    Well, the attachment is a confidential
11    record.  Without the attachment I don't -- I mean, I
12    don't know.  I don't know that this would be
13    necessarily a converted document.  I don't know that.
14    Q.    Okay.
15    A.    But certainly the confidential document is
16    the attachment.
17    Q.    Okay.  And is this a document that OLPC
18    alleges Tim A. improperly obtained from the server?
19    A.    I believe this is one of them, yes.
20    Q.    Okay.  It's a screenshot of an e-mail,
21    correct?
22    A.    It looks like some kind of a screenshot,
23    uh-huh (affirmative).
24    Q.    Okay.  What is the proof that Tim A.
25    obtained this document, this e-mail, from the server?

1      A.   This particular screenshot and e-mail?

2 Well, the e-mail would have been on our server.

3      Q.   So your server backs up all e-mails?

4      A.   Yeah.  There's a portion of the server

5 that does e-mails.  And this would have gone to Joshua

6 at OL Tax.  So this would have been Joshua's document

7 on the server.  And so yeah, this would have -- this

8 would have, I think -- I mean, if this came from when

9 he was in the server, this could have come from

10 Joshua's e-mail.

11      Q.   Okay.

12      A.   But I --

13      Q.   To access e-mail, does an employee have to

14 go through the VPN?

15      A.   There's a -- for e-mails, I think there's

16 a different mechanism for e-mails, if I'm not mistaken.

17 The answer is I don't recall off the top of my head if

18 they go through a VPN or there's a different similar

19 system, a sister system to get into e-mails.  There

20 might be a sister system.  So one system goes into

21 e-mails, but I'm speculating at this point and I'm

22 probably saying more than I really know.

23      It's a technical issue.  There's a way

24 into e-mails.  It's a different part of the server.

25 Whether they use the same VPN or a different mechanism,

Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com      801-746-5080

# EXHIBIT E

Filed Under Seal



CONFIDENTIAL

Document Produced in
Native Format

OL PRIVATE COUNSEL-EPHRAIM OLSON 13073





# EXHIBIT F

# EXHIBIT F

David J. Jordan (1751)
Monica S. Call (11361)
Ellen E. Ostrow (14743)
FOLEY & LARDNER LLP
299 S. Main Street, Suite 2000
Salt Lake City, UT 84111
Telephone: 801.401.8900
djordan@foley.com
mcall@foley.com
eostrow@foley.com

*Attorneys for Plaintiff OL Private Counsel,*
*LLC*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF UTAH

| | |
|---|---|
| OL PRIVATE COUNSEL, LLC, a Utah limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>EPHRAIM OLSON, an individual,<br><br>        Defendant. | **PLAINTIFF OL PRIVATE COUNSEL, LLC'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST AND SECOND SET OF DISCOVERY REQUESTS**<br><br>Case No. 2:21-cv-00455-DDB-DAO<br><br>The Honorable David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Federal Rules of Civil Procedure 26, 33, 34, and 36 OL Private Counsel, LLC ("OLPC"), by and through its undersigned counsel, hereby submits its responses and objections to Defendant's First and Second Set of Discovery Requests, as follows:

## PRELIMINARY STATEMENT

A.      OLPC has not completed its investigation in this matter and reserves the right,

without assuming any obligation, to amend, revise, clarify, or correct these responses as necessary, including if new information is uncovered. OLPC also reserves the right to introduce evidence from any source and testimony from any witness in any future proceedings in this action.

B.      OLPC will respond to the Requests and each Request contained therein as it interprets and understands them. OLPC reserves the right to supplement its objections and/or responses thereto if Defendant subsequently asserts an interpretation of any Request that differs from OLPC's understanding.

C.      OLPC makes these responses and/or objections solely for the purpose of, and in relation to, this action. Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning competency, relevance, materiality, propriety, and admissibility) that would require the exclusion of any information, document, or thing during the hearing or any other proceeding in this action. All such objections, and the grounds for such objections, are reserved and may be interposed during any proceeding in this action.

D.      Except for the facts explicitly admitted herein (if any), no admission of any nature whatsoever is to be implied or inferred from these responses. The fact that OLPC responds to a Request should not be taken as an admission, or concession of the existence of, any fact or document set forth, assumed, or implied by such Request, or that the Request is relevant or otherwise constitutes evidence of any fact thus set forth, assumed or implied.

E.      All responses are given based on present recollection.

F.      Without assuming any obligation to do so, OLPC expressly reserves the right to revise, correct, add to, clarify, and/or further supplement any of its responses herein. Also, without obligating itself to do so, OLPC reserves the right to change or supplement these responses as

additional facts or documents are discovered and as further analysis and research discloses additional facts, contentions, or legal theories that may apply. Moreover, if any information has been inadvertently omitted from these responses, OLPC reserves the right to change or supplement these responses.

G.      These responses are marked as CONFIDENTIAL pursuant to the Standard Protective Order that applies to this case pursuant to DUCivR 26-2(a).

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      OLPC objects to Defendant's definitions and instructions to the extent the definitions and/or instructions seek to impose on OLPC any obligations in addition to or different from those set forth in the Federal Rules of Civil Procedure.

2.      OLPC objects to Paragraph 1 of the Instructions in that it contains incomplete sentences and seeks to impose obligations in addition or different from those set forth in the Federal Rules of Civil Procedure. OLPC will comply with its obligations to supplement under the Federal Rules of Civil Procedure in supplementing its discovery responses

3.      OLPC objects to Paragraph 2 of the Instructions because it contains detail not required by the Federal Rules of Civil Procedure. OLPC will comply with its obligation with respect to any privilege log per the terms of Rule 26(b)(5) of the Federal Rules of Civil Procedure. Many of Defendants' requests are impermissibly broad and seek confidential client information the disclosure of which violates the attorney/client privilege or work produce doctrine. Those documents would be too cumbersome and burdensome to log. Moreover, similar to the position Defendant has taken, OLPC will not log privileged communications that have occurred since this Litigation was filed.

4.	OLPC objects to Paragraph 3 of the Instructions because it requires more detail on particular objections than required by Rules 26 or 34 of the Federal Rules of Civil Procedure. OLPC will comply with the Federal Rules of Civil Procedure.

5.	OLPC objects to Paragraph 5 of the Instructions. The Federal Rules of Civil Procedure do not require the production of all files in native format. OLPC will produce documents as load files that can easily be uploaded into a discovery review platform. If Defendant seeks the native format of a particular document, OLPC will consider that request.

6.	OLPC objects to Paragraph 7 of the Instructions as it places on OLPC a burden in addition to or different from the Federal Rules of Civil Procedure. Moreover, some documents are responsive to multiple requests. Consistent with Rule 34(b)(2)(E) of the Federal Rules of Civil Procedure, OLPC will produce documents as they are kept in the usual course of business.

7.	OLPC objects to Paragraph 1 of the Definitions that defines the term "OLPC" to mean "Thomas Olson." OLPC will interpret the terms "OLPC" to refer to OL Private Counsel, LLC and any of its predecessors, successors, subsidiaries, affiliates, members, officers, agents, attorneys, employees, representatives, or others acting on its behalf.

8.	OLPC objects to Paragraph 2 of the Definitions that defines the term "OLPCCI" to mean "Thomas Olson." OLPC will interpret the terms "OLPCCI" to refer to OL Private Corporate Counsel International, Ltd. and any of its predecessors, successors, subsidiaries, affiliates, members, officers, agents, attorneys, employees, representatives, or others acting on its behalf.

9.	OLPC objects to Paragraph 3 of the Definitions that defines the term "ITC" to mean "Thomas Olson". OLPC will interpret the terms "ITC" to refer International Tax Counsel Ltd. and

any of its predecessors, successors, subsidiaries, affiliates, members, officers, agents, attorneys, employees, representatives, or others acting on its behalf.

10.     OLPC objects to the definition of the term "Document" in Paragraph 11 of the Definitions as inconsistent with the Federal Rules of Civil Procedure and other applicable law. OLPC will comply with the Federal Rules of Civil Procedure.

11.     OLPC objects to the definition of "relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" in Paragraph 13 of the Definitions as facially overbroad and unduly burdensome and as seeking to impose burdens beyond those imposed by the Federal Rules of Civil Procedure.

12.     OLPC objects to the definition of "identify" or "identity" in Paragraphs 17 and 18 of the Definitions as it improperly expands the number of limited interrogatories in this matter to provide the detail requested. OLPC will respond to the Requests as written.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:** Please identify each "Converted Document" which Ephraim Olson allegedly accessed or obtained, including the name, date, custodian, and owner of each Converted Document.

**RESPONSE NO. 1:**  In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 1 on the grounds that it is overly broad and unduly burdensome in requiring OLPC to extract certain information from documents that is just as accessible to Defendant. Moreover, OLPC objects because Interrogatory No. 1 is vague and ambiguous because it does not define what it means by the terms "custodian" or "owner".

OLPC has not completed its investigation in this matter and reserves the right, without assuming any obligation, to amend, revise, clarify, or correct these responses as necessary,

including if new information is uncovered. OLPC also reserves the right to introduce evidence from any source and testimony from any witness in any future proceedings in this action.

OLPC objects to Interrogatory No. 1 as it requests information that is not in its possession custody or control. OLPC is uncertain of all "Converted Documents" that Defendant may have accessed or obtained and will not know unless and until Defendant is forthcoming in his discovery responses and deposition.

Subject to and based on these objections, OLPC responds that the Converted Documents contain information for clients for which OLPC was providing services. OLPC has already produced the "Converted Documents" currently known to it at as part of Timothy Akarapanich's Declaration. *See* OL Private Counsel-Ephraim Olson 0001-0324. Concurrent with these responses, OLPC is also producing communications attaching documents that were converted. *See* OL Private Counsel-Ephraim Olson 0330-472, 0473-83, 485-86, 487-88, 501-643, 702-868, and 869-874. OLPC further responds that it will produce handwritten notes with client information that Ephraim Olson improperly converted. *See* OL Private Counsel-Ephraim Olson 0882-883. Finally, OLPC also believes certain documents reflecting client information were contained in a box that was stored in a house where Ephraim Olson resided also constitute "Converted Documents." OLPC has not yet gained access to that information.

**SUPPLEMENTAL RESPONSE:** OLPC's investigation is ongoing as to additional "Converted Documents" and as additional information is learned, will supplement its production. Please also see OL Private Counsel-Ephraim Olson 1267, 1307, 1348, and 1367.

**INTERROGATORY NO. 2:** Please detail and describe the corporate relationship and/or association between OLPC, OLPCCI, and ITC, including but not limited to each client that they served in common from 2014 to 2020, and all contracts and documents between OLPC, OLPCCI,

and ITC which permit the companies to serve clients in common, share fees, share documents, and or otherwise conduct joint business.

**RESPONSE NO. 2:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 2 on the grounds that it (a) is vague and ambiguous because it does not define what is meant by "corporate relationship and/or association;" (b) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (c) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and the relationship between the corporate entities or their joint business relationship is not relevant to the allegations in this Action; (d) is overly broad and unduly burdensome in that it seeks highly confidential information identifying clients of a law firm over a 6 year period when such information is not relevant to the Action; and (e) is overly broad and not proportional to the needs of the case in seeking "all contracts and documents" between these business entities when the business relationship has no relevance in the Action.

Subject to and based on these objections, OLPC responds that OLPC and ITC provide legal and other professional services to OLPCCI and clients of OLPCCI.

**SUPPLEMENTAL RESPONSE NO. 2**: Subject to and based on these objections, OLPC will provide two sample engagement letters.

**SECOND SUPPLEMENTAL RESPONSE NO. 2**: Based on the Court's ruling dated December 6, 2022 at Docket No. 97, OLPC further responds to Interrogatory No. 2, as modified by the Court, as follows: the relationship between OLPC, OLPCCI, and ITC is contractual which permits them to serve the same clients, share documents, and otherwise conduct joint business. OLPC, OLPCCI, and ITC do not share fees. Clients engage OLPCCI to provide services to those clients. As part of that engagement, OLPCCI receives authorization from its clients to retain other professional firms to assist in providing services. Through a contractual relationship, OLPCCI retains ITC to assist in providing services to the clients of OLPCCI. Through a contractual relationship, OLPCCI indirectly retains OLPC (OLPCCI retains OL Private Counsel Pte. Ltd.; OL Private Counsel Pte. Ltd. retains OLPC) to assist in providing services to the clients of OLPCCI. OLPCCI compensates OLPC and ITC for the services OLPC and ITC provide on behalf of OLPCCI. OLPCCI invoices its clients in accordance with its engagement agreements. OLPCCI does not split fees with OLPC or ITC. OLPCCI allows the staff of OLPC and ITC electronic access to documents in the possession of OLPCCI relating to the clients of OLPCCI to the extent necessary for OLPC and ITC to provide their contracted services. Further details or specifics about the relationship between these entities are detailed in the documents produced, including OL Private Counsel-Ephraim Olson 932-942, 943-948, 1408-1410, 1411-1413, and 1414-1418.

**INTERROGATORY NO. 3**: Please detail and describe Timothy Akarapanich's employment history with OLPC, OLPCCI, and/or ITC, including but not limited to his dates of employment at each corporate entity from 2014 to the present, his title, and his job duties.

**RESPONSE NO. 3:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 3 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both

before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and the employment history of Timothy Akarapanich is not relevant to the Action; and (c) seeks detailed employment information that OLPC understands may be protected by privacy laws in Thailand.

Subject to and based on these objections, OLPC states that it understands Mr. Akarapanich's employment began on or before December 2016 and he resigned on May 14, 2020. His title was Client Service Manager and his duties included communicating with clients, sending confidential documents to clients, receiving confidential documents from clients, and sending confidential documents to firms providing services to OLPCCI and its clients.

**INTERROGATORY NO. 4:** Please detail and describe OLPC's document retention policy and document management system, including but not limited to the location and ownership of its servers and its server providers from 2014 to 2020.

**RESPONSE NO. 4:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 4 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and ownership or location of servers is not

relevant to the Action; and (c) is vague and ambiguous because it does not define what is meant by "document retention policy" or "document management system."

Subject to and based on these objections, OLPC states that as necessary for the professional services it provides, OLPC has access to documents which belong to OLPCCI or clients of OLPCCI. OLPC does not have any server or digital document management system. OLPC is permitted to retain documents relating to matters on which it works for as long as necessary to its provision of professional services to OLPCCI or its clients.

**INTERROGATORY NO. 5:** Please detail and describe ITC's document retention policy and document management system, including but not limited to the location and ownership of its servers and its server providers from 2014 to 2020.

**RESPONSE NO. 5:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 5 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and ownership or location of servers is not relevant to the Action; and (c) is vague and ambiguous because it does not define what is meant by "document retention policy" or "document management system."

Subject to and based on these objections, OLPC states that OLPC understands that, as necessary for the professional services it provides, ITC has access documents which belong to OLPCCI or clients of OLPCCI. OLPC understands that ITC does not have any server or digital

document management system. OLPC understands that ITC is permitted to retain documents relating to matters on which it works for as long as necessary to its provision of professional services to OLPCCI or its clients.

**INTERROGATORY NO. 6:** Please detail and describe OLPCCI's document retention policy and document management system, including but not limited to the location and ownership of its servers and its server providers from 2014 to 2020.

**RESPONSE NO. 6:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 6 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and ownership or location of servers is not relevant to the Action; and (c) is vague and ambiguous because it does not define what is meant by "document retention policy" or "document management system."

Subject to and based on these objections, OLPC states that OLPC understands that OLPCCI retains a copies of documents relating to its provision of professional services to clients of OLPCCI, including, for example, client documents and communications with clients. OLPC understands that OLPCCI may, at times, discard documents which relate to former or inactive clients or in the ordinary course of business. OLPC understands that OLPCCI uses Worldox as its digital document management system. OLPC understand that access to servers used to store

documents is through Microsoft Remote Desktop. OLPC understands that servers used by OLPCCI to store documents were owned by or on behalf of OLPCCI.

**SUPPLEMENT TO RESPONSE NO. 6:** Subject to and based on these objections, OLPC further responds that the server provider is Volta Data Centres and the data center is located at 36-43 Great Sutton Street, London EC1V 0AB. OLPC understands that OLPCCI's document retention policy from 2018 to 2020 was to retain certain client documents, such as tax returns, client communications, and engagement letters, for a minimum of ten years or until a client closed its file with OLPCCI. Internal communications and draft documents could be deleted immediately and were not required to be retained. Emails and communications on the exchange server were backed up and retained for thirty days. Lastly, OLPCCI's system is backed up through file servers and databases, which are retained for a minimum of thirteen months.

**INTERROGATORY NO. 7:** Please detail and describe all OLPC clients and/or contracts, both existing and potential, which Olson's actions have allegedly interfered with as alleged in the Complaint.

**CONFIDENTIAL**

**RESPONSE NO. 7:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 7 on the grounds that it seeks detailed information about attorney client relationships that are protected by the attorney client privilege and the work product doctrine.

Subject to and based on these objections, OLPC states that Ephraim Olson's actions have interfered with OLPC's relationship with OLPCCI and their joint clients because Ephraim Olson converted confidential client documents entrusted to OLPC.

The converted documents include client information for the following clients: Thomas Olson, The Olson Estate Trust, White Buffalo Trust, The Waterton Land Trust, The Thomas H.

Olson Trust, William Bell Hardy Trust, The Ruth Doxey Family Trust, The George Whitehead

Family Trust, OL Private Counsel PTE. LTD., Hans Maier, Orin Harker, Glenn Chan, Gordon

Marsh, Faisal Kassam Brock Walberger, Brett Habijanac, RogerDavis, S. Robert Chad, Darcy

Erickson, and John Robinson.

OLPC's prospective relationship with potential clients has also been harmed to the extent

OLPC's reputation has been damaged and those potential clients choose not to retain OLPC's

services because of the disclosure of client confidential information due to Ephraim Olson's

actions.

**INTERROGATORY NO. 8:** Please detail and describe OLPC's compliance with Utah
Rules of Professional Conduct 5.4 from 2014 the present, including but not limited to the names
and Utah bar numbers of all lawyers who purport to share legal fees.

**RESPONSE NO. 8:** In addition to the objections set forth above and incorporated herein

by reference, OLPC objects to Interrogatory No. 8 on the grounds that it (a) is facially overbroad

in that it does not have a reasonable limit in temporal scope and seeks information created both

before and after the allegations in the Complaint (Defendant himself takes the position that the

"only time period relevant to OLPC's claims is post May 2020," yet seeks information here for

6 years prior to that); (b) sweeps within its scope information that is neither relevant nor

reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory

does not have a reasonable limit in substantive scope and OLPC's compliance with any Rules of

Professional Conduct is not relevant to the Action; and (c) is vague and ambiguous because it

requires a legal conclusion as to the requirements of the cited rule.

Based on these objections, OLPC will not respond to this request.

**SUPPLEMENT TO RESPONSE NO. 8:** OLPC further responds that based on the objections and its understanding of the Interrogatory, it does not share legal fees with any Utah lawyers.

**INTERROGATORY NO. 9:** Please detail and describe OLPC's compliance with the Rules Governing the Utah State Bar 14-1001 *et. seq*, from 2014 to the present, including but not limited to the IOLTA bank account number held by OLPC and the institution at which the account is held.

**RESPONSE NO. 9:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 9 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and OLPC's compliance with any Rules Governing the Utah State Bar is not relevant to the Action; and (c) is vague and ambiguous because it requires a legal conclusion as to the requirements of the cited rule.

Based on these objections, OLPC will not respond to this request.

**SUPPLEMENT TO RESPONSE NO. 9:** Based on these objections, OLPC does not have an IOLTA account.

**INTERROGATORY NO. 10:** Please detail and describe all persons and entities, including employees of any entities, who had access to OLPC, ITC, or OLPCCIL servers or documents at any time from 2014-2020, including but not limited to the time frame in which the person or entity had access.

**RESPONSE NO. 10:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 10 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope; and (c) is overly broad, unreasonably burdensome, and not proportional to the needs of the case because it seeks names of persons and entities with whom OLPC might not have any relationship or knowledge of.

Subject to and based on these objections, OLPC states that OLPC understands that the only persons or entities that have authorized access to the documents retained by OLPC, ITC, or OLPCCI are those employees, agents, or other authorized individuals or entities that have obligations to keep such information confidential.

**SUPPLEMENT TO RESPONSE NO. 10:** Subject to and based on the objections, OLPC further responds that from 2018 to 2020 employees of OLPC, OL Private Counsel Ltd., and ITC had varying levels of access to the servers and documents depending on their particular assignments and responsibilities. Narongchai Ungurawanich serves as the Senior Systems Administrator to ITC. In addition to office protocols and security on ITC's premises in Thailand, OLPC understands that employees were generally required to use only company owned computers with anti-virus software. Each employee had their own credentials to log on to a company owned computer, and when an employee needed access to the remote servers, the

employee had to enter another set of credentials. Access to the servers was limited for each employee to client files on which the employee was working. The computers and the server included security policies that limited the use of snipping tools, USB sticks or flash drives, and unauthorized installation of software. Only approved staff were authorized to access the server by remote desktop from a registered computer, and all internet traffic inside a remote server had to go through a firewall. The firewall was programmed to block file sharing programs so that staff members could not upload documents or download infected documents onto the server. Remote access required the user to login with his or her registered computer through Global Protect using a secure VPN connection. OLPC will also produce the Security Access List with Volta.

**SECOND SUPPLEMENTAL RESPONSE NO. 10:** Based on the Court's ruling dated December 6, 2022 at Docket No. 97, the agreed upon limit in time of the Request from 2018-2020, and subject to a continuing objections that the *names* of all individuals who had access to the servers are not relevant, OLPC further responds that attached hereto as Exhibit 1 is a list of persons, identified by category, that had access to the servers from 2018 to 2020.

**INTERROGATORY NO. 11:** Please detail and describe Timothy Akarapnich's [*sic*] access to OLPC's, ITC's, and OLPCCI's computer networks and servers, including OLPC's Confidential Documents, detailing the dates on which his access to each corporate network or server began and the date on which such access was affirmatively revoked, from the beginning of Mr. Akarapnich's employment to the present.

