# EXHIBIT 1

# EXHIBIT 1

```
 1        &
                    IN THE UNITED STATES DISTRICT COURT
 2
                      FOR THE CENTRAL DISTRICT OF UTAH
 3
 4        OL PRIVATE COUNSEL,      )  30(b)(6) Deposition of
          LLC, a Utah limited      )
 5        liability company,       )  OL Private Counsel, LLC
                                   )  through:
 6             Plaintiff,          )
                                   )  Thomas Olson
 7        vs.                      )
                                   )  Civil No. 2:21-CV-00455-DBB
 8        EPHRAIM OLSON, an        )
 9        individual,              )  Judge David Barlow
10                                 )  Magistrate Daphne A. Oberg
11             Defendants.         )
12
13
14
15
16                  February 15, 2023 * 9:00 a.m.
17
18                  Location:  Fabian VanCott
19               95 South State Street, Suite 2300
20                  Salt Lake City, Utah 84111
21
22
23
24                Reporter:  Diana Kent, RPR, CRR
25           Notary Public in and for the State of Utah

                                                        Page 1
```

### Page 2

```
  1         A P P E A R A N C E S
  2  FOR THE PLAINTIFF:
  3        David J. Jordan
           FOLEY & LARDNER, LLP
  4        Attorney at Law
           299 South Main Street
  5        Suite 2000
           Salt Lake City, Utah 84111
  6        Tel: (801) 401-8900
           djordan@foley.com
  7
     FOR THE DEFENDANT:
  8
           Scott M. Lilja
  9        Sarah C. Vaughn
           FABIAN VANCOTT
 10        Attorney at Law
           95 South State Street
 11        Suite 2300
           Salt Lake City, Utah 84111
 12        Tel: (801) 531-8900
           slilja@fabianvancott.com
 13        svaughn@fabianvancott.com
 14  ALSO PRESENT:
 15        Ephraim Olson
```

### Page 3

```
  1              I N D E X
  2  THOMAS OLSON - OL PRIVATE COUNSEL 30(B)(6)     PAGE
  3  Examination By Ms. Vaughn                8
  4
  5
  6          E X H I B I T S
  7  NUMBER        DESCRIPTION            PAGE
  8  Exhibit 1   Notice of 30(b)(6) Deposition of    10
              OL Private Counsel, LLC
  9
     Exhibit 2   Utah Business Search for OL         13
 10           Private Counsel, LLC
 11  Exhibit 3   State of Utah Articles of           14
              Organization for Thomas Olson, LLC
 12
     Exhibit 4   State of Utah Articles of Amendment  15
 13           to Articles of Organization for
              Thomas Olson, LLC
 14
     Exhibit 5   Response to Defendant's Third,      21
 15           Fourth, and Fifth Set of
              Discovery Requests
 16
     Exhibit 6   Services Agreement dated October    23
 17           1, 2020
 18  Exhibit 7   Services Agreement dated September  26
              1, 2012 between PTE and OLPC, LLC
 19
     Exhibit 8   Services Agreement dated September  32
 20           1, 2012 between OLPCCI and PTE
 21  Exhibit 9   Plaintiff OL Private Counsel,       51
              LLC's Supplemental Response to
 22           Defendant's First and Second Set
              of Discovery Requests
 23
     Exhibit 10  Information from Volta Data         65
 24           Centers, with cover e-mail dated
              2-27-19, re: SAL Audit E-mail
 25  (Continued)
```

### Page 4

```
  1          E X H I B I T S
  2  NUMBER        DESCRIPTION            PAGE
  3  Exhibit 11  Plaintiff OL Private Counsel,       69
              LLC's Second Supplemental
  4           Response to Defendant's First and
              Second Set of Discovery Requests
  5
     Exhibit 12  Summary of Trust Information        72
  6
     Exhibit 13  The CO Spousal Trust dated          78
  7           February 2, 2000
  8  Exhibit 14  Settlement dated March 15, 2005     81
              between Bruce Lemons and Bruce
  9           Lemons
 10  Exhibit 15  Trust Settlement dated January 4,   84
              1993 between Thomas H. And
 11           Carolyn R. W. Olsen and Jack H.
              Olson
 12
     Exhibit 16  Settlement dated March 15, 2005     85
 13           between Thomas Olson and Bruce
              Lemons
 14
     Exhibit 17  Settlement document dated July      87
 15           31, 2006 between Marlene Olson
              and Carolyn R.W. Olson
 16
     Exhibit 18  Settlement dated September 28,      88
 17           2004 between Bruce Lemons and
              1030911 Alberta Ltd.
 18
     Exhibit 19  Trust Settlement dated February     91
 19           28, 2992 between Ruth T. Doxey
              and Carolyn R.W. Olson and Jack
 20           H. Olson
 21  Exhibit 20  Resolution of the Trustee of        98
              Olson Manitoba Conservation Trust
 22
     Exhibit 21  The William Bell Hardy Trust        100
 23           dated September 1, 2001
 24  Exhibit 22  OL Private Counsel PTE. LTD         101
              Directors' Resolutions in Writing
 25  (Continued)
```

