# EXHIBIT 4

# EXHIBIT 4

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE CENTRAL DISTRICT OF UTAH
 3
          OL PRIVATE COUNSEL,       )  Deposition of OL PRIVATE
 4        LLC, a Utah limited       )  COUNSEL, LLC through:
          liability company,        )
 5                                  )  Thomas Olson
               Plaintiff,           )
 6                                  )  Case No.
          vs.                       )  2:21-CV-00455-DBB
 7                                  )
          EPHRAIM OLSON, an         )  Judge:  David Barlow
 8        individual,               )
                                    )  Magistrate Judge:
 9             Defendant.           )  Daphne A. Oberg
10
11
12                   REMOTE PROCEEDING VIA ZOOM
13
14
15
16
17              March 27, 2024 * 3:00 p.m.
18
19
20
21
22
23
24             Reporter:  Diana Kent, RPR, CRR
25         Notary Public in and for the State of Utah


                                                      Page 1
```

```
                  A P P E A R A N C E S
FOR THE PLAINTIFF:
        David J. Jordan
        David Mortensen
        FOLEY & LARDNER, LLP
        Attorney at Law
        95 South State Street
        Suite 2500
        Salt Lake City, Utah  84111
        Tel: (801) 401-8900
        djordan@foley.com
        dmortensen@foley.com

FOR THE DEFENDANT:

        Sarah C. Vaughn
        FABIAN VANCOTT
        Attorney at Law
        95 South State Street
        Suite 2300
        Salt Lake City, Utah  84111
        Tel: (801) 531-8900
        svaughn@fabianvancott.com
```

Page 2

```
                    I N D E X
THOMAS OLSON                              PAGE
Examination By Ms. Vaughn                    4

                   E X H I B I T S
NUMBER        DESCRIPTION                 PAGE
Exhibit 10   February 27, 2019 e-mail thread   33
             re: SAL Audit Email, with
             attachments
Exhibit 11   Plaintiff OL Private Counsel,     35
             LLC's Second Supplemental
             Response to Defendant's First and
             Second Set of Discovery Requests

Exhibit 59   Information from Tim                7
             Akarapanich's mobile phone,
             produced by IDC forensic experts

Exhibit 60   Logs regarding Tim Akarapanich's   10
             e-mail, produced by IDC forensic
             experts
```

Page 3

```
                    P R O C E E D I N G S

                Thomas Olson,
         called as a witness, being first duly sworn,
             was examined and testified as follows:

                     EXAMINATION
BY MS. VAUGHN:
    Q.   Mr. Olson, I am Sarah Vaughn and I
represent your son, Ephraim Olson, in this litigation.
Tell me what you did to prepare -- let me back up.  You
understand you are here today to testify on behalf of
OLPC, correct?
    A.   Yes.
    Q.   What did you do to prepare to testify on
behalf of OLPC today?
    A.   I spoke with Joshua Olson, Hyrum Olson,
Narong, Crucial Logics; I met with David Jordan and
Dave Mortensen; I reviewed the judge's order; and
reviewed Exhibit 1 and reviewed parts of my previous
transcript.
    Q.   When did you speak with Joshua?
    A.   I have spoken with him several times, as
late as yesterday, but several times over the last few
weeks.
```

Page 4