**RESPONSE NO. 11:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Interrogatory No. 11 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information for all time periods (Defendant himself takes the position that the "only time period relevant to OLPC's claims

is post May 2020"); (b) sweeps within its scope information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Interrogatory does not have a reasonable limit in substantive scope and Mr. Akarapanich's access during the various years of his employment is not relevant to the allegations in this Action; (c) seeks information may be the subject of expert opinion and discovery concerning expert opinion is premature; and (d) seeks the disclosure of privileged attorney/client communications and attorney work product.

Subject to and based on these objections, OLPC states that OLPC understands Mr. Akarapanich was granted access around the time his employment began on or about December 2016. OLPC understands Mr. Akarapanich's authorization to access to OLPCCI's computer networks and servers was revoked by May 15, 2020. OLPC is still investigating how Mr. Akarapanich gained unauthorized access to the Converted Documents after his authorization was revoked.

### REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1**: Admit that Thomas Olson has never been licensed to practice law in the State of Utah.

**RESPONSE NO. 1:** OLPC objects to this request on the grounds that "licensed to practice law in the State of Utah" is vague and ambiguous and requires a legal conclusion. OLPC admits that Thomas Olson has never been admitted to the Utah State Bar.

**REQUEST FOR ADMISSION NO. 2**: Admit that in 2020 Ephraim Olson was a trustee of The Ruth Doxey Family Trust.

**RESPONSE NO. 2:** Admit.

**REQUEST FOR ADMISSION NO. 3**: Admit that in 2020 Ephraim Olson was a trustee of The Carolyn Olson Spousal Trust.

**RESPONSE NO. 3:** Admit.

**REQUEST FOR ADMISSION NO. 4**: Admit that in 2020 and/or any time prior, Ephraim Olson was a beneficiary of the White Buffalo Trust.

**RESPONSE NO. 4:** OLPC objects to this request on the grounds that it calls for a legal conclusion as to Ephraim Olson's qualifications as a beneficiary throughout all time periods. OLPC does not have sufficient facts to determine whether Ephraim Olson qualified as a beneficiary during any of those years.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1**: Produce all communications maintained by OLPC from 2014 to the present, which were sent or received by the email address and/or user name ephraim@oltax.com and the phone number 403-949-3949, including but not limited to, all text, IMs, internal messaging, and/or skype messages.

**RESPONSE NO. 1:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 1 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and Ephraim Olson's communications over an eight year period is not relevant to the allegations in this Action; and (c) is overly broad, unduly burdensome and not proportional to the needs of the case in that it seeks vast amounts of information over an eight year period.

Based on these objections, OLPC will not respond to this request.

**SUPPLEMENTAL RESPONSE NO. 1**: Subject to and based on these objections, OLPC will produce Ephraim Olson's redacted time entry logs from the period of his employment.

**REQUEST FOR PRODUCTION NO. 2:** Produce all documents which detail and describe the corporate relationship and/or association between OLPC, OLPCCI, and ITC, from 2014 to 2020, including but not limited to all contracts and documents between OLPC, OLPCCI, and ITC which permit the companies to serve clients in common, share fees, share documents, and or otherwise conduct joint business.

**RESPONSE NO. 2:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 2 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and the corporate relationship between the named entities is not relevant to the allegations in this Action; and (c) is overly broad and not proportional to the needs of the case in seeking "all contracts and documents" between these business entities when the business relationship has no relevance in the Action.

Based on these objections, OLPC will not respond to this request.

**SUPPLEMENT TO RESPONSE NO. 2:** Subject to these objections, OLPC will produce two sample engagement letters (one from 2018 and another from 2020) that describe the relationship between OLPC, OLPCCI, and ITC.

**SECOND SUPPLEMENT TO RESPONSE NO. 2:** Based on the Court's ruling dated December 6, 2022 at Docket No. 97 and its limiting of Request for Production No. 2, OLPC will

produce contracts and documents between OLPC, OLPCCI, and ITC which permitted the companies to serve clients in common, collect fees, share documents, and otherwise conduct business from 2018 to 2020 (including historical documents in effect during this time period).

**REQUEST FOR PRODUCTION NO. 3:** Produce all OLPC employment records for Olson from 2014 to 2019, including but not limited to payment records, tax records, and all contracts between Ephraim Olson allegedly signed detailing his employment, such as any employment agreement, non-compete agreement and/or a non-disclosure and confidentiality agreement.

**RESPONSE NO. 3:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 3 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and Ephraim Olson's employment records are not relevant to the allegations in this Action; and (c) vague and ambiguous because it does not define what is meant by "employment records."

Subject to and based on these objections, OLPC has conducted a reasonable search and will produce non-privileged, responsive documents related to the allegations in this Action.

**SUPPLEMENT TO RESPONSE NO. 3:** OLPC has no documents responsive to the request for employment agreements. OLPC will produce additional tax records that are responsive to this Request.

**REQUEST FOR PRODUCTION NO. 4:** Produce all OLPC, OLPCCI, and/or ITC employment records for Timothy Akarapanich from 2018 to the present, including but not limited to personnel files, payroll, and all contracts allegedly signed detailing his employment, such as any employment agreement, non-compete agreement and/or a non-disclosure and confidentiality agreement.

**RESPONSE NO. 4:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 4 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and Timothy Akarapanich's employment records are not relevant to the allegations in this Action; (c) requires disclosure of detailed employment records that may be protected under Thailand law; (d) is overly broad and not proportional to the needs of the case because it seeks payroll and personnel files that have no relevance on the allegations in this case; and (e) vague and ambiguous because it does not define what is meant by "employment records."

Subject to and based on these objections, OLPC has conducted a reasonable search and will produce non-privileged, responsive documents related to the allegations in this Action.

**REQUEST FOR PRODUCTION NO. 5**: Produce all engagement agreements, effective from 2014-2020, between OLPC, OLPCCI, and/or ITC and (1) the Ruth Doxey Family

Trust, (2) Carolyn Olson Spousal Trust, and (3) White Buffalo Trust, including any authorizations to possess and control documents for these individuals or entities.

**RESPONSE NO. 5:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 5 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for 6 years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and terms of the engagement agreements with clients are not relevant to the allegations in this Action; and (c) vague and ambiguous because it does not define what is meant by "authorizations to possess and control documents."

Subject to and based on these objections, OLPC has conducted a reasonable search and will produce non-privileged, responsive documents related to the allegations in this Action.

**SUPPLEMENT TO RESPONSE NO. 5:** OLPC has not yet located written engagement agreements with the Ruth Doxey Family Trust, Carolyn Olson Spousal Trust, or White Buffalo Trust. The authorizations from the Ruth Doxey Family Trust and Carolyn Olson Spousal Trust are produced at OL Private Counsel-Ephraim Olson 0496-0499.

**REQUEST FOR PRODUCTION NO. 6:** Produce all documents that OLPC, OLPCCI, and/or ITC possess relating to (1) the Ruth Doxey Family Trust, (2) Carolyn Olson Spousal Trust, and (3) White Buffalo Trust, including but not limited to any planning document, planning memorandum, planning notes, excel spreadsheets, or other documents detailing actions taken or to be taken with respect to these trusts.

**RESPONSE NO. 6:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 6 on the grounds that it (a) is facially overbroad in

that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for an unlimited number of years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and seeks "all documents" related to certain clients are not relevant to the allegations in this Action; and (c) seeks the disclosure of privileged attorney/client communications and attorney work product.

OLPC further objects because the requested documents likely contain attorney/client communications and attorney work product and logging such conversations would be an excessive burden for OLPC. Request No. 6 would require OLPC to create an unnecessarily long and cumbersome privilege log for every privileged communication and its work product related to the client documents Ephraim Olson is alleged to have improperly obtained.

Defendant appears to be seeking confidential client documents to which he is not entitled, similar to those he converted that caused the damages alleged in this Action. If he is in fact entitled to some information, he can seek that information through the proper channels, not through discovery that is not relevant to the allegations in the Action.

Based on these objections, OLPC will not respond to this request.

**SUPPLEMENT TO RESPONSE NO. 6:** Subject to these objections, and based on the Court's ruling dated December 6, 2022 at Docket No. 97 and subsequent clarification, OLPC is conducting a reasonable search and will produce non-privileged, responsive documents in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 7:** Produce all emails, texts, internal communication records, written records and other communications stored or held by OLPC between Tom Olson, Hyrum Olson, Joshua Olson, Ruth Olson, Bruce Lemons, or any combination of them, relating in any way to Ephraim Olson and/or the allegations in this lawsuit from 2019 to the present.

**RESPONSE NO. 7:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 7 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for a year prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and would literally include any document relating to Ephraim in any way; (c) is overly broad and unduly burdensome in that it seeks communications "all" communications "relating in any way" and thus is overly broad and not proportional to the needs of the case, and (d) seeks information protected by the attorney/client or work product doctrine.

The individuals listed in Request No. 7 regularly communicate with each other as part of the provision of legal services and representation of various clients. As such, OLPC objects that requiring OLPC to search and review those communications is especially burdensome and not proportional to the needs of the case. OLPC further objects because the documents likely contain attorney/client communications and attorney work product and logging such conversations would be an excessively burdensome, especially for communications after the filing of this Action.

Subject to and based on these objections, OLPC has conducted a reasonable search and will produce non-privileged, responsive documents that relate to the allegations in this Action.

**REQUEST FOR PRODUCTION NO. 8:** Produce all documents, including but not limited to emails, texts, and other communications, reflecting communications between Timothy Akarapanich and Hyrum Olson, Thomas Olson, Joshua Olson, and/or Bruce Lemons, from 2019 to the present relating to Ephraim Olson and/or the allegations in this litigation.

**RESPONSE NO. 8:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 8 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for a year prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and would include any document relating to Ephraim whether or not relevant to this Action; and (c) seeks information protected by the attorney/client or work product doctrine.

The individuals listed in Request No. 8 regularly communicate with each other as part of the provision of legal services and representation of various clients. As such, OLPC objects that requiring OLPC to search and review those communications is especially burdensome and not proportional to the needs of the case. OLPC further objects because the documents likely contain attorney/client communications and attorney work product and logging such conversations would be an excessively burdensome, especially for communications after the filing of this Action.

Subject to and based on these objections, OLPC has conducted a reasonable search and will produce non-privileged, responsive documents that relate to the allegations in this Action.

**REQUEST FOR PRODUCTION NO. 9:** Produce documents, communications, data logs, and other data or information, showing Timothy Akarapanich accessed OLPC, OLPCCI, or ITC'sservers in June 2020.

**RESPONSE NO. 9:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 9 on the grounds that it seeks information and documents that may be the subject of expert opinion and discovery concerning expert opinion is premature. OLPC further objects to Request No. 9 because it seeks the disclosure of privileged attorney/client communications and attorney work product.

Subject to and based on these objections, OLPC has conducted a reasonable search and will produce non-privileged, responsive documents that relate to the allegations in this Action. *See also* OL Private Counsel-Ephraim Olson 0001-0324.

**SUPPLEMENT TO RESPONSE NO. 9:** OLPC's investigation is ongoing, and OLPC will produce non-privileged, responsive documents related to the allegations in this Action as they become available.

**REQUEST FOR PRODUCTION NO. 10:** Produce the Telegram message in which Ephraim Olson asked "Former Employee to access ITC's computer servers to obtain any information relevant to the Marital Dispute," as alleged in paragraph 30 of the Complaint. Please specifically reference the bates number on which this message appears.

**RESPONSE NO. 10:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 10 because it seeks specific information that is just as accessible to Ephraim Olson as to OLPC. OLPC responds that the messages related to that allegation appear on OL Private Counsel-Ephraim Olson 0001-0324.

**REQUEST FOR PRODUCTION NO. 11:** Please produce each OLPC client invoice detailing the legal work allegedly performed by Olson from 2014 to 2019.

**RESPONSE NO. 11:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 11 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information

created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for six years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope and would include descriptions of Ephraim Olson's legal work whether or not relevant to this Action; and (c) seeks information protected by the attorney/client or work product doctrine because the invoices referenced would detail legal work performed for clients.

OLPC has conducted a reasonable search and will produce non-privileged, responsive documents that demonstrate the hours Ephraim Olson worked.

**REQUEST FOR PRODUCTION NO. 12:** Produce all documents which detail and describe Timothy Akarapanich's access to OLPC, OLPCCI, and ITC's computer networks and servers, including documents which show when his access began and when it was affirmatively revoked for each corporate entity.

**RESPONSE NO. 12:** In addition to the objections set forth above and incorporated herein by reference, OLPC objects to Request No. 12 on the grounds that it (a) is facially overbroad in that it does not have a reasonable limit in temporal scope and seeks information created both before and after the allegations in the Complaint (Defendant himself takes the position that the "only time period relevant to OLPC's claims is post May 2020," yet seeks information here for years prior to that); (b) sweeps within its scope documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence because the Request does not have a reasonable limit in substantive scope; (c) is overly broad in that it seeks documents related to when Mr. Akarapanich's access began which are not relevant to the allegations in the complaint; (d) seeks information may be the subject of expert opinion and discovery concerning expert opinion is

premature; and (d) seeks the disclosure of privileged attorney/client communications and attorney work product.

Based on these objections, OLPC will not respond to this request.

**SUPPLEMENT TO RESPONSE NO. 12:** Subject to and based on these objections, OLPC is conducting an investigation and will produce non-privileged, responsive documents related to the allegations in this Action as they become available.

DATED: December 20, 2022

FOLEY & LARDNER LLP

*/s/ Ellen E. Ostrow*
David J. Jordan
Monica S. Call
Ellen E. Ostrow
*Attorneys for Plaintiff OL Private Counsel,*
*LLC*

## <u>VERIFICATION</u>

I, Thomas Olson, have read Plaintiff OL Private Counsel, LLC's Second Supplemental Response to First and Second Set of Discovery Requests and know the answers set forth therein, which were prepared with the assistance and advice of my counsel upon whose advice I have relied. The answers set forth therein, subject to inadvertent or undiscovered errors, are based on and are therefore necessarily limited by the records and information still in existence, presently recollected, and thus far discovered or accessible in the course of the preparation of the answers. Consequently, I reserve the right to make any changes to those answers if it appears at any time that omissions or errors have been made therein or that more accurate information is available. Subject to these limitations, the answers are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 20th day of December, 2022.

Thomas Olson
_____

Title: _____
                    Director

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2022 a true and correct copy of the foregoing

**PLAINTIFF OL PRIVATE COUNSEL, LLC'S SECOND SUPPLEMENTAL RESPONSE**

**TO FIRST AND SECOND SET OF DISCOVERY REQUESTS** was via email to the following

counsel of record:

>Scott M. Lilja
>slilja@fabianvancott.com
>Sarah C. Vaughn
>svaughn@fabianvancott.com
>FABIAN VANCOTT
>215 S STATE ST STE 1200
>SALT LAKE CITY, UT 84111-2323
>(801) 531-8900

>*/s/ Ellen E. Ostrow*_____

CONFIDENTIAL

| Entity | Category | Start Date (if after December 31, 2017) | End date (if before January 1, 2021) | Access level |
|---|---|---|---|---|
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | January 3, 2018 | February 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | January 8, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | February 1, 2018 | May 17, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | February 1, 2018 | August 10, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | February 13, 2018 | March 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | February 15, 2018 | August 8, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | March 2, 2018 | June 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 2, 2018 | May 14, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | March 26, 2018 | June 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | April 17, 2018 | November 16, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | April 17, 2018 | March 7, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Lawyer | May 1, 2018 | November 20, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | September 6, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | September 25, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | September 26, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | September 26, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | October 26, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | November 8, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | November 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2018 | June 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | August 3, 2018 | October 4, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | August 21, 2018 | August 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | September 4, 2018 | February 15, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | September 17, 2018 | October 25, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | September 17, 2018 | January 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | November 26, 2018 | January 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | November 26, 2018 | March 29, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | December 7, 2018 | April 15, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | January 7, 2019 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | February 26, 2019 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | March 18, 2019 | October 23, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Support Staff | March 25, 2019 | August 24, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | May 1, 2019 | May 14, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | May 1, 2019 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | May 16, 2019 | August 21, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Client Service Manager | May 25, 2019 | October 12, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2019 | July 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | June 1, 2019 | August 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | June 16, 2019 | August 27, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | July 1, 2019 | July 6, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | July 1, 2019 | August 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | July 8, 2019 | November 8, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | July 15, 2019 | June 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | August 14, 2019 | March 7, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | September 2, 2019 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | September 3, 2019 | March 7, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | September 4, 2019 | October 9, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | September 4, 2019 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | September 6, 2019 | October 8, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | September 19, 2019 | December 19, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | September 23, 2019 | October 2, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | September 23, 2019 | June 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | October 1, 2019 | October 17, 2019 | Access to client files on matters for which the individual was performing services. |

| Entity | Role | Start Date | End Date | Access |
|---|---|---|---|---|
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | October 1, 2019 | January 22, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | October 26, 2019 | October 27, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | October 28, 2019 | February 20, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | November 1, 2019 | November 2, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | November 2, 2019 | November 30, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | November 4, 2019 | June 16, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | December 2, 2019 | December 14, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | December 2, 2019 | January 2, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | December 2, 2019 | June 17, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | December 9, 2019 | January 27, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Lawyer | December 28, 2019 | May 10, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | January 1, 2020 | February 10, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | January 6, 2020 | February 22, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | January 13, 2020 | February 22, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | January 15, 2020 | May 3, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | January 16, 2020 | July 11, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | January 20, 2020 | March 11, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Lawyer | February 1, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | February 17, 2020 | March 3, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | February 24, 2020 | March 6, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | March 2, 2020 | March 16, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 2, 2020 | May 29, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | March 2, 2020 | June 6, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 2, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 3, 2020 | March 3, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | March 9, 2020 | March 14, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 9, 2020 | April 25, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | March 12, 2020 | May 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 16, 2020 | April 25, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 16, 2020 | May 13, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | March 18, 2020 | June 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | April 1, 2020 | April 25, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | April 1, 2020 | May 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | April 13, 2020 | April 21, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | April 24, 2020 | August 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Legal Assistant | May 27, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Legal Assistant | May 28, 2020 | October 22, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Legal Assistant | June 29, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Client Service Manager | July 1, 2020 | September 25, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | July 26, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Client Service Manager | October 9, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Client Service Manager | October 9, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Client Service Manager | October 15, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Lawyer | December 29, 2020 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | January 15, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | January 18, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | January 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | January 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | January 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | February 15, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | February 20, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | February 20, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | February 22, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | February 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | February 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | February 28, 2018 | Access to client files on matters for which the individual was performing services. |

| | | | | |
|---|---|---|---|---|
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | February 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | February 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | March 9, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | March 22, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | March 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | March 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | March 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | April 12, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | April 14, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | April 23, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | April 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | April 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | April 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 3, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | May 7, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | May 12, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | May 17, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | May 24, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | May 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | June 8, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | June 9, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | June 15, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | June 15, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | June 15, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | June 25, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | Prior to January 1, 2018 | June 27, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Lawyer | Prior to January 1, 2018 | June 27, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | June 28, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | June 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Support Staff | Prior to January 1, 2018 | July 1, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | July 6, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | July 10, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | July 11, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | July 13, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | July 18, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | July 21, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | July 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | August 27, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | Prior to January 1, 2018 | August 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | September 4, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | September 14, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | September 29, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | September 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | Prior to January 1, 2018 | October 8, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | October 9, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | October 12, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | October 26, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | October 31, 2018 | Access to client files on matters for which the individual was performing services. |

| | | | | |
|---|---|---|---|---|
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | October 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | October 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | November 12, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | November 24, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | November 30, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | December 19, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Support Staff | Prior to January 1, 2018 | December 31, 2018 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Support Staff | Prior to January 1, 2018 | January 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | February 21, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | April 30, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | Prior to January 1, 2018 | May 6, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | May 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | June 19, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | July 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | August 27, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Ephraim Olson | Prior to January 1, 2018 | September 1, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | October 10, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | November 12, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | December 31, 2019 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | January 10, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | February 15, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | February 22, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | March 13, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | Prior to January 1, 2018 | March 21, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | April 10, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | April 30, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Thonggrachang Akarapanich | Prior to January 1, 2018 | May 10, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | May 15, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Legal Assistant | Prior to January 1, 2018 | November 6, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Client Service Manager | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Lawyer | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel Ltd. / International Tax Counsel Ltd. | Support Staff | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Analyst | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Lawyer | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd / OL Private Counsel, LLC | Lawyer | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Support Staff | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel PTE Ltd | Lawyer | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |
| OL Private Counsel, LLC | Lawyer | Prior to January 1, 2018 | After December 31, 2020 | Access to client files on matters for which the individual was performing services. |