### Page 5

```
  1          E X H I B I T S
  2  NUMBER        DESCRIPTION            PAGE
  3  Exhibit 23  Documents relating to OL Private   103
              Counsel PTE. LTD.
  4
     Exhibit 24  Information from the Utah State    107
  5           Bar website on Seth Daniels
  6  Exhibit 25  Re: Velocity Closing Instruction   108
              Letter with cover e-mail
  7
     Exhibit 26  Screenshot of e-mail from          112
  8           Vladimir Cabiagao to Sam dated
              April 24, with cover e-mail from
  9           Timothy Akarapanish
 10  Exhibit 27  Handwritten notes by Ephraim Olson  113
 11  Exhibit 28  Handwritten notes by Ephraim Olson  117
 12  Exhibit 29  Copies from "Box of Documents"     117
              with CD Titles "Olson Trust
 13           Settlements"
 14  Exhibit 30  Tables created by Salt Lake Legal, 128
              representing scanned documents
 15
     Exhibit 31  Assessment After Normal            136
 16           (Re)Assessment Period,
              Recommendation Report
 17
     Exhibit 32  Stipulation and Settlement         141
 18           Agreement, with cover e-mail
              dated 3-7-2019
 19
     Exhibit 33  1099 for Carolyn Olson for 2018    143
 20           from OL Private Counsel, LLC
 21  Exhibit 34  Stipulation and Settlement         147
              Agreement, with cover e-mail from
 22           Hyrum Olson dated 5-24-1029
 23  Exhibit 35  Article of Incorporation of        151
              Whitehall Law, Inc.
 24
     Exhibit 36  Stipulation and Settlement Agreement 152
 25           with cover e-mail dated 10-1-2018
     (Continued)
```

| | E X H I B I T S | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| Exhibit 37 | Stipulation and Settlement Agreement with cover e-mail dated 1-10-2019 | 153 |
| Exhibit 38 | Employment Agreement between OL Private Counsel, Ltd. And Thonggrachang Akarapanich, dated December 9, 2016 | 178 |
| Exhibit 39 | Employment Agreement between OL Private Counsel, Ltd. And Thonggrachang Akarapanich, dated July 1, 2017 | 179 |
| Exhibit 40 | Employment Agreement between OL Private Counsel, Ltd. And Thonggrachang Akarapanich dated April 1, 2018 | 179 |
| Exhibit 41 | Letter written in Thai signed by Timothy Akarapanich | 179 |
| Exhibit 42 | Employment Agreement between International Tax Counsel, Ltd and Thonggrachang T. Akarapanich dated September 1, 2019 | 181 |
| Exhibit 43 | Employment Certificate dated May 16, 2020 signed by Jaturong Chuithong | 181 |
| Exhibit 44 | May 14, 2020 e-mail from Timothy Akarapanich re: Resignation Letter | 183 |
| Exhibit 45 | Communications between Thomas Olson and Tim Akarapanich | 183 |
| Exhibit 46 | 6-6-20 e-mail from Timothy Akarapanich to Joshua Olson | 194 |
| Exhibit 47 | 6-6-2020 e-mail from Timothy Akarapanich to Joshua Olson | 194 |

(Continued)

Page 6

| | E X H I B I T S | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| Exhibit 48 | 6-6-2020 e-mail from Timothy Akarapanich to Joshua Olson with Screenshot of communication re: Velocity Closing Instruction Letter | 195 |
| Exhibit 49 | 6-6-2020 e-mail from Timothy Akarapanich to Joshua Olson with attached screenshot of e-mail from Vladimir Cabigao | 196 |
| Exhibit 50 | 6-6-2020 e-mail from Timothy Akarapanich to Joshua Olson | 201 |
| Exhibit 51 | Communications between Thomas Olson and Timothy Akarapanich | 202 |
| Exhibit 52 | Declaration of Timothy Akarapanich | 203 |
| Exhibit 53 | October 28, 2020 e-mail from Timothy Akarapanich to Thomas Olson re: Telegram | 205 |
| Exhibit 54 | Communications between Timothy Akarapanich and Thomas Olson | 212 |
| Exhibit 55 | Billings from Peacock Linder Halt & Mack | 219 |
| Exhibit 56 | e-mail thread dated October 27-28, 2020 re: Documents, with attachments | 224 |
| Exhibit 57 | Declaration of Timothy Akarapanich | 239 |
| Exhibit 58 | Line chat history between Tim A. And Thomas Olson | 239 |

Page 7

P R O C E E D I N G S

Thomas Olson,
called as a witness, being first duly sworn,
was examined and testified as follows:

EXAMINATION
BY MS. VAUGHN:
Q. Mr. Olson, my name is Sarah Vaughn. As you know, I represent your son in this litigation. Can you please state your name and title for the record.
A. My name is Thomas Howard Olson.
Q. And what is your title with OLPC?
A. I am the owner of OLPC.
Q. Okay. What is your current address?
A. 7 South Sathorn, Bangkok, Thailand.
Q. Are there any other addresses that you maintain?
A. Addresses meaning?
Q. Residences.
A. Places I stay?
Q. Yes.
A. I sometimes stay in Chang Mai, when I'm there on business. Sometimes stay in Pine River when I'm there on business. And I sometimes stay in London

Page 8

when I'm on business.
Q. Do you maintain residences in any of those locations?
A. What do you mean by "residences"?
Q. Do you have a home?
A. Do I have a home? No.
Q. You are the owner of OLPC and that refers to OL Private Counsel, the Utah entity.
A. LLC, yes.
Q. And that is the Utah entity in this litigation; is that right?
A. Yes.
Q. Okay. What is your title with OL Private Corporate Counsel International, LTD?
A. I am director.
Q. Okay. What is your title with International Tax Counsel?
A. I am -- I don't recall exactly what my title is.
Q. Okay. Did you establish International Tax Counsel?
A. I did not establish it.
Q. Who did?
A. Joshua.
Q. Is that your son, Joshua Olson?