```
    Q.   Several times in anticipation of this
deposition, or several times in general?
    A.   Several times in anticipation of this
deposition.
    Q.   Okay.  And what about Hyrum?
    A.   The same.  I spoke with him several times
in connection with preparing for this deposition.
    Q.   And remind me, what is Narong's position?
Who does he work for?
    A.   He is -- Narong works for ITCL.
    Q.   And what is his position there?
    A.   He works with IT.
    Q.   Okay.  When did you speak to Narong?
    A.   Multiple times, but as recently as, I
believe, three days ago.
    Q.   You also said you spoke to Crucial Logics.
Is it "Crucial Logistics" or "Crucial Logics"?
    A.   Crucial Logics.
    Q.   Okay.  And when did you speak to them?
    A.   On several occasions.
    Q.   As recently as when?
    A.   A couple of days ago.
    Q.   And who did you speak with there?  What
was their name?
    A.   Amol Joshi.
```

Page 5

2 (Pages 2 - 5)

|  |  |
|---|---|
| Page 34 | Page 36 |

**Page 34**

1  me know if I'm going too fast. It's talking about
2  standard access lists to the server. And then we
3  have -- let me see if I can rotate it. There we go.
4  It's my recollection from the prior deposition that
5  Volta is a company that houses the server; is that
6  correct?
7      A.   Yes.
8      Q.   Okay. And this document was a security
9  access list from the year 2018, with Ephraim Olson
10 having at least three levels of access. Do you see
11 that? It's right here. Ephraim's access.
12     A.   When you say "authority" -- sorry. He
13 clearly was listed as a list owner, portal user, and
14 fast track user.
15     Q.   Yeah. And my only question goes to, in
16 your last deposition I asked you if this document had
17 ever been updated and you didn't know. Do you know
18 today if this security access list has ever been
19 updated to remove Ephraim's access?
20         MR. JORDAN: Beyond the scope.
21         You can answer.
22     A.   Yes, it has been updated.
23     Q.   Do you know when it was updated?
24     A.   It's updated periodically, so it's been
25 updated several times.

**Page 35**

1      Q.   Okay. We will look at Exhibit 11 to your
2  first deposition.
3          Okay. These are OLPC's Responses to
4  Written Discovery. And what we care about, what I care
5  about today is this document at the end.
6          Do you recognize this document, Mr. Olson?
7      A.   Yes.
8      Q.   Do you know who helped prepare this
9  document?
10     A.   Yes.
11     Q.   Who was it?
12     A.   This was Jaturong Chuithong and Joshua
13 Olson, with input from others.
14     Q.   And do you know the source material from
15 the information in this document?
16     A.   Yes.
17     Q.   Let's go down to what I really care about
18 here. Here we have "Ephraim Olson." Do you see
19 "Ephraim" right here, Mr. Olson? This line?
20     A.   Yes.
21     Q.   Okay. And then we can look back up at
22 columns. So the column for entity, where does the
23 information for that entity data come from?
24     A.   That came from just knowledge of who had
25 engaged the person, and from payroll records.

**Page 36**

1      Q.   And the category, where does that
2  information come from?
3      A.   It came from knowledge of the role of the
4  people, plus it was the position to which we hired
5  people.
6      Q.   Okay. The start date, where did that come
7  from?
8      A.   From the payroll records. Primarily from
9  payroll records. Primarily it comes from the payroll
10 records.
11     Q.   Okay. So for Ephraim it just says, "Prior
12 to January 1, 2018." Do you know why it's not more
13 specific there?
14         MR. JORDAN: Objection. Calls for legal
15 conclusion.
16         Counsel, you know that's the start date
17 that the Court provided in its order.
18         MS. VAUGHN: Oh, no, I didn't have that on
19 top of my mind. I'll trust you, though, on that one,
20 David.
21     Q.   (By Ms. Vaughn) Okay. The end date, the
22 next column over, where does that come from?
23     A.   A combination of payroll records and
24 Hyrum's and Joshua's best recollection of when the
25 access was terminated.

**Page 37**

1      Q.   Okay. So for Ephraim it states September
2  1, 2019. Where does that information come from?
3      A.   From payroll records and from Hyrum and
4  Joshua's best recollection of when the access was
5  terminated on Ephraim's account.
6      Q.   Okay. Are there no other records besides
7  Hyrum's and Joshua's memory as to when an individual's
8  access to the server is cut off?
9          MR. JORDAN: Objection. Mischaracterizes
10 the witness's testimony.
11     A.   Generally it is related to the date of
12 termination of employment.
13     Q.   Okay.
14     A.   But, for example, if I get terminated from