# EXHIBIT G

# EXHIBIT G

```
 1                    P R O C E E D I N G S

 2

 3                      Thomas Olson,

 4          called as a witness, being first duly sworn,

 5               was examined and testified as follows:

 6

 7                       EXAMINATION

 8    BY MS. VAUGHN:

 9          Q.    Mr. Olson, I am Sarah Vaughn and I

10    represent your son, Ephraim Olson, in this litigation.

11    Tell me what you did to prepare -- let me back up.  You

12    understand you are here today to testify on behalf of

13    OLPC, correct?

14          A.    Yes.

15          Q.    What did you do to prepare to testify on

16    behalf of OLPC today?

17          A.    I spoke with Joshua Olson, Hyrum Olson,

18    Narong, Crucial Logics; I met with David Jordan and

19    Dave Mortensen; I reviewed the judge's order; and

20    reviewed Exhibit 1 and reviewed parts of my previous

21    transcript.

22          Q.    When did you speak with Joshua?

23          A.    I have spoken with him several times, as

24    late as yesterday, but several times over the last few

25    weeks.
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          Q.    Several times in anticipation of this
2     deposition, or several times in general?
3          A.    Several times in anticipation of this
4     deposition.
5          Q.    Okay.  And what about Hyrum?
6          A.    The same.  I spoke with him several times
7     in connection with preparing for this deposition.
8          Q.    And remind me, what is Narong's position?
9     Who does he work for?
10          A.    He is -- Narong works for ITCL.
11          Q.    And what is his position there?
12          A.    He works with IT.
13          Q.    Okay.  When did you speak to Narong?
14          A.    Multiple times, but as recently as, I
15     believe, three days ago.
16          Q.    You also said you spoke to Crucial Logics.
17     Is it "Crucial Logistics" or "Crucial Logics"?
18          A.    Crucial Logics.
19          Q.    Okay.  And when did you speak to them?
20          A.    On several occasions.
21          Q.    As recently as when?
22          A.    A couple of days ago.
23          Q.    And who did you speak with there?  What
24     was their name?
25          A.    Amol Joshi.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          Q.    Anyone else?

2          A.    No.  He is the primary one, the primary

3    person I spoke with.

4          Q.    And you said you reviewed the Court's

5    order, Exhibit 1 to the prior written discovery.

6          A.    Yes.

7          Q.    And parts of your previous transcript.

8    Did you review any other documents in anticipation of

9    today's deposition?

10         A.    I reviewed a document that was sent by

11   David to you that has quite a few columns on it.

12         Q.    Okay.  Any other documents you reviewed?

13         A.    I reviewed the -- I reviewed Tim's

14   declaration.

15         Q.    Okay.  Anything else that you recall?

16         A.    I reviewed a screenshot.  I reviewed what

17   appears to be a screenshot of Tim's e-mail with an

18   error message on it.

19         Q.    Anything else?

20         A.    I don't recall any other documents I

21   looked at, no.

22         Q.    Okay.  We are going to mark Exhibit 59.  I

23   think I'm just going to drop it in the Chat so that you

24   can open it up, as well.  Does that work?  Maybe it

25   won't work.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          (Discussion off the record.)

2          (EXHIBIT 59 WAS MARKED.)

3          Q.    So Mr. Olson, do you see this document

4    here?

5          A.    Yes.

6          Q.    Okay.  Is this one of the documents you

7    reviewed to prepare for today's deposition?

8          A.    Yes, I have looked at this document.

9          Q.    Okay.  What is this document?

10         A.    Can you scroll all the way over to the

11   left, please?  It's quite a long document.  Can you

12   scroll all the way over to the left and then can you

13   scroll all the way over to the right?

14         Q.    All the way over to the left and then to

15   the right?

16         A.    Yes.  So I can see the whole length of the

17   document.  So that's the whole document there, right?

18         Q.    Well, that's the end of the document,

19   yeah.

20         A.    Okay.  And then go back over to the left

21   for me, please.

22               So this document is a document created by

23   the forensic IT expert hired by Foley's.

24         Q.    A forensic IT expert hired by your

25   attorneys at Foley; is that right?

Page 7

1          A.    That's correct.
2          Q.    Let me back up.  Where does the data in
3     this document come from?
4          A.    Tim's mobile phone.
5          Q.    Okay.  Do you know who the forensic IT
6     expert is that was hired by Foley?
7          A.    The company is called IDS.
8          Q.    Okay.  Do you know what IDS stands for?
9          A.    I don't remember the full name.
10         Q.    Do you know where they are located?
11         A.    I don't.
12         Q.    Okay.  How do you know that the data in
13    this document comes from Tim's mobile phone?
14         A.    That was what the forensic expert advised.
15         Q.    Do you know how the forensic expert
16    accessed the data on Tim's mobile phone?
17         A.    No.
18         Q.    Who would know that information?
19         A.    The expert would.
20         Q.    Do you know if the forensic expert was
21    provided with the password to Tim's mobile phone?
22         A.    No.
23         Q.    No, he was not, or no, you do not know?
24         A.    No, he was not given the password.
25         Q.    He didn't ask for it?

1    A.    I don't recall that he asked for it.  But

2  -- I don't recall that he asked for it.

3    Q.    So how do you know that he was not

4  provided the password to the phone?

5    A.    Because I don't know -- OLPC doesn't know

6  what the password is.

7    Q.    Okay.  When was the expert provided the

8  phone?

9    A.    I think over the past three months.

10  During the last few months the process of -- yeah, I

11  think during the last three months.

12    Q.    Okay.  And why -- do you know why this

13  document was produced to us?

14    A.    Because of the data that the expert was

15  able to get from the phone.

16    Q.    Do you know what this is telling us?  Do

17  you know what any of these columns mean?

18    A.    I do not.

19    Q.    Okay.  Do you know what any of the data in

20  this document means?

21    A.    I do not.

22    Q.    Okay.

23    A.    Well, no, I do not know what these columns

24  refer to.

25    Q.    And how long has OLPC been in possession

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    of Tim A's phone?

2          A.    Are you asking when OLPC first acquired

3    the phone?

4          Q.    Yes.

5          A.    It first acquired the phone on September

6    -- or sorry, October 28, 2020.

7          Q.    Okay.  So you don't know what any of these

8    columns mean.  Can you tell me -- well, is that

9    correct?  You don't know what any of the information in

10   this document means?  You'd have to refer to your

11   expert?

12         A.    OLPC, correct.

13         Q.    Okay.  We will mark Exhibit 60.  This is

14   Bates numbered OLPC 13468.

15               (EXHIBIT 60 WAS MARKED.)

16         Q.    Mr. Olson, is this one of the documents

17   that you received or that you reviewed in preparation

18   for your deposition today?

19         A.    Yes.

20         Q.    Okay.  What is this document?

21         A.    These are logs relating to Tim's e-mail

22   account.

23         Q.    Where did the data in these logs come

24   from?

25         A.    It comes from a backup.

1        Q.    A backup of what?

2        A.    A backup of the firm's servers.

3        Q.    How do you know that this information

4   comes from the backup of the firm's servers?

5        A.    That's what OLPC was advised when the

6   forensic expert advised us that this is -- that this

7   came from the backups.

8        Q.    And who was that forensic expert?

9        A.    The same company that I referred to

10  earlier.

11       Q.    IDS?

12       A.    Yes.

13       Q.    Okay.  What information did OLPC provide

14  to IDS to create this document?

15             MR. JORDAN:  Objection.  Assumes facts not

16  in evidence.

17       A.    Are you asking what did the forensic

18  expert look at to prepare this document?

19       Q.    Yes.

20       A.    Backup of the firm's servers.

21       Q.    How were those backups provided to them?

22       A.    He went online to our servers in London

23  and pulled the data, pulled the logs from those

24  backups, the servers in London.

25       Q.    And how long has OLPC had access to the

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    backups of its servers?

2         A.   You're asking when these backups were

3    created, or are you asking -- what's your question

4    exactly?  When you say "access," what do you mean by

5    that?  Sorry.

6         Q.   How long has OLPC been able to access the

7    backups to its server?

8         A.   Access the backup itself?  Is that what

9    you're asking?

10        Q.   Yes.

11        A.   Well, backups have been there since the

12   backup was made.

13        Q.   When was the backup made?

14        A.   One of the backups was July 5th of 2020.

15        Q.   Is that the only backup?

16        A.   And there was another backup from 2022.

17        Q.   What date in 2022?

18        A.   It would have been early in 2022.

19        Q.   Okay.  So presumably OLPC had access --

20   had the ability to access the data in this document,

21   Exhibit 60, going back as early as July 5, 2020?

22             MR. JORDAN:  I'm sorry.  I didn't hear the

23   question.

24             MS. VAUGHN:  Diana, could you repeat it,

25   please.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          A.    Yeah.  The remote server, you'd asked

2     about -- sorry.  You're asking about -- there was a

3     question, you asked about a program that was spyware

4     that monitored people's activity.  Is that what you are

5     referring to?  Because you asked quite a bit of

6     questions, so try to narrow the question of what you

7     are talking about.

8          Q.    I did ask a lot of questions.  It was a

9     long day.  The question I'm referring to is the program

10    that monitors access to the server, not the spyware

11    that may or may not have been installed on computers.

12    I'm talking about access to the server.  Do you know

13    what program OLPC or OLPCCIL uses to monitor access to

14    its server?

15         A.    It's not a program.  OLPC -- access is

16    granted on the server to the exchange server through

17    the domain controller.  So that is a program that

18    grants access to the server.

19         Q.    Okay.  The domain controller is?

20         A.    The domain controller.

21         Q.    Okay.  We are going to look at Exhibit 10

22    to your first deposition.  This is Exhibit 10 to -- I'm

23    not sure why it says "Olson," it should say "OLPC," but

24    this is to OLPC's deposition.  I'll just scroll slowly,

25    Mr. Olson.  What I care about is on the last page.  Let

1    me know if I'm going too fast.  It's talking about

2    standard access lists to the server.  And then we

3    have -- let me see if I can rotate it.  There we go.

4    It's my recollection from the prior deposition that

5    Volta is a company that houses the server; is that

6    correct?

7         A.    Yes.

8         Q.    Okay.  And this document was a security

9    access list from the year 2018, with Ephraim Olson

10   having at least three levels of access.  Do you see

11   that?  It's right here.  Ephraim's access.

12        A.    When you say "authority" -- sorry.  He

13   clearly was listed as a list owner, portal user, and

14   fast track user.

15        Q.    Yeah.  And my only question goes to, in

16   your last deposition I asked you if this document had

17   ever been updated and you didn't know.  Do you know

18   today if this security access list has ever been

19   updated to remove Ephraim's access?

20             MR. JORDAN:  Beyond the scope.

21             You can answer.

22        A.    Yes, it has been updated.

23        Q.    Do you know when it was updated?

24        A.    It's updated periodically, so it's been

25   updated several times.

1          Q.    Okay.  We will look at Exhibit 11 to your

2    first deposition.

3               Okay.  These are OLPC's Responses to

4    Written Discovery.  And what we care about, what I care

5    about today is this document at the end.

6               Do you recognize this document, Mr. Olson?

7          A.    Yes.

8          Q.    Do you know who helped prepare this

9    document?

10         A.    Yes.

11         Q.    Who was it?

12         A.    This was Jaturong Chuithong and Joshua

13   Olson, with input from others.

14         Q.    And do you know the source material from

15   the information in this document?

16         A.    Yes.

17         Q.    Let's go down to what I really care about

18   here.  Here we have "Ephraim Olson."  Do you see

19   "Ephraim" right here, Mr. Olson?  This line?

20         A.    Yes.

21         Q.    Okay.  And then we can look back up at

22   columns.  So the column for entity, where does the

23   information for that entity data come from?

24         A.    That came from just knowledge of who had

25   engaged the person, and from payroll records.

                                          Page 35

1         Q.    And the category, where does that
2    information come from?
3         A.    It came from knowledge of the role of the
4    people, plus it was the position to which we hired
5    people.
6         Q.    Okay.  The start date, where did that come
7    from?
8         A.    From the payroll records.  Primarily from
9    payroll records.  Primarily it comes from the payroll
10   records.
11        Q.    Okay.  So for Ephraim it just says, "Prior
12   to January 1, 2018."  Do you know why it's not more
13   specific there?
14             MR. JORDAN:  Objection.  Calls for legal
15   conclusion.
16             Counsel, you know that's the start date
17   that the Court provided in its order.
18             MS. VAUGHN:  Oh, no, I didn't have that on
19   top of my mind.  I'll trust you, though, on that one,
20   David.
21        Q.    (By Ms. Vaughn)  Okay.  The end date, the
22   next column over, where does that come from?
23        A.    A combination of payroll records and
24   Hyrum's and Joshua's best recollection of when the
25   access was terminated.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          Q.    Okay.  So for Ephraim it states September

2     1, 2019.  Where does that information come from?

3          A.    From payroll records and from Hyrum and

4     Joshua's best recollection of when the access was

5     terminated on Ephraim's account.

6          Q.    Okay.  Are there no other records besides

7     Hyrum's and Joshua's memory as to when an individual's

8     access to the server is cut off?

9          MR. JORDAN:  Objection.  Mischaracterizes

10     the witness's testimony.

11          A.    Generally it is related to the date of

12     termination of employment.

13          Q.    Okay.

14          A.    But, for example, if I get terminated from

15     Fabian, just by virtue of my termination it's not going

16     to end my access to various, you know, electronic

17     things.  IT has to go in and do that.  So that's what

18     I'm referencing.  Just because you stop paying them

19     doesn't mean their access to various servers is cut

20     off, correct?

21          MR. JORDAN:  Objection.  Incomplete

22     hypothetical.  Calls for speculation.

23          A.    The mere fact that -- the answer is no.

24     Sorry.  Repeat the question.

25          Q.    Okay.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          A.    If you're asking me if the mere fact of

2     not sending a paycheck is sufficient to cut off access,

3     the answer is no, that's not sufficient.

4          Q.    Okay.

5          A.    By itself.

6          Q.    What is the process to cut off an

7     employee's access to OLPC's server?

8          A.    Someone in the IT department will, upon

9     termination, will go in and cut off access.

10         Q.    Okay.

11         A.    That's the process.

12         Q.    Okay.  And now you're telling me that the

13    information in this column, in this document, comes

14    from payroll records and Joshua's and Hyrum's best

15    memory; is that correct?

16         A.    Well, as I said, primarily it's off

17    payroll records.

18         Q.    Okay.

19         A.    And for Ephraim, I believe the payroll

20    actually goes a bit beyond September 1st, but he was no

21    longer providing services after September 1st and the

22    decision was taken to remove his access at that time.

23         Q.    Okay.  And other than Hyrum's and Joshua's

24    memory, are there any documents that establish that

25    Ephraim's access was terminated on September 1, 2019?

1        A.    OLPC is not aware of any documents that

2    would document his access change or remove his access

3    on September 1.

4        Q.    Same for Tim A.  He is just a few lines

5    down.  It says his access ended May 15, 2020.  Do you

6    see that?

7        A.    Yes.

8        Q.    Okay.  Is that also a best guess based off

9    of payroll records and Hyrum's and Joshua's memory?

10            MR. JORDAN:  Objection.  Mischaracterizes

11    the document.  Mischaracterizes the -- argumentative by

12    counsel.

13        A.    Tim was terminated or Tim resigned on the

14    14th, and his access was removed on the 14th.  But

15    that's North American time.  Sorry.  His access was

16    removed late on the 14th.  So on the 15th his access

17    was gone.  He no longer had access on the 15th.

18        Q.    Okay.  And what is that statement based

19    off of?  What information supports that statement?

20        A.    That was based on the practice of going in

21    to remove people's access when they finish on their

22    final day of working for the firm, and discussions with

23    Narong and Joshua.

24        Q.    Okay.  Do either Narong or Joshua have an

25    explicit memory of removing Tim A's access to the

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    server?

2         A.    Narong believes that he -- Narong does not

3    have an explicit recollection of it, but he believes

4    that he did it, but does not have a specific

5    recollection.

6         Q.    Okay.  So in other words, there are no

7    documents to back up this May 15, 2020 date terminating

8    Tim A's access to the server?

9         A.    OLPC is not aware of any documents that

10   would confirm that Tim's access was cut off.  That's

11   correct.

12        Q.    In your last deposition, when I asked you

13   the source material for the columns in this document

14   that we're looking at, you said it came "off the

15   computer record."  Now, today, do you know what those

16   computer records were, or do you think you misspoke in

17   your prior deposition?

18        A.    No.  The computer records are our payroll

19   records.  They are computerized.

20        Q.    Okay.

21        A.    As I said, there was also personal

22   knowledge in the case of Ephraim.  They reviewed the

23   payroll records and if there was anything different

24   than the actual payroll final day, as I explained

25   before.

1      Q.    Okay.  So the computer records are just
2  the payroll records, correct?
3      A.    Yes.
4      Q.    Okay.  And on the last column it says
5  everyone has "access to client files on matters for
6  which the individual was performing services."  Do you
7  see that?
8      A.    Yes.
9      Q.    What is the source material for that
10  statement?
11      A.    The source material is that management
12  limited access to remote servers based on what the
13  person was doing and their need to access files.
14      Q.    So this document that we're looking at, is
15  this only access to the remote server, or is it also
16  access to the exchange server and the controller
17  domain?
18      A.    This is -- well, everyone has access to
19  their own e-mail account.  In some cases, someone else
20  is granted access to someone's e-mail account.  But
21  everybody has access to their own e-mail account.  The
22  remote server contains client files, and access to the
23  client files is dependent on the nature of the work
24  being done by the person, by the staff member.
25      Q.    So this document that we are looking at,

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1      when it says access -- let's scroll up a little bit

2      more.  The date, where it says access ended on a

3      specific date, is that talking about access to the

4      remote server?

5          A.    It's access to any server.

6          Q.    Okay.  Any server.  So that can include --

7      are these little Teams things popping up for you guys?

8          A.    No.

9          Q.    I'm on a chat with a bunch of associates I

10     don't know, and they being are very talkative.

11              Okay, this is all servers; the exchange

12     server, the remote server, and the domain controller;

13     is that correct?

14         A.    You don't technically have access to the

15     domain controller.  It's what gives you access to the

16     other servers.

17         Q.    Okay.  And then the comment over here,

18     "Access to client files," and the "Access Level," that

19     statement only applies to the remote server; is that

20     correct?

21         A.    Those words apply.  But the access to --

22     that's referring to remote server access.  You also

23     have access to your own e-mail account.

24         Q.    Okay.  Okay.  Since your last deposition

25     who have you spoken to in order to prepare to answer

# EXHIBIT H

# Filed Under Seal



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

THOMAS-OLSON-0000027



CONFIDENTIAL



THOMAS-OLSON-0000029



CONFIDENTIAL



CONFIDENTIAL



THOMAS-OLSON-0000032



CONFIDENTIAL

THOMAS-OLSON-0000033



CONFIDENTIAL



CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL

THOMAS-OLSON-0000037



# EXHIBIT I

## Filed Under Seal







OL Private Counsel-Ephraim Olson 0020



OL Private Counsel-Ephraim Olson 0021



OL Private Counsel-Ephraim Olson 0022





[redacted]

OL Private Counsel-Ephraim Olson 0025



 **OL Private Counsel-Ephraim Olson 0026**

# EXHIBIT J

# EXHIBIT J



# Expert Report of Matthew R. Morrise

## OL Private Counsel vs. Olson

### 2:21-CV-00455-DBB

### August 12, 2024

Morrise Thompson, PLLC
825 North 900 West
Orem, UT 84057
(801) 473-6228

# Table of Contents

Introduction..................................................................................................1

    Engagement background.......................................................................1

    Experience and qualifications..............................................................1

    Compensation.......................................................................................2

Executive summary.........................................................................................3

OLPC has not produced the primary sources analyzed in the iDS Report.........4

Evidence in the iDS Report's exhibits demonstrates that OLPC did
not terminate Akarapanich's access to the OLPC Microsoft Exchange
Server until July 2, 2020................................................................................6

    The iDS Report's conclusions about Akarapanich's access
    to the Exchange Server........................................................................6

    OLPC did not terminate Akarapanich's access to the Exchange
    Server until July 2, 2020......................................................................7

Evidence cited in the iDS Report is inconclusive as to whether
Akarapanich downloaded confidential OLPC documents from a
live connection to the Exchange Server or from cloud storage.......................15

    The iDS Report's conclusions about confidential OLPC
    documents on Akarapanich's phone...................................................15

    Evidence indicates that the confidential OLPC documents
    were also stored in Akarapanich's cloud storage and could
    have been downloaded from there, rather than from a live
    connection to the Exchange Server....................................................16

Evidence in the iDS Report's exhibits contradicts the conclusion that
Akarapanich deleted the Microsoft Outlook app between
October 10, 2020, and October 14, 2020......................................................18

    The iDS Report's conclusions about deletion of the
    Outlook app.......................................................................................18

    Evidence in the iDS Report's exhibits indicates that Akarapanich
    did not delete the Outlook app from his Samsung Galaxy S8
    between October 10, 2020, and October 14, 2020.............................18

Conclusion...................................................................................................19



### a.    **Introduction.**

#### i.    Engagement background.

¶1 Morrise Thompson, PLLC, was retained by law firm Fabian Vancott to provide digital forensic investigative services in connection with litigation in the case of OL Private Counsel vs. Ephraim Olson, case number 2:21-CV-00455-DBB.

¶2 I, Matthew R. Morrise, have been asked to provide a report responding to the report of Daniel L. Regard II of iDiscovery Solutions, dated July 12, 2024. I took all actions related to this investigation. No other personnel participated in this investigation.

#### ii.    Experience and qualifications.

¶3 Morrise Thompson, PLLC is a law firm that specializes in digital forensic investigations. I am a partner in Morrise Thompson, PLLC. I have a degree in physics from Brigham Young University, and a Juris Doctorate from the J. Reuben Clark Law School at Brigham Young University, where I graduated cum laude. I am licensed to practice law in the State of Utah.

¶4 Prior to attending law school, I worked between 1996 and 2006 as a content developer and consultant for software companies Capsoft and LexisNexis. After completing my law degree in 2009 I joined the software company HotDocs Corporation, where I first managed the technical support team and then managed the Quality Assurance team in the software development department.

¶5 During my time working for these software companies, I gained experience in computer hardware and software, computer programming, Windows network administration, web server administration, and cloud technologies.

¶6 In 2011 I joined the Utah County Public Defender Association as a full-time trial attorney, and over my career investigated and litigated over 2,000 criminal cases including multiple cases for murder, rape, robbery, burglary, assault, securities fraud, and other types of crimes. As an attorney I frequently consulted with digital forensics experts and was exposed to the field.

¶7 Based on my combined technology and legal experience, in 2019 I founded MRM Data Services, LLC, a digital forensics consulting firm. MRM Data Services, LLC consulted on criminal cases including capital homicide, murder, rape, sexual assault, child pornography, and arson; civil cases including liability, wrongful death, automobile accidents, medical malpractice, copyright and trademark, probate, divorce, child custody, and juvenile delinquency; and private investigations including fraud, marital infidelity, student discipline, and missing persons.



¶8 While at MRM Data Services, LLC, I gained experience in computer forensics of Windows, macOS, and Linux operating systems; cell phone forensics of Apple and Android devices; analysis of third-party data from companies such as Facebook, Instagram, Snapchat, and TikTok; and location analysis including GPS and cell site analytics.

¶9 In 2023 I co-founded Morrise Thompson, PLLC, a law firm which specializes in digital forensic investigations. While at Morrise Thompson, PLLC I continued to work on criminal cases, civil matters, and private investigations.

¶10 To date, I have consulted in over three hundred cases in my capacity as a digital forensic investigator. I have testified and submitted numerous affidavits, declarations, witness statements, and/or expert reports in that capacity. In the past five years I have offered sworn testimony in the following courts/tribunals:

- California – University of California-Berkeley (Administrative Hearing)
- Connecticut – Superior Court (Deposition)
- Idaho – District Court (Jury Trial)
- Utah – District Courts (Hearings/Bench Trials/Jury Trials)
- Utah – Juvenile Court (Bench Trial)

¶11 Further details can be viewed in the attached curriculum vitae, which sets forth a detailed list of my background, qualifications, and testimony experience.

### iii.  Compensation.

¶12 Morrise Thompson, PLLC is compensated for my work on this case at a rate of $250 per hour. My compensation does not depend on the outcome of this case.

 

### b.　Executive Summary.

¶13 Attorneys Sarah Vaughn and Scott Lilja of the law firm Fabian Vancott asked me to review and respond to the expert report of Daniel L. Regard II of iDiscovery Solutions, dated July 12, 2024 (hereinafter "the iDS Report"). I have thoroughly reviewed the iDS Report. I summarize its conclusions as follows:

1. OLPC attempted to terminate Timothy Akarapanich's access to the OLPC Microsoft Exchange Server between May 14, 2020, and May 22, 2020, and evidence suggests that Akarapanich could not access the OLPC Microsoft Exchange Server on May 30, 2020.[1]

2. Akarapanich's access to the OLPC Microsoft Exchange Server was restored on or before June 6, 2020.[2]

3. Between June 6, 2020, and July 2, 2020, Akarapanich accessed the OLPC Microsoft Exchange Server via the Microsoft Outlook app on his Samsung Galaxy S8 and used his access to download confidential OLPC documents from email attachments.[3]

4. The attachments Akarapanich downloaded between June 6, 2020, and July 2, 2020, were downloaded via a live connection to the OLPC Microsoft Exchange Server.[4]

5. Akarapanich's access to the OLPC Microsoft Exchange Server was disabled on July 2, 2020, and he did not access it after that date.[5]

6. Akarapanich deleted the Microsoft Outlook app from his Samsung Galaxy S8 on or before October 14, 2020.[6]

¶14 The iDS Report primarily relied on data from sources which have not been produced by OLPC and to which I did not have access when preparing this report. The lack of access to these primary sources makes it difficult, if not impossible, to verify and appropriately respond to the iDS Report's conclusions. Without access to the primary sources, I respond to the iDS Report in a limited way as follows:

1. Evidence in the iDS Report's exhibits demonstrates that OLPC did not terminate Akarapanich's access to the OLPC Microsoft Exchange Server until July 2, 2020.

---

[1] iDS Report, ¶¶ 53-68.
[2] iDS Report, ¶¶ 74, 77-91.
[3] iDS Report, ¶¶ 77-128.
[4] iDS Report, ¶¶ 34-52.
[5] iDS Report, ¶¶ 75-76.
[6] iDS Report, ¶¶ 129-139.



2. Evidence cited in the iDS Report is inconclusive as to whether Akarapanich downloaded confidential OLPC documents from a live connection to the Exchange Server or from cloud storage.

3. Evidence in the iDS Report's exhibits contradicts the conclusion that Akarapanich deleted the Microsoft Outlook app between October 10, 2020, and October 14, 2020.

¶15 These conclusions are explained in detail below.

**c.    OLPC has not produced the primary sources analyzed in the iDS Report.**

¶16 Paragraph 21 of the iDS Report describes the primary electronic sources relied upon in the report as follows:

> 21.    *I have been provided the following devices and accounts, or copies thereof, for inspection:*
>
> a.    *Tim Akarapanich's Microsoft 365 mailbox (timothy@oltax.com), identified by iDS as Evidence Identifier (EID) A0001 ("Akarapanich Email").*
>
> b.    *Samsung Galaxy S8, serial number RF8JB05LW2T ("Akarapanich Phone"), identified by iDS as EID A0002.*
>
> c.    *Samsung Kies Backup of the Akarapanich Phone, identified by iDS as EID S0001.*
>
> d.    *Logs from a September 2022 backup of Microsoft Exchange server (EX01), identified by iDS as EID S0002.*
>
> e.    *Logs from a January 2022 backup of Microsoft Exchange server (EX01), identified by iDS as EID S0003.*
>
> f.    *Backup of domain controller (DC01) taken on or about July 4, 2020 in VMDK format, identified by iDS as EID S0004.*
>
> g.    *Backup of domain controller (DC02) taken on or about July 4, 2020, in VMDK format, identified by iDS as EID S0005.*
>
> h.    *Backups of Remote Desktop Servers (SVR-RDS01 through SVR-RDS01), identified by iDS as EID S0006.*

¶17 My understanding is that OLPC has not produced any of these primary electronic sources to Fabian Vancott, and they were therefore not provided to me.



¶ 18 In addition to the above sources, the iDS Report also relied on discussions with Joshua Olson and Hyrum Olson.[7] It is my understanding that Defendant Ephraim Olson has asked to depose these witnesses, but the Court has denied these requests.[8] I have not had access to these witnesses for this report.

¶19 Without access to the primary sources, I am unable to verify or adequately respond to the iDS Report's conclusions. I give the following illustrative (but non-exhaustive) list of limitations occasioned by my lack of access to the primary sources:

- The iDS Report analyzed server event logs, and relied on discussions with Joshua and Hyrum Olson, to conclude that OLPC took steps to restrict Akarapanich's email access between May 14, 2020, and May 22, 2020.[9] OLPC has not produced the original server event logs or backups analyzed in the iDS Report, and I do not have access to Joshua and Hyrum Olson, so I am unable to verify this conclusion.[10] I am also unable to determine whether any additional evidence in logs, backups, or procedures at OLPC would confirm or contradict this conclusion.

- The iDS Report analyzed Akarapanich's Samsung Galaxy S8 and concluded that confidential OLPC documents were located on Akarapanich's Samsung Galaxy S8 in the Downloads folder.[11] OLPC has not produced Akarapanich's Samsung Galaxy S8, and so I am unable to verify this conclusion.[12] I am also unable to determine whether any additional evidence on Akarapanich's Samsung Galaxy S8 would confirm or contradict this conclusion.

- The iDS Report analyzed Akarapanich's Samsung Galaxy S8 and concluded that thumbnail images of OLPC emails were located on Akarapanich's Samsung Galaxy S8.[13] OLPC has not produced Akarapanich's Samsung Galaxy S8, and so I am unable to verify this conclusion. I am also unable to determine whether any additional evidence on Akarapanich's Samsung Galaxy S8 would confirm or contradict this conclusion.

- The iDS Report analyzed the timothy@oltax.com mailbox and concluded that confidential OLPC documents found in the Downloads folder on Akarapanich's

---

[7] iDS Report, ¶¶ 22, 54.

[8] *See* Memorandum Decision and Order Denying Defendant's Short Form Discovery Motions Regarding Depositions of Joshua Olson, Hyrum Olson, and Timothy Akarapanich (Doc. Nos. 116, 117, 118), filed November 20, 2023.

[9] iDS Report, ¶¶ 54-61.

[10] Exhibits C and D to the iDS report are spreadsheets allegedly containing data parsed from excerpts of server event logs, specifically from events containing the word "Timothy." *See* iDS Report, ¶ 57. I cannot verify the accuracy of these spreadsheets.

[11] iDS Report, ¶¶ 103, 118, 126.

[12] Exhibit F to the iDS Report is a spreadsheet allegedly containing metadata of files found in the Downloads folder. I cannot verify the accuracy of this spreadsheet.

[13] iDS Report,. ¶¶ 77-97.



Samsung Galaxy S8 were attached to numerous emails.[14] OLPC has not produced the [timothy@oltax.com](mailto:timothy@oltax.com) mailbox, nor has it produced the emails it alleges had confidential OLPC documents attached to them, so I am unable to verify this conclusion. I am also unable to determine whether additional evidence in the [timothy@oltax.com](mailto:timothy@oltax.com) would confirm or contradict this conclusion.

- The iDS Report analyzed Akarapanich's Samsung Galaxy S8 and concluded that Akarapanich deleted the Microsoft Outlook app between October 10 and October 14, 2020.[15] OLPC has not produced Akarapanich's Samsung Galaxy S8, and so I am unable to verify this conclusion.[16] I am also unable to determine whether additional evidence on Akarapanich's Samsung Galaxy S8 would confirm or contradict this conclusion. And, in fact, as explained below, the attachments to the iDS Report, which were allegedly derived from Akarapanich's Samsung Galaxy S8, contradict this conclusion.

¶20 In summary, without access to the primary sources it is impossible to verify and appropriately respond to the iDS Report's conclusions. I therefore respond to the iDS Report in a limited way as follows.

**d.** **Evidence in the iDS Report's exhibits demonstrates that OLPC did not terminate Akarapanich's access to the OLPC Microsoft Exchange Server until July 2, 2020.**

i. The iDS Report's conclusions about Akarapanich's access to the Exchange Server.

¶21 The iDS Report explained that OLPC used a Microsoft Exchange Server (hereinafter the "Exchange Server") in conjunction with a Microsoft Active Directory domain controller (hereinafter the "Domain Controller") to provide employees with access to OLPC email.[17] Under the OLPC system, a user account was created on the Domain Controller, and a mailbox was created on the Exchange Server. To access the mailbox, an employee would log into their user account on the Domain Controller, which would then allow the employee to connect to their mailbox on the Exchange Server.[18]

¶22 According to the iDS Report, Akarapanich had a user account on the Domain Controller and a mailbox on the Exchange Server. The iDS Report recounted that Akarapanich sent a

---

[14] iDS Report, ¶ 104.
[15] iDS Report, ¶¶ 130-139.
[16] The iDS Report relies on three artifacts for this conclusion: the Bixby log file, SurveyUploaderDB.db, and usagestats files. While the Bixby log file and SurveyUploaderDB.db were included as attachments to the iDS Report in Exhibit G, the usagestats files were not.
[17] iDS Report, ¶¶ 10-11.
[18] iDS Report, ¶¶ 11, 70-71.



resignation letter on May 14, 2020.[19] According to the iDS Report, after Akarapanich sent the resignation letter OLPC took the following actions:

1. On May 14, 2020, Akarapanich's mailbox was hidden from OLPC address lists;[20]

2. On May 14, 2020, incoming mail to Akarapanich's mailbox was forwarded to Hyrum Olson;[21] and

3. On May 22, 2020, ActiveSync was disabled for Akarapanich's mailbox.[22]

¶23 The iDS Report said that these actions were part of a "departed employee process" which iDS followed when an employee was terminated.[23] The iDS Report did not describe any other steps in the departed employee process.

¶24 The iDS Report determined that, despite the above-described actions, Akarapanich continued to have email access until an unspecified change was made to Akarapanich's user account on the Domain Controller on July 2, 2020.[24] The iDS Report did not say whether this unspecified change was part of the departed employee process.

ii.     OLPC did not terminate Akarapanich's access to the Exchange Server until July 2, 2020.

¶25 In support of the above conclusions, the iDS Report attached excerpts from event logs on the Exchange Server and Domain Controller as Exhibits C and D. Analysis of these exhibits reveals additional information about OLPC's actions regarding Akarapanich's email access.

¶26 The excerpts indicate that Akarapanich had a user account on the Domain Controller named "OLSONLEMONS\timothy." At various times, this user account had access to at least three mailboxes on the Exchange Server that appear to have direct association with Akarapanich. The main details of these mailboxes that can be gleaned from the log excerpts are as follows:

---

[19] iDS Report, ¶ 53.
[20] iDS Report, ¶ 56.
[21] iDS Report, ¶ 56.
[22] iDS Report, ¶ 59.
[23] iDS Report, ¶ 54.
[24] iDS Report, ¶¶ 74-75.



| Mailbox | Primary Email Address | Domain Controller Account |
|---|---|---|
| Timothy Akarapanich | timothy@oltax.com | OLSONLEMONS\timothy |
| zzTimothy Akarapanich | zztimothy@oltax.com | OLSONLEMONS\timothy |
| Timothy (HCB) | Unknown | OLSONLEMONS\timothy |

*Table 1 – Akarapanich Email Accounts*

¶27 The roles of these mailboxes cannot be determined from the log excerpts or the iDS Report. According to the iDS Report, only the Timothy Akarapanich (timothy@oltax.com) mailbox was provided to iDS for analysis.

¶28 Analysis of the event log excerpts in Exhibits C and D to the iDS Report demonstrates that Akarapanich's access to these three mailboxes changed repeatedly during the period in which Akarapanich allegedly accessed the Exchange Server to download confidential OLPC documents. The table below contains the most important events:

| Date | Mailbox | Action |
|---|---|---|
| 2/28/2020 – 3/6/2020 | Timothy Akarapanich | Multiple attempts to export emails from a folder in Hyrum Olson's mailbox to this mailbox. It is unclear if these attempts succeeded. |
| 3/7/2020 | zzTimothy Akarapanich | Removes OLSONLEMONS\timothy access to mailbox |
| 5/14/2020 | Timothy Akarapanich | Hides mailbox in address lists |
| 5/14/2020 | Timothy Akarapanich | Forwards new emails to Hyrum Olson |
| 5/14/2020 | Timothy (HCB) | Hides mailbox in address lists |
| 5/14/2020 | Timothy (HCB) | Forwards new emails to Hyrum Olson |
| 5/14/2020 | Timothy (HCB) | Removes OLSONLEMONS\timothy access to mailbox |
| 5/16/2020 | Timothy Akarapanich | Disables Unified Messaging |
| 5/20/2020 | Timothy Akarapanich | Un-hides mailbox in address lists |
| 5/20/2020 | Timothy Akarapanich | Enables Unified Messaging |



| 5/20/2020 | Timothy Akarapanich | Attempts to recover the Unified Messaging PIN |
|---|---|---|
| 5/20/2020 | Timothy Akarapanich | Stops forwarding new email to Hyrum Olson |
| 5/20/2020 | Timothy Akarapanich | Forwards new email to Hyrum Olson |
| 5/22/2020 | Timothy Akarapanich | Disables Unified Messaging |
| 5/22/2020 | Timothy Akarapanich | Disables ActiveSync |
| 5/25/2020 | Joanne Watson | Removes OLSONLEMONS\timothy rights to access to the Joanne Watson mailbox |
| 5/26/2020 | Timothy Akarapanich | Hides mailbox in address lists |
| 5/26/2020 | Timothy Akarapanich | Forwards new email to Joanne Watson |
| 5/30/2020 | Timothy Akarapanich | Forwards new email to Joanne Watson AND allows mail to be delivered to the mailbox |
| 6/5/2020 | Document Control | Removes OLSONLEMONS\timothy rights to access to the Document Control mailbox |
| 6/9/2020 | zzTimothy Akarapanich | Disables ActiveSync |
| 6/9/2020 | zzTimothy Akarapanich | Disables access to older Microsoft Outlook Web App |
| 6/9/2020 | Timothy Akarapanich | Disables Outlook on the Web |
| 6/9/2020 | Timothy (HCB) | Disables Outlook on the Web |
| 6/9/2020 | zzTimothy Akarapanich | Disables Outlook on the Web |
| 6/23/2020 | Legal Services | Removes OLSONLEMONS\timothy rights to access to the Legal Services mailbox |
| 6/23/2020 | Jenny Chittamin | Removes OLSONLEMONS\timothy rights to access to the Jenny Chittamin mailbox |
| 7/2/2020 | Timothy (HCB) | Forwards new email to Joanne Watson |
| 7/2/2020 | Timothy (HCB) | Removes OLSONLEMONS\timothy rights to send mail as this mailbox |


| 7/2/2020 | N/A | Disables OLSONLEMONS\timothy user account on the Domain Controller |
|---|---|---|

*Table 2 – Selected Event Log Entries from Exhibits C and D*

¶29 Only the last step in the above table would terminate Akarapanich's email access. Hiding Akarapanich's mailbox(es) in address lists would do nothing to remove his access. Forwarding new email to another mailbox, while preventing Akarapanich from receiving future email, would not remove his access to older emails. Disabling ActiveSync and Outlook on the Web might prevent Akarapanich from accessing some emails from web browsers and mobile devices but would not have prevented him from accessing email from a computer, which the iDS Report says he did.[25]

¶30 Two steps that *would* have terminated Akarapanich's email access would have been to remove the rights of Akarapanich's user account (OLSONLEMONS\timothy) to access his mailboxes, and/or to disable Akarapanich's user account on the Domain Controller. As outlined above, the log excerpts indicate that OLPC removed the rights of Akarapanich's user account to access to the zzTimothy Akarapanich mailbox on March 7, 2020, before Akarapanich sent the resignation letter, and removed rights to access the Timothy (HCB) mailbox on May 14, 2020, the day Akarapanich sent the resignation letter. But, according to the log excerpts in Exhibits C and D, OLPC never removed Akarapanich's user account access to the Timothy Akarapanich mailbox ([timothy@oltax.com](mailto:timothy@oltax.com)). And OLPC did not disable Akarapanich's user account on the Domain Controller until July 2, 2020.

¶31 It is unclear why OLPC did not disable Akarapanich's user account on the domain controller until July 2, 2020. The iDS Report partially outlines OLPC's "departed employee process," which includes hiding a user's account from the address book, forwarding new incoming emails to a designated staff member, and disabling ActiveSync. However, the iDS Report does not mention any other steps in the departed employee process, and it is reasonable to assume that when an employee is terminated or resigns from OLPC, the employee's user account on the Domain Controller is disabled and/or the password is changed, which in most implementations would prevent the former employee from accessing sensitive resources including email. As demonstrated above, in Akarapanich's case this did not occur until July 2, 2020.

¶32 The above evidence suggests that OLPC did not intend to terminate Akarapanich's email access until July 2, 2020. This suggestion is strengthened by additional evidence indicating that, despite Akarapanich's resignation letter of May 14, 2020, OLPC did not intend to terminate his employment at that time, and Akarapanich may have had some role at OLPC

---

[25] iDS Report, ¶ 58.



until at least June 4, 2020. The following brief excerpts from Line chats between Akarapanich and Thomas Olson indicate this:

- May 17, 2020[26]
    - *....*
    - *Phone call 1:45*
    - *....*
    - *Phone call 6:29*
    - *Akarapanich: oh beautiful Tom*
    - *Akarapanich: no more HR right, and i dont need a desk in the office right or I still need one*
    - *Akarapanich: and i really do like planning*
    - *Akarapanich: Tom Joshua just told me that I will start on wednesday i wont be able to help on mon and tues i got no gear ><*
    - *Thomas Olson: That is fine*
    - *Akarapanich: okay*
    - *Thomas Olson: Very happy to have you back*
    - *Thomas Olson: [Sticker]*
    - *Akarapanich: never left Tom, just heart broken><*
    - *Akarapanich: no hr for me right please*
- May 18, 2020[27]
    - *Akarapanich: Tom will you be on the call as well?*
    - *Thomas Olson: Which call?*
    - *Akarapanich: Joshua call on your tuesday i think*
- May 19, 2020[28]
    - *....*
    - *Thomas Olson: When you get back we need to send an engagement letter for [redacted]*
    - *Thomas Olson: We did not do one for tax and Corp compliance*
    - *Akarapanich: you got numers of error last time you tried Tom so we only send project by manual*
    - *Thomas Olson: The tax and Corp compliance never went out though*
    - *Akarapanich: im not sure if we manual it as well, I dont have my docusign account Tom*
    - *Akarapanich: if it didnt im sorry Tom*
    - *Akarapanich: I think [redacted] can access it Tom*

---

[26] Line Chat, Thomas-Olson-00025.
[27] Line Chat, Thomas-Olson-00025.
[28] Line Chat, Thomas-Olson-00028.



- May 20, 2020[29]
  - *Akarapanich: i can solve all your dcc work problem if you give me a week Tom, i can give you a blueprint on each task. then you can decide the proper process Tom.*
- May 21, 2020[30]
  - *Akarapanich: Hi Tom if you have 5 mins today anytime can you phone me*
  - *Thomas Olson: Are you free now?*
  - *Thomas Olson: Please phone me right away*
  - *Thomas Olson: It is important*
- May 22, 2021[31]
  - *....*
  - *Akarapanich: im at the office but they told me to back home Tom?*
  - *Akarapanich: Well [redacted] told me to go home, this is not funny at all Tom.*
  - *....*
  - *Thomas Olson: Phone me so I can deal with these issues*
- May 23, 2021[32]
  - *....*
  - *Phone call 8:27*
  - *....*
  - *Phone call 9:25*
  - *Phone call 8:19*
  - *Phone call 3:55*
  - *....*
  - *Phone call 3:35*
  - *....*
  - *Akarapanich: pride or not no one deserved that treatment Tom.*
  - *Thomas Olson: Up to you Tim*
  - *Thomas Olson: I can only do what I can*
  - *Thomas Olson: The rest is up to you*
  - *Akarapanich: "thank you Tom sorry"*
  - *Thomas Olson: Ok*
  - *Thomas Olson: We will both move on*
  - *Thomas Olson: Best of luck to you*
  - *Thomas Olson: I will assign your files to[redacted]*
  - *Thomas Olson: By the way, the problem yesterday arose because your refused to talk to Joshua*
  - *....*

---

[29] Line Chat, Thomas-Olson-0000028.
[30] Line Chat, Thomas-Olson-0000028.
[31] Line Chat, Thomas-Olson-0000030.
[32] Line Chat, Thomas-Olson-0000031, Thomas-Olson-0000032.



- o *Akarapanich: all your files spreadsheet are done Tom, the latest one regards to thin cap is done as well.*
- o *....*
- o *Akarapanich: Tom sorry the one month thing you wanted me to finish up your file and T1 right. are you looking for those*
- o *Akarapanich: or do you have something special that needed to be done in a month*
- o *....*
- May 26, 2020[33]
  - o *....*
  - o *Akarapanich: people don't even think im gone.*
  - o *Akarapanich: it has nothing to do with you Tom, you know I love working for you.*
  - o *Akarapanich: thank you Tom*
  - o *Akarapanich: my feeling for you is always the same.*
  - o *Akarapanich: if you need help i will help if you are fine, i will move on.*
  - o *Akarapanich: I don't have to like them to work with them, dont worry Tom.*
  - o *Akarapanich: if you wants me to recruit and training i have to do it during the day, working hours never been a problem Tom.*
  - o *Akarapanich: if you let me know in the next hour, docusign or office i will go sign it Tom.*
  - o *Akarapanich: i dont care about saving face Tom i care about you thats all*
  - o *Thomas Olson: We can talk tomorrow*
  - o *Akarapanich: would you like me to come in and sign it today*
  - o *Thomas Olson: No*
  - o *Thomas Olson: I have not had time to talk to Joshua*
  - o *....*
- May 27, 2020[34]
  - o *....*
  - o *Akarapanich: im sorry Tom, really but i felt like i really had to*
  - o *Akarapanich: im very sorry*
  - o *Akarapanich: hope you can trust me again*
  - o *Thomas Olson: Had to do what?*
  - o *Akarapanich: quit at that point*
  - o *Thomas Olson: to get your attention*
  - o *Thomas Olson: Tim, we all do goofy things sometimes*
  - o *Akarapanich: i never wanna leave now im iobless T T*
  - o *....*
  - o *Phone call 34:43*

---

[33] Line Chat, Thomas-Olson-0000035, Thomas-Olson-0000036.
[34] Line Chat, Thomas-Olson-0000037.



- - *Akarapanich: Tom i can start right away as well to work on process and training with Joshua*
  - ....
- May 28, 2020[35]
  - ....
  - *Akarapanich: Tom what is going on*
  - *Thomas Olson: ?*
  - *Akarapanich: Joshua wouldnt take any call or chat, theres a mistake on the paper [redacted] gave me*
  - ....
  - *Thomas Olson: Just text [redacted] and tell him he made a mistake on the position*
  - *Akarapanich: i did, he wont read my text*
  - *Thomas Olson: We are all totally stressed on getting T1 deadline met*
  - *Thomas Olson: Extremely busy*
  - *Akarapanich: oh*
  - *Akarapanich: sorry Tom*
  - *Akarapanich: Tom u want me there just observation?*
  - *Akarapanich: i can start today and help with all the t1, i know where to find them*
  - ....
- June 2, 2020[36]
  - ....
  - *Akarapanich: Tom, im trying very hard to move on.*
  - *Akarapanich: and i moving on*
  - *Thomas Olson: Ok*
  - *Thomas Olson: I guess that ends our discussion*
  - *Thomas Olson: You had not told me that*
  - ....
  - *Thomas Olson: So you are saying you are not interested in talking about returning*
  - *Akarapanich: u r like a dad to me*
  - *Akarapanich: i love the work love the job but if you are treating me like a retarded yellow monkey, then its very sad. i want to be appreciated*
  - ....
  - *Thomas Olson: You were until you tried to tell me how to run the firm. And then quit with NO notice. That is pretty stupid*
  - *Thomas Olson: I don't want you to be the firm gossip or my representative to the firm*
  - *Thomas Olson: I told you I only want to work on my file*

---

[35] Line Chat, Thomas-Olson-0000038, Thomas-Olson-0000039.
[36] Line Chat, Thomas-Olson-0000047, Thomas-Olson-0000048.



- - *Thomas Olson: And other files I assign to you*
  - ....
  - *Thomas Olson: And work on special projects*
- June 4, 2020[37]
  - *Akarapanich: Tom what exactly are you planning to do with me if you tell me, i probably do it. if you are not planning to hire me anymore please let me know, night Tom.*
  - *Thomas Olson: Will try to contact you later tonight or tomorrow*
  - *Thomas Olson: Rest well*

¶33 These conversations between Akarapanich and Thomas Olson suggest that Akarapanich may have continued his professional association with OLPC in some capacity at least until June 4, 2020, which may explain why OLPC did not take definitive action to terminate his email access until July 2, 2020. However, without access to the primary sources, many things are unclear. It is unclear why Akarapanich had at least three mailboxes on the Exchange Server. It is unclear whether the confidential OLPC documents allegedly attached to emails in the Timothy Akarapanich mailbox were also attached to emails in the zzTimothy Akarapanich or Timothy (HCB) mailboxes. It is unclear why OLPC took the actions on the Exchange Server that it did with respect to these three mailboxes.

¶34 Without answers to these questions, I conclude from the limited evidence available to me that OLPC did not intend to terminate Akarapanich's email access until July 2, 2020, when it terminated Akarapanich's email access by disabling his user account on the domain controller.

**e. Evidence cited in the iDS Report is inconclusive as to whether Akarapanich downloaded confidential OLPC documents from a live connection to the Exchange Server or from cloud storage.**

i. The iDS Report's conclusions about confidential OLPC documents on Akarapanich's phone.

¶35 The iDS Report listed the following confidential OLPC documents found on Akarapanich's Samsung Galaxy S8:

- Unsigned legal documents Roger Davis.pdf
- Draft - DDOI 2019 Director disclosures (01457060xD7E9B).PDF
- HighCountry & Moose Mountain -CRA May 8 May 9 2020.pdf
- White Buffalo Trust.pdf
- The Carolyn Olson Spousal Trust.pdf
- The George Whitehead Family Trust .pdf

---

[37] Line Chat, Thomas-Olson-0000051.



- The Olson Estate Trust.pdf
- Olson Manitoba Conservation Trust.pdf
- The Waterton Land Trust.pdf
- The Ruth Doxey Family Trust.pdf
- The Thomas H. Olson Trust.pdf
- William Bell Hardy Trust.pdf
- Signed AGM 2018 FYE – Annual General Meeting (01456750xD7E9B).pdf

¶36 The iDS Report concluded that Akarapanich downloaded these documents between June 12, 2020, and June 17, 2020, via a live connection to the Exchange Server.[38]

¶37 The iDS Report reached this conclusion by inference. According to the iDS Report, thumbnail images of the Microsoft Outlook app found on Akarapanich's Samsung Galaxy S8 indicate that Akarapanich had access to the Exchange Server beginning June 6, 2020. Server event logs also show that Akarapanich's user account on the Domain Controller accessed the Exchange Server between June 18, 2020, and July 2, 2020. Because the confidential OLPC documents identified above were downloaded in this window, specifically between June 12, 2020, and June 17, 2020, the iDS Report concluded that they must have been downloaded via a live connection to the Exchange Server.

ii. <u>Evidence indicates that the confidential OLPC documents were also stored in Akarapanich's cloud storage and could have been downloaded from there, rather than from a live connection to the Exchange Server.</u>

¶38 I disagree with the iDS Report's conclusion that the confidential OLPC documents found on Akarapanich's Samsung Galaxy S8 were downloaded via a live connection to the Exchange Server. While it is possible that Akarapanich could have downloaded the documents from email attachments, other evidence indicates that the same documents were stored in Akarapanich's cloud storage and could have been downloaded from there.

¶39 A brief explanation of cloud storage is needed here. In the context of mobile devices, documents and files can be stored on mobile devices themselves, or they can be stored elsewhere and accessed from mobile devices. Various companies provide remote storage space for mobile device users.[39] Mobile device users can access remote storage space through apps installed on mobile devices. When users wishes to access documents or files in cloud storage, they can either view the documents or files in cloud storage apps or can download the files to their mobile devices.

¶40 Such storage is known as "cloud storage." Because mobile devices typically have limited storage capacity, and because they are prone to being lost, stolen, or damaged, many mobile device users use cloud storage to store important documents and files. The

---

[38] iDS Report, ¶¶ 84, 90, 100, 115, 120, 128.
[39] Popular cloud storage providers include Dropbox, Google Drive, Microsoft OneDrive, and Apple iCloud.



benefit of cloud storage is that if a mobile device is lost, stolen, or damaged, the user can log into cloud storage on a new mobile device and continue to access their important documents and files.

¶41 Evidence indicates that Akarapanich utilized an unidentified cloud storage app to store and access confidential OLPC documents on his Samsung Galaxy S8. Evidence further indicates that OLPC obtained control of this cloud storage, and that OLPC IT personnel deleted from this cloud storage the same confidential OLPC documents that the iDS Report found in the Downloads folder on Akarapanich's phone.

¶42 The evidence is as follows: Akarapanich apparently provided his Samsung Galaxy S8 to OLPC, probably between October 28-31, 2020.[40] On October 31, 2020, Akarapanich complained to Thomas Olson "I dunno why you had to delete 4 years of my life, I was okay with delete anything from the firm not everything in my life."[41] Thomas Olson responded "They did not delete 4 years of your life, only the documents you illegally took from the firm."[42] Thomas Olson later clarified during this statement during his deposition:

> Q.     Are there any documents logging the IT people's access to Tim A.'s phone, computer, or cloud?
>
> A.     I don't know what documents would exist, what paper they may have prepared. I don't know. But I do know that they went through the cloud with him and removed all the documents which were simply backed up at Ephraim's request onto his cloud account. **And those were the same documents that were on his phone**, and a copy was made of that first, and then the duplicates on his cloud account were removed.[43]

¶43 This testimony explicitly states that the confidential OLPC documents found on Akarapanich's Samsung Galaxy S8 were also located in a cloud storage app. If so, they could have been downloaded from cloud storage rather than from a live connection to the Exchange Server.

¶44 For this reason, I find the evidence to be inconclusive as to whether Akarapanich downloaded the confidential OLPC documents from cloud storage or from the Exchange Server, and I therefore disagree with the iDS Report's conclusion that the confidential OLPC documents were downloaded through a live connection to the Exchange Server.

---

[40] *Cf.* 30(b)(6) Deposition of Thomas Olson, 207:14-21; New Line Chat Thomas Olson_0000015, Thomas Olson._0000016 (discussing Akarapanich coming into the OLPC office on Wednesday, 10/28/2020, on Friday, 10/30/2020, and on Saturday, 10/31/2020).
[41] New Line Chat Thomas-Olson-0000017.
[42] New Line Chat Thomas-Olson-0000017.
[43] 30(b)(6) Deposition of Thomas Olson, 233:24-25 – 234:1-7 (emphasis added).



**f.** **Evidence in the iDS Report's exhibits contradicts the conclusion that Akarapanich deleted the Microsoft Outlook app between October 10, 2020, and October 14, 2020.**

i.   The iDS Report's conclusions about deletion of the Outlook app.

¶45 The iDS Report concluded that Akarapanich deleted the Microsoft Outlook app from his Samsung Galaxy S8 between October 10, 2020, and October 14, 2020.

¶46 The iDS Report analyzed three sources extracted from Akarapanich's Samsung Galaxy S8 to arrive at this conclusion: the Bixby log file, SurveyUploaderDB.db, and Usagestats files. According to the iDS Report, the last entry in the Bixby log file related to the Outlook app was on October 11, 2020 at 10:26 PM (UTC).[44] The last entry in SurveyUploaderDB.db related to the Outlook app was on October 14, 2020.[45] And there were no entries related to the Outlook app in the Usagestats files, whose earliest entry was October 12, 2020.[46]

ii.   Evidence in the iDS Report's exhibits indicates that Akarapanich did not delete the Outlook app from his Samsung Galaxy S8 between October 10, 2020, and October 14, 2020.

¶47 Exhibit G to the iDS Report contained the Bixby log file and SurveyUploaderDB.db but did not contain the Usagestats files. I thus cannot analyze the Usagestats files myself. I have analyzed SurveyUploaderDB.db and have confirmed that the last entry related to the Outlook app is dated October 15, 2020 2:49:22 (UTC).

¶48 However, my analysis of the Bixby log file is completely different than the analysis in the iDS Report. The iDS Report said that the last entry related to the Outlook app in the Bixby log file was on October 10, 2020 at 10:26:19 PM (UTC) as follows:[47]