Page 9

3 (Pages 6 - 9)

## Page 10

1  A. Olson.
2  Q. What is your title with International
3 Commercial Services?
4  A. I have no title with that.
5  Q. Okay. And what is your title with OL
6 Private Counsel PTE, LTD.?
7  A. I'm a director.
8  Q. Okay.
9     (EXHIBIT 1 WAS MARKED.)
10  Q. Have you seen this document before,
11 Mr. Olson?
12  A. Yes.
13  Q. Okay. And you understand that you are
14 here today to testify on behalf of OL Private Counsel,
15 LLC?
16  A. Yes.
17  Q. And you understand that you are designated
18 to testify as to the topics on pages 4 through 6?
19  A. Yes.
20  Q. And you understand you had a duty to
21 prepare for this deposition?
22  A. Yes.
23  Q. Okay. What did you do to -- well, back
24 up. When did OLPC determine that you would be the
25 corporate designee for this deposition?

## Page 11

1  A. I don't recall the exact date. I don't
2 know the date.
3  Q. When were you told that you would be the
4 corporate designee?
5  A. That would be some time ago.
6  Q. Okay. What did you do to prepare for the
7 deposition today?
8  A. I reviewed the interrogatories, the
9 document requests, something else. There's three
10 things. I forget the third thing. And then I looked
11 at -- what's that called?
12  Q. When did you prepare for this deposition?
13  A. During the last few days.
14  Q. Okay. So do you remember what else you
15 looked at besides the written discovery? Is that a no?
16  A. I'm thinking --
17  Q. Okay.
18  A. -- what documents I looked at.
19     I think there was some other documents. I
20 just don't recall all the documents I looked at.
21     I remember one. I looked at the
22 employment contract for Tim and an employment contract
23 for one of the Canadians who worked for the firm.
24  Q. Who was that?
25  A. I don't recall his name as I sit here

## Page 12

1 right now, but one of the contractors in Canada.
2  Q. Who were they a contractor for?
3  A. For OL Private Counsel Private Limited.
4  Q. Is that OL Private Counsel PTE, LTD?
5  A. It is.
6  Q. Any other documents that you recall
7 looking at in preparation for today's deposition?
8  A. I suspect there are others. I just don't
9 recall specific documents right now.
10  Q. Okay. Did you speak to anybody besides
11 your lawyer in preparing for today's deposition?
12  A. I did.
13  Q. Who?
14  A. I spoke with Hyrum Olson and Joshua Olson.
15  Q. When did you speak to them?
16  A. I have spoken to them several times over
17 the last --
18  Q. All in preparation for this deposition?
19  A. Well, I spoke to them about other matters,
20 but I also spoke to them in connection with this
21 deposition.
22  Q. What did you speak to them about?
23  A. About some of the searches that were done
24 and so on and so forth.
25  Q. Searches for document production?