15 Fabian, just by virtue of my termination it's not going
16 to end my access to various, you know, electronic
17 things. IT has to go in and do that. So that's what
18 I'm referencing. Just because you stop paying them
19 doesn't mean their access to various servers is cut
20 off, correct?
21         MR. JORDAN: Objection. Incomplete
22 hypothetical. Calls for speculation.
23     A.   The mere fact that -- the answer is no.
24 Sorry. Repeat the question.
25     Q.   Okay.

### Page 38

1  A. If you're asking me if the mere fact of
2  not sending a paycheck is sufficient to cut off access,
3  the answer is no, that's not sufficient.
4  Q. Okay.
5  A. By itself.
6  Q. What is the process to cut off an
7  employee's access to OLPC's server?
8  A. Someone in the IT department will, upon
9  termination, will go in and cut off access.
10  Q. Okay.
11  A. That's the process.
12  Q. Okay. And now you're telling me that the
13  information in this column, in this document, comes
14  from payroll records and Joshua's and Hyrum's best
15  memory; is that correct?
16  A. Well, as I said, primarily it's off
17  payroll records.
18  Q. Okay.
19  A. And for Ephraim, I believe the payroll
20  actually goes a bit beyond September 1st, but he was no
21  longer providing services after September 1st and the
22  decision was taken to remove his access at that time.
23  Q. Okay. And other than Hyrum's and Joshua's
24  memory, are there any documents that establish that
25  Ephraim's access was terminated on September 1, 2019?

### Page 39

1  A. OLPC is not aware of any documents that
2  would document his access change or remove his access
3  on September 1.
4  Q. Same for Tim A. He is just a few lines
5  down. It says his access ended May 15, 2020. Do you
6  see that?
7  A. Yes.
8  Q. Okay. Is that also a best guess based off
9  of payroll records and Hyrum's and Joshua's memory?
10  MR. JORDAN: Objection. Mischaracterizes
11  the document. Mischaracterizes the -- argumentative by
12  counsel.
13  A. Tim was terminated or Tim resigned on the
14  14th, and his access was removed on the 14th. But
15  that's North American time. Sorry. His access was
16  removed late on the 14th. So on the 15th his access
17  was gone. He no longer had access on the 15th.
18  Q. Okay. And what is that statement based
19  off of? What information supports that statement?
20  A. That was based on the practice of going in
21  to remove people's access when they finish on their
22  final day of working for the firm, and discussions with
23  Narong and Joshua.
24  Q. Okay. Do either Narong or Joshua have an
25  explicit memory of removing Tim A's access to the

### Page 40

1  server?
2  A. Narong believes that he -- Narong does not
3  have an explicit recollection of it, but he believes
4  that he did it, but does not have a specific
5  recollection.
6  Q. Okay. So in other words, there are no
7  documents to back up this May 15, 2020 date terminating
8  Tim A's access to the server?
9  A. OLPC is not aware of any documents that
10  would confirm that Tim's access was cut off. That's
11  correct.
12  Q. In your last deposition, when I asked you
13  the source material for the columns in this document
14  that we're looking at, you said it came "off the
15  computer record." Now, today, do you know what those
16  computer records were, or do you think you misspoke in
17  your prior deposition?
18  A. No. The computer records are our payroll
19  records. They are computerized.
20  Q. Okay.
21  A. As I said, there was also personal
22  knowledge in the case of Ephraim. They reviewed the
23  payroll records and if there was anything different
24  than the actual payroll final day, as I explained
25  before.

### Page 41

1  Q. Okay. So the computer records are just
2  the payroll records, correct?
3  A. Yes.
4  Q. Okay. And on the last column it says
5  everyone has "access to client files on matters for
6  which the individual was performing services." Do you
7  see that?
8  A. Yes.
9  Q. What is the source material for that
10  statement?
11  A. The source material is that management
12  limited access to remote servers based on what the
13  person was doing and their need to access files.
14  Q. So this document that we're looking at, is
15  this only access to the remote server, or is it also
16  access to the exchange server and the controller
17  domain?
18  A. This is -- well, everyone has access to
19  their own e-mail account. In some cases, someone else
20  is granted access to someone's e-mail account. But
21  everybody has access to their own e-mail account. The
22  remote server contains client files, and access to the
23  client files is dependent on the nature of the work
24  being done by the person, by the staff member.
25  Q. So this document that we are looking at,