```
10-11 05:24:57.982 19791 IndexManager (INFO) [UPDATE] pkgName=[com.samsung.android.contacts], luceneDocument=[2471]
10-11 05:24:57.983 19791 IndexManager (INFO) [UPDATE] pkgName=[com.samsung.android.contacts], luceneDocument=[2502]
10-11 05:25:00.274 19832 IndexManager (INFO) [UPDATE] pkgName=[com.samsung.android.apps],
ids=[com.microsoft.office.outlook@0@com.microsoft.office.outlook.MainActivity]
10-11 05:26:19.912 19832 IndexManager (SEVERE) deleteIndex: ids is null or empty. Index: com.samsung.android.apps
```

*Figure 6. (Exhibit G)*

¶49 I have thoroughly reviewed the Bixby log file attached to the iDS Report in Exhibit G (filename 0_com.samsung.android.bixby.service_bixbysearch_index.log) and I cannot find the above entry, or any of the surrounding entries depicted in Figure 6 above. In the file I reviewed, the entries during the same timeframe are as follows:

---

[44] iDS Report, ¶¶ 131-133.
[45] iDS Report, ¶¶ 134-135.
[46] iDS Report, ¶¶ 136-138.
[47] iDS Report, ¶ 133 Figure 6 (Exhibit G).



```
10-10 10:13:25.787 17374 IndexManager [DELETE] pkgName=[com.sec.android.app.myfiles], ids=[17598]
10-10 10:48:14.228 22245 IndexManager [UPDATE] pkgName=[com.samsung.android.contacts], luceneDocument=[2471]
10-11 03:16:13.430 6632 IndexManager [UPDATE] pkgName=[com.samsung.android.contacts], luceneDocument=[3315]
10-11 09:15:45.971 15954 IndexManager [INSERT] pkgName=[com.sec.android.app.myfiles], indexablesList.size()=11
10-11 09:16:56.201 17033 IndexManager [DELETE] pkgName=[com.sec.android.app.myfiles], ids=[17600, 17601, 17602,
```

*Figure 1 – Selected Entries from Bixby Log File from 10/10/2020 – 10/11/2020*

¶50 Furthermore, there are numerous entries related to the Microsoft Outlook app after October 14, 2020. The last of these entries is on March 27, 2021, at 5:38:17 PM (UTC):