## Page 13

1  A. That's correct.
2  Q. Did you speak to any other employees of
3 OLPC?
4  A. No.
5  Q. What about any employees of OLPCCIL?
6  A. No.
7  Q. ITC?
8  A. No.
9  Q. ICS?
10  A. Well, Joshua is an employee of ITC. So to
11 clarify, he is an employee of ITC.
12  Q. What about ICS?
13  A. No.
14  Q. What about any employees of OL Private
15 Counsel PTE, LTD?
16  A. No.
17  Q. Okay. When was the corporate structure of
18 OLPC established?
19  A. I don't recall the exact date.
20  Q. Okay. We'll mark Exhibit 2.
21     (EXHIBIT 2 WAS MARKED.)
22  Q. Mr. Olson I'll represent to you that this
23 is from Utah's government website, a business entity
24 search that I did yesterday. No, this is one that we
25 did on March 16th of 2021. Do you see here that the

```
 1    A.   Those are old records. I would have to --
 2  a person would have to go back and see the payments and
 3  when they were paid and how they were charged. They
 4  would be charged -- they could have come from various
 5  entities charged back to the family plan.
 6    Q.   And are those payments logged at the time
 7  they are made?
 8    A.   "Logged" meaning?
 9    Q.   Contemporaneous with when the payments are
10  made.
11    A.   Well, there would be a check, if that's
12  what you mean, or a wire.
13    Q.   And what was the nature of Ephraim's
14  employment at OLPC?
15    A.   He was engaged when he was -- when he was
16  admitted to the Bar, he was engaged as a lawyer.
17    Q.   Did he ever sign an employment agreement?
18    A.   Not that we have found to date.
19    Q.   Did OLPC keep an employment file for
20  Ephraim?
21    A.   Ephraim was managing that, and we have
22  seen no employment file for Ephraim.
23    Q.   Does OLPC keep employment files on other
24  employees?
25    A.   What does "an employment file" mean?
                                                  Page 62
```

```
 1    Q.   A file where you keep relevant documents
 2  like an employment agreement, any discipline, W-2
 3  history, things like that.
 4    A.   I don't know that that would be a
 5  particular file, but W-2 history would be kept
 6  somewhere. I'm not aware of any discipline.
 7  Contracts, when they are forwarded to the head office,
 8  forwarded to Bangkok, are recorded electronically. So
 9  there's a place to record electronically contracts. If
10  it's not forwarded there, it would be -- I don't know
11  where it would be. I would doubt there would be any
12  physical files, like file folders, that I'm aware of.
13    Q.   Okay. So OLPC maintains all of its
14  records electronically?
15    A.   They were supposed to be -- as a general
16  rule they are supposed to be maintained electronically.
17    Q.   But OLPC doesn't have a document
18  management system, right?
19    A.   No.
20    Q.   So where were they maintained
21  electronically?
22    A.   They would be on the remote server.
23    Q.   For OLPCCIL?
24    A.   Yes.
25    Q.   And you have no record of an employment
                                                  Page 63
```

```
 1  agreement for Ephraim?
 2    A.   Not that we have found.
 3    Q.   Okay. How was Ephraim paid for his work?
 4    A.   Salary, I believe, W-2.
 5    Q.   What was his salary?
 6    A.   It varied. When he first came, it was
 7  sort of equivalent -- I believe it was in the thirties,
 8  $30,000 to $40,000 range. And then it was raised at
 9  some later date.
10    Q.   Were there any documents evidencing the
11  changes for that change in salary?
12    A.   It would be the W-2s. I mean the W-2s
13  would show that.
14    Q.   Any documents showing why the change was
15  made?
16    A.   Not that I'm aware of.
17    Q.   Okay. When did Ephraim gain access to the
18  OLPCCIL server?
19    A.   I don't recall the date on which he would
20  have gained access to the server.
21    Q.   Okay. And would Ephraim have had access
22  to the entire server or just specific files?
23    A.   Ephraim would have had access to most of
24  the server, perhaps all the server. People in whom we
25  reposed the highest confidence and who would
                                                  Page 64
```

```
 1  occasionally deal with management type issues would
 2  typically have broad access to the file, to the server.
 3         (EXHIBIT 10 WAS MARKED.)
 4         MS. VAUGHN: I'll represent to counsel,
 5  you'll note that the Bates number here has a ".01." Do
 6  you see that, David?
 7         MR. JORDAN: I do.
 8         MS. VAUGHN: That is because -- and I'm
 9  not sure how we transmitted the files to you, if you
10  had natives. But the image that was uploaded to our
11  document review file cut off some of the information.
12  So we went back to the native and printed it as this
13  version. That's why it has the ".01." So if you have
14  concerns about that, let me know. I think we provided
15  natives in our production. I'm not sure. But I just
16  wanted to get that out there.
17    Q.   (By Ms. Vaughn) Mr. Olson, this is an
18  e-mail that was sent from Volta Data Centers to various
19  individuals, mostly just Joshua, Hyrum, and Ephraim.
20  Do you see that?
21    A.   I see that.
22    Q.   Okay. Is Volta Data Centers the company
23  that maintains the physical server for OLPCCIL?
24    A.   During the time in question, yes.
25    Q.   Okay. Why are -- do you know why Volta
                                                  Page 65
```

### Page 66

1  Data Centers is e-mailing people at olsonlemons.com,
2  iCloud accounts, or gMail accounts?
3     A.   I have no idea.
4     Q.   Okay.  Can you please --
5          You'll see the original, David, as the
6  third page.
7          Could you please turn to the last page of
8  this Exhibit 10.  This is a security access list from
9  Volta Data Centers to the company International
10 Commercial Services, LTD.  Do you see that?
11    A.   I see that.
12    Q.   I believe you testified earlier that it's
13 OLPCCIL that has the contract with Volta.  Does this
14 refresh your memory that it could be ICS instead?
15    A.   ICS, being done on behalf of OLPCCIL.  But
16 OLPCCI paid all the fees and so on.  So I'm not sure
17 why that's listed there.  But OLPCCI was responsible
18 for it.  So why the holding company -- I would only
19 speculate as to why that might or how they might have
20 that name on there.
21    Q.   Okay.  And do you see that as of the date
22 of this e-mail, February 27, 2019, Ephraim Olson, line
23 3 on this table, had all levels of access to this
24 server?  Do you see that?
25    A.   I don't see where it says that.

### Page 67

1     Q.   I can provide some additional context for
2  you, Mr. Olson.  On the prior page it defines what List
3  Owners, Portal Users, and Fast Track Users are.
4     A.   Okay.  May I take this document apart?
5     Q.   You can.  We will have to make sure it
6  gets put back in the correct --
7     A.   I'm trying to read this at the same time.
8          MR. JORDAN:  Don't.  You can use mine to
9  look at, but don't take the exhibits apart.
10         Why don't we take a break.
11         (Break taken from 11:00 to 11:04 a.m.)
12    Q.   Mr. Olson, have you had a chance to review
13 this document?
14    A.   I'm in the process of doing it right now.
15    Q.   Okay.
16    A.   I don't know exactly what this means but,
17 Ephraim is checked off as a list owner, a portal user,
18 and a fast track user.
19    Q.   Okay.
20    A.   But it says -- it talks about various
21 responsibilities.  My understanding was he had access
22 to all or substantially all of the system.  I don't see
23 that it says that here, necessarily, but that may well
24 be the -- but that was my understanding generally, that
25 he had access to substantially all of the system.