```
 1     Q.  Okay.  Where did you deliver it to Tim?
 2     A.  In the boardroom of ITCL.
 3     Q.  I'd like to just take a quick break, and
 4  then I think we might be done.
 5         (Break taken from 4:24 to 4:27 p.m.)
 6     Q.  Just a few quick questions.  Looking again
 7  at Exhibit 59, you said this data comes from Tim's
 8  mobile phone.  When did OLPC obtain a copy of this
 9  document?
10     A.  I believe on Monday.  I believe it was on
11  Monday this week.
12     Q.  Okay.  He did produce it to us on Monday.
13  I'm wondering when OLPC got it.  Do you know that,
14  Mr. Olson?
15     A.  OLPC didn't get -- OLPC did not get this
16  independent to counsel, and I believe that counsel -- I
17  think it was Monday that OLPC saw this document.  It
18  might have been Friday last, but I believe it was
19  Monday last, I believe.  Very recently, though.  In the
20  last few days.
21     Q.  Okay.  And is this all the data from Tim
22  A's phone or is it a specific subset of data; do you
23  know?
24     A.  Can you scroll down for me, please?
25         Well, the answer is OLPC doesn't know what
```
Page 46

```
 1  this is, actually.  All the stuff in it, I don't know
 2  that.
 3     Q.  Okay.  And then the same with Exhibit 60;
 4  do you know when OLPC obtained a copy of this document?
 5     A.  It's the same.  OLPC did not receive a
 6  copy of this.  It went to counsel.  I think OLPC saw
 7  this document within the last few days.  Very recently.
 8     Q.  Okay.  Those are all the questions I have.
 9  Thank you very much, Mr. Olson.
10         MR. JORDAN:  I have no questions at this
11  time.
12         We will read and sign.
13         (The deposition concluded at 4:30 p.m.)
```
Page 47

```
 1                 REPORTER'S CERTIFICATE
 2
    STATE OF UTAH      )
 3                     ) ss.
    COUNTY OF SALT LAKE )
 4
 5      I, Diana Kent, Registered Professional
    Reporter and Notary Public in and for the State of
 6  Utah, do hereby certify:
 7      That prior to being examined, the witness,
    Thomas Olson for OL Private Counsel, LLC, was by me
 8  duly sworn to tell the truth, the whole truth, and
    nothing but the truth;
 9
        That said deposition was taken down by me
10  in stenotype on March 27, 2024, at the place therein
    named, and was thereafter transcribed and that a true
11  and correct transcription of said testimony is set
    forth in the preceding pages;
12
        I further certify that, in accordance with
13  Rule 30(e), a request having been made to review the
    transcript, a reading copy was sent to David J. Jordan
14  for the witness to read and sign, and the original
    transcript will be prepared for delivery to the court.
15
        I further certify that I am not kin or
16  otherwise associated with any of the parties to said
    cause of action and that I am not interested in the
17  outcome thereof.
18      WITNESS MY HAND AND OFFICIAL SEAL this
    28th day of March, 2024.
19
20
21
22
23                  Diana Kent
                    _____
                    Diana Kent, RPR, CRR
24                  Notary Public
                    Residing in Salt Lake County
25
```
Page 48

```
 1  David J. Jordan
 2  djordan@foley.com
 3              April 1st, 2024
 4  RE:OL Private Counsel, LLC v. Olson, Ephraim
 5     3/27/2024, Thomas Olson (#6596270)
 6     The above-referenced transcript is available for
 7  review.
 8     Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  (Calendar-utah@veritext.com).
16   Return completed errata within 28 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22         Yours,
23         Veritext Legal Solutions
24
25
```
Page 49