```
03-28 00:38:17.726 9356 IndexManager [UPDATE] pkgName=[com.samsung.android.apps],
luceneDocument=[com.microsoft.office.word0@com.microsoft.office.apphost.LaunchActivity]
03-28 00:38:17.726 9356 IndexManager [UPDATE] pkgName=[com.samsung.android.apps],
luceneDocument=[com.microsoft.office.outlook0@com.microsoft.office.outlook.MainActivity]
03-28 00:38:17.727 9356 IndexManager [UPDATE] pkgName=[com.samsung.android.apps],
luceneDocument=[hk.easyvan.app.client0@com.lalamove.app.launcher.view.LauncherActivity]
```

*Figure 2 – Final Entry Related from Bixby Log File to Microsoft Outlook App*

¶51 These entries suggest that the Microsoft Outlook app was not deleted between October 10, 2020, and October 14, 2020.

¶52 As seen above, the Bixby log file I reviewed does not contain the entries cited in the iDS Report, and the entries it contains indicate that the Microsoft Outlook app was not deleted between October 10, 2020, and October 14, 2020. As noted throughout this report, I do not have access to Akarapanich's Samsung Galaxy S8 and cannot verify the Bixby log file or any other data. Therefore, based on the limited evidence available to me, my conclusion is that the Bixby log file attached to the iDS Report in Exhibit G contradicts the iDS Report's conclusion that Akarapanich deleted the Microsoft Outlook app between October 10, 2020, and October 14, 2020.

## g.   Conclusion.

¶53 In summary, as outlined above, I disagree with the iDS Report in the following important respects:

1.  Evidence in the iDS Report's exhibits demonstrates that OLPC did not terminate Akarapanich's access to the OLPC Microsoft Exchange Server until July 2, 2020.

2.  Evidence cited in the iDS Report is inconclusive as to whether Akarapanich downloaded confidential OLPC documents from a live connection to the Exchange Server or from cloud storage.

3.  Evidence in the iDS Report's exhibits contradicts the conclusion that Akarapanich deleted the Microsoft Outlook app between October 10, 2020, and October 14, 2020.



¶54 I also reiterate that OLPC has not produced the primary sources the iDS Report relies on, and therefore my ability to respond to the iDS Report is limited.

Signed August 12, 2024.

_____
Matthew R. Morrise
Digital Forensic Investigator
Morrise Thompson, PLLC



# Matthew R. Morrise

Digital Forensic Investigator

**Morrise Thompson, PLLC**
825 North 900 West
Orem, UT 84057
matt@morrisethompson.com
www.morrisethompson.com
(801) 473-6228

**Curriculum Vitae**

## Licenses and Certifications

Licensed attorney Utah Bar #13082

## Education

**Juris Doctor** - December 2009
*J. Reuben Clark Law School, Brigham Young University, Provo, Utah*
- Cum laude graduate
- BYU Linda Anderson Trial Advocacy Competition Champion
- John L. Costello National Criminal Law Trial Advocacy Competition semi-finalist

**Bachelor of Science, Physics** - August 2007
*Brigham Young University, Provo, Utah*
- Senior thesis in audio engineering

## Experience

**Attorney/Digital Forensic Investigator** - August 2023 - Present
*Morrise Thompson, PLLC, Orem, Utah*
- Directing and conducting investigation and litigation
- Conducting data recovery and analysis from diverse electronic evidence sources
- Providing expert testimony in the area of digital forensics



**Forensic Examiner** - April 2019 - July 2023
*MRM Data Services, LLC, Springville, Utah*
- Digital forensic examiner
- Data recovery and analysis from devices including Apple iOS and Google Android mobile devices, Microsoft Windows, Apple macOS, and Linux computers, and internal and external memory storage
- Data recovery and analysis from cloud services including iCloud, Google, Facebook, Instagram, TikTok, Snapchat, and many others
- Analyzing call detail records from Verizon, AT&T, T-Mobile, and other carriers
- Analyzing digital evidence collected by federal and state law enforcement agencies

**Adjunct Professor** - August 2018 - December 2022
*J. Reuben Clark Law School, Brigham Young University, Provo, Utah*
- Co-teaching the Prosecution/Defense Clinical Alliance Course

**Trial Attorney** - May 2011 - July 2023
*Utah County Public Defender Association, Provo, Utah*
- Investigating and litigating over 2,000 criminal cases
- Cases included misdemeanors, felonies and capital offenses

**QA & Technical Support Manager** - May 2010 - May 2011
*HotDocs Corporation, Lindon, Utah*
- Managed employees in the technical support and quality assurance teams
- Administered Windows Server network for ~40 employees
- Built and maintained Apache and Windows IIS-based web servers
- Built and maintained Windows-based computer workstations
- Programmed automated test scripts
- Supported cloud and workstation-based software products

Consultant - November 1999 - August 2006
*LexisNexis, Provo, Utah*
- Designed and programmed cloud and workstation-based automated legal document systems to client specifications
- Clients included GE, Bank of America, JP Morgan, Philip Morris, Medtronic, Proskauer Rose, Snell & Wilmer, and many others



## Training

**Cellebrite**
- Best practices for Collecting from macOS 12 including the M1 chip – December 16, 2021
- We're Not in Document Land Anymore: Modern Data Collections for Litigation Technology Professionals – September 7, 2022
- Tips and Tricks for Collecting Employee Chat Data – August 31, 2023
- Harnessing the Power of Advanced Extractions with Mobile Ultra – November 29, 2023
- Empowering Investigations with Data from the Cloud – April 30, 2024

**H-11 Forensics**
- X-Ways Forensics Certified Training (32 hour course) – March 1, 2022 – March 4, 2022

**Hawk Analytics**
- Carrier Breakdown Series - Verizon Returns – June 25, 2020
- Carrier Breakdown Series - T-Mobile Returns – July 23, 2020
- Carrier Breakdown Series - AT&T Returns – August 8, 2020
- CellHawk New User & Refresher Training – August 18, 2020
- Beyond the Map: 5 Ways to Take CDR Analysis to the Next Level – September 24, 2020
- Chasing Cellphones with CellHawk and Whooster – Deep Diving in the Pool of Numbers: October 14, 2020
- Making the Case for CellHawk – Put Us to Work for You – November 4, 2020
- Cellular Technology, Mapping and Analysis (28 hour course) – May 17, 2021 - May 20, 2021
- CellHawk Refresher Training – December 7, 2021
- Digital License Plates are Here and On the Road – January 27, 2022
- Creating a Successful Cellular Analysis Report – April 21, 2022

**Magnet Forensics**
- Dig Deeper: Acquisitions and Analysis of AWS Cloud Data – September 2, 2020
- Slacking on insider threats? Investigative and monitoring approaches to use within Slack to locate bad actors – October 28, 2020
- Comparing iOS Logical vs. Full File System Extractions – August 5, 2021
- RAM Is King: Analyzing RAM in Axiom – August 18, 2021
- Finding Evidence of Cloud Data 'Footprints' in Existing Evidence – September 8, 2022
- Collect and Analyze Data from Off-Network Endpoints with AXIOM Cyber: November 24, 2021
- Dig Deeper: Cloud Investigations with AXIOM Cyber – December 8, 2021
- Hiding in Plain Sight (IoT Devices) – March 30, 2022
- Forensic Readiness: A Panacea to Successful Incident Response – June 22, 2022



- Lost Time, Can It Be Found? – November 16, 2022
- Duty to Preserve, But How? – August 9, 2023
- Internal Data Exfiltration – Getting to the Bottom of IP Theft – August 16, 2023
- Mobile Unpacked: Ep. 8 // Figuring Out File Explorers - Part 2 – August 30, 2023

**Oxygen Forensics**
- Certified Forensic Examiner (15 hour course) – May 13, 2019 – May 15, 2019
- Decrypting iTunes Backups – September 7, 2022
- KeyScout 2023 – August 10, 2023
- Device Extraction – August 10, 2023

**Other Supplemental Training**
- Professor Mangrum on Expert Testimony in Utah (8 hour course) – August 27, 2021
- Scientific Analytical Tools: Forensic Video and Image Analysis with Amped Software – November 16, 2022
- Voyager Labs: Social Media Warrants: How to Save Time & Enhance Evidence Collection – January 31, 2023

## <u>Presentations</u>

**Mobile Forensics Overview - November 1, 2019**
Utah County Public Defender Association

**Digital Forensics and Sex Crimes - November 6, 2020**
Utah Association of Criminal Defense Lawyers

**Cell Phone Forensics - February 10, 2021**
Central Utah Bar Association

**Challenging Expert Testimony Under Utah Rule of Evidence 702 - October 1, 2021**
Utah Association of Criminal Defense Lawyers

**Understanding and Using Cellebrite Reader - February 4, 2022**
Utah County Public Defender Association

**Digital Evidence CLE: A Practitioner's Approach to Digital Evidence and Witnesses - May 3, 2023**
Utah Association for Justice



**Using Digital Forensics Expert Witnesses – October 19, 2023**
Utah Association of Criminal Defense Lawyers

**The Fourth Amendment's Digital Side – March 29, 2024**
Utah Association of Criminal Defense Lawyers

## Examples of Expert Witness Consulting in Federal Criminal Cases

- *United States of America vs. Mubarak Sulaiman Ukashat* (United States District Court case no. 2:23-cr-00111-HCN)
- 2022 (Case name and number withheld due to federal contract restriction on disclosure)

## Examples of Expert Witness Consulting in State Criminal Cases

- *State of Utah vs. James A Brenner* (Utah Case Number 231100110)
- *State of Idaho vs. Kellie Wilson* (Idaho case no. CR04-23-74)
- *State of Utah vs. Preston Smith Marsh* (Utah case no. 221400385)
- *State of Utah vs. Sione Kaihau Lund* (Utah case no. 211903604)
- *State of Utah vs. Jonathan Montrail Johnson* (Utah case no. 211903171)
- *State of Utah vs. Victor Maya Garcia* (Utah case no. 201913842)
- *State of Utah vs. Shaquelle Lynnard Risin* (Utah case no. 201402525)
- *State of Utah vs. Ronald Lee Wiggins* (Utah case no. 201401583)
- *State of Utah vs. Jared Kenji Motogawa* (Utah case no. 191403914)
- *State of Utah vs. Alexander John Bowcut* (Utah case no. 181908051)
- *State of Utah vs. Taylor Levi Tate* (Utah case no. 181800625)
- *State of Utah vs. Michael Wallace Tuinman* (Utah case no. 181800120)

## Examples of Expert Witness Consulting in State Juvenile Cases

- *State of Utah in the interest of D.L.* (Utah juvenile case no. 1218859)
- *State of Utah in the interest of D.A.* (Utah juvenile case no. 1075817)
- *State of Utah in the interest of J.G.H.* (Utah juvenile case no. 1120193)
- *State of Utah in the interest of W.L.* (Utah juvenile case no. 1179102)
- *State of Utah in the interest of T.F.* (Utah juvenile case no. 1174781)

## Examples of Expert Witness Consulting in Civil Cases

- *In the Matter of the Estate of Eileen G. Peterson* (Utah case no. 223500046)
- *Eryn Marie Morse Pr Harrison vs. Summit Materials Inc et al.* (Utah case no. 220100058)



- *Genesis Ramos vs. Kimball M. Crofts et al.* (Utah case no. 210400931)
- *John Ranciato, Jr., et al., vs. The Hopkins School, Inc.* (Connecticut Docket No. NNH-CV-21-6110316-S)
- *Kylie Stoddard vs. William Terry Hyde et al.* (Utah case no. 200500209)
- *Crystaleen Hunt vs. Lake City Custom Homes, Inc.* (Utah case no. 180902424)

### Examples of Expert Witness Consulting in State Appeals Cases

- *State of Utah v. Kristy Lee Whitchurch* (Utah appeals case no. 20200938-SC)
- *State of Utah v. Douglas Jack Carter* (Utah appeals case no. 20190708-CA)

### Examples of Expert Witness Consulting in Administrative Cases

- *In re J.L.* (University of California-Berkeley Case No. 00432-2019)

### Sworn Testimony

**Trials**
- *State of Utah in the interest of J.G.H.* (Utah juvenile case no. 1120193)
  - Bench trial on rape
- *State of Utah vs. Ronald Lee Wiggins* (Utah case no. 201401583)
  - Bench trial on aggravated sexual abuse of a child, dealing in materials harmful to a minor
- *State of Utah vs. James Erwin Gaines* (Utah case no. 2119002190)
  - Jury trial on sexual exploitation of a minor
- *State of Utah vs. William Paul Mike* (Utah case no. 231500246)
  - Jury trial on aggravated assault (domestic violence), obstructing justice, and intoxication
- *State of Idaho vs. Kellie Wilson* (Idaho case no. CR04-23-74)
  - Jury trial on possession of child pornography
- *State of Utah vs. Franklin Gustavo Toyo Marcano* (Utah case no. 231701529)
  - Jury trial on rape, object rape, burglary, criminal mischief, assault, aggravated assault

**Depositions**
- *John Ranciato, Jr., et al., vs. The Hopkins School, Inc.* (Connecticut Docket No. NNH-CV-21-6110316-S)
  - Civil deposition in lawsuit against private school for wrongful expulsion



**Hearings**

- *In re J.L.* (University of California-Berkeley Case No. 00432-2019)
  - Administrative hearing for student discipline
- *State of Utah vs. Preston Smith Marsh* (Utah case no. 221400385)
  - Criminal hearing on request for discovery in murder case

# EXHIBIT K

# EXHIBIT K

| | |
|---|---|
| **From:** | Timothy Akarapanich [timothy.akarapanich@gmail.com] |
| **Sent:** | 6/6/2020 1:52:33 PM |
| **To:** | Joshua Olson [joshua@oltax.com] |

time to talk,

did you know once you synchronized email with phone or cloud its always there? i saw this tips on msn, hope it will help.

i also see another news on the website where things went missing during construction. strange things do happens

cheers

# EXHIBIT L

# Filed Under Seal

**From:** Timothy Akarapanich [timothy.akarapanich@gmail.com]
**Sent:** 6/6/2020 2:21:13 PM
**To:** Joshua Olson [joshua@oltax.com]
**Attachments:** Screenshot_20200607-032009_Outlook.jpg



CONFIDENTIAL

OL PRIVATE COUNSEL-EPHRAIM OLSON 0486

**From:** Timothy Akarapanich [timothy.akarapanich@gmail.com]
**Sent:** 6/6/2020 2:31:12 PM
**To:** Joshua Olson [joshua@oltax.com]
**Attachments:** Screenshot_20200607-032955_Outlook.jpg

now?



CONFIDENTIAL

# EXHIBIT M

# EXHIBIT M

**From:** Timothy Akarapanich [timothy.akarapanich@gmail.com]
**Sent:** 6/6/2020 4:08:35 PM
**To:** Joshua Olson [joshua@oltax.com]

cell email fix is you have to force them to log out or delete app before block their account. it wont update but all the old stuff wont dissapeare as well.

Good luck,
you did hold all the pain now i understand
thanks

# EXHIBIT N

# EXHIBIT N

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE CENTRAL DISTRICT OF UTAH
3   -ooOoo-

4   OL PRIVATE COUNSEL, LLC,   :
    a Utah limited liability
5   company,                    :
6           Plaintiff,      : Case No.
                                 2:21-cv-00455-DDB-DAO
7   v.                          :
                               The Honorable David
8   EPHRAIM OLSON, an         : Barlow
    individual,
9                            : Magistrate Judge Daphne
            Defendant.         A. Oberg
10

    _____
11

12
      ZOOM VIDEO CONFERENCE DEPOSITION OF ELIJAH KUKHARUK
13
14              Taken on May 26, 2023
15                 At 9:00 a.m.
16
17
18              At Foley & Lardner
19          95 S. State Street, Suite 2500
20          Salt Lake City, UT 84111
21
22
23
24
25      Reported by:  Rockie E. Dustin, RPR, CSR, CCR

                                              Page 1

```
1    convicted of a crime?
2         A.    Does that include traffic infractions?
3         Q.    It does not.
4         A.    No.
5         Q.    Did you do anything to prepare for your
6    deposition today?
7         A.    Yes.
8         Q.    What did you do?
9         A.    I reviewed some of the materials that I
10   produced in response to the earlier documents.
11        Q.    So you produced documents in response to a
12   subpoena in this case; is that right?
13        A.    Yes.
14        Q.    And you reviewed all of those documents or
15   just some portion of them?
16        A.    I skimmed over all of them.
17        Q.    Did you read any of them or just skim them
18   all?
19        A.    I read some.
20        Q.    Which ones did you read?
21        A.    I don't remember.
22        Q.    When did you read these documents?
23        A.    Last night and this morning.
24        Q.    So you read documents last night and this
25   morning, but you don't remember which ones you read?
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          A.    I don't recall specifically.
2          Q.    Do you recall any of the ones you read
3     either last night or this morning?
4          A.    I recall pieces of documents that I've
5     read, yes.
6          Q.    What documents -- what pieces of documents
7     do you recall?
8          A.    Some emails and some texts.
9          Q.    Who were the emails between?
10         A.    If I recall correctly, there were some
11    emails between Hyrum and myself and Josh and myself.
12         Q.    Did you read -- who were the texts between?
13         A.    If I recall correctly, there were some
14    texts between Hyrum and myself and Ruth and myself.
15         Q.    Did reviewing those documents refresh your
16    memory of the events that you're going to be asked to
17    testify about today?
18         A.    Some of the events, yes.
19         Q.    For example, when you say "some of the
20    events," what events do you recall being -- do you have
21    a refreshed memory of, having reviewed those documents?
22         A.    The emails, if I recall correctly, that
23    Hyrum sent me, the texts that Hyrum sent me, or the
24    texts that Ruth sent me.
25         Q.    The emails that Hyrum sent you, what were

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1  they related to?

2       A.   They weren't all related to one thing, but

3  the ones that I recall were related to documents that

4  he had sent me.

5       Q.   So he had sent you documents and those were

6  in the email that you read this morning and last night?

7       A.   Yes.

8       Q.   What documents did he send you?

9       A.   If I recall correctly, they were documents

10  related to clients.

11       Q.   Whose clients?

12       A.   I don't know.

13       Q.   They were documents related to -- when you

14  say "clients," clients of who?

15       A.   I don't know whose clients they were.

16       Q.   How do you know they were clients?

17       A.   Because they weren't, as I understood it,

18  Hyrum's documents and they weren't mine, so I

19  understood them to be client documents.

20       Q.   Clients for what purpose?

21       A.   My understanding is that they were tax

22  clients.

23       Q.   These were documents of tax clients but you

24  don't know who?

25       A.   Their name would likely be on the

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

documents.

Q.    You don't know, though -- they were tax clients of someone is your assumption, but you don't know who they were tax clients of.

Is that what you're saying?

A.    I don't know who specifically they were tax clients of, no.

Q.    Do you recall why the documents were being sent to you?

A.    Yes.

Q.    What was that?

A.    To mail the documents, to print and mail the documents.

Q.    So documents were being sent to you so that you could print and mail them; is that right?

A.    Yes.

Q.    Okay.

The -- you mentioned that there were some emails between you and Joshua.

Do you recall what those emails were about?

A.    I don't recall.

Q.    So they're the ones that you read either this morning or last night and you don't recall what they were about?

A.    I may have a vague impression, but I

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1    wouldn't like to guess.
 2         Q.    What's your vague impression?
 3         A.    They were likely related to work.
 4         Q.    What work?
 5         A.    The work that I was performing.
 6         Q.    The work that you were performing for who?
 7         A.    As I understood it, I was performing work
 8    for Thomas.
 9         Q.    Your father, Thomas Olson?
10         A.    Yes.
11         Q.    This work was for him personally?
12         A.    I don't believe so.
13         Q.    You understood it was being done for a
14    company; is that right?
15         A.    An entity of some sort, yes.
16         Q.    What was that entity?
17         A.    I don't know which entity it was being
18    performed for.
19         Q.    Did you ever ask which entity you were
20    performing work for?
21         A.    In specific contexts, yes.
22         Q.    Well, tell me about those specific
23    contexts.
24         A.    For example, in one instance, if I recall
25    correctly, I was calling CRA and I asked Hyrum which
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    entity I should represent that I was calling from.
2        Q.    And what year was this?
3        A.    I don't recall specifically.
4        Q.    What was the purpose for your call to the
5    CRA?
6        A.    I don't recall.
7        Q.    What was Hyrum's response to your question?
8        A.    In reviewing my notes, it looked like my
9    notes indicated that his answer was OLPC.
10       Q.    Are there any other instances that you can
11   recall where you asked which entity you were working
12   for?
13       A.    Not that I recall.
14       Q.    Do you remember any instance where you were
15   told that you were working for anyone other than OLPC?
16       A.    Can you repeat the question?
17       Q.    Yes.
18             During this time that you were working with
19   Hyrum, and as you put it for your father, Thomas Olson,
20   through some entity, do you recall a situation where
21   you were told that you were working for any entity
22   other than OLPC?
23       A.    No.
24       Q.    So we're clear, when you say "OLPC," you
25   mean the plaintiff in this case, OL Private Counsel,

                                                    Page 17

```
 1   LLC; is that right?
 2         A.    I would assume so.
 3         Q.    Other than reviewing those documents did
 4   you do anything else to prepare for your deposition
 5   today?
 6         A.    Yes.
 7         Q.    What else did you do?
 8         A.    I spoke with my attorney.
 9         Q.    When did you speak with your attorney?
10         A.    This morning, and yesterday.
11         Q.    How long did you speak with your attorney
12   this morning?
13         A.    Something in and about an hour.
14         Q.    How long did you speak with your attorney
15   yesterday?
16         A.    Thirty minutes.
17         Q.    When you say "your attorney," are you
18   referring to Mr. Sackett?
19         A.    Yes.
20         Q.    Was there anyone else in either of those
21   meetings with you when you spoke with your attorney,
22   either yesterday or this morning?
23         A.    No.
24         Q.    No one else was involved in those
25   communications, other than you and Mr. Sackett; is that
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1   correct?
 2        A.    Yes.
 3        Q.    Did you do anything else to prepare for
 4   your deposition today, other than what you've told me
 5   now?
 6        A.    No.
 7        Q.    Have you reviewed the pleadings of any of
 8   the litigation that's currently pending between the
 9   various family members you have?
10        A.    In which litigation?
11        Q.    Any of them.
12        A.    Yes.
13        Q.    Which cases have you reviewed the pleadings
14   in?
15        A.    In this case.
16        Q.    So you've reviewed the pleadings in the
17   case that we're talking about today?
18        A.    Yes.
19        Q.    When did you do that?
20        A.    On multiple occasions.
21        Q.    When was the first time you reviewed the
22   pleadings in the case that we're talking about today,
23   the OLPC versus Ephraim Olson?
24        A.    I don't recall specifically.
25        Q.    Was it when the case was started?
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1          A.    No.

 2          Q.    So it was after the case started?

 3          A.    Yes.

 4          Q.    Do you recall how long after the case

 5    started that you read it, read the pleadings?

 6          A.    If I recall correctly, it was sometime in

 7    2021.

 8          Q.    And you said you've read them multiple

 9    times -- the pleadings multiple times since then; is

10    that right?

11          A.    Pieces of them multiple times, yes.

12          Q.    Why have you reviewed the pleadings

13    multiple times?

14          A.    Because I thought it was interesting.

15          Q.    Were you asked to review them multiple

16    times?

17          A.    No.

18          Q.    Who gave you the pleadings?

19          A.    Lindberg Law.

20          Q.    You pulled them up yourself?

21          A.    Yes.

22          Q.    No one has given you any of the documents?

23          A.    No.

24                MR. SACKETT:  Objection.  Vague.

25                THE WITNESS:  Which documents are you
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1              MS. VAUGHN:  Okay.
 2              THE WITNESS:  Can you repeat the question?
 3    BY MS. VAUGHN:
 4         Q.    Yeah.
 5              I'm just wondering if it's your belief that
 6    the five pages attached to this email are the documents
 7    that are, you know, imaged in the attachments on the
 8    first page.
 9         A.    I believe they are some of them.
10         Q.    Okay.
11              And you were provided these documents by
12    whom?
13         A.    If I recall correctly, it was either or
14    both of Joshua and Thomas.
15         Q.    And who was the individual -- well, let me
16    back up.
17              This was to provide -- or to demonstrate to
18    your university that you could pay, is that correct,
19    pay tuition?
20         A.    Generally speaking, yes.
21         Q.    Okay.
22              MR. MORTENSEN:  Objection.  Misstates prior
23    testimony.
24    BY MS. VAUGHN:
25         Q.    And it was Thomas Olsen who was paying the
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    tuition at that time?

2         A.    That was my anticipation, yes.

3         Q.    So you believe these are Thomas Olson's

4    personal bank accounts?

5         A.    That was my understanding, yes.

6         Q.    Okay.

7               There was some testimony generally about

8    Tim A, and you said that you recalled seeing some chats

9    with Tim A during the summer of 2020, roughly.

10              Do you recall who the chats were with?

11        A.    I don't recall specifically, but generally

12   with, I believe, other client service managers, CSMs.

13        Q.    Okay.

14              Did you ever see texts or communications

15   between Tim A and Thomas Olson during the summer of

16   2020?

17        A.    Not that I recall.

18        Q.    Okay.  All right.

19              What we're calling "Thomas's firm" in this

20   deposition, obviously, OL Private Counsel may or may

21   not be part of that, but it's involved in this

22   litigation.

23              What do you know about the corporate

24   structure of OL Private Counsel?

25              MR. SACKETT:  Foundation.

1          MR. MORTENSEN:  Join.  Calls for
         2    speculation.
         3          THE WITNESS:  My understanding is that OLPC
         4    is related to other entities in Thailand and elsewhere.
         5    BY MS. VAUGHN:
         6          Q.   Do you know what OL Private Counsel PT is?
         7          MR. SACKETT:  Foundation.
         8          THE WITNESS:  I believe that's an
         9    international version of OLPC.
        10    BY MS. VAUGHN:
        11          Q.   Do you know where that belief comes from?
        12          A.   If I recall correctly, I saw that name on
        13    documents.  I don't know if I recall.
        14          Q.   Do you know what OL Private Corporate
        15    Counsel International is?
        16          MR. MORTENSEN:  Same objection.
        17          THE WITNESS:  Can you repeat the name
        18    again?
        19          MR. MORTENSEN:  Lack of foundation.
        20    BY MS. VAUGHN:
        21          Q.   OL Private Corporate Counsel International.
        22          MR. MORTENSEN:  Same objection.
        23    BY MS. VAUGHN:
        24          Q.   It's also sometimes referred to as OLPCCIL.
        25          MR. MORTENSEN:  Same objection.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1                    THE WITNESS:  I have heard of OLPCCIL, but
 2    I'm not familiar with its relationship to other
 3    entities.
 4    BY MS. VAUGHN:
 5         Q.    Okay.
 6               Do you know what International Tax Counsel
 7    is?
 8               MR. MORTENSEN:  Same objection.
 9               THE WITNESS:  I believe so.
10    BY MS. VAUGHN:
11         Q.    What do you believe International Tax
12    Counsel is?
13         A.    If I recall correctly, it at least is in
14    part an entity in Thailand that provides tax and
15    accounting services.
16         Q.    Okay.
17               Since summer of 2012, since you've sort of
18    been on and off employed by Thomas's firm, do you know
19    or -- let me back up.
20               Were you aware, at any given time you were
21    employed by one of Thomas's firms, which corporate
22    entity you were working for at the time?
23               MR. MORTENSEN:  Object to the form.
24    Misstates the testimony.  Assumes facts.
25               THE WITNESS:  No.
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

BY MS. VAUGHN:

Q.   How were you paid for the work that you performed for Thomas's firm from roughly 2012 to 2020?

A.   It took various forms.

Q.   What were those forms?

A.   Some of those were -- one of them at least was a payment from Olson Lemons, LLP.  Another was a payment from OLPC.  And then if I recall correctly, there were personal payments or payments from Hyrum's personal account.

Q.   Okay.

At any time that you were working for Thomas's firm, did you ever sign an employment agreement?

A.   No.

Q.   At any time you were working for Thomas's firm, did you ever sign a confidentiality agreement?

A.   No.

Q.   At any time that you were working for Thomas's firm, did you ever sign a nondisclosure agreement?

A.   No.

Q.   At any time that you were working for Thomas's firm, did you ever sign a typical employment-related document?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1              MR. SACKETT:  Objection.  Vague.

 2              MR. MORTENSEN:  Join.

 3              THE WITNESS:  No.

 4    BY MS. VAUGHN:

 5         Q.    Okay.

 6              When you would leave employment from

 7    Thomas's firms during a school year, were you ever

 8    asked to delete files that you had created during your

 9    employment?

10              MR. MORTENSEN:  Overbroad and vague.

11              THE WITNESS:  No.

12    BY MS. VAUGHN:

13         Q.    Were you ever asked to return documents to

14    Thomas's firm when you would sort of halt your

15    employment during the school year?

16              MR. MORTENSEN:  Same objection.

17              THE WITNESS:  Not that I recall.

18              MS. VAUGHN:  Okay.  Are we on Exhibit 13?

19              (Exhibit 13 marked.)

20    BY MS. VAUGHN:

21         Q.    This is one of the documents that you

22    produced.  It is double sided.  And on the bottom, it

23    looks like Hyrum is forwarding an email to you that

24    Hyrum received from Michael Gedlaman.

25              Do you see that?
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1          A.    (Witness reviews document.)  Yes.
 2          Q.    Do you know who Michael Gedlaman is?
 3          A.    Yes.
 4          Q.    Who is Michael Gedlaman?
 5          A.    My understanding is that he monitors or
 6    works with IT within Thomas's firm.
 7          Q.    Do you know where Michael Gedlaman lives?
 8          A.    I believe so.
 9          Q.    Where do you believe that he lives?
10          A.    Alberta, Canada.
11          Q.    Okay.
12                Do you know why Hyrum was forwarding this
13    Microsoft key to you?
14                MR. SACKETT:  Foundation.
15                MR. MORTENSEN:  Join.
16                THE WITNESS:  (Witness reviews document.)
17    If I recall correctly, it was a link to download
18    Microsoft Office.
19    BY MS. VAUGHN:
20          Q.    At this time, September of 2016, were you
21    working for Thomas's firm?
22                MR. MORTENSEN:  Asked and answered.
23                THE WITNESS:  I don't believe so.
24    BY MS. VAUGHN:
25          Q.    And the Microsoft Office that he was
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    sending you, is that related to the firm or was that

2    just sort of general software?

3             MR. MORTENSEN:  Calls for speculation.

4    Lack of foundation.

5             THE WITNESS:  My understanding, given the

6    date, my recollection is that it was for use in school.

7             MS. VAUGHN:  Okay.  We'll mark Exhibit 14.

8    One for you and one for the reporter.

9             (Exhibit 14 marked.)

10   BY MS. VAUGHN:

11        Q.    This is another document that you produced,

12   Elijah.

13             Do you recognize this document?

14        A.    Yes.

15        Q.    Are these your notes?

16        A.    I believe so.

17        Q.    Okay.

18             I want to talk about the "training with

19   Ephraim" section here.  It has a date, July 14, 2017.

20             Do you think that's the date that you took

21   these notes?

22        A.    I believe so.

23        Q.    Okay.

24             Under the "Work on Email/Document Review"

25   bullet point.