### Page 68

1     Q.   Okay.  Do you see that it listed him as a
2  manager under Job Title?
3     A.   I see that.
4     Q.   Okay.  Is that a manager of ICS?
5     A.   I don't know where those names came from,
6  why they were put there.
7     Q.   Okay.  Would they have come from Joshua
8  Olson, who is the list owner?
9          MR. JORDAN:  Objection.  Calls for
10 speculation.
11    A.   I don't know where those names come from.
12    Q.   Okay.  Do you know if the security access
13 list has ever been amended or updated?
14    A.   I suspect it has been, during the time in
15 question, 2018 to 2020.  I suspect it has been changed
16 but I don't know that for sure.
17    Q.   And would those changes have been
18 documented?
19    A.   If they were changed, I suspect there
20 would be some kind of communication, whether oral or
21 written, I don't know, between somebody, Mike Gedlaman
22 or Joshua or somebody and Volta.
23         I can't speculate as to how changes were
24 made, if they were made internally by, say, one of the
25 IT experts internally.  I don't know that.  I don't

### Page 69

1  know if Volta had to be involved in that.  I don't know
2  that.
3     Q.   Okay.  Does Olson Lemons have access to
4  the OLPCCIL server?
5     A.   No.
6     Q.   Okay.  Do you know why Volta would be
7  e-mailing individuals at an Olson Lemons e-mail account
8  if they should not be accessing that server?
9     A.   That was just an old e-mail address that
10 forwarded to OL Tax.
11    Q.   Okay.
12         (EXHIBIT 11 WAS MARKED.)
13    Q.   Mr. Olson, this is another one of OLPC's
14 responses to written discovery.  For now, and you are
15 free to look at the whole thing, but I am particularly
16 interested in Exhibit 1 to this document, which is the
17 last four pages.
18         Have you seen this document before?
19    A.   I have seen this before.
20    Q.   Okay.  Did you help prepare the document?
21    A.   No.  It was prepared by those much smarter
22 than I.
23    Q.   Who was it prepared by?
24    A.   I believe it was prepared by someone in --
25 some of the IT experts.

Page 70

1  Q. Do you know their names?
2  A. No, I don't know the name of the person or
3 persons who assembled this information for me.
4  Q. Okay. Do you know the source material for
5 the columns?
6  A. This would have been -- it would have been
7 off the computer record, but I'm not sure exactly what
8 portion of the computer record would have this.
9  Q. Okay. If you could turn to the last page.
10 Just above the mid-point of the document you see an
11 entry for OL Private Counsel Ephraim Olson. Do you see
12 that?
13  A. I see that.
14  Q. Okay. And this document purports to
15 represent that his access to the server started prior
16 to January 1, 2018. Do you see that?
17  A. I see that.
18  Q. Do you know the date that that access
19 started?
20  A. I think I mentioned earlier, I don't know
21 when he first got access to the servers.
22  Q. Okay. And it says that the access to the
23 server ended on September 1, 2019. Do you see that?
24  A. I see that.
25  Q. Where did that date come from?

Page 71

1  A. It came from the computer logs, I assume,
2 that they gathered, whatever computer records they had
3 to gather to demonstrate this.
4  Q. So you think there are documents that back
5 up this table?
6  A. I assume there's some kind of a computer
7 log that shows that.
8  Q. Okay. And then it says he had access to
9 client files on matters for which the individual was
10 performing those services. Do you see that?
11  A. I see that.
12  Q. It says that for everyone; is that correct?
13  A. Right.
14  Q. Okay. Where does that information come
15 from?
16  A. That would be on some kind of a computer
17 record that showed accesses to -- showing that -- that
18 phrase refers to, as I -- I can't say. Those are not
19 my words, so I believe it just means -- I'm
20 speculating.
21  Q. Do you know whose words they are?
22  A. That would either be the words that come
23 off the computer, or the words that some IT person
24 would have put in there.
25  Q. Okay. So again, you think that there are

Page 72

1 documents which would support the information in the
2 last column of this table?
3  A. There would be some kind of computer
4 record, I assume, that would show that. I'm assuming
5 that.
6  Q. Okay. The allegations in this case,
7 Mr. Olson, and I am paraphrasing here, I realize this
8 will not be correct, but are generally that Ephraim
9 Olson improperly obtained access to OLPC's private
10 confidential information. Is that your understanding
11 of the general nature of this lawsuit?
12      MR. JORDAN: Objection. Misstates the
13 pleadings.
14  A. Got access to documents, yes. He got
15 access to documents to which he wasn't entitled to get.
16  Q. Okay. Let's go through those documents.
17      (EXHIBIT 12 WAS MARKED.)
18  Q. Mr. Olson, do you recognize this document?
19  A. I do recognize the document, yes.
20  Q. What is it?
21  A. It looks like it's a summary of trusts
22 with some information, well, it speaks for itself, but
23 summarizing information about the trust.
24  Q. Who created this document?
25  A. It would have been created by one of the