```
 1                    Do you see that?

 2         A.    Yes.

 3         Q.    There's a sub bullet saying, "We want to

 4    make sure we are not giving legal advice in the emails

 5    unless it is reviewed by a lawyer."

 6                    Do you see that?

 7         A.    Yes.

 8         Q.    Who was the "we" referring to there?

 9         A.    My understanding is that that was Ephraim

10    and I was the "we."

11         Q.    Did Ephraim ever tell you that he was

12    employed by OLPC as a lawyer?

13         A.    No.

14         Q.    Did Ephraim ever tell you how he was

15    employed by OLPC?

16         A.    Do you mean like in what capacity or the

17    fact that he was employed?

18         Q.    Let me ask it a different way.

19                    Did Ephraim ever tell you that he was

20    employed by OLPC but specifically not a lawyer?

21         A.    Yes.

22         Q.    Okay.

23                    What do you recall of that conversation?

24         A.    If I recall correctly, he mentioned to me

25    that he was not authorized to practice law in Canada,
```

```
 1                    THE WITNESS:  I don't recall.
 2     BY MS. VAUGHN:
 3         Q.    Okay.
 4                    MS. VAUGHN:  Let's mark Exhibit 20.
 5                    (Exhibit 20 marked.)
 6     BY MS. VAUGHN:
 7         Q.    I just want to talk about this "Software
 8     Research for Tom" section.
 9                    Do you remember what software research you
10     were doing for Tom that you're talking about in these
11     notes?
12                    MR. SACKETT:  Objection, foundation.
13                    THE WITNESS:  (Witness reviews document.)
14     If I recall correctly, this was the research that I
15     referred to earlier, in the summer of 2019.
16     BY MS. VAUGHN:
17         Q.    You think that was the CMS software; is
18     that right?
19         A.    CRM --
20         Q.    CRM.
21         A.    -- and ERP, yes.
22         Q.    Okay.
23                    MS. VAUGHN:  Let's mark Exhibit 21.
24                    (Exhibit 21 marked.)
25     BY MS. VAUGHN:
```

Q.   I just want to focus in on the first bullet
point here that says, "(change to Maverick law)," in
parentheses on the second line.

         Do you see that?

    A.   Yes.

    Q.   What is Maverick law?  Do you know?

    A.   If I recall, it was a firm either owned or
related to Ruth Bigler.

    Q.   Were they affiliated -- do you know if
they're affiliated in any way with Tom's firm?

         MR. SACKETT:  Foundation.

         MR. MORTENSEN:  Join.

         THE WITNESS:  I don't believe so.

BY MS. VAUGHN:

    Q.   Okay.

         Sorry, one more thing.

         The "Seller Remittance Process," about a
little bit further than halfway down the page, do you
know what that's referring to?

    A.   I don't believe so.

         MS. VAUGHN:  Exhibit 22.

         (Exhibit 22 marked.)

BY MS. VAUGHN:

    Q.   I want to talk about this part on Tim's
emails.

1      Do you see that?

2   A.  Yes.

3   Q.  Okay.

4      It says, "Look for damaging information

5 (trade secrets)."

6   A.  Yes.

7   Q.  Who told you to look for -- well, first, is

8 Tim Tim Akarapanich?

9   A.  I believe so.

10   Q.  Okay.

11      Who told you to look for damaging

12 information or trade secrets on Tim's email?

13      MR. MORTENSEN:  Calls for speculation.

14 Lack of foundation.  Assumes facts.

15      Sorry.  Go ahead.

16      THE WITNESS:  If I recall correctly, that

17 was Hyrum.

18 BY MS. VAUGHN:

19   Q.  What do you remember about that

20 conversation with Hyrum?

21   A.  My recollection is that it was a call with

22 Joshua, or shortly after a call with Joshua, in which

23 Hyrum suggested or was laying out a potential project

24 for me to look through Tim's email account to look for

25 any documents, emails, within that email account that

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    were damaging information, trade secrets or would be

2    evidence of extortion.

3              Q.    Evidence of extortion against Tim A?

4                    Let me rephrase it.

5                    What do you mean by "extortion"?

6              A.    If I recall correctly, it was extortion by

7    Tim A.

8              Q.    And what gives you that -- what gave you

9    that impression?

10             A.    Well, it's what I recall from the

11   conversation, but also the context.  I'm looking

12   through Tim's email for evidence.  My understanding was

13   that these were things to use against him.  And since

14   extortion is presumably wrong, I understood it to be

15   extortion by Tim.

16             Q.    Who were they concerned about Tim

17   extorting?  Do you know?

18                   MR. SACKETT:  Foundation.

19                   MR. MORTENSEN:  Join.

20                   THE WITNESS:  I don't recall.  Although the

21   context, I imagine would be Thomas's firm or employees

22   of that.

23   BY MS. VAUGHN:

24             Q.    Do you remember when this call with Hyrum

25   was?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1        A.    If I recall correctly, it was towards the
 2   end of the summer of 2020.
 3        Q.    Did you ever talk to Joshua about this?
 4        A.    Yes.
 5        Q.    What did you talk to Joshua about?
 6        A.    My recollection is that either on the same
 7   phone call with Hyrum or immediately before or after,
 8   Joshua called me and he discussed that after Tim had
 9   left Thomas's firm, and after they had changed his
10   login credentials, he retained access through his phone
11   to his work email account.
12        Q.    Did Joshua ever tell you about emails he
13   received from Tim A on that subject?
14        A.    Not that I recall.
15             MS. VAUGHN:  Let's mark Exhibit 23.
16             (Exhibit 23 marked.)
17   BY MS. VAUGHN:
18        Q.    Have you ever seen this document before?
19        A.    I don't believe so.
20        Q.    Okay.
21             What's the date on this document?
22        A.    June 6, 2020.
23        Q.    Okay.
24             And it's from Tim Akarapanich to Joshua
25   Olson; correct?
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1          A.     Yes.

 2          Q.     Okay.

 3                 And here, Tim is telling Joshua, "Did you

 4    know once you synchronized email with phone or icloud

 5    it's always there?"

 6          A.     Yes.

 7          Q.     Does that sound to you like what Joshua is

 8    telling you in that email, or in that phone call we

 9    talked about in Exhibit 22?

10                 MR. SACKETT:  Objection, foundation.  Calls

11    for speculation.

12                 MR. MORTENSEN:  Join.

13                 THE WITNESS:  Yes.

14    BY MS. VAUGHN:

15          Q.     Okay.

16                 MS. VAUGHN:  Okay, Exhibit 24.

17                 (Exhibit 24 marked.)

18    BY MS. VAUGHN:

19          Q.     This is another email from Tim A to Joshua

20    Olson dated June -- oh, I'm sorry.

21                 THE COURT REPORTER:  Maybe start that over.

22                 MS. VAUGHN:  Yeah, I'm sorry.

23    BY MS. VAUGHN:

24          Q.     This is another email from Tim A to Joshua

25    Olson dated June 6, 2020.
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
 1              Have you ever seen this email before?

 2       A.    I don't believe so.

 3       Q.    Okay.

 4              And again, it looks to me that Tim A is

 5   talking about having access to emails on his phone.

 6              Is that similar to what Joshua was talking

 7   to you about in that VoIP call we talked about in

 8   Exhibit 22?

 9              MR. SACKETT:  Objection, foundation.  Calls

10   for speculation.

11              MR. MORTENSEN:  Same objection, and

12   leading.

13              THE WITNESS:  Yes.

14   BY MS. VAUGHN:

15       Q.    Okay.

16              Do these emails between Tim A and Joshua

17   Olson help you remember when Joshua asked you to start

18   looking at Tim A's emails?

19              MR. MORTENSEN:  Object to the form.  Misuse

20   of refreshing memory.

21              THE WITNESS:  I believe it was after this

22   date.

23   BY MS. VAUGHN:

24       Q.    Okay.

25              So sometime after June 6, 2020?
```

```
 1          A.    Yes.

 2                MR. SACKETT:  Can we take a break real

 3    quick?

 4                MS. VAUGHN:  Yes, definitely.

 5                THE VIDEOGRAPHER:  We're going off the

 6    record.  The time is 3:27.

 7                (Recess taken from 3:27 p.m. to 3:35 p.m.)

 8                THE VIDEOGRAPHER:  We are back on the

 9    record.  The time is 3:35.

10    BY MS. VAUGHN:

11          Q.    Okay.

12                After you had the phone call with Hyrum and

13    Joshua, that we talked about while looking at

14    Exhibit 22, did you look into Tim A's emails?

15          A.    Not that I recall.

16          Q.    Okay.

17                Do you know if anyone at the firm looked at

18    Tim A's emails?

19                MR. MORTENSEN:  Calls for speculation.

20    Lack of foundation.

21                THE WITNESS:  I don't recall.

22    BY MS. VAUGHN:

23          Q.    Do you know what program the firm used to

24    monitor access to the server?

25                MR. SACKETT:  Objection, foundation.
```

```
 1                 MR. MORTENSEN:  Join.

 2                 THE WITNESS:  I probably did at one point.

 3      I don't recall sitting here.

 4                 MS. VAUGHN:  Okay.  Let's mark 25.

 5                 (Exhibit 25 marked.)

 6      BY MS. VAUGHN:

 7           Q.    Okay, I'm looking at midway down the page,

 8      "Security policies with CSM."

 9           A.    Yes.

10           Q.    Second bullet point, "Two issues with

11      internal emails."

12                 Do you see that?

13           A.    Yes.

14           Q.    It says, "We have a policy this week where

15      we delete all internal emails"?

16           A.    Yes.

17           Q.    What is that referring to?

18           A.    If I recall correctly, it was a policy that

19      Tom wanted, and Joshua was implementing, to get rid of

20      all internal emails.

21           Q.    Did Tom or Joshua tell you that they wanted

22      a policy where they delete all internal emails?

23           A.    If I recall correctly, yes.

24           Q.    Which one, Tom or Joshua?

25           A.    If I recall correctly, both.
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

# EXHIBIT O

# EXHIBIT O

1    discussion with someone is about -- whether someone    11:53:36

2    told her about the purpose of the trust is    11:53:39

3    privileged.    11:53:41

4            MS. PORTER:  Well, I mean, let me -- can I    11:53:42

5    just give you a hypothetical.  Suppose I said to you:    11:53:43

6    Did anyone tell you who murdered, you know, Jim    11:53:45

7    Smith?  Yes.  Okay.  Who told you?  It's privileged.    11:53:48

8    I mean, you've just disclosed who told you -- do you    11:53:51

9    see what I mean?  It's a tie-in of the two    11:53:54

10   questions --    11:53:56

11           MR. MORTENSEN:  I understand your point.    11:53:57

12   But I'm not -- I didn't ask what the purpose of the    11:53:58

13   trust was.  My question was far broader.  What -- did    11:54:01

14   anyone tell you what the purpose was?    11:54:03

15           MS. PORTER:  The thing is, though, the    11:54:05

16   purpose is a little narrower.  If it was about the    11:54:06

17   trust, I'm not sure that I would be making this    11:54:09

18   objection just if it was about the trust.  But the    11:54:11

19   purpose seems to narrow the question.    11:54:12

20       Q.   (BY MR. MORTENSEN)  All right.  In an    11:54:14

21   attempt to try to resolve this concern, I'm going to    11:54:15

22   carve out Carolyn Olson for now.  I am reserving the    11:54:18

23   right to readdress this issue when we're going to be    11:54:21

24   talking about this later.    11:54:24

25           But for purposes of now, exclude    11:54:25

| | | |
|---|---|---|
| 1 | conversations, did anyone tell you about the purpose | 11:54:30 |
| 2 | of the trust other than Carolyn Olson? | 11:54:32 |
| 3 | A.    Not that I recall. | 11:54:34 |
| 4 | Q.    Did you have any discussions with anyone | 11:54:35 |
| 5 | other than Carolyn Olson about what the assets of the | 11:54:39 |
| 6 | trusts were? | 11:54:42 |
| 7 | A.    When? | 11:54:43 |
| 8 | Q.    At any point ever. | 11:54:44 |
| 9 | A.    Yes. | 11:54:46 |
| 10 | Q.    And when? | 11:54:49 |
| 11 | A.    I mean, what comes to my mind is I | 11:54:51 |
| 12 | remember asking Jim Hanks a lot of questions.  I was | 11:54:54 |
| 13 | trying to do my due diligence. | 11:54:56 |
| 14 | Q.    Okay. | 11:55:00 |
| 15 | A.    But, I mean, I can't give you specifics of | 11:55:00 |
| 16 | which ones I asked about or what I asked or -- but, I | 11:55:03 |
| 17 | mean, I remember having questions. | 11:55:07 |
| 18 | Q.    Okay.  Anyone other than Jim Hanks? | 11:55:13 |
| 19 | A.    Yeah, I believe that there may have | 11:55:16 |
| 20 | been -- may have -- I'm trying to remember.  I know | 11:55:31 |
| 21 | at some point I learned about the specific like | 11:55:50 |
| 22 | parcels of land.  And I know -- but I can't remember | 11:55:55 |
| 23 | how I got that information.  And I'm talking about | 11:56:02 |
| 24 | the Waterton Trust.  But I'm guessing.  I just don't | 11:56:07 |
| 25 | remember specifics. | 11:56:15 |

Page 110

1      Q.    Okay.  Do you have a general memory as to      11:56:17

2   how, other than your conversation with Mr. Hanks, you   11:56:21

3   may have learned about any of the assets of any of      11:56:24

4   the entities identified as third party defendants in   11:56:27

5   the counter petition?                                    11:56:30

6      A.    I mean, I know I've learned information,       11:56:31

7   but I can't tell you how or when off the top of my      11:56:46

8   head.                                                    11:56:51

9      Q.    When you say you know you've learned           11:56:52

10   information?                                             11:56:55

11      A.    Well, like, for instance, there's been        11:56:56

12   discovery in the divorce case.  And there's been -- I   11:56:57

13   mean, there's -- yeah, I just can't -- I can't          11:57:02

14   pinpoint what I learned or when I've learned it or      11:57:07

15   how I've learned it just sitting here.                  11:57:11

16      Q.    Did you have discussions with Ephraim         11:57:18

17   Olson about the assets of the various entities          11:57:22

18   identified as counter -- the third party defendants    11:57:24

19   in the counter petition?                                11:57:26

20      A.    I don't recall specifically, no.              11:57:27

21      Q.    You don't recall whether you had             11:57:29

22   conversations with Ephraim Olson about the assets of   11:57:33

23   those entities?                                          11:57:36

24      A.    I don't recall, no.  I don't recall if I      11:57:37

25   learned anything.                                        11:57:39

Page 111

1    Q.   When you say you don't recall whether        11:57:40

2    you've learned anything, setting aside whether you   11:57:47

3    learned it from him --                               11:57:50

4    A.   Uh-huh.                                         11:57:50

5    Q.   -- have you had discussions with him about  11:57:50

6    the assets?                                          11:57:53

7    A.   I just don't remember is what I was trying  11:57:53

8    to say.                                              11:57:55

9    Q.   At this point when you filed the counter    11:57:56

10   petition, did you have a copy of any of the trust   11:58:02

11   documents for any of the trusts identified as third 11:58:06

12   party defendants?                                    11:58:11

13   A.   I don't remember.                              11:58:12

14   Q.   At this point when you filed the counter    11:58:14

15   petition, did you have any of the formation documents 11:58:20

16   for any of the entities identified as third party   11:58:26

17   defendants?                                          11:58:30

18   A.   Formation documents, like the actual trust 11:58:31

19   document, is that what you're saying?               11:58:39

20   Q.   The trust document or the articles of      11:58:40

21   incorporation or -- for the LLCs, the membership    11:58:43

22   agreements.                                          11:58:47

23   A.   So I can say that if it's a Utah entity, I 11:58:47

24   would have pulled whatever was on the State of Utah  11:58:52

25   Department of Corporations before I filed this.  I   11:58:56

| | | |
|---|---|---|
| 1 | don't have a specific recollection of that, but | 11:59:00 |
| 2 | that's my practice. | 11:59:02 |
| 3 | As for the trusts, I don't remember | 11:59:05 |
| 4 | specifically.  I believe I did, but I don't -- that's | 11:59:08 |
| 5 | a guess. | 11:59:15 |
| 6 | Q.   So I want to make sure.  You believe you | 11:59:23 |
| 7 | had copies of the trusts, but you don't recall for | 11:59:26 |
| 8 | sure? | 11:59:28 |
| 9 | A.   Right. | 11:59:29 |
| 10 | MR. MORTENSEN:  Okay.  I'm about ready to | 11:59:32 |
| 11 | launch into a new area, so I think it's best to take | 11:59:33 |
| 12 | a break.  Let's take our lunch break now.  Let's go | 11:59:36 |
| 13 | off the record. | 11:59:39 |
| 14 | VIDEOGRAPHER:  Off the record at 11:59. | 11:59:39 |
| 15 | (Break taken from 11:59 to 12:39.) | 11:59:41 |
| 16 | (EXHIBIT NUMBER 8 WAS MARKED.) | 12:40:13 |
| 17 | VIDEOGRAPHER:  This is the beginning of | 12:40:21 |
| 18 | media 3.  We're back on the record.  The time is | 12:40:23 |
| 19 | 12:39. | 12:40:26 |
| 20 | Q.   (BY MR. MORTENSEN)  Ms. Kuendig, I'm going | 12:40:27 |
| 21 | to show you what is being marked as Exhibit 8.  It is | 12:40:29 |
| 22 | a document that you produced in response to the | 12:40:32 |
| 23 | subpoena that was served on Dodd & Kuendig.  And you | 12:40:36 |
| 24 | can see it's an assessment after normal reassessment | 12:40:44 |
| 25 | period recommendation report.  Do you see that | 12:40:48 |

1    document?                                              12:40:51

2          A.    I see it.                                  12:40:51

3          Q.    And I will represent to you this is one of 12:40:51

4    the documents that you produced to us in response to   12:40:54

5    the subpoena.  Have you seen this document before?     12:40:57

6          A.    Yes.                                       12:40:59

7          Q.    When did you first see it?                 12:41:01

8          A.    I don't remember exactly.                  12:41:02

9          Q.    Do you have a year or a month or anything? 12:41:08

10         A.    I don't.  I know I produced it in          12:41:11

11   discovery in the divorce case, so it would have been   12:41:15

12   before then.                                           12:41:18

13         Q.    How did you get the document?              12:41:19

14         A.    This was in a box of documents delivered   12:41:32

15   to my office, or boxes, sorry.                         12:41:45

16         Q.    When were the boxes of documents delivered 12:41:53

17   to you?                                                12:42:00

18         A.    I don't remember.                          12:42:00

19         Q.    I take it before you produced it, any of   12:42:01

20   it?                                                    12:42:04

21         A.    Absolutely.                                12:42:04

22         Q.    So before you did the discovery in the     12:42:05

23   divorce case you got those boxes of documents?         12:42:09

24         A.    Yes.                                       12:42:11

25         Q.    And who delivered the box of -- the boxes  12:42:12

1    of documents to you?                                    12:42:16

2            A.    My client.                                12:42:17

3            Q.    Carolyn Olson?                             12:42:18

4            A.    Yes.                                       12:42:20

5            Q.    And did she deliver them personally?       12:42:21