Page 73

1 lawyers.
2  Q. For which entity?
3  A. Well, one of the lawyers for the firm
4 would have summarized this for all of the trusts.
5  Q. And what firm are you talking about?
6  A. Well, this would have probably been done
7 in ITCL, but it could have been prepared somewhere
8 else. But probably ITCL.
9  Q. Okay. Do you know when it was created?
10  A. I don't know the date it was created.
11  Q. Was it created for OLPC?
12  A. It was created for use by any lawyers that
13 had need to look at this information.
14  Q. And who did those lawyers -- what entity
15 did those lawyers work for?
16  A. They could have worked for or could have
17 been contractors with OLPTE, ICL, they could have been
18 any of the contractors that had a need to go through
19 this particular information on a client, on a trust.
20  Q. Does this document -- to which client does
21 this document refer, the individual or the -- yeah, to
22 which client does this document refer?
23  A. Sorry?
24  Q. Does this document refer to a specific
25 client of OLPCCIL?

1 fact that all of our previous thinking and what we had
2 thought about in previous drafts, including all the
3 changes that were sent prior to sending a final offer,
4 affected our ability to be able to close a settlement
5 with Carolyn because of the fact they saw that we
6 thought about other things, and perhaps thought about
7 paying more money and so on and so forth at previous
8 times.
9    Q.   Does OLPC still represent you in the
10 divorce?
11    A.   It does.
12    Q.   By who?  Who is the lawyer?
13    A.   OLPC has engaged -- well, put it this way:
14 Tom Burns is my lawyer here, but it continues to
15 provide services to Tom Burns in connection with the
16 divorce.
17    Q.   Who is the lawyer that provides those
18 services?
19    A.   Well, there are several of them.
20    Q.   Who are they?
21    A.   Names of the lawyers?
22    Q.   Yeah.
23    A.   That would include Hyrum.
24    Q.   I didn't think he worked for OLPC anymore.
25 I thought you said he works for OLPCCIL.

Page 162

1    A.   He gets paid -- everybody gets paid by
2 OLPCCI indirectly.  PCCI pays all the contractors,
3 either through PTE or through OLPC or some other
4 entity.
5    Q.   Okay.  So is it OLPCCIL that has incurred
6 damages as a result of the sharing of these documents,
7 or is it OLPC?
8    A.   OLPC is going to be having to pay for all
9 of those damages.
10    Q.   Okay.  And where --
11    A.   It's going to get a bill for the services.
12    Q.   And where are those bills?  Do they exist
13 today?
14    A.   No.  When the work is all done and tallied
15 up, they will be billed.
16    Q.   Are you talking about your legal fees in
17 this case?
18    A.   I'm talking about any costs incurred by
19 OLPC in connection with having to resolve the problems
20 caused by these improper disclosures.
21    Q.   And to date, what are those costs?
22    A.   I don't know what they are.  We will know
23 them when we are finished.  We are only part way
24 through this.
25    Q.   And how are you going to calculate those

Page 163

1 costs?  What are you going to use?
2    A.   It's going to be the way we calculate all
3 fees.
4    Q.   Whose fees are you calculating?  Like,
5 you're going to get a document -- you are going to get
6 a document from David, you are going to get presumably
7 a document from whatever lawyer works for OLPC.  What
8 documents are you going to use to calculate those
9 damages?
10         MR. JORDAN:  Objection.  Calls for
11 speculation.
12    A.   That will be determined at some later
13 date.
14    Q.   Okay.  What is your method of calculating
15 those damages?
16    A.   One of the methods is trying to determine
17 the time spent and what it was --
18    Q.   The time spent by whom?  That's what I'm
19 trying to get at.  Whose legal fees?
20    A.   By anybody in the organization who was
21 required to work to solve the problems caused by the
22 disclosure of information by OLPC.
23    Q.   Okay.  And is the allegation that the
24 divorce settlement fell apart because of these sharing
25 of these documents?  Because you're getting a divorce

Page 164

1 no matter what, right?  So you are incurring fees for
2 your divorce no matter what.  So help me explain the
3 difference.  Where do the increased costs come from?
4    A.   The increased --
5         MR. JORDAN:  Objection.  Asked and
6 answered.
7    A.   The increased costs come from -- I have
8 already talked about a lot of these things, so if you'd
9 like me to review them I can review them ad seriatim.
10 We talked about a settlement.  We understood it was
11 acceptable, and then documents start going out, then
12 it's not acceptable anymore.  Then a divorce is finally
13 filed, after two settlement proposals are made.
14    Q.   Who filed the divorce?
15    A.   I filed the divorce.
16    Q.   Okay.  Continue.
17    A.   And in the counter petition, information
18 that came from the other breaches here show up in the
19 counter petition.  That information was confidential,
20 it shows up in the counter petition and then all of the
21 sudden the Mareva injunction and in a stipulation and
22 in an alimony order and in a whole bunch of other
23 places.  All this information all starts to percolate
24 up, causing tremendous harm and damage that OLPC has to
25 go -- OLPCCI is required now to fix and charge back to

Page 165

42 (Pages 162 - 165)