6            A.    Yes.                                       12:42:26

7            Q.    What is your understanding of what the     12:42:27

8    documents in the boxes of documents was?  Excuse me,    12:42:40

9    let me try that again.                                  12:42:44

10           The boxes of documents, what's your              12:42:45

11   understanding of where they came from?                  12:42:48

12           MS. PORTER:  I'm going to object only to         12:42:51

13   the extent that any understanding might have derived     12:42:53

14   from communications with her client.  You can answer     12:42:56

15   it excluding any communications with your client.        12:43:04

16           THE WITNESS:  Then I can't answer it.            12:43:07

17           Q.    (BY MR. MORTENSEN)  Is it -- is it your     12:43:10

18   testimony that the only person you've discussed those    12:43:11

19   boxes of documents with is Carolyn Olson?                12:43:14

20           A.    You asked me about the origin of the       12:43:17

21   documents, and the answer is yes.                        12:43:19

22           Q.    Okay.  So with respect to the origin of     12:43:22

23   the documents, the only person you've discussed the      12:43:24

24   boxes of documents with is Carolyn; is that what         12:43:27

25   you're saying?                                           12:43:29

| | | |
|---|---|---|
| 1 | A.    Let me make sure I'm clear.  The only | 12:43:30 |
| 2 | person that has given me information about the | 12:43:33 |
| 3 | origin, yes, is my client. | 12:43:37 |
| 4 | Q.    Okay.  Have you discussed the boxes of | 12:43:39 |
| 5 | documents with anyone other than Carolyn Olson? | 12:43:41 |
| 6 | A.    Yes. | 12:43:45 |
| 7 | Q.    Who? | 12:43:45 |
| 8 | A.    Gosh, lots of people.  Mark Hindley, | 12:43:46 |
| 9 | Monica Call, Sarah Vaughn.  And I can't remember | 12:43:52 |
| 10 | Chase's last name, but Chase -- he represents Ruth | 12:43:59 |
| 11 | Doxey Trust.  I'm blanking on his last name.  I | 12:44:05 |
| 12 | cannot think of it, so we're just going to say Chase. | 12:44:17 |
| 13 | Other counsel. | 12:44:23 |
| 14 | Q.    And what did -- what did you discuss about | 12:44:27 |
| 15 | the box of documents with Sarah Vaughn? | 12:44:33 |
| 16 | A.    So we -- at Mark Hindley's request, we put | 12:44:40 |
| 17 | the documents at Salt Lake Legal, and then there's | 12:44:50 |
| 18 | multiple e-mails with all of us because we agreed | 12:44:56 |
| 19 | that all of us would be involved, and like we talked | 12:45:00 |
| 20 | about like do we get them inventoried, how do we get | 12:45:04 |
| 21 | them inventoried, what do we need more information | 12:45:08 |
| 22 | on, who do they belong to?  And there's been a lot of | 12:45:11 |
| 23 | group communications and we went there in person.  I | 12:45:15 |
| 24 | think Sarah was there, I think so.  I mean, I can't | 12:45:21 |
| 25 | remember exactly.  But this was a -- that box has | 12:45:24 |

1    been a source of discussion and sort of group          12:45:27

2    consciousness.                                          12:45:31

3         Q.    And in any of those discussions was there   12:45:34

4    any discussion about the source of those boxes of      12:45:36

5    documents?                                              12:45:39

6         A.    Not that I recall, more -- it was more       12:45:39

7    about ownership.                                        12:45:46

8         Q.    And do you have a copy of the documents      12:45:47

9    that are in the boxes of documents?                     12:45:52

10        A.    No.  The only thing that I've retained was   12:45:55

11   what was produced in discovery in the divorce case.     12:45:59

12   Mark Hindley asked me not to keep anything with that    12:46:03

13   exception.                                              12:46:13

14        Q.    Did you review the documents in the boxes    12:46:14

15   of documents before they were delivered to Salt Lake    12:46:34

16   Legal?                                                  12:46:39

17        A.    Not all but some.                            12:46:39

18        Q.    How did you pick what to review and what     12:46:41

19   not to review?                                          12:46:48

20        A.    I don't know that I can answer that.         12:46:49

21        MS. PORTER:  I was just thinking that.  I          12:46:55

22   do think that is intruding into mental impressions.     12:46:57

23        Q.    (BY MR. MORTENSEN)  What portion of the      12:47:03

24   documents did you review?                               12:47:04

25        A.    I --                                         12:47:05

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

| | | |
|---|---|---|
| 1 | MS. PORTER: That's going to be work | 12:47:09 |
| 2 | product. | 12:47:10 |
| 3 | MR. MORTENSEN: No way that's true. | 12:47:12 |
| 4 | Q. (BY MR. MORTENSEN) Okay. Is there any | 12:47:13 |
| 5 | records that would show what of the box of documents | 12:47:23 |
| 6 | you reviewed and which ones you didn't? | 12:47:26 |
| 7 | A. Not that comes to mind. | 12:47:30 |
| 8 | Q. Did anyone review the documents in the | 12:47:32 |
| 9 | boxes of documents other than you that you're aware | 12:47:35 |
| 10 | of? | 12:47:37 |
| 11 | A. I believe your office has a copy of them. | 12:47:39 |
| 12 | And we all when we went there looked in the boxes. | 12:47:49 |
| 13 | But no, not that I can -- not that I know of or I can | 12:48:00 |
| 14 | remember other than that. | 12:48:04 |
| 15 | Q. Okay. So other than whatever portion you | 12:48:07 |
| 16 | reviewed and then whatever portion counsel in this | 12:48:13 |
| 17 | room may have reviewed after getting them from Salt | 12:48:18 |
| 18 | Lake Legal -- | 12:48:22 |
| 19 | A. Well, not everybody's in the room. | 12:48:22 |
| 20 | Q. Okay. Other than Mark Hindley and anyone | 12:48:26 |
| 21 | associated with Stoel Rives and now Foley & Lardner, | 12:48:32 |
| 22 | anyone at Ms. Vaughn's law firm or yourself, are you | 12:48:38 |
| 23 | aware of anyone else reviewing the docs -- the | 12:48:41 |
| 24 | documents in the boxes of documents? | 12:48:44 |
| 25 | A. From the time I had them forward? | 12:48:46 |

Page 118

1       Q.    At any point ever?                          12:48:47

2       A.    Well, I'm not aware of anything before I    12:48:48

3    had them.  So I would say -- remember I mentioned    12:48:51

4    Chase earlier, but I can't remember his last name.   12:48:59

5    He was present at that meeting.  And then I don't --  12:49:02

6    we know Salt Lake Legal had to have because they did  12:49:05

7    an inventory.                                          12:49:08

8       Q.    Okay.  Other than those individuals?  So    12:49:09

9    we've now excluded Ms. Vaughn's firm, the individuals 12:49:13

10   at Stoel Rives and at Foley, we've excluded Chase,    12:49:16

11   whatever his last name is, and Salt Lake Legal and    12:49:20

12   yourself.                                              12:49:24

13      A.    Uh-huh.                                       12:49:25

14      Q.    Other than that, are you aware of anyone     12:49:25

15   else reviewing any of the documents that were in the  12:49:28

16   boxes of documents?                                    12:49:30

17      A.    Sorry, I don't remember who else, if        12:49:31

18   anybody, was at that meeting.  So I would just say I  12:49:35

19   don't know.  And then obviously this doc -- I think   12:49:39

20   this is the document -- this was produced with        12:49:44

21   regards to number 3 request on the subpoena; is that  12:49:46

22   right?                                                 12:49:49

23      Q.    I don't remember which specific request     12:49:50

24   you were produced it in response to, but -- but...    12:49:53

25      A.    Okay.  Let me -- let me just review it to   12:49:58

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

| | | |
|---|---|---|
| 1 | make sure I -- | 12:50:00 |
| 2 | Q.    Please, take whatever time you need. | 12:50:02 |
| 3 | A.    So I think this is the document that I | 12:50:25 |
| 4 | produced with regards to number 3 on your subpoena | 12:50:27 |
| 5 | duces tecum.  And there's an e-mail showing this was | 12:50:31 |
| 6 | sent to Dentons in Canada.  And like I said, this was | 12:50:35 |
| 7 | produced in the divorce case, so divorce counsel, | 12:50:42 |
| 8 | various divorce counsel would also have it. | 12:50:45 |
| 9 | Q.    Okay.  So setting aside those people | 12:50:47 |
| 10 | you've now told me, and I'm probably going to keep | 12:50:54 |
| 11 | asking this question until you've given me the | 12:50:57 |
| 12 | exhaustive list that you're aware of -- | 12:50:59 |
| 13 | A.    Uh-huh. | 12:50:59 |
| 14 | Q.    -- are you aware of anyone else reviewing | 12:51:00 |
| 15 | any of the documents in the boxes of documents? | 12:51:02 |
| 16 | A.    Other than the answers I've given you, I | 12:51:05 |
| 17 | don't remember. | 12:51:07 |
| 18 | Q.    Okay.  Are you aware of whether Ephraim | 12:51:07 |
| 19 | Olson reviewed the documents in the boxes of | 12:51:15 |
| 20 | documents? | 12:51:17 |
| 21 | A.    I don't know. | 12:51:17 |
| 22 | MS. VAUGHN:  Foundation. | 12:51:18 |
| 23 | THE WITNESS:  I don't know if he was -- I | 12:51:19 |
| 24 | don't think he was at that meeting, but no, I don't | 12:51:20 |
| 25 | know. | 12:51:22 |

Page 120

| | | |
|---|---|---|
| 1 | Q. (BY MR. MORTENSEN) So after you received | 12:51:22 |
| 2 | the boxes of documents from Ms. Carolyn Olson and | 12:51:35 |
| 3 | before you gave them to Salt Lake Legal, did you do | 12:51:40 |
| 4 | anything with the documents? | 12:51:43 |
| 5 | A. I've already told you I reviewed some of | 12:51:44 |
| 6 | them. | 12:51:49 |
| 7 | Q. Other than the ones that you reviewed -- | 12:51:50 |
| 8 | well, did you use any of the documents that you | 12:51:58 |
| 9 | reviewed in connection with any of the legal services | 12:52:01 |
| 10 | you provided? | 12:52:04 |
| 11 | A. Whatever I've produced in discovery only, | 12:52:05 |
| 12 | that I can think of. I know this was one of them. I | 12:52:12 |
| 13 | just don't -- I haven't looked back at the discovery | 12:52:18 |
| 14 | in a while. | 12:52:19 |
| 15 | Q. How long did you spend reviewing documents | 12:52:20 |
| 16 | in the boxes of documents? | 12:52:22 |
| 17 | A. Oh, I don't know. | 12:52:23 |
| 18 | Q. Did you -- other than providing the | 12:52:24 |
| 19 | documents to Salt Lake Legal, did you provide any of | 12:52:33 |
| 20 | the documents in the boxes of documents to anyone | 12:52:38 |
| 21 | else? | 12:52:41 |
| 22 | A. I already told you I -- this document was | 12:52:41 |
| 23 | e-mailed to Dentons. | 12:52:43 |
| 24 | Q. Okay. So Exhibit 8 you sent to Dentons? | 12:52:45 |
| 25 | A. Yeah, this was in that subpoena duces | 12:52:51 |

Page 121

| | | |
|---|---|---|
| 1 | tecum three response, there was an e-mail. | 12:52:55 |
| 2 | MR. MORTENSEN:  Let's go off the record. | 12:53:02 |
| 3 | VIDEOGRAPHER:  Going off the record at | 12:53:02 |
| 4 | 12:52.) | 12:53:08 |
| 5 | (Break taken from 12:52 to 12:52.) | 12:53:15 |
| 6 | VIDEOGRAPHER:  Back on the record, 12:52. | 12:53:17 |
| 7 | Q.  (BY MR. MORTENSEN)  Okay.  Other than that | 12:53:22 |
| 8 | e-mail that you sent when you sent this document to | 12:53:23 |
| 9 | Dentons, anyone else that you've sent any of the | 12:53:27 |
| 10 | documents from the box of documents to? | 12:53:29 |
| 11 | A.  I don't recall. | 12:53:32 |
| 12 | Q.  Why were you sending the document to | 12:53:39 |
| 13 | Dentons, Exhibit 8? | 12:53:42 |
| 14 | MS. PORTER:  I think that intrudes into | 12:53:43 |
| 15 | mental impressions.  I'm going to instruct her not to | 12:53:45 |
| 16 | answer. | 12:53:48 |
| 17 | Q.  (BY MR. MORTENSEN)  You mentioned that | 12:53:56 |
| 18 | there were disks in the boxes of documents.  Did you | 12:54:00 |
| 19 | review any of the documents on the disks? | 12:54:03 |
| 20 | A.  I mentioned -- I didn't mention that. | 12:54:05 |
| 21 | Q.  Are you aware were there any disks in the | 12:54:10 |
| 22 | boxes of documents? | 12:54:12 |
| 23 | A.  I know I can recall one.  I don't know if | 12:54:13 |
| 24 | there were multiple. | 12:54:15 |
| 25 | Q.  And did you review any of the documents on | 12:54:16 |

Page 122

| | | |
|---|---|---|
| 1 | the one you remember? | 12:54:18 |
| 2 | A. I don't recall reviewing them. I recall | 12:54:19 |
| 3 | reviewing the file names. | 12:54:22 |
| 4 | Q. I see. So you opened the disk, looked at | 12:54:27 |
| 5 | the file names, but don't recall actually looking at | 12:54:31 |
| 6 | the documents; is that what you're saying? | 12:54:34 |
| 7 | A. Yeah, I don't recall. | 12:54:36 |
| 8 | Q. Okay. Let's turn back to Exhibit 8. When | 12:54:37 |
| 9 | you got -- when you reviewed this document -- well, | 12:54:47 |
| 10 | let me change the question. You did review this | 12:54:56 |
| 11 | document, I take it, Exhibit 8? | 12:54:58 |
| 12 | A. Yeah. | 12:55:01 |
| 13 | Q. And you provided a copy of this to | 12:55:02 |
| 14 | Dentons? | 12:55:05 |
| 15 | A. Yes. | 12:55:06 |
| 16 | Q. For use in connection with the Mareva | 12:55:07 |
| 17 | injunction? | 12:55:11 |
| 18 | A. I didn't say that. | 12:55:12 |
| 19 | Q. Was that true or not? | 12:55:12 |
| 20 | MS. PORTER: Let me have the question. | 12:55:14 |
| 21 | You're asking her why she sent it? | 12:55:15 |
| 22 | Q. (BY MR. MORTENSEN) Did you send it to | 12:55:16 |
| 23 | Dentons for use in connection with the Mareva | 12:55:18 |
| 24 | injunction? | 12:55:22 |
| 25 | MS. PORTER: I think that intrudes into | 12:55:22 |

Page 123

| | | |
|---|---|---|
| 1 | mental impressions.  I'm going to instruct her not to | 12:55:24 |
| 2 | answer. | 12:55:26 |
| 3 |         Q.    (BY MR. MORTENSEN)  When did you send it | 12:55:26 |
| 4 | to Dentons? | 12:55:28 |
| 5 |         A.    I'd have to see the e-mail.  I don't know. | 12:55:29 |
| 6 |         Q.    Do you have a memory of -- even of the | 12:55:31 |
| 7 | timing at all? | 12:55:35 |
| 8 |         A.    I don't. | 12:55:35 |
| 9 |         Q.    Did you discuss this document with anyone | 12:55:36 |
| 10 | other than Carolyn Olson? | 12:55:48 |
| 11 |         A.    With Dentons. | 12:55:55 |
| 12 |         Q.    Okay.  So Exhibit 8, other than with | 12:55:59 |
| 13 | Dentons or with Carolyn Olson, did you discuss it | 12:56:03 |
| 14 | with anyone else? | 12:56:06 |
| 15 |         A.    No.  Not that I recall. | 12:56:06 |
| 16 |         Q.    When you received this document, were you | 12:56:08 |
| 17 | aware that the findings in the document had been | 12:56:17 |
| 18 | reversed? | 12:56:20 |
| 19 |         A.    I'm not aware of that. | 12:56:21 |
| 20 |         Q.    You're not aware of that even as of today? | 12:56:25 |
| 21 |         A.    Yes. | 12:56:32 |
| 22 |         Q.    Did you have any idea where the document | 12:56:32 |
| 23 | came from other than with respect to the box of | 12:56:39 |
| 24 | documents? | 12:56:43 |
| 25 |         A.    I can't answer that without going into | 12:56:44 |

Page 124

| | | |
|---|---|---|
| 1 | what my client shared. | 12:56:50 |
| 2 | Q.    So the only -- your only understanding of | 12:56:52 |
| 3 | where this document came from is based on what your | 12:56:56 |
| 4 | client told you? | 12:56:59 |
| 5 | A.    Yes. | 12:57:00 |
| 6 | Q.    Did you have an understanding this was a | 12:57:06 |
| 7 | confidential document? | 12:57:07 |
| 8 | MS. VAUGHN:  Assumes facts not in | 12:57:14 |
| 9 | evidence. | 12:57:15 |
| 10 | MS. PORTER:  I'm going to again object to | 12:57:18 |
| 11 | any understanding to the extent that it derives from | 12:57:21 |
| 12 | communication with your client.  But apart from that, | 12:57:25 |
| 13 | please answer. | 12:57:31 |
| 14 | THE WITNESS:  Could we take a short break? | 12:57:32 |
| 15 | I have a question on the objection. | 12:57:35 |
| 16 | MS. PORTER:  Okay.  Since it's for the | 12:57:38 |
| 17 | purpose of assessing privilege, I think we are | 12:57:40 |
| 18 | entitled to do that. | 12:57:42 |
| 19 | MR. MORTENSEN:  We'll take a break. | 12:57:43 |
| 20 | VIDEOGRAPHER:  Off the record, 12:57. | 12:57:44 |
| 21 | (Break taken from 12:57 to 1:01 p.m.) | 12:57:47 |
| 22 | VIDEOGRAPHER:  Back on the record at 1:01. | 13:01:40 |
| 23 | MS. PORTER:  Could we have the last | 13:01:43 |
| 24 | question back, please. | 13:01:44 |
| 25 | THE REPORTER:  "Did you have an | 13:01:45 |

Page 125

| | | |
|---|---|---|
| 1 | understanding this was a confidential document?" | 12:57:06 |
| 2 | MR. MORTENSEN: It should be that this was | 13:01:57 |
| 3 | a confidential document. But anyway. | 13:01:59 |
| 4 | Q. (BY MR. MORTENSEN) Let's go ahead. I'll | 13:01:59 |
| 5 | ask the question again. Did you have an | 13:02:02 |
| 6 | understanding that Exhibit 8 was a confidential | 13:02:03 |
| 7 | document? | 13:02:06 |
| 8 | MS. VAUGHN: Assumes facts not in | 13:02:07 |
| 9 | evidence. | 13:02:09 |
| 10 | MS. PORTER: I am going to instruct her | 13:02:10 |
| 11 | not to answer because the -- it implicates | 13:02:11 |
| 12 | attorney/client privilege. Even just the yes or no | 13:02:14 |
| 13 | part for the reasons I discussed earlier. | 13:02:19 |
| 14 | Q. (BY MR. MORTENSEN) So your only | 13:02:21 |
| 15 | understanding as to whether this document is | 13:02:22 |
| 16 | confidential or not is based on something that was | 13:02:25 |
| 17 | told to you by Carolyn Olson; is that correct? | 13:02:26 |
| 18 | MS. PORTER: I think he's entitled to | 13:02:32 |
| 19 | know. | 13:02:34 |
| 20 | THE WITNESS: Okay. My answer is no. | 13:02:34 |
| 21 | Q. (BY MR. MORTENSEN) Okay. So there is | 13:02:35 |
| 22 | another basis for your understanding as to whether | 13:02:37 |
| 23 | this is confidential. What is the other basis? | 13:02:39 |
| 24 | A. Can I answer that? | 13:02:42 |
| 25 | MS. PORTER: Yeah, I think you can. I | 13:02:49 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

| | | |
|---|---|---|
| 1 | think he's entitled to that, but I don't think you go | 13:02:53 |
| 2 | any further. | 13:02:55 |
| 3 | THE WITNESS:  Okay.  Through conversations | 13:02:56 |
| 4 | with Canadian lawyer, "s," plural. | 13:02:57 |
| 5 | Q.   (BY MR. MORTENSEN)  Okay.  Let me see if I | 13:03:03 |
| 6 | can parse this out.  Your understanding as to the | 13:03:05 |
| 7 | confidentiality of this document is based on two | 13:03:09 |
| 8 | things:  Communications with Carol Carolyn Olson and | 13:03:12 |
| 9 | Canadian lawyers at Dentons? | 13:03:16 |
| 10 | A.   Yes. | 13:03:19 |
| 11 | Q.   Okay.  When did you have the | 13:03:21 |
| 12 | communications with Carolyn Olson about whether or | 13:03:26 |
| 13 | not this document was confidential? | 13:03:29 |
| 14 | A.   I don't remember that, but I just want to | 13:03:31 |
| 15 | be careful as to -- | 13:03:40 |
| 16 | MS. PORTER:  The question does incorporate | 13:03:43 |
| 17 | the subject of the discussion. | 13:03:44 |
| 18 | MR. MORTENSEN:  That's why I said whether | 13:03:46 |
| 19 | or not as opposed to -- and I didn't make an opinion | 13:03:48 |
| 20 | as to the actual answer. | 13:03:50 |
| 21 | MS. PORTER:  Yes.  I did appreciate the | 13:03:53 |
| 22 | wording on that.  But it's still a very narrow | 13:03:56 |
| 23 | subject. | 13:04:00 |
| 24 | MR. MORTENSEN:  Well, Ms. Porter, she's | 13:04:01 |
| 25 | already told that her understanding of whether or not | 13:04:04 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

# EXHIBIT P

# Filed Under Seal





OL PRIVATE COUNSEL-EPHRAIM OLSON 2519



2

CONFIDENTIAL OL PRIVATE COUNSEL-EPHRAIM OLSON 2520



3

OL PRIVATE COUNSEL-EPHRAIM OLSON 2521



4

 OL PRIVATE COUNSEL-EPHRAIM OLSON 2522



5

OL PRIVATE COUNSEL-EPHRAIM OLSON 2523



6

CONFIDENTIAL

OL PRIVATE COUNSEL-EPHRAIM OLSON 2524



7

CONFIDENTIAL

OL PRIVATE COUNSEL-EPHRAIM OLSON 2525



CONFIDENTIAL



9

OL PRIVATE COUNSEL-EPHRAIM OLSON 2527



10

OL PRIVATE COUNSEL-EPHRAIM OLSON 2528



11

OL PRIVATE COUNSEL-EPHRAIM OLSON 2529



CONFIDENTIAL

OL PRIVATE COUNSEL-EPHRAIM OLSON 2530



CONFIDENTIAL

OL PRIVATE COUNSEL-EPHRAIM OLSON 2531



14

OL PRIVATE COUNSEL-EPHRAIM OLSON 2532



15

OL PRIVATE COUNSEL-EPHRAIM OLSON 2533



16

OL PRIVATE COUNSEL-EPHRAIM OLSON 2534



17

CONFIDENTIAL

OL PRIVATE COUNSEL-EPHRAIM OLSON 2535



18

OL PRIVATE COUNSEL-EPHRAIM OLSON 2536



19

CONFIDENTIAL



20

OL PRIVATE COUNSEL-EPHRAIM OLSON 2538