1  Q.  Ephraim Olson.
2  A.  Yes, converted a bunch of documents and
3 confidential information. OLPCCI, the law firm, is
4 required to spend a bunch of time to help undo that
5 damage.
6  Q.  And what is that damage?
7  A.  I have already told you that. The damage
8 is the Mareva injunction was brought against me, and
9 I'm a client that suffered as a result of the
10 impairment, as well as other legal entities, and other
11 lawsuits.
12  Q.  Okay. So the damage is the lawsuits.
13  A.  The damage is the work that PCCIL has to
14 do to help deal with the damage followed from the
15 lawsuits.
16  Q.  Okay. How does that damage get transferred
17 to OLPC?
18  A.  It's going to get billed for all that work
19 and all the -- because OLPCCIL has only its time to
20 offer to provide its services to its clients. And now
21 it's providing for a bunch of unbilled time and a bunch
22 of time that it is going to have to spend to solve
23 problems created by these defalcations.
24  Q.  So the damage are the legal fees that
25 OLPCCIL will incur in those lawsuits?

Page 170

1  A.  It won't be just legal fees. There's
2 accounting fees. There will be lots of other kinds of
3 service fees. IT fees and so on and so forth.
4  Q.  But they are the fees that OLPCCIL will
5 incur related to those lawsuits; is that right?
6  A.  That it will incur to help right the
7 wrongs caused by the default information. That is
8 correct.
9  Q.  Okay.
10  A.  OLPC itself at this point has suffered.
11 We live in a small community. OLPC was known to many
12 of the clients in Canada. It is a small community, and
13 when things like the Mareva injunction, for example,
14 were passed out and so on, it doesn't just harm Tom
15 Olson's name. It harms the entire law firm's name.
16 Whether we can continue to use OLPC in the future is
17 under serious doubt at this point.
18  Q.  Okay.
19  A.  But that decision is not one that has yet
20 been taken on.
21  Q.  So am I correct in assuming that OLPC will
22 not be able to accurately calculate its damages in this
23 case until the divorce is finalized and all of the
24 other lawsuits are resolved? Is that right?
25  A.  No, that's not true. Because some of

Page 171

1 these matters may -- some of the issues may be
2 resolved. It's not the lawsuit itself. It's not the
3 lawsuit. Tom Burns is dealing with that. It has
4 nothing to do with that. What this has to do with is
5 the issues that arise because of the disclosure.
6  Q.  And those issues arise in the lawsuits,
7 right?
8  A.  Well, those are some of the issues in the
9 lawsuits. Not exclusively, but those are some of the
10 issues.
11  Q.  Okay.
12  A.  Those are the issues we are talking about.
13  Q.  And when will those issues be resolved?
14      MR. JORDAN: Objection. Calls for
15 speculation.
16  Q.  Will they be resolved when the lawsuits
17 are complete?
18  A.  They may be resolved before then.
19  Q.  How?
20      MR. JORDAN: Objection. Calls for
21 speculation.
22  A.  Litigation has its own ways of dealing
23 with issues. It doesn't follow a clear path always.
24  Q.  Okay. So you believe those issues could
25 be resolved even if the litigations are going forward?

Page 172

1  A.  Yeah. The issues could be.
2  Q.  Okay. And help me -- let's take a break.
3      (Break taken from 3:20 to 3:29 p.m.)
4  Q.  We talked a lot about the issues that were
5 created because of the sharing of the documents. Have
6 you identified all of those issues today?
7  A.  Can you repeat your question?
8  Q.  Yes. Have you identified all of the
9 issues created by Ephraim's alleged sharing of these
10 documents?
11  A.  "Issues" meaning the use of them, the harm
12 done?
13  Q.  The harm.
14  A.  The harm done. Yes.
15      Well, as I said, there's ongoing matters
16 of other lawsuits and stuff that, at this point, that
17 he may or may not have been involved in in passing on
18 either converted documents or related confidential
19 information.
20  Q.  Okay. And my understanding is that
21 sitting here today, you cannot quantify those damages
22 for me; is that right?
23  A.  Today I can't quantify them.
24  Q.  And my understanding is that sitting here
25 today you do not know when you will be able to quantify

Page 173

44 (Pages 170 - 173)

Page 174

1  those damages; is that right?
2      A.  No, I don't know when we be able to
3  quantify those.
4      Q.  Okay.  What are the terms of Ephraim's --
5  first, we have talked about you do not have a copy of
6  Ephraim's employment agreement; is that right?
7      A.  No.
8      Q.  No, that is correct; or no, that is not
9  right?
10      A.  I'm sorry.  I do not have a copy of his
11  employment contract.
12      Q.  Okay.  Thank you.  Do you know if an
13  employment agreement ever existed?
14      A.  A written employment -- an employment
15  agreement existed.  A written employment agreement,
16  you're asking?
17      Q.  A written employment agreement.
18      A.  I don't know the answer to that.
19      Q.  What are the terms of Ephraim's employment
20  agreement that OLPC believes his possession or sharing
21  of the documents we have gone over breached?
22      A.  It would be the keeping of confidential
23  information confidential, and returning confidential
24  documents, as well as all of the additional ethical
25  obligations that affect lawyers.

Page 175

1      Q.  Okay.  And the requirement to keep
2  confidential information confidential, was that a term
3  that was intended to last for more than one year?
4      A.  Well, when it comes to confidential client
5  information, that would be in perpetuity, as long as
6  it's confidential.
7      Q.  Okay.  So that's a yes?
8      A.  The answer is yes, for that kind of
9  information it would be in perpetuity.
10      Q.  Okay.  And the returning of confidential
11  information, it's my understanding that the only
12  confidential information we have gone over today that
13  Ephraim -- let me back up.
14          I think of these documents that we went
15  over today sort of as two buckets.  One is the trust
16  documents that he got from Tim A. and/or may have come
17  from the box of documents, like all those trust
18  documents.  And then I have the divorce settlement
19  documents.  Do you see that distinction that I'm
20  drawing?
21      A.  Yes, I do.
22      Q.  Okay.  And you said that you believed
23  Ephraim breached the requirement of returning
24  confidential information.
25      A.  Yes.

Page 176

1      Q.  It is my understanding that the trust
2  documents were all obtained post employment; is that
3  right?
4      A.  Yes.
5      Q.  Okay.  So the only documents that would
6  have fallen under that term of returning confidential
7  information are the divorce related documents; is that
8  correct?
9      A.  And the box of documents.
10      Q.  Okay.
11      A.  And his notebooks and One Note.
12      Q.  Okay.  So are you alleging today that his
13  notebooks and the One Note are OLPC's confidential
14  documents?
15      A.  Yeah.  He's got confidential information
16  that should have been returned.
17      Q.  Okay.  But you don't have any evidence
18  that those notebooks or One Note have been shared
19  and/or caused any damage to OLPC, do you?
20      A.  At this point I'm not aware of the books
21  themselves being shared, although information in there
22  may have been.  But the books themselves I'm not aware.
23      Q.  And One Note?
24      A.  Same answer.
25      Q.  Okay.  Have you ever seen the box of

Page 177

1  documents?
2      A.  The physical box or documents?
3      Q.  Yes.
4      A.  I have not.
5      Q.  Has anybody at OLPC ever seen that box of
6  documents?
7          MR. JORDAN:  Do you mean to include
8  counsel?
9          MS. VAUGHN:  No.
10      A.  I believe that Hyrum has seen some or all
11  of the documents, and I know Hyrum has gone through the
12  list of all the documents.  But as I sit here right
13  now, I can't recall if Hyrum has looked at the
14  documents or copies of those documents.  I can't say
15  that.  I don't recall.
16      Q.  All right.  When did OLPC learn that
17  Ephraim allegedly obtain the improper access to its
18  documents?
19      A.  I believe it was -- I believe it was
20  either October or November of 2020.
21      Q.  Okay.  And did that information come from
22  Tim A.?
23      A.  Pardon me?  Can you repeat the question,
24  please?
25      Q.  Did that information come from Tim A.?

```
 1              REPORTER'S CERTIFICATE
 2   STATE OF UTAH       )
                         ) ss.
 3   COUNTY OF SALT LAKE )
 4
 5        I, Diana Kent, Registered Professional
     Reporter and Notary Public in and for the State of
 6   Utah, do hereby certify:
 7        That prior to being examined, the witness,
     Thomas Olson, was by me duly sworn to tell the truth,
 8   the whole truth, and nothing but the truth;
 9        That said deposition was taken down by me
     in stenotype on February 15, 2023, at the place therein
10   named, and was thereafter transcribed and that a true
     and correct transcription of said testimony is set
11   forth in the preceding pages;
12        I further certify that, in accordance with
     Rule 30(e), a request having been made to review the
13   transcript, a reading copy was sent to Attorney David
     Jordan for the witness to read and sign, and the
14   original transcript will be delivered to Attorney Sarah
     Vaughn for safekeeping.
15
          I further certify that I am not kin or
16   otherwise associated with any of the parties to said
     cause of action and that I am not interested in the
17   outcome thereof.
18        WITNESS MY HAND AND OFFICIAL SEAL this
     22nd day of February, 2023.
19
20
21
22
           [signature: Diana Kent]
23
           Diana Kent, RPR, CRR
24         Notary Public
           Residing in Salt Lake County
25
                                                   Page 250
```

```
 1  Case:  OL Private Counsel v. Ephraim Olson
    Case No.:  2:21-CV-00455-DBB's
 2  Reporter:  Diana Kent
    Date taken:  February 15, 2023
 3
                WITNESS CERTIFICATE
 4
         I, THOMAS OLSON, HEREBY DECLARE:
 5       That I am the witness in the foregoing
    transcript; that I have read the transcript and know
 6  the contents thereof; that with these corrections I
    have noted this transcript truly and accurately
 7  reflects my testimony.
 8  PAGE-LINE    CHANGE/CORRECTION       REASON

 9  _____  _____    _____
    _____  _____    _____
10  _____  _____    _____
    _____  _____    _____
11  _____  _____    _____
    _____  _____    _____
12  _____  _____    _____
    _____  _____    _____
13  _____  _____    _____
    _____  _____    _____
14  _____  _____    _____
    _____  _____    _____
15  _____  _____    _____
    _____  _____    _____
16  _____  _____    _____
    _____  _____    _____
17  _____  _____    _____
    _____  _____    _____
18
    _____ No corrections were made.
19
         I, THOMAS OLSON, HEREBY DECLARE UNDER THE
20  PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES
    OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE
21  FOREGOING IS TRUE AND CORRECT.
22
           _____
23
                  Thomas Olson
24
25         _____
                  Date Signed
                                                   Page 251